**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**14 CV       9366**

BLACKROCK BALANCED CAPITAL
PORTFOLIO (FI); BLACKROCK CORE
ACTIVE LIBOR FUND B; BLACKROCK
CORE BOND TRUST; BLACKROCK
COREALPHA BOND FUND E;
BLACKROCK COREALPHA BOND
MASTER PORTFOLIO; BLACKROCK
COREPLUS BOND FUND B;
BLACKROCK DYNAMIC HIGH
INCOME – STRUCTURED CREDIT
PORTFOLIO; BLACKROCK FIXED
INCOME GLOBALALPHA MASTER
FUND LTD.; BLACKROCK FUNDS II,
INFLATION PROTECTED BOND
PORTFOLIO; BLACKROCK INCOME
TRUST, INC.; BLACKROCK LONG
DURATION ALPHAPLUS BOND FUND;
BLACKROCK MASTER TOTAL
RETURN PORTFOLIO OF MASTER
BOND LLC; BLACKROCK MULTI-
ASSET INCOME – NON-AGENCY MBS
PORTFOLIO; BLACKROCK MULTI-
SECTOR INCOME TRUST;
BLACKROCK STRATEGIC INCOME
OPPORTUNITIES PORTFOLIO;
BLACKROCK TOTAL RETURN
PORTFOLIO (INS – SERIES);
BLACKROCK US MORTGAGE; AST
PIMCO TOTAL RETURN BOND
PORTFOLIO; FIXED INCOME SHARES
(SERIES R); FIXED INCOME SHARES:
SERIES C; FIXED INCOME SHARES:
SERIES M; LVS I LLC; LVS I SPE XIV
LLC; LVS II LLC; PACIFIC BAY CDO,
LTD.; PACIFIC SHORES CDO, LTD.;
PCM FUND, INC.; PIMCO ABSOLUTE
RETURN STRATEGY 3D OFFSHORE
FUND LTD.; PIMCO ABSOLUTE
RETURN STRATEGY II MASTER FUND
LDC; PIMCO ABSOLUTE RETURN
STRATEGY III MASTER FUND LDC;
PIMCO ABSOLUTE RETURN
STRATEGY IV IDF LLC; PIMCO

Case No.

**VERIFIED DERIVATIVE
COMPLAINT AND ALTERNATIVE
CLASS ACTION AGAINST HSBC
BANK USA, NATIONAL
ASSOCIATION FOR BREACH OF
CONTRACT; VIOLATION OF THE
TRUST INDENTURE ACT OF 1939;
BREACH OF FIDUCIARY DUTY;
BREACH OF DUTY OF
INDEPENDENCE; AND
NEGLIGENCE**

<u>JURY DEMAND</u>



RECEIVED
NOV 24 2014
U.S.D.C. S.D.N.Y.
CASHIERS

RECEIVED
2014 NOV 24 P 11: 01
U.S. DISTRICT COURT SDNY

ABSOLUTE RETURN STRATEGY IV
MASTER FUND LDC; PIMCO
ABSOLUTE RETURN STRATEGY V
MASTER FUND LDC; PIMCO
BERMUDA TRUST II: PIMCO
BERMUDA EMERGING MARKETS
BOND FUND (M); PIMCO BERMUDA
TRUST II: PIMCO BERMUDA INCOME
FUND (M); PIMCO BERMUDA TRUST
II: PIMCO BERMUDA JGB FLOATER
FOREIGN STRATEGY FUND; PIMCO
BERMUDA TRUST IV: PIMCO
BERMUDA GLOBAL BOND EX-JAPAN
FUND; PIMCO BERMUDA TRUST:
PIMCO EMERGING MARKETS BOND
FUND (M); PIMCO CAYMAN SPC
LIMITED: PIMCO CAYMAN GLOBAL
AGGREGATE BOND SEGREGATED
PORTFOLIO; PIMCO CAYMAN SPC
LIMITED: PIMCO CAYMAN JAPAN
COREPLUS SEGREGATED
PORTFOLIO; PIMCO CAYMAN SPC
LIMITED: PIMCO CAYMAN JAPAN
COREPLUS STRATEGY SEGREGATED
PORTFOLIO; PIMCO CAYMAN SPC
LIMITED: PIMCO CAYMAN JAPAN
LOW DURATION SEGREGATED
PORTFOLIO; PIMCO CAYMAN SPC
LIMITED: PIMCO CAYMAN
UNCONSTRAINED BOND
SEGREGATED PORTFOLIO; PIMCO
CAYMAN TRUST: PIMCO CAYMAN
FOREIGN BOND FUND; PIMCO
CAYMAN TRUST: PIMCO CAYMAN
GLOBAL ADVANTAGE BOND FUND;
PIMCO CAYMAN TRUST: PIMCO
CAYMAN GLOBAL AGGREGATE
BOND FUND; PIMCO CAYMAN
TRUST: PIMCO CAYMAN GLOBAL
AGGREGATE EX-JAPAN (YEN-
HEDGED) BOND FUND II; PIMCO
CAYMAN TRUST: PIMCO CAYMAN
GLOBAL AGGREGATE EX-JAPAN
(YEN-HEDGED) INCOME FUND;
PIMCO CAYMAN TRUST: PIMCO
CAYMAN GLOBAL AGGREGATE EX-

JAPAN BOND FUND; PIMCO CAYMAN
TRUST: PIMCO CAYMAN GLOBAL
BOND (NZD-HEDGED) FUND; PIMCO
CAYMAN TRUST: PIMCO CAYMAN
GLOBAL EX-JAPAN (YEN-HEDGED)
BOND FUND; PIMCO CAYMAN
TRUST: PIMCO CAYMAN TOTAL
RETURN STRATEGY FUND; PIMCO
CAYMAN TRUST: PIMCO CAYMAN
U.S. BOND FUND; PIMCO COMBINED
ALPHA STRATEGIES MASTER FUND
LDC; PIMCO CORPORATE & INCOME
OPPORTUNITY FUND; PIMCO
CORPORATE & INCOME STRATEGY
FUND; PIMCO DISTRESSED SENIOR
CREDIT OPPORTUNITIES FUND II,
L.P.; PIMCO DYNAMIC CREDIT
INCOME FUND; PIMCO DYNAMIC
INCOME FUND; PIMCO ETF TRUST:
PIMCO TOTAL RETURN ACTIVE
EXCHANGE-TRADED FUND; PIMCO
FUNDS: GLOBAL INVESTORS SERIES
PLC, DIVERSIFIED INCOME
DURATION HEDGED FUND; PIMCO
FUNDS: GLOBAL INVESTORS SERIES
PLC, DIVERSIFIED INCOME FUND;
PIMCO FUNDS: GLOBAL INVESTORS
SERIES PLC, EMERGING LOCAL
BOND FUND; PIMCO FUNDS: GLOBAL
INVESTORS SERIES PLC, EMERGING
MARKETS BOND FUND; PIMCO
FUNDS: GLOBAL INVESTORS SERIES
PLC, EURO BOND FUND; PIMCO
FUNDS: GLOBAL INVESTORS SERIES
PLC, EURO INCOME BOND FUND;
PIMCO FUNDS: GLOBAL INVESTORS
SERIES PLC, GLOBAL ADVANTAGE
REAL RETURN FUND; PIMCO FUNDS:
GLOBAL INVESTORS SERIES PLC,
GLOBAL BOND FUND; PIMCO FUNDS:
GLOBAL INVESTORS SERIES PLC,
GLOBAL INVESTMENT GRADE
CREDIT FUND; PIMCO FUNDS:
GLOBAL INVESTORS SERIES PLC,
INCOME FUND; PIMCO FUNDS:
GLOBAL INVESTORS SERIES PLC,

PIMCO CREDIT ABSOLUTE RETURN
FUND; PIMCO FUNDS: GLOBAL
INVESTORS SERIES PLC, PIMCO
DIVIDEND AND INCOME BUILDER
FUND; PIMCO FUNDS: GLOBAL
INVESTORS SERIES PLC,
STOCKSPLUS™ FUND; PIMCO
FUNDS: GLOBAL INVESTORS SERIES
PLC, STRATEGIC INCOME FUND;
PIMCO FUNDS: GLOBAL INVESTORS
SERIES PLC, TOTAL RETURN BOND
FUND; PIMCO FUNDS: GLOBAL
INVESTORS SERIES PLC,
UNCONSTRAINED BOND FUND;
PIMCO FUNDS: PIMCO
COMMODITIESPLUS® STRATEGY
FUND; PIMCO FUNDS: PIMCO
COMMODITY REAL RETURN
STRATEGY FUND®; PIMCO FUNDS:
PIMCO CREDIT ABSOLUTE RETURN
FUND; PIMCO FUNDS: PIMCO
DIVERSIFIED INCOME FUND; PIMCO
FUNDS: PIMCO EM FUNDAMENTAL
INDEXPLUS® AR STRATEGY FUND;
PIMCO FUNDS: PIMCO EMERGING
LOCAL BOND FUND; PIMCO FUNDS:
PIMCO EMERGING MARKETS BOND
FUND; PIMCO FUNDS: PIMCO
EMERGING MARKETS CURRENCY
FUND; PIMCO FUNDS: PIMCO EMG
INTL LOW VOLATILITY RAFI®-PLUS
AR FUND; PIMCO FUNDS: PIMCO
FLOATING INCOME FUND; PIMCO
FUNDS: PIMCO FOREIGN BOND FUND
(U.S. DOLLAR-HEDGED); PIMCO
FUNDS: PIMCO FOREIGN BOND FUND
(UNHEDGED); PIMCO FUNDS: PIMCO
FUNDAMENTAL ADVANTAGE
ABSOLUTE RETURN STRATEGY
FUND; PIMCO FUNDS: PIMCO
GLOBAL ADVANTAGE® STRATEGY
BOND FUND; PIMCO FUNDS: PIMCO
GLOBAL BOND FUND (U.S. DOLLAR-
HEDGED); PIMCO FUNDS: PIMCO
GLOBAL BOND FUND (UNHEDGED);
PIMCO FUNDS: PIMCO GLOBAL

MULTI-ASSET FUND; PIMCO FUNDS:
PIMCO GNMA FUND; PIMCO FUNDS:
PIMCO INCOME FUND; PIMCO
FUNDS: PIMCO INFLATION
RESPONSE MULTI-ASSET FUND;
PIMCO FUNDS: PIMCO
INTERNATIONAL FUNDAMENTAL
INDEXPLUS® AR STRATEGY FUND;
PIMCO FUNDS: PIMCO
INTERNATIONAL STOCKSPLUS® AR
STRATEGY FUND (U.S. DOLLAR-
HEDGED); PIMCO FUNDS: PIMCO
INTERNATIONAL STOCKSPLUS® AR
STRATEGY FUND (UNHEDGED);
PIMCO FUNDS: PIMCO INVESTMENT
GRADE CORPORATE BOND FUND;
PIMCO FUNDS: PIMCO LONG
DURATION TOTAL RETURN FUND;
PIMCO FUNDS: PIMCO LONG-TERM
CREDIT FUND; PIMCO FUNDS: PIMCO
LONG-TERM U.S. GOVERNMENT
FUND; PIMCO FUNDS: PIMCO LOW
DURATION FUND; PIMCO FUNDS:
PIMCO LOW DURATION FUND II;
PIMCO FUNDS: PIMCO LOW
DURATION FUND III; PIMCO FUNDS:
PIMCO LOW VOLATILITY RAFI®-
PLUS AR FUND; PIMCO FUNDS:
PIMCO MODERATE DURATION
FUND; PIMCO FUNDS: PIMCO
MORTGAGE OPPORTUNITIES FUND;
PIMCO FUNDS: PIMCO REAL ESTATE
REAL RETURN STRATEGY FUND;
PIMCO FUNDS: PIMCO REAL RETURN
FUND; PIMCO FUNDS: PIMCO SHORT-
TERM FUND; PIMCO FUNDS: PIMCO
SMALL CAP STOCKSPLUS® AR
STRATEGY FUND; PIMCO FUNDS:
PIMCO SMALL COMPANY
FUNDAMENTAL INDEXPLUS® AR
STRATEGY FUND; PIMCO FUNDS:
PIMCO STOCKSPLUS® ABSOLUTE
RETURN FUND; PIMCO FUNDS:
PIMCO STOCKSPLUS® AR SHORT
STRATEGY FUND; PIMCO FUNDS:
PIMCO STOCKSPLUS® FUND; PIMCO

FUNDS: PIMCO TOTAL RETURN
FUND; PIMCO FUNDS: PIMCO TOTAL
RETURN FUND II; PIMCO FUNDS:
PIMCO TOTAL RETURN FUND III;
PIMCO FUNDS: PIMCO TOTAL
RETURN FUND IV; PIMCO FUNDS:
PIMCO UNCONSTRAINED BOND
FUND; PIMCO FUNDS: PIMCO
UNCONSTRAINED TAX MANAGED
BOND FUND; PIMCO FUNDS: PIMCO
WORLDWIDE FUNDAMENTAL
ADVANTAGE AR STRATEGY FUND;
PIMCO FUNDS: PRIVATE ACCOUNT
PORTFOLIO SERIES ASSET-BACKED
SECURITIES PORTFOLIO; PIMCO
FUNDS: PRIVATE ACCOUNT
PORTFOLIO SERIES DEVELOPING
LOCAL MARKETS PORTFOLIO;
PIMCO FUNDS: PRIVATE ACCOUNT
PORTFOLIO SERIES EMERGING
MARKETS PORTFOLIO; PIMCO
FUNDS: PRIVATE ACCOUNT
PORTFOLIO SERIES INTERNATIONAL
PORTFOLIO; PIMCO FUNDS: PRIVATE
ACCOUNT PORTFOLIO SERIES LONG
DURATION CORPORATE BOND
PORTFOLIO; PIMCO FUNDS: PRIVATE
ACCOUNT PORTFOLIO SERIES
MORTGAGE PORTFOLIO; PIMCO
FUNDS: PRIVATE ACCOUNT
PORTFOLIO SERIES SHORT-TERM
PORTFOLIO; PIMCO GLOBAL CREDIT
OPPORTUNITY MASTER FUND LDC;
PIMCO GLOBAL INCOME
OPPORTUNITIES FUND; PIMCO
GLOBAL STOCKSPLUS & INCOME
FUND; PIMCO HIGH INCOME FUND;
PIMCO INCOME OPPORTUNITY
FUND; PIMCO INCOME STRATEGY
FUND; PIMCO INCOME STRATEGY
FUND II; PIMCO LARGE CAP
STOCKSPLUS ABSOLUTE RETURN
FUND; PIMCO MULTI-SECTOR
STRATEGY FUND LTD.; PIMCO
OFFSHORE FUNDS - PIMCO
ABSOLUTE RETURN STRATEGY IV

EFUND; PIMCO OFFSHORE FUNDS:
PIMCO OFFSHORE FUNDS - PIMCO
ABSOLUTE RETURN STRATEGY V
ALPHA FUND; PIMCO STRATEGIC
INCOME FUND, INC.; PIMCO
TACTICAL OPPORTUNITIES MASTER
FUND LTD.; PIMCO VARIABLE
INSURANCE TRUST: PIMCO
COMMODITY REAL RETURN
STRATEGY PORTFOLIO; PIMCO
VARIABLE INSURANCE TRUST:
PIMCO EMERGING MARKETS BOND
PORTFOLIO; PIMCO VARIABLE
INSURANCE TRUST: PIMCO FOREIGN
BOND PORTFOLIO (U.S. DOLLAR
HEDGED); PIMCO VARIABLE
INSURANCE TRUST: PIMCO GLOBAL
ADVANTAGE STRATEGY BOND
PORTFOLIO; PIMCO VARIABLE
INSURANCE TRUST: PIMCO GLOBAL
BOND PORTFOLIO (UNHEDGED);
PIMCO VARIABLE INSURANCE
TRUST: PIMCO LOW DURATION
PORTFOLIO; PIMCO VARIABLE
INSURANCE TRUST: PIMCO REAL
RETURN PORTFOLIO; PIMCO
VARIABLE INSURANCE TRUST:
PIMCO SHORT-TERM PORTFOLIO;
PIMCO VARIABLE INSURANCE
TRUST: PIMCO TOTAL RETURN
PORTFOLIO; TERLINGUA FUND 2, LP;
CREF BOND MARKET ACCOUNT;
CREF SOCIAL CHOICE ACCOUNT;
TIAA GLOBAL PUBLIC
INVESTMENTS, MBS LLC; TIAA-CREF
BOND FUND; TIAA-CREF BOND PLUS
FUND; TIAA-CREF LIFE BOND FUND;
TIAA-CREF LIFE INSURANCE
COMPANY; TIAA-CREF SHORT-TERM
BOND FUND; PRUDENTIAL
RETIREMENT INSURANCE AND
ANNUITY COMPANY; PRUDENTIAL
TRUST COMPANY; THE GIBRALTAR
LIFE INSURANCE COMPANY, LTD.;
THE PRUDENTIAL INSURANCE
COMPANY OF AMERICA; THE

PRUDENTIAL INVESTMENT
PORTFOLIOS 2; THE PRUDENTIAL
INVESTMENT PORTFOLIOS 9; THE
PRUDENTIAL INVESTMENT
PORTFOLIOS INC.; THE PRUDENTIAL
INVESTMENT PORTFOLIOS, INC. 17;
THE PRUDENTIAL SERIES FUND;
BROOKFIELD MORTGAGE
OPPORTUNITY INCOME FUND INC.;
BROOKFIELD SECURITIZED CREDIT
QIF FUND; BROOKFIELD TOTAL
RETURN FUND INC.; CRYSTAL RIVER
CAPITAL INC.; MILLERTON ABS CDO
LTD.; LIICA RE I, INC.; LIICA RE II,
INC.; STONEBRIDGE LIFE
INSURANCE COMPANY;
TRANSAMERICA LIFE INSURANCE
COMPANY; TRANSAMERICA
PREMIER LIFE INSURANCE
COMPANY; KORE ADVISORS LP;
CHARLES SCHWAB & CO. INC.;
SEALINK FUNDING LIMITED; and DZ
BANK AG; derivatively, on behalf of the
Trusts Identified in Exhibit 1,

        Plaintiffs,

    -against-

HSBC BANK USA, NATIONAL
ASSOCIATION,

        Defendant,

    -and-

The Trusts Identified in Exhibit 1,

        Nominal Defendants.

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    NATURE AND SUMMARY OF THE ACTION ................................................... 1

II.   PARTIES ............................................................................................................ 8

    A.    Plaintiffs ............................................................................................... 8

        1.    AEGON ...................................................................................... 9

        2.    BlackRock Funds ....................................................................... 9

        3.    Brookfield ................................................................................ 11

        4.    Charles Schwab ....................................................................... 11

        5.    DZ Bank ................................................................................... 11

        6.    Kore .......................................................................................... 11

        7.    PIMCO ..................................................................................... 12

        8.    Prudential ................................................................................. 24

        9.    Sealink ..................................................................................... 26

        10.   TIAA ........................................................................................ 26

    B.    Defendants .......................................................................................... 28

        1.    HSBC ....................................................................................... 28

        2.    The Nominal Defendant Trusts ............................................... 29

III.  OVERVIEW OF THE TRUSTS ....................................................................... 29

IV.   JURISDICTION AND VENUE ....................................................................... 30

V.    COMPLIANCE WITH THE NO ACTION CLAUSE IS EXCUSED ............ 30

VI.   DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS ..................... 32

VII.  BACKGROUND - THE TRUSTEE'S ROLE AS GATEKEEPER IN THE
    SECURITIZATION PROCESS ...................................................................... 34

VIII. HSBC'S CONTRACTUAL OBLIGATIONS ................................................. 37

    A.    The Mortgage Loan Purchase And Sale Agreement ........................... 38

    B.    The Pooling And Servicing Agreements ............................................ 40

1.    HSBC's Duties And Obligations Under The PSAs ................................. 40

        a)    Duty To Provide Notice Of Breaches And To Enforce Putback Rights ........................................................41

        b)    HSBC's Duties Regarding The Servicers .....................................42

        c)    Duties Upon Knowledge Of An Event Of Default ........................................................................43

2.    The Servicers' Duties And Obligations Under The PSAs ....................... 44

        a)    Duty To Provide Notice Of Breaches And To Enforce Putback Rights ........................................................44

        b)    Duty To Perform Prudent And Customary Servicing Practices ...................................................45

        c)    Duty To Perform Prudent Foreclosure Practices ........................................................................46

        d)    Duty To Perform Prudent Servicing Advances ........................................................................46

C.    The Indentures And Sale Servicing Agreements .................................... 48

IX.    THE TRUSTS SUFFERED FROM PERVASIVE BREACHES OF REPRESENTATIONS AND WARRANTIES BY THE SELLERS ............................. 50

A.    High Default Rates Of The Mortgage Loans And Plummeting Credit Ratings Are Indicative Of Massive Seller Breaches ................................. 51

B.    The Systemic Disregard Of Underwriting Standards Was Pervasive During The Relevant Period ............................................. 52

C.    There Is Evidence Of Widespread Breaches Of Representations And Warranties By The Specific Originators That Sold Loans To The Trusts .............................................................. 55

    1.    Wells Fargo ............................................................ 55

    2.    Fremont ................................................................ 57

    3.    GreenPoint ............................................................ 60

    4.    Countrywide ........................................................... 61

    5.    Option One ............................................................ 65

    6.    New Century ........................................................... 66

    7.    WMC .................................................................. 69

8.     American Home ................................................. 72

9.     IndyMac ........................................................... 74

D.    The Systemic Disregard Of Prudent Securitization Standards Was Pervasive During The Relevant Period ................... 76

E.    There Is Evidence Of Widespread Breaches Of Representations And Warranties By The Specific Sponsors Of The Trusts ................. 77

1.     Wells Fargo Bank, N.A. ................................... 77

2.     Deutsche Bank ................................................. 80

3.     Lehman ........................................................... 83

4.     Nomura ........................................................... 85

5.     Merrill Lynch ................................................... 87

X.    HSBC KNEW THAT THE TRUSTS WERE FILLED WITH DEFECTIVE LOANS .................................................. 90

A.    The Trusts' Poor Performance ................................ 91

B.    Credit Rating Downgrades Of The Certificates Further Support The Sellers' Problems ............................................. 93

C.    HSBC Discovered Widespread Seller Breaches Of Representations And Warranties In Its Capacity As Servicer ................. 94

D.    HSBC Was Named In RMBS Litigation Involving Common Loan Sellers' Systemic Abandonment Of Underwriting Guidelines ............ 95

E.    HSBC Received Written Notice Of Pervasive And Systemic Seller Breaches From Financial Guaranty Insurers ................. 97

F.    HSBC And Its Responsible Officers Received Written Notice From Certificateholders Of Pervasive And Systemic Seller Breaches ........ 99

G.    HSBC Has Selectively Asserted The Trusts' Repurchase Rights Against The Sellers In Bankruptcy Proceedings ................. 103

H.    HSBC Initiated Putback  Litigation Against Many Of The Sellers ........ 104

XI.    THE TRUSTS SUFFERED FROM PERVASIVE SERVICER VIOLATIONS .................................................. 106

A.    The Servicers Failed To Give Notice Of Seller Breaches Of Representations And Warranties And Enforce The Sellers' Repurchase Obligations ........................................... 107

B.    The Servicers Have Violated Their Prudent Servicing Obligations ........ 109

C.      The Servicers Have Violated Their Foreclosure Obligations ............................ 115

D.      The Servicers Have Violated Their Modification Obligations .......................... 120

E.      The Servicers Have Abused Their Servicing Advances Obligations ................. 121

XII.    HSBC HAS KNOWN OF SERVICER VIOLATIONS PLAGUING THE
        TRUSTS ......................................................................................................................... 124

A.      HSBC Itself Was Involved In Government Enforcement Actions
        And Litigation Stemming From The Servicers' Violations ............................... 125

B.      HSBC And Its Responsible Officers Received Written Notice
        From Certificateholders Of Pervasive And Systemic Servicer
        Breaches ............................................................................................................ 127

C.      HSBC Had Knowledge Of The Servicers' Failures Through The
        Monthly Servicer And Remittance Reports ....................................................... 129

XIII.   HSBC FAILED TO DISCHARGE ITS CRITICAL PRE- AND POST-
        DEFAULT DUTIES ...................................................................................................... 129

A.      Failure To Enforce The Trusts' Repurchase Rights .......................................... 129

B.      Failure To Provide Notice To The Servicers Of Events Of Defaults ................ 130

C.      Failure To Act Prudently Subsequent To The Uncured Events Of
        Defaults ............................................................................................................. 131

D.      Failure To Provide Notice To The Certificateholders Of The
        Uncured Events Of Defaults .............................................................................. 132

XIV.    HSBC FAILED TO PROTECT THE TRUSTS FOLLOWING THE
        INSOLVENCY OF CERTAIN SPONSORS ............................................................... 132

XV.     HSBC FAILED TO PROTECT THE TRUSTS DUE TO ITS
        CONFLICTS OF INTEREST ....................................................................................... 134

A.      HSBC Was Economically Beholden To The Mortgage Loan
        Sellers ................................................................................................................ 135

B.      HSBC Was Engaged In The Same Wrongful Servicing Activities ................... 135

C.      HSBC Originated And Sponsored Defective Loans .......................................... 137

D.      HSBC Refused To Discharge Its Duties In Order To Preserve
        Profits ................................................................................................................ 139

XVI.    CAUSATION ................................................................................................................. 140

XVII.   DAMAGES .................................................................................................................... 141

XVIII.  CAUSES OF ACTION .................................................................................................. 142

FIRST CAUSE OF ACTION  BREACH OF CONTRACT (In The Right Of The Trustee And On Behalf Of The Trusts Against HSBC) .................................................. 142

SECOND CAUSE OF ACTION  VIOLATION OF THE TRUST INDENTURE ACT OF 1939, 53 STAT. 1171 (In The Right Of The Trustee And On Behalf Of The Trusts Against HSBC) ............................................. 149

THIRD CAUSE OF ACTION  NEGLIGENCE − BREACH OF PRE-DEFAULT DUTY OF INDEPENDENCE (In The Right Of The Trustee And On Behalf Of The Trusts Against HSBC) ........................... 152

FOURTH CAUSE OF ACTION  BREACH OF FIDUCIARY DUTY – DUTY OF CARE (In The Right Of The Trustee And On Behalf Of The Trusts Against HSBC) ....................................................... 154

FIFTH CAUSE OF ACTION  NEGLIGENCE – DUTY OF CARE (In The Right Of The Trustee And On Behalf of the Trusts Against HSBC) ..................................... 156

SIXTH CAUSE OF ACTION  BREACH OF FIDUCIARY DUTY – BREACH OF POST-DEFAULT DUTY OF INDEPENDENCE (In The Right Of The Trustee And On Behalf Of The Trusts Against HSBC) ......................................... 158

XIX.    CLASS ACTION ALLEGATIONS ........................................................... 160

XX.     RELIEF REQUESTED ............................................................................ 162

XXI.    JURY DEMAND ..................................................................................... 163

Plaintiffs AEGON (as defined herein); BlackRock Funds (as defined herein); Brookfield (as defined herein); Charles Schwab & Co., Inc. ("Schwab"); Deutsche Zentral-Genossenschaftsbank AG, New York Branch, d/b/a DZ Bank AG, New York Branch ("DZ Bank"); Kore Advisors, L.P. ("Kore"); PIMCO (as defined herein); Prudential (as defined herein); Sealink Funding Limited ("Sealink"); and TIAA (as defined herein) (collectively, "Plaintiffs") by and through their undersigned attorneys, hereby bring this derivative complaint (the "Complaint") in the right of the trustee and on behalf of and for the benefit of the residential mortgage-backed securities ("RMBS") Trusts listed in Exhibit 1 ("Trusts"), against HSBC Bank USA, National Association ("HSBC" or the "Trustee"), the Trustee for the Trusts to recover losses sustained by the Trusts as a result of HSBC's wrongful conduct.  Alternatively, Plaintiffs bring this action on their own behalf and on behalf of a class of all current owners of certificates in the Trusts (the "Class") to recover for the losses directly suffered by Plaintiffs and the Class as a result of HSBC's wrongful conduct.

## I.     NATURE AND SUMMARY OF THE ACTION

1.     Defendant HSBC is a national banking association that is the Trustee for hundreds of RMBS trusts originally securitized by approximately $350 billion of residential mortgage loans.  Among them are the Trusts at issue in this action: 271 private-label RMBS Trusts securitized between 2004 and 2008 collateralized with loans worth approximately $257 billion at the time of securitization.  HSBC, as Trustee, is the sole gatekeeper for the protection of the Trusts and their beneficial certificateholders (the "Certificateholders"), and must at all times act in the best interests of the Trusts.  As alleged herein, HSBC failed to discharge its duties and obligations to protect the Trusts.  Instead, to protect its own business interests, HSBC ignored pervasive and systemic deficiencies in the underlying loan pools and the servicing of those loans

and unreasonably refused to take any action.  This derivative action seeks to recover billions of dollars in damages to the Trusts caused by HSBC's abdication of responsibility.[1]

2.      RMBS trusts are created to facilitate the securitization and sale of residential mortgage loans to investors.  The trust's assets consist entirely of the underlying loans, and the principal and interest payments ("P&I") on the loans are "passed through" to the certificateholders.  Between 2004 and 2008, a handful of large investment banks − including HSBC − dominated the RMBS market and controlled the process from beginning to end.   These banks act as "sponsors" of the RMBS, acquiring the mortgage loans from originators, who often were affiliates of the sponsors or beholden to them through warehouse lending or other financial arrangements.  Once the loans are originated, acquired and selected for securitization, the sponsor creates a trust where the loans are deposited for the benefit of the certificateholders.  The sponsor also hand-picks the servicer, often an affiliate of the sponsor or originator, to collect payments on the loans.  Finally, a select number of these same banks that originate, securitize and service RMBS also act as trustees on other sponsor's deals.

3.      To ensure the quality of the RMBS and the underlying loans, the Trust documents generally include representations and warranties from the loan sellers attesting to the quality and characteristics of the mortgages as well as an agreement to cure, substitute, or repurchase mortgages that do not comply with those representations and warranties.  Because the risk of non-payment or default on the loans is "passed through" to investors, other than these representations and warranties, the large investment banks and other players in the mortgage

---

[1] This Complaint does not allege in any way that the Trustee was or is burdened by conflicts in connection with its negotiation, evaluation, or acceptance of any RMBS settlement, including the $8.5 billion settlement with Bank of America/Countrywide, the $4.5 billion settlement with JPMorgan, or the $1.125 billion settlement with Citibank.

securitization industry have no "skin" in the game once the RMBS are sold to certificateholders. Instead, their profits are principally derived from the spread between the cost to originate or purchase loans, how much they can sell them to investors once packaged as securities, as well as various servicing-related income. Accordingly, volume became the focus, and the quality of the loans was disregarded.

4.     The fundamental role of a trustee in an RMBS securitization is to ensure that there is at least one independent party, free from any conflicting self-interest, to protect the trust corpus. Certificateholders have no access to the underlying loan files and other documents necessary to confirm compliance with the representations and warranties, cannot monitor the servicers' conduct and performance, cannot act independently to enforce the trusts' contractual rights, and must rely on the trustee to protect their interests. HSBC, as Trustee, was the sole contractual party in the Trusts' securitization process intended to be independent of the investment banks that sponsored the securitization, the lenders that originated the loans, and the servicers that were often affiliated with either the sponsors or lenders, or both. Certificateholders must rely on the Trustee to protect the rights and interests of the trusts.

5.     HSBC knew that the pools of loans backing the Trusts were filled with defective mortgage loans. The abysmal performance of the Trust collateral – including spiraling defaults, delinquencies and foreclosures – is outlined on monthly remittance reports that HSBC, as Trustee, publishes and publicly files with the government. The monthly remittance reports detail how, by January 2009, the Trusts had suffered collateral losses exceeding $11.1 billion. On average, over one in every four loans in the Trusts was delinquent. Moreover, 121 Trusts had delinquency rates exceeding 33%, and 37 Trusts had delinquency rates of over 50%. By January 2011, the Trusts' total losses had increased **four-fold** to $47 billion, meaning that nearly 18% of

the Trusts' entire loan pool had been written off.  By the start of 2010, nearly all of the securities issued by the Trusts had experienced multiple downgrades, with most reduced to "junk" status.

6.      A steady stream of public disclosures has linked the abject performance of the Trusts to systemic abandonment of underwriting guidelines, and the deficient and often fraudulent securitization practices of the sponsors.  Highly publicized government investigations, reports and enforcement actions; high-profile RMBS litigation by government agencies, federal banks, and institutional investors; and claims and litigation instituted by monoline insurers have repeatedly noted the "pervasive disregard" and "systemic abandonment" of underwriting guidelines in the years leading up to the financial crisis.  Voluminous complaints in these proceedings detail gross misstatements in the Trust documents of key metrics concerning the quality of the underlying loan pools, including loan-to-value ratios ("LTVs"), owner occupancy status, and borrower credit scores – as well as the completeness of the loan files themselves.

7.      Indeed, HSBC has admitted its knowledge of breaches of representations and warranties and "Events of Default."  With this knowledge, HSBC has taken action to protect certain trusts, but only trusts that are **not** at issue herein.   In fact, at the direction of certificateholders, HSBC has pursued *over twenty* lawsuits against Deutsche Bank and Nomura, two of the Trusts' largest sponsors, for breach of representations and warranties. In each of those actions, HSBC conducted forensic analyses of loans within the trusts, after which it concluded in court filings that the scale of the sponsor's breaches concerning loans produced by the same originators of loans in the Trusts at issue herein were ***"staggering,"*** and that the sponsors had dumped into the Trusts a "***massive number of defective loans – loans that blatantly breached [the sponsors'] representations and warranties***."  In fact, HSBC regularly found breach rates ***over 80%*** and sometimes as high as ***91.5%***.  As HSBC observed, the breaches included

"widespread misrepresentations of borrower income, misrepresentations of occupancy status, incorrect calculations of debt and debt-to-income ratios, improper calculations of LTV ratios, the provision of inaccurate information with respect to these loans and other breaches."  As additional evidence of pervasive seller breaches, HSBC cited government investigations revealing that sponsors "*disregarded underwriting guidelines, and as a result made representations and warranties for mortgages that did not meet stated criteria in the governing documents*."

8.     HSBC was further informed of pervasive and systemic deficiencies infecting the Trusts' collateral through additional "putback" initiatives.  For example, in December 2011, a group of major institutional investors asked HSBC, as trustee, to investigate large numbers of ineligible mortgages in loan pools underlying dozens of JPMorgan sponsored trusts and deficient servicing of those loans. Together with similar instructions provided to four other trustees of the JPMorgan-sponsored trusts, the initiative covered more than *$95 billion* of RMBS issued from 2005 to 2007.  Less than two years later, HSBC and the other trustees were presented with a comprehensive $4.5 billion settlement offer covering 330 JPMorgan-sponsored trusts.   On August 1, 2014 and October 2, 2014, HSBC and the other trustees involved in the putback initiative *accepted* JPMorgan's $4.5 billion offer for the vast majority of the 330 trusts included in the offer and petitioned for *court approval* of the settlement.  In another investor-led initiative, HSBC, as trustee, gave its *approval* to a $7 billion settlement covering 570 RMBS trusts sponsored by Residential Capital and its affiliates ("ResCap") from 2004 to 2008 with an original face amount of over *$320 billion*.

9.     These and other certificateholder-led initiatives sought to "putback" large quantities of loans (1) originated by many of the same lenders that also originated large

quantities of the loans sold to the Trusts, including Wells Fargo ($56.2 billion of loans sold to the Trusts), GreenPoint ($10.7 billion of loans sold to the Trusts) and Fremont ($31.5.1 billion of loans sold to the Trusts); and (2) securitized by the same investment banks and financial institutions that sponsored the Trusts, including Wells Fargo ($71.8 billion of sponsored Trusts) and Luminent Mortgage ($4.2 billion of sponsored Trusts).  In addition, the initiatives identified and sought recovery of losses relating to servicing deficiencies by many of the same major servicers of loans backing the Trusts, including Wells Fargo (servicer to $231.4 billion of loans sold to the Trusts).

10.    Finally, as a major player in the RMBS securitization market, HSBC learned of the industrywide servicer violations plaguing the Trusts. Indeed, many of the servicers to the Trusts have faced federal and state regulatory enforcement actions which have led to landmark settlements, including the $25 billion "National Mortgage Settlement" entered into between forty-nine state attorneys general and some of the Trusts' servicers.  Notably, without receiving certificateholder approval, many of these settlement agreements effectively permit the servicers to use trust assets to finance their settlement payments for their own wrongdoing.

11.    Moreover, HSBC itself was the target of government investigations and lawsuits regarding its deficient servicing operations.  For example, during the fourth quarter of 2010, the Federal Reserve, the Office of the Comptroller of the Currency ("OCC"), the Federal Deposit Insurance Corporation ("FDIC"), and the Office of Thrift Supervision ("OTS") conducted on-site reviews of the adequacy of controls and governance over servicers' foreclosure processes at HSBC.  The reviews uncovered significant problems in foreclosure processing at HSBC, including "critical weaknesses in [HSBC's] foreclosure governance processes, foreclosure document preparation processes, and oversight and monitoring of third-party vendors, including

foreclosure attorneys." Based on the deficiencies in the review and the risk of additional issues as a result of weak controls and processes, the Federal Reserve Board initiated formal enforcement actions requiring HSBC North America Holdings, Inc. and HSBC Finance Corporation, the corporate parent and affiliate of HSBC, to address its pattern of misconduct and negligence related to deficient practices in residential mortgage loan servicing and foreclosure processing. Ultimately, HSBC entered into a consent order with the OCC, which found that HSBC had engaged in "unsafe or unsound practices with respect to the manner in which [HSBC] handled various foreclosure and related activities."

12.     Under the governing Pooling and Servicing Agreements ("PSAs"), upon HSBC's knowledge of an "Event of Default" by a servicer, HSBC is obligated to provide written notice of the default to the servicer. HSBC systematically failed, however, to provide notice to the servicers of their defaults because HSBC did not want to jeopardize its close business relationships with the servicers. Moreover, HSBC, which also acts as a servicer for billions of dollars of other RMBS, has engaged in the same improper and illicit servicing activities that plagued the Trusts. Similarly, HSBC originated billions of dollars in loans that have been securitized in other RMBS and that contain pervasive breaches of representations and warranties. Many of the same entities that act as servicers for the Trusts also service these defective HSBC-originated loans. Thus, HSBC, acting in its own self-interest, refused to provide notice to the servicers of their defaults to avoid scrutiny of its own servicing business and evade liability for its own defective loans.

13.     Further, under the PSAs, within sixty to ninety days after the occurrence of an Event of Default, HSBC is obligated to transmit by mail to all Certificateholders notice of each Event of Default known to HSBC, unless the Event of Default has been cured or waived.

Although Events of Default occurred and were not – and have not been – cured or waived, HSBC has similarly failed to provide written notice to the Certificateholders of the Events of Default.  HSBC has covered up the Events of Default for several self-interested reasons.  Among other things, as noted above, providing notice of the servicers' default could jeopardize HSBC's close business relationships with the servicers and lead to HSBC's own potential liability in its capacity as an originator, sponsor and servicer to other RMBS trusts.  Moreover, as discussed in greater detail below, had HSBC provided notice of an Event of Default, it would have greatly increased HSBC's liabilities and duties, but HSBC's compensation under the PSA would have remained the same.

14.     Finally, after the Events of Default, HSBC failed to exercise its rights under the Governing Agreements as a prudent person would, under those circumstances, in the conduct of its own affairs.  HSBC did nothing to protect the Trusts and Certificateholders, choosing instead to deliberately ignore the egregious Events of Default for its own benefit and to the detriment of the Trusts.

## II.     PARTIES

### A.     Plaintiffs

15.     Each of the plaintiffs identified below (collectively, the "Plaintiffs") is a Certificateholder in the Trusts as identified in Exhibit 1 attached hereto.  Each of the Plaintiffs was a Certificateholder of the respective Trusts at the time of the transactions of which it complains, or interests therein devolved upon it by operation of law in accordance with New York General Obligations Law § 13-107.

16.     The Plaintiffs hold the economic and beneficial interest in their Certificates and are the true parties in interest.  No other party has an economic or beneficial interest in the Plaintiffs' Certificates in this matter.

1.      **AEGON**

17.     The following plaintiffs are collectively referred to as "AEGON."

18.     Plaintiff LIICA Re I, Inc. is a corporation organized under the laws of the State of Vermont with its principal place of business in Burlington, Vermont.

19.     Plaintiff LIICA Re II, Inc. is a corporation organized under the laws of the State of Vermont with its principal place of business in Burlington, Vermont.

20.     Plaintiff Stonebridge Life Insurance Company is a corporation organized under the laws of the State of Vermont with its principal place of business in Rutland, Vermont.

21.     Plaintiff Transamerica Life Insurance Company is a corporation organized under the laws of the State of Iowa with its principal place of business in Cedar Rapids, Iowa.

22.     Plaintiff Transamerica Premier Life Insurance Company is a corporation organized under the laws of Iowa with its principal place of business at 4333 Edgewood Road NE, Cedar Rapids, Iowa.

2.      **BlackRock Funds**

23.     The following plaintiffs are collectively referred to as the "BlackRock Funds."

24.     Plaintiff BlackRock Balanced Capital Portfolio (FI) is a registered investment company with its principal place of business in Wilmington, Delaware.

25.     Plaintiff BlackRock Core Active LIBOR Fund B is a collective trust fund with its principal place of business in San Francisco, California.

26.     Plaintiff BlackRock Core Bond Trust is Cayman Island trust.

27.     Plaintiff BlackRock CoreAlpha Bond Fund E is a collective trust fund with its principal place of business in San Francisco, California.

28.     Plaintiff BlackRock CoreAlpha Bond Master Portfolio is a registered investment company with its principal place of business in Wilmington, Delaware.

29.    Plaintiff BlackRock CorePlus Bond Fund B is a Cayman Island Private Fund.

30.    Plaintiff BlackRock Dynamic High Income – Structured Credit Portfolio is a Cayman Island Private Fund.

31.    Plaintiff BlackRock Fixed Income GlobalAlpha Master Fund Ltd. is a Cayman LLC with its principal place of business in San Francisco, California.

32.    Plaintiff BlackRock Funds II, Inflation Protected Bond Portfolio is Cayman Island Private Fund.

33.    Plaintiff BlackRock Income Trust, Inc. is a registered investment company with its principal place of business in Wilmington, Delaware.

34.    Plaintiff BlackRock Long Duration AlphaPlus Bond Fund is a Cayman Island Private Fund.

35.    Plaintiff BlackRock Master Total Return Portfolio of Master Bond LLC is a limited liability company.

36.    Plaintiff BlackRock Multi-Asset Income – Non-Agency MBS Portfolio is a registered investment company with its principal place of business in Wilmington, Delaware.

37.    Plaintiff BlackRock Multi-Sector Income Trust is a registered investment company with its principal place of business in Wilmington, Delaware.

38.    Plaintiff BlackRock Strategic Income Opportunities Portfolio is a registered investment company with its principal place of business in Wilmington, Delaware.

39.    Plaintiff BlackRock Total Return Portfolio (Ins – Series) is a registered investment company with its principal place of business in Wilmington, Delaware.

40.    Plaintiff BlackRock US Mortgage is a registered investment company with its principal place of business in Wilmington, Delaware.

### 3. **Brookfield**

41.    The following plaintiffs are collectively referred to as "Brookfield."

42.    Plaintiff Brookfield Mortgage Opportunity Income Fund Inc. is a corporation organized under the laws of the State of Maryland.

43.    Plaintiff Brookfield Securitized Credit QIF Fund is an Irish qualifying investor fund (and a sub-fund of Brookfield Investment Funds (QIF) plc, an Irish public limited company).

44.    Plaintiff Brookfield Total Return Fund Inc. is a corporation organized under the laws of the State of Maryland.

45.    Plaintiff Crystal River Capital Inc. is a corporation organized under the laws of the State of Maryland.

46.    Plaintiff Millerton ABS CDO Ltd. is a Cayman exempted company with limited liability.

### 4. **Charles Schwab**

47.    Plaintiff Schwab is a California corporation and a wholly owned subsidiary of The Charles Schwab Corporation.

### 5. **DZ Bank**

48.    Plaintiff DZ Bank is a commercial bank incorporated in Germany.  DZ Bank maintains an office at 609 Fifth Avenue, New York, New York.

### 6. **Kore**

49.    Plaintiff Kore is a Delaware Limited Partnership with its principal place of business located at 1501 Corporate Drive, Suite 230, Boynton Beach, Florida.  Kore is the investment manager to Kore Fixed Income Fund Ltd., a private fund formed under the laws of the Cayman Islands and Sunrise Partners Limited Partnership, a private fund formed under the

laws of Delaware (collectively, the "Private Funds"). Kore, through the Private Funds, is a Certificateholder in the Trusts identified in Exhibit 1 attached hereto. Kore, through the Private Funds, has been a Certificateholder of these Trusts at the time of the transactions of which it complains, or its interests therein devolved upon it by operation of law in accordance with New York General Obligations Law § 13–107.

### 7. PIMCO

50. The following plaintiffs are collectively referred to as "PIMCO."

51. Plaintiff AST PIMCO Total Return Bond Portfolio is a Cayman Islands business trust.

52. Plaintiff Fixed Income SHares (Series R) is a Massachusetts business trust.

53. Plaintiff Fixed Income SHares: Series C is a Massachusetts business trust.

54. Plaintiff Fixed Income SHares: Series M is a Massachusetts business trust.

55. Plaintiff LVS I LLC is a Delaware limited liability company.

56. Plaintiff LVS I SPE XIV LLC is a Delaware limited liability company.

57. Plaintiff LVS II LLC is a Delaware limited liability company.

58. Plaintiff Pacific Bay CDO, Ltd. is a Cayman Islands exempted company.

59. Plaintiff Pacific Shores CDO, Ltd. is a Cayman Islands exempted company.

60. Plaintiff PCM Fund, Inc. is a corporation existing under the laws of Maryland, with its principal place of business located at 1345 Avenue of the Americas, New York, New York.

61. Plaintiff PIMCO Absolute Return Strategy 3D Offshore Fund Ltd. is a limited partnership existing under the laws of the Cayman Islands.

62. Plaintiff PIMCO Absolute Return Strategy II Master Fund LDC is a limited duration company existing under the laws of the Cayman Islands.

63.     Plaintiff PIMCO Absolute Return Strategy III Master Fund LDC is a limited duration company existing under the laws of the Cayman Islands.

64.     Plaintiff PIMCO Absolute Return Strategy IV IDF LLC is a limited liability company existing under the laws of Delaware.

65.     Plaintiff PIMCO Absolute Return Strategy IV Master Fund LDC is a limited duration company existing under the laws of the Cayman Islands.

66.     Plaintiff PIMCO Absolute Return Strategy V Master Fund LDC is a limited duration company existing under the laws of the Cayman Islands.

67.     Plaintiff PIMCO Bermuda Trust II: PIMCO Bermuda Emerging Markets Bond Fund (M) is a business trust existing under the laws of the Cayman Islands.

68.     Plaintiff PIMCO Bermuda Trust II: PIMCO Bermuda Income Fund (M) is a Bermuda business trust.

69.     Plaintiff PIMCO Bermuda Trust II: PIMCO Bermuda JGB Floater Foreign Strategy Fund is a business trust existing under the laws of the Cayman Islands.

70.     Plaintiff PIMCO Bermuda Trust IV: PIMCO Bermuda Global Bond Ex-Japan Fund is a Cayman Islands business trust.

71.     Plaintiff PIMCO Bermuda Trust: PIMCO Emerging Markets Bond Fund (M) is a business trust existing under the laws of the Cayman Islands.

72.     Plaintiff PIMCO Cayman SPC Limited: PIMCO Cayman Global Aggregate Bond Segregated Portfolio is a Cayman Islands exempted company.

73.     Plaintiff PIMCO Cayman SPC Limited: PIMCO Cayman Japan CorePLUS Segregated Portfolio is a Cayman Islands business trust.

74.     Plaintiff PIMCO Cayman SPC Limited: PIMCO Cayman Japan CorePLUS Strategy Segregated Portfolio is a Cayman Islands business trust.

75.     Plaintiff PIMCO Cayman SPC Limited: PIMCO Cayman Japan Low Duration Segregated Portfolio is a Cayman Islands business trust.

76.     Plaintiff PIMCO Cayman SPC Limited: PIMCO Cayman Unconstrained Bond Segregated Portfolio is a Cayman Islands exempted company.

77.     Plaintiff PIMCO Cayman Trust: PIMCO Cayman Foreign Bond Fund is a business trust existing under the laws of the Cayman Islands.

78.     Plaintiff PIMCO Cayman Trust: PIMCO Cayman Global Advantage Bond Fund is a business trust existing under the laws of the Cayman Islands.

79.     Plaintiff PIMCO Cayman Trust: PIMCO Cayman Global Aggregate Bond Fund is a Cayman Islands business trust.

80.     Plaintiff PIMCO Cayman Trust: PIMCO Cayman Global Aggregate Ex-Japan (Yen-Hedged) Bond Fund II is a Cayman Islands business trust.

81.     Plaintiff PIMCO Cayman Trust: PIMCO Cayman Global Aggregate Ex-Japan (Yen-Hedged) Income Fund is a business trust existing under the laws of the Cayman Islands.

82.     Plaintiff PIMCO Cayman Trust: PIMCO Cayman Global Aggregate Ex-Japan Bond Fund is a Cayman Islands business trust.

83.     Plaintiff PIMCO Cayman Trust: PIMCO Cayman Global Bond (NZD-Hedged) Fund is a business trust existing under the laws of the Cayman Islands.

84.     Plaintiff PIMCO Cayman Trust: PIMCO Cayman Global Ex-Japan (Yen-Hedged) Bond Fund is a business trust existing under the laws of the Cayman Islands.

85.    Plaintiff PIMCO Cayman Trust: PIMCO Cayman Total Return Strategy Fund is a business trust existing under the laws of the Cayman Islands.

86.    Plaintiff PIMCO Cayman Trust: PIMCO Cayman U.S. Bond Fund is a business trust existing under the laws of Cayman Islands.

87.    Plaintiff PIMCO Combined Alpha Strategies Master Fund LDC is a limited duration company existing under the laws of the Cayman Islands.

88.    Plaintiff PIMCO Corporate & Income Opportunity Fund is a business trust existing under the laws of Massachusetts.

89.    Plaintiff PIMCO Corporate & Income Strategy Fund is a business trust existing under the laws of Massachusetts.

90.    Plaintiff PIMCO Distressed Senior Credit Opportunities Fund II, L.P. is a limited partnership existing under the laws of Delaware.

91.    Plaintiff PIMCO Dynamic Credit Income Fund is a business trust existing under the laws of Massachusetts.

92.    Plaintiff PIMCO Dynamic Income Fund is a business trust existing under the laws of Massachusetts.

93.    Plaintiff PIMCO ETF Trust: PIMCO Total Return Active Exchange-Traded Fund is a statutory trust existing under the laws of Delaware.

94.    Plaintiff PIMCO Funds: Global Investors Series plc, Diversified Income Duration Hedged Fund is a business trust organized under the laws of Ireland.

95.    Plaintiff PIMCO Funds: Global Investors Series plc, Diversified Income Fund is a Cayman Islands business trust.

96.     Plaintiff PIMCO Funds: Global Investors Series plc, Emerging Local Bond Fund is a corporation existing under the laws of Ireland.

97.     Plaintiff PIMCO Funds: Global Investors Series plc, Emerging Markets Bond Fund is a corporation existing under the laws of Ireland.

98.     Plaintiff PIMCO Funds: Global Investors Series plc, Euro Bond Fund is a Cayman Islands business trust.

99.     Plaintiff PIMCO Funds: Global Investors Series plc, Euro Income Bond Fund is a corporation organized under the laws of Ireland.

100.    Plaintiff PIMCO Funds: Global Investors Series plc, Global Advantage Real Return Fund is a Cayman Islands business trust.

101.    Plaintiff PIMCO Funds: Global Investors Series plc, Global Bond Fund is a Cayman Islands business trust.

102.    Plaintiff PIMCO Funds: Global Investors Series plc, Global Investment Grade Credit Fund is a Cayman Islands business trust.

103.    Plaintiff PIMCO Funds: Global Investors Series plc, Income Fund is a corporation organized under the laws of Ireland.

104.    Plaintiff PIMCO Funds: Global Investors Series plc, PIMCO Credit Absolute Return Fund is a Cayman Islands business trust.

105.    Plaintiff PIMCO Funds: Global Investors Series plc, PIMCO Dividend and Income Builder Fund is a corporation existing under the laws of Ireland.

106.    Plaintiff PIMCO Funds: Global Investors Series plc, StocksPLUS™ Fund is a Cayman Islands business trust.

107.    Plaintiff PIMCO Funds: Global Investors Series plc, Strategic Income Fund is a Cayman Islands business trust.

108.    Plaintiff PIMCO Funds: Global Investors Series plc, Total Return Bond Fund is a corporation organized under the laws of Ireland.

109.    Plaintiff PIMCO Funds: Global Investors Series plc, Unconstrained Bond Fund is a corporation organized under the laws of Ireland.

110.    Plaintiff PIMCO Funds: PIMCO CommoditiesPLUS® Strategy Fund is a business trust existing under the laws of Massachusetts.

111.    Plaintiff PIMCO Funds: PIMCO Commodity Real Return Strategy Fund® is a Cayman Islands business trust.

112.    Plaintiff PIMCO Funds: PIMCO Credit Absolute Return Fund is a business trust existing under the laws of Massachusetts.

113.    Plaintiff PIMCO Funds: PIMCO Diversified Income Fund is a business trust existing under the laws of Massachusetts.

114.    Plaintiff PIMCO Funds: PIMCO EM Fundamental IndexPLUS® AR Strategy Fund is a business trust existing under the laws of Massachusetts.

115.    Plaintiff PIMCO Funds: PIMCO Emerging Local Bond Fund is a business trust existing under the laws of Massachusetts.

116.    Plaintiff PIMCO Funds: PIMCO Emerging Markets Bond Fund is a business trust existing under the laws of Massachusetts.

117.    Plaintiff PIMCO Funds: PIMCO Emerging Markets Currency Fund is a business trust existing under the laws of Massachusetts.

118.   Plaintiff PIMCO Funds: PIMCO EMG Intl Low Volatility RAFI®-PLUS AR Fund is a business trust existing under the laws of Massachusetts.

119.   Plaintiff PIMCO Funds: PIMCO Floating Income Fund is a business trust existing under the laws of Massachusetts.

120.   Plaintiff PIMCO Funds: PIMCO Foreign Bond Fund (U.S. Dollar-Hedged) is a business trust existing under the laws of Massachusetts.

121.   Plaintiff PIMCO Funds: PIMCO Foreign Bond Fund (Unhedged) is a business trust existing under the laws of Massachusetts.

122.   Plaintiff PIMCO Funds: PIMCO Fundamental Advantage Absolute Return Strategy Fund is a business trust existing under the laws of Massachusetts.

123.   Plaintiff PIMCO Funds: PIMCO Global Advantage® Strategy Bond Fund is a business trust existing under the laws of Massachusetts.

124.   Plaintiff PIMCO Funds: PIMCO Global Bond Fund (U.S. Dollar-Hedged) is a business trust existing under the laws of Massachusetts.

125.   Plaintiff PIMCO Funds: PIMCO Global Bond Fund (Unhedged) is a business trust existing under the laws of Massachusetts.

126.   Plaintiff PIMCO Funds: PIMCO Global Multi-Asset Fund is a business trust existing under the laws of Massachusetts.

127.   Plaintiff PIMCO Funds: PIMCO GNMA Fund is a business trust existing under the laws of Massachusetts.

128.   Plaintiff PIMCO Funds: PIMCO Income Fund is a business trust existing under the laws of Massachusetts.

129.    Plaintiff PIMCO Funds: PIMCO Inflation Response Multi-Asset Fund is a business trust existing under the laws of Massachusetts.

130.    Plaintiff PIMCO Funds: PIMCO International Fundamental IndexPLUS® AR Strategy Fund is a business trust existing under the laws of Massachusetts.

131.    Plaintiff PIMCO Funds: PIMCO International StocksPLUS® AR Strategy Fund (U.S. Dollar-Hedged) is a business trust existing under the laws of Massachusetts.

132.    Plaintiff PIMCO Funds: PIMCO International StocksPLUS® AR Strategy Fund (Unhedged) is a business trust existing under the laws of Massachusetts.

133.    Plaintiff PIMCO Funds: PIMCO Investment Grade Corporate Bond Fund is a business trust existing under the laws of Massachusetts.

134.    Plaintiff PIMCO Funds: PIMCO Long Duration Total Return Fund is a Massachusetts business trust.

135.    Plaintiff PIMCO Funds: PIMCO Long-Term Credit Fund is a Massachusetts business trust.

136.    Plaintiff PIMCO Funds: PIMCO Long-Term U.S. Government Fund is a Massachusetts business trust.

137.    Plaintiff PIMCO Funds: PIMCO Low Duration Fund is a Massachusetts business trust.

138.    Plaintiff PIMCO Funds: PIMCO Low Duration Fund II is a Massachusetts business trust.

139.    Plaintiff PIMCO Funds: PIMCO Low Duration Fund III is a Massachusetts business trust.

140.    Plaintiff PIMCO Funds: PIMCO Low Volatility RAFI®-PLUS AR Fund is a Massachusetts business trust.

141.    Plaintiff PIMCO Funds: PIMCO Moderate Duration Fund is a Massachusetts business trust.

142.    Plaintiff PIMCO Funds: PIMCO Mortgage Opportunities Fund is a Massachusetts business trust.

143.    Plaintiff PIMCO Funds: PIMCO Real Estate Real Return Strategy Fund is a Massachusetts business trust.

144.    Plaintiff PIMCO Funds: PIMCO Real Return Fund is a Massachusetts business trust.

145.    Plaintiff PIMCO Funds: PIMCO Short-Term Fund is a Massachusetts business trust.

146.    Plaintiff PIMCO Funds: PIMCO Small Cap StocksPLUS AR Strategy Fund is a Massachusetts business trust.

147.    Plaintiff PIMCO Funds: PIMCO Small Company Fundamental IndexPLUS® AR Strategy Fund is a business trust existing under the laws of Massachusetts.

148.    Plaintiff PIMCO Funds: PIMCO StocksPLUS® Absolute Return Fund is a Massachusetts business trust.

149.    Plaintiff PIMCO Funds: PIMCO StocksPLUS® AR Short Strategy Fund is a Massachusetts business trust.

150.    Plaintiff PIMCO Funds: PIMCO StocksPLUS® Fund is a Massachusetts business trust.

151.   Plaintiff PIMCO Funds: PIMCO Total Return Fund is a Massachusetts business trust.

152.   Plaintiff PIMCO Funds: PIMCO Total Return Fund II is a Massachusetts business trust.

153.   Plaintiff PIMCO Funds: PIMCO Total Return Fund III is a Massachusetts business trust.

154.   Plaintiff PIMCO Funds: PIMCO Total Return Fund IV is a Massachusetts business trust.

155.   Plaintiff PIMCO Funds: PIMCO Unconstrained Bond Fund is a Massachusetts business trust.

156.   Plaintiff PIMCO Funds: PIMCO Unconstrained Tax Managed Bond Fund is a Massachusetts business trust.

157.   Plaintiff PIMCO Funds: PIMCO Worldwide Fundamental Advantage AR Strategy Fund is a Massachusetts business trust.

158.   Plaintiff PIMCO Funds: Private Account Portfolio Series Asset-Backed Securities Portfolio is a Massachusetts business trust.

159.   Plaintiff PIMCO Funds: Private Account Portfolio Series Developing Local Markets Portfolio is a Massachusetts business trust.

160.   Plaintiff PIMCO Funds: Private Account Portfolio Series Emerging Markets Portfolio is a Massachusetts business trust.

161.   Plaintiff PIMCO Funds: Private Account Portfolio Series International Portfolio is a Massachusetts business trust.

162.    Plaintiff PIMCO Funds: Private Account Portfolio Series Long Duration Corporate Bond Portfolio is a Massachusetts business trust.

163.    Plaintiff PIMCO Funds: Private Account Portfolio Series Mortgage Portfolio is a Massachusetts business trust.

164.    Plaintiff PIMCO Funds: Private Account Portfolio Series Short-Term Portfolio is a Massachusetts business trust.

165.    Plaintiff PIMCO Global Credit Opportunity Master Fund LDC is a limited duration company existing under the laws of the Cayman Islands.

166.    Plaintiff PIMCO Global Income Opportunities Fund is a trust existing under the laws of Canada.

167.    Plaintiff PIMCO Global StocksPLUS & Income Fund is a Massachusetts business trust.

168.    Plaintiff PIMCO High Income Fund is a Massachusetts business trust.

169.    Plaintiff PIMCO Income Opportunity Fund is a Massachusetts business trust.

170.    Plaintiff PIMCO Income Strategy Fund is a Massachusetts business trust.

171.    Plaintiff PIMCO Income Strategy Fund II is a Massachusetts business trust.

172.    Plaintiff PIMCO Large Cap StocksPLUS Absolute Return Fund is a Delaware business trust.

173.    Plaintiff PIMCO Multi-Sector Strategy Fund Ltd. is a Cayman Islands Exempted Company.

174.    Plaintiff PIMCO Offshore Funds - PIMCO Absolute Return Strategy IV eFund is a Cayman Islands business trust.

175.    Plaintiff PIMCO Offshore Funds: PIMCO Offshore Funds - PIMCO Absolute Return Strategy V Alpha Fund is a Cayman Islands business trust.

176.    Plaintiff PIMCO Strategic Income Fund, Inc. is a corporation existing under the laws of Maryland.

177.    Plaintiff PIMCO Tactical Opportunities Master Fund Ltd. is a limited partnership existing under the laws of the Cayman Islands.

178.    Plaintiff PIMCO Variable Insurance Trust: PIMCO Commodity Real Return Strategy Portfolio is a Cayman Islands Exempted Company.

179.    Plaintiff PIMCO Variable Insurance Trust: PIMCO Emerging Markets Bond Portfolio is a Delaware business trust.

180.    Plaintiff PIMCO Variable Insurance Trust: PIMCO Foreign Bond Portfolio (U.S. Dollar Hedged) is a Delaware business trust.

181.    Plaintiff PIMCO Variable Insurance Trust: PIMCO Global Advantage Strategy Bond Portfolio is a Delaware business trust.

182.    Plaintiff PIMCO Variable Insurance Trust: PIMCO Global Bond Portfolio (Unhedged) is a Delaware business trust.

183.    Plaintiff PIMCO Variable Insurance Trust: PIMCO Low Duration Portfolio is a Delaware business trust.

184.    Plaintiff PIMCO Variable Insurance Trust: PIMCO Real Return Portfolio is a Delaware business trust.

185.    Plaintiff PIMCO Variable Insurance Trust: PIMCO Short-Term Portfolio is a Delaware business trust.

186.    Plaintiff PIMCO Variable Insurance Trust: PIMCO Total Return Portfolio is a Delaware business trust.

187.    Plaintiff Terlingua Fund 2, LP is a Delaware limited partnership.

### 8.    Prudential

188.    The following plaintiffs are collectively referred to as "Prudential."

189.    Plaintiff Prudential Retirement Insurance and Annuity Company ("PRIAC") is an insurance company formed under the laws of Connecticut, with its principal place of business in Hartford, Connecticut.   PRIAC is a wholly owned subsidiary of The Prudential Insurance Company of America, which is owned by Prudential Holdings, LLC, and ultimately by Prudential Financial, Inc.   PRIAC established and maintains the following open-end, commingled, insurance company separate accounts: Western Asset: Enhanced Cash, Wellington: Investment Grade Fixed Income, the Core Plus Bond Fund / REAMS Fund, Core Plus Bond Pimco Fund, High Grade Bond Fund / GSAM Fund, North Carolina Fixed Income Fund - JP Morgan Chase and Union Carbide I (collectively, the "Separate Accounts").

190.    Plaintiff Prudential Trust Company ("PTC") is a corporation formed under the laws of Pennsylvania, with its principal place of business in Scranton, Pennsylvania.  PTC is a wholly owned subsidiary of Prudential Investment Management, and ultimately Prudential Financial, Inc.  PTC serves as Trustee for the Institutional Core Plus Bond Fund of the Prudential Company Master Commingled Investment Fund for Tax Exempt Trusts, the Institutional Core Bond Fund of the Prudential Trust Company Master Commingled Investment Fund for Tax Exempt Trusts, and the Prudential Merged Retirement Plan.

191.    Plaintiff The Gibraltar Life Insurance Company, Ltd. ("Gibraltar") is a life insurance company formed under the laws of Japan, with its principal place of business at Prudential Tower 2-13-10, Nagatacho, Chiyoda-ku, Tokyo, Japan 100-0014.   Gibraltar is a

wholly owned subsidiary of Prudential Holdings of Japan, Inc., and ultimately Prudential Financial, Inc.

192.    Plaintiff The Prudential Insurance Company of America ("Prudential Insurance") is an insurance company formed under the laws of, and domiciled in, the State of New Jersey, with its principal place of business at 751 Broad Street, Newark, New Jersey.   Prudential insurance is a wholly owned subsidiary of Prudential Holdings, LLC, which is a Delaware limited liability company.  Prudential Holdings, LLC is a wholly owned subsidiary of Prudential Financial, Inc.

193.    Plaintiff The Prudential Investment Portfolios 2 ("PIP 2"), formerly known as the Dryden Investment Fund, is a Delaware statutory trust with a principal place of business in Newark, New Jersey.  PIP2 is an open-ended management investment company registered with the Securities and Exchange Commission.  PIP 2 is comprised of two series funds, including the Prudential Core Short-Term Bond Fund.

194.    Plaintiff The Prudential Investment Portfolios 9 ("PIP 9"), formerly known as the Dryden Large-Cap Core Equity, is a Delaware statutory trust with a principal place of business in Newark, New Jersey.  PIP 9 is an open-ended management investment company registered with the Securities and Exchange Commission.  PIP 9 is comprised of three series funds, including the Prudential Absolute Return Bond Fund.

195.    Plaintiff The Prudential Investment Portfolios Inc. is a Maryland Corporation with a principal place of business at Gateway Center Three, 100 Mulberry Street, Newark, New Jersey 07102.  It is an open-end management investment company registered with the Securities and Exchange Commission ("SEC").   It consists of six series, including the Prudential Asset Allocation Fund.

196.    Plaintiff The Prudential Investment Portfolios, Inc. 17 ("PIP 17"), formerly known as Prudential Total Return Bond Fund, Inc., is a Maryland Corporation with a principal place of business in Newark, New Jersey.  It is an open-ended management investment company registered with the Securities and Exchange Commission.  PIP 17 consists of two series funds, including the Prudential Total Return Bond Fund.  PIP 17, through the Prudential Total Return Bond Fund, is a Certificateholder in the Trusts identified in Exhibit 1 attached hereto.

197.    Plaintiff The Prudential Series Fund ("PSF"), formerly known as Prudential Series Fund, Inc., is an unincorporated Delaware statutory trust with a principal place of business at Gateway Center Three, 100 Mulberry Street, Newark, New Jersey.  PSF is an open-end management investment company registered with the Securities and Exchange Commission. PSF consists of eighteen series funds, including The Prudential Series Fund-Conservative Balanced Portfolio, The Prudential Series Fund-Diversified Bond Portfolio, The Prudential Series Fund-High Yield Portfolio and The Prudential Series Fund-Flexible Managed Portfolio. PSF, through The Prudential Series Fund-Conservative Balanced Portfolio, The Prudential Series Fund-Diversified Bond Portfolio, The Prudential Series Fund-High Yield Portfolio and The Prudential Series Fund-Flexible Managed Portfolio.

### 9.    Sealink

198.    Plaintiff Sealink is a company incorporated under the laws of Ireland with the registered address of Sealink Funding Limited, Fourth Floor, 3 George's Dock, IFSC, Dublin 1, Ireland.

### 10.    TIAA

199.    The following plaintiffs are collectively referred to as "TIAA."

200.    Plaintiff CREF Bond Market Account is a Delaware mutual fund with its principal place of business in the State of New York.

201.    Plaintiff CREF Social Choice Account is a New York investment company with its principal place of business in the State of New York.

202.    Plaintiff TIAA Global Public Investments, MBS LLC, a wholly owned subsidiary of TIAA-CREF Life Insurance Company, is a Delaware limited liability company with its principal place of business in the State of New York.

203.    Plaintiff TIAA-CREF Bond Fund is a Delaware mutual fund with its principal place of business in the State of New York.

204.    Plaintiff TIAA-CREF Bond Plus Fund is a Delaware mutual fund with its principal place of business in the State of New York.

205.    Plaintiff TIAA-CREF Life Bond Fund is a Delaware mutual fund with its principal place of business in the State of New York.

206.    Plaintiff TIAA-CREF Life Insurance Company is a direct wholly-owned subsidiary of Teachers Life Insurance and Annuity Association of America, a legal reserve life insurance company established under the insurance laws of the State of New York.  Through its separate accounts (General Pension Act.; TIAA Stable Value; TIAA-CREF Life Ins. GFA; General Acct PA; T-C Life Ins. PA; TIAA Stable Return Annuity), TIAA-CREF Life Insurance Company is a Certificateholder in the Trusts identified in Exhibit 1 attached hereto.  TIAA-CREF Life Insurance Company, through its managed accounts, has been a Certificateholder of these Trusts at the time of the transactions of which it complaints, or interests therein devolved upon it by operation of law in accordance with New York General Obligations Law § 13-107.

207.    Plaintiff TIAA-CREF Short-Term Bond Fund is a Delaware mutual fund with its principal place of business in the State of New York.

B.     **Defendants**

1.     **HSBC**

208.    Defendant HSBC Bank USA, National Association is a national banking association and is the principal subsidiary of HSBC USA Inc.  HSBC's principal executive office is located at 2 Hanson Place, 14th Floor, Brooklyn, New York and its registered main office is located in McLean, Virginia.  With total assets of $179.8 billion as of December 31, 2013, HSBC has been, and currently is serving as trustee for numerous securities transactions and together with its affiliates, are involved in many facets of the private-label RMBS market.  HSBC currently administers as corporate trustee several billions of dollars in assets, including RMBS.

209.    HSBC and its affiliates are involved in the servicing of residential mortgage loans.  As of April 2011, HSBC, together with HSBC Finance Corporation and other subsidiaries ("HSBC Mortgage Servicing Companies") was the twelfth largest servicer of residential mortgages in the United States, servicing a portfolio of 892,200 residential mortgage loans.  In particular, HSBC Mortgage Servicing Companies service residential mortgage loans held by securitization trusts pursuant to PSAs.

210.    HSBC, through its affiliates HSBC Finance Corporation, Household Finance Corp., Beneficial and Decision One ("HSBC Originating Companies") has also acted as a mortgage loan seller to several RMBS offerings.  Between 2004 and 2007, HSBC Originating Companies sold over $10 billion of loans in RMBS deals ("HSBC-Originated Trusts").

211.    From 2005 through 2008, HSBC was also a leading sponsor of private-label mortgage-backed securities, sponsoring more than thirty-three RMBS offerings under the HASC, HALO and HFCHC shelves that were collateralized by a total of over $26 billion in certificates issued from trusts ("HSBC-Sponsored Trusts").

**2.**     **The Nominal Defendant Trusts**

212.     Each Trust is named herein as a nominal defendant.  248 of the Trusts are New York common law trusts established under its respective PSA.  The twenty-three remaining Trusts are Delaware statutory trust established under its respective Indenture and Sale Servicing Agreement ("SSA").  All of the Trusts are governed by the substantive laws of the state of New York, and are subject to the TIA.

213.     The Trusts' Governing Agreements set forth HSBC's duties as trustee.  All of the Governing Agreements are substantially similar, and impose the same duties on HSBC as Trustee to the Trusts and Certificateholders. Accordingly, this Complaint primarily refers to the PSAs when discussing the Trustee's contractual obligations.

## III.   OVERVIEW OF THE TRUSTS

214.     The Trusts in this action, identified in the attached Exhibit 1, are 248 New York common law trusts and twenty-three Delaware statutory trusts, resulting from non-agency RMBS issued between 2004 and 2008, inclusive.  The Trusts have a total original principal balance of over $257.6 billion and current balance of over $53.4 billion as of November 1, 2014.  To date, the Trusts have suffered total realized collateral losses of over $34 billion.  Moreover, as a result of defective mortgage collateral and servicer violations, the Trusts have incurred and will incur substantial losses.

215.     The Trusts have a high concentration of loans originated by ten lenders. Specifically, Wells Fargo & Company ("Wells Fargo"), Fremont Investment & Loan ("Fremont"), Lehman Brothers Holdings Inc. affiliates (including BNC and Aurora) ("Lehman"), GreenPoint Mortgage Funding, Inc. ("GreenPoint"), Countrywide Financial Corp. ("Countrywide"), Deutsche Bank, N.A., through its affiliates MortgageIT and Chapel, New Century Mortgage Corp. ("New Century"), IndyMac Bank, FSB ("IndyMac"), WMC Mortgage

Corporation ("WMC"), Option One Mortgage Corporation ("Option One"), and American Home Mortgage Corp., collectively originated approximately $142.8 billion in loans, representing more than 55% of the total original face value of the mortgage loans in the Trusts.

216.    A significant portion of loans was sponsored by six entities.  Specifically, approximately $187 billion in loans were sold to the Trusts by sponsors Wells Fargo, Deutsche Bank, N.A. ("Deutsche Bank"), Fremont, Lehman,  Nomura Holding America, Inc. ("Nomura"), and Merrill Lynch & Co. ("Merrill Lynch"), representing approximately 65% of the total original face value of the mortgage loans in the Trusts.

217.    An overwhelming majority of the Trusts' loans are (or were) serviced by Wells Fargo.  Specifically, over $231 billion in loans are (or were) serviced by Wells Fargo and affiliated entities, representing approximately 90% of the total original face value of the mortgage loans in the Trusts.  Additional prominent servicers include Aurora Loan Servicers Inc. ("Aurora"), Ocwen Financial Corporation ("Ocwen"), U.S. Bank, N.A., and Countrywide (Bank of America).

## IV.    JURISDICTION AND VENUE

218.    This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331 for violations of the TIA, and supplemental jurisdiction over the remaining claims.  This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d).

219.    Venue is proper in this District under 28 U.S.C. § 1391(b).

## V.    COMPLIANCE WITH THE NO ACTION CLAUSE IS EXCUSED

220.    Compliance with the pre-suit requirements of the Trusts' "no action" clause is excused.  For nearly all of the Trusts, the no action clause in the PSA identifies HSBC, as Trustee, as the sole notice party.  If the no action clause's pre-suit requirements for these Trusts were to apply, they would require Plaintiffs to demand that HSBC initiate proceedings against

itself and to indemnify HSBC for its own liability to the Trusts, an "absurd" requirement that the parties did not intend.  *See Cruden v. Bank of New York*, 957 F.2d 961, 968 (2d Cir. 1992).

221.    For most of the remaining Trusts identifies Wells Fargo, in its capacity as Trust Administrator, Securities Administrator or Master Servicer, as a notice party.  For these trusts, it would be similarly absurd for Plaintiffs to demand that Wells Fargo bring the instant suit against HSBC because Wells Fargo also suffers from disabling conflicts, and compliance with such a demand would require Wells Fargo to admit to its wrongdoing.  In connection with these Trusts, Wells Fargo, in its capacity as Master Servicer or primary servicer, defaulted and continues to default on its obligations to the Trusts and has harmed trust beneficiaries by failing to observe and perform covenants and agreements set forth in the PSAs, including by unreasonably refusing to provide notice of seller breaches of representations and warranties, requiring the sellers to perform their repurchase obligations and to service and administer the mortgage loans in accordance with applicable law and customary and usual standards of practice of mortgage lenders and loan servicers.  Consequently, it would be absurd to demand that Wells Fargo bring claims against HSBC in connection with these Trusts because doing so would require Wells Fargo to allege and prove its own misconduct and liability to the Trusts and may invoke Wells Fargo's indemnity obligations to the Trustee.  Likewise, it would be absurd and contravene the parties' intentions to require Plaintiffs to indemnify Wells Fargo against the costs, expenses, and liabilities incurred in a suit against HSBC.  Moreover, Wells Fargo receives a direct financial benefit from not suing HSBC, because any suit by Wells Fargo against HSBC would expose Wells Fargo's own defaults as Master Servicer or primary servicer, would lead to its termination as servicer to the Trust and loss of servicing fees.  The suit would also interfere with Wells Fargo's business relationships with HSBC, including billions of dollars in servicing fees annually

from HSBC.  For example, Wells Fargo serves as Master Servicer to over 381 RMBS trusts issued between 2004 and 2008 with an original face value of over $307.4 billion for which HSBC serves as trustee.

## VI.   DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

222.    Plaintiffs bring the claims set forth below derivatively in the right of the Trustee and on behalf of the Trusts.  Plaintiffs have the right to bring this suit derivatively under New York law.  All of Plaintiffs' claims relate to HSBC's breach of common duties owed to the Trusts and Certificateholders through its mismanagement of the Trusts and its failure and unreasonable refusal to act in the best interests of the Trusts, including enforcing the Trusts' rights against those who have harmed the Trusts.  This is common to all holders of interests in the Trusts, not just Plaintiffs, because all Certificateholders are paid from the cash flows generated by the same pool or pools of mortgages in the Trusts.  Accordingly, Plaintiffs' claims concern a purported injury to the Trusts as a whole.  *See Dallas Cowboys Football Club, Ltd. v. Nat'l Football League Trust*, No. 95 Civ. 9426, 1996 WL 601705, at *2-4 (S.D.N.Y. Oct. 18, 1996).

223.    The terms of the PSAs are consistent with asserting the claims derivatively, as they specifically provide as follows:

> no one or more Holders of Certificates shall have any right in any manner whatever by virtue or by availing itself or themselves of any provisions of this Agreement to affect, disturb or prejudice the rights of the Holders of any other of the Certificates, or to obtain or seek to obtain priority over or preference to any other such Holder or to enforce any right under this Agreement, except in the manner herein provided *and for the common benefit of all Certificateholders*.

PSA § 12.07 (emphasis added).

224.    This is not a collusive action to confer jurisdiction on this Court which it would not otherwise have.

225.    Plaintiffs are Certificateholders and have been beneficial owners of RMBS in each of the Trusts during all or a large portion of HSBC's wrongful course of conduct alleged herein.  Moreover, under New York General Obligations Law §13-107, the transfer of ownership in the certificates vested in the Plaintiffs the claims or demands alleged herein.

226.    Plaintiffs will adequately and fairly represent the interests of the Trusts and their investors in enforcing and prosecuting the rights that form the subject matter of this action.  At all relevant times, Plaintiffs have acted equitably and in good faith, without any ulterior motive, and in the belief that the Trusts and Certificateholders are entitled to the relief sought on their behalf.

227.    As set forth below, Plaintiffs have not made a demand on HSBC or Wells Fargo to institute this action because such demand would be futile.

228.    Any demand on HSBC to institute this action would be futile because the wrongful acts alleged herein were committed by HSBC and HSBC would not agree to sue itself, particularly since it faces claims for losses by the Trusts in excess of $34 billion.  In addition, since HSBC itself committed the wrongdoing complained of herein, and is accused of negligent and misconduct, it therefore is not disinterested and lacks independence to exercise business judgment.  Moreover, HSBC has benefitted from, and continues to benefit from, its wrongdoing as alleged herein, (i.e., its failure to act in the best interest of the Trusts and Certificateholders), as HSBC has maintained and preserved its business relationships with the Sellers and Servicers and thereby continues to derive financial benefits from serving as Trustee to Trusts, and many other RMBS trusts, due to its continuing wrongdoing as alleged herein.

229.    Any demand on Wells Fargo to institute this action on behalf of the remaining Trusts in which it is identified as a notice party under the PSAs' no action clause also would be

futile because, as alleged above, Wells Fargo committed wrongdoing in its capacity as Master Servicer or servicer, and any suit brought by Wells Fargo on behalf of the Trusts would expose Wells Fargo's own defaults as Master Servicer or primary servicer, would lead to its termination as servicer to the Trust and loss of servicing fees and could implicate certain indemnity obligations owed to HSBC. Wells Fargo also has benefitted from, and continues to benefit from, its wrongdoing as alleged herein as it continues to derive financial benefits from serving as Master Servicer or servicer to the Trusts and to many other RMBS trusts for which HSBC acts as Trustee. Accordingly, Wells Fargo is not disinterested and lacks independence to exercise business judgment.

## VII.    BACKGROUND - THE TRUSTEE'S ROLE
AS GATEKEEPER IN THE SECURITIZATION PROCESS

230.    RMBS provide investors with an interest in the income generated by one or more designated pools of residential mortgages. The securities themselves represent an interest in an "issuing trust" that holds the designated mortgage pools. The corpus of the trust – like the Trusts at issue here – consists entirely of the underlying mortgage loans.

231.    The TIA requires that a trustee be appointed for all bond issues over $10 million so that the rights of investors are not compromised. In an RMBS transaction, the "issuer" appoints the trustee, which is the only independent party to the PSA. Accordingly, the trustee serves the critical role of an independent party with access to all relevant information, including the mortgage loan files. Investors reasonably understand that the trustee is under an affirmative duty to take action to protect the interests of the trusts and their beneficiaries, the Certificateholders. As part of the RMBS transaction, the trustee is assigned "all right, title and interest" in the underlying mortgage loans. The PSAs require the trustee, or its agent, to take

physical possession of the mortgage loans, ensure that each of the mortgage loans was properly conveyed and certify that the documentation for each loan was accurate and complete.

232. The trustee is contractually responsible for the transactions of the "issuing trust." The trustee is responsible for administering the trust for the benefit of investors, including guaranteeing that the transactions are administered in accordance with the related documentation, following compliance and performance-related matters, and handling cash and information processing for the investors. The trustee must work closely with the issuer and servicer to protect the welfare of the investors. In contrast to the roles of issuer or servicer, which can be combined, the trustee's sole purpose is to represent the investor and, therefore, the trustee must be an independent entity without any conflicts-of-interest. The PSAs contractually obligate the trustee to oversee and manage the servicer, including granting the trustee the power to replace the service for its failure to act in accordance with the servicer's contractual obligations.

233. Although the structure and underlying collateral of the mortgages may vary from trust to trust, RMBS trusts all function similarly: the cash flow from interest and principal payments is passed through to the trust and distributed to certificateholders in the order laid out in the securitization agreements, commonly referred to as the cash-flow "waterfall." Likewise, the duties and responsibilities of the trustee are identical in all RMBS transactions – namely to represent the trusts and their investors as an independent third party. Between 2003 and 2009, private label RMBS offerings totaled more than $3 trillion. Yet, only a handful of major American financial institutions served as trustees for these RMBS and contractually agreed to perform the vitally important gatekeeping functions to protect Certificateholders. Specifically, seven trustees made up around 90% of the market. Among this handful of major RMBS trustees, HSBC held a sizeable 7% market share during this period.



234.    The process of securitizing mortgages into RMBS involves a number of steps, each of which is critical to finalize the securitization and sell the RMBS to investors.  First, a sponsor creates a loan pool from mortgages it originated or purchased from other financial institutions.  The sponsor has the right to require the seller to repurchase or replace loans that do not meet represented quality standards after purchasing a mortgage pool.

235.    Second, the sponsor transfers the loans to a "depositor," which segments the cash flows and risks in the loan pool among different levels of investment or "tranches."  Generally, cash flows from the loan pool are applied in order of seniority, going first to the most senior tranches.  In addition, any losses to the loan pool due to defaults, delinquencies, foreclosure or otherwise, are applied in reverse order of seniority, and are generally applied first to the most junior tranches.

236.     Third, the depositor transfers the mortgage pool to the issuing trust so that it can be used as collateral for RMBS that will be issued and sold to investors. The depositor then passes the RMBS to the underwriters for sale to investors in exchange for payment.

237.     The servicer is appointed by the sponsor and is a party to the PSA.  The servicer is often an affiliate of the sponsor or an originator of a substantial portion of the loans in the trust. The servicer collects payments from the underlying borrowers.  After collection, the servicer sends the funds to the trustee, which then makes payments to the certificateholders.  Mortgage defaults reduce the available principal and interest payments to be paid to the trust and passed through to investors.  Mortgage delinquencies similarly reduce the available principal and interest to be paid to the trust and distributed to investors.

238.     Accordingly, if an underlying borrower does not timely make the required payments to the servicer, the servicer may have to take action to mitigate or minimize the losses to the trust, including foreclosing on the property and providing property maintenance to maximize the return on the investment to the trust and its beneficial owners – the certificateholders.  Foreclosures result in higher losses to the trust (and therefore to the RMBS investors) if the value of the collateral is lower than anticipated.  For these reasons, proper loan origination and underwriting of the mortgages underlying the RMBS, and proper and timely loan servicing and oversight are essential to the quality of the RMBS and the timely receipt of principal and interest payments to the trust for distribution to the certificateholders.

## VIII.   HSBC'S CONTRACTUAL OBLIGATIONS

239.     The Trusts and Certificateholders' rights and HSBC's contractual duties, as Trustee for the Trusts at issue in this action are set forth in the relevant securitization agreements, including the Mortgage Loan Purchase and Sale Agreements ("MLPAs") (or similar documents) and the Governing Agreements.

240.    Although the Governing Agreements for each of the Trusts are separate agreements that were individually negotiated and differ slightly in certain respects, the terms that are pertinent to the subject matter of this Complaint are substantially similar, if not identical, in all of the Governing Agreements and impose substantially the same, if not identical, duties and obligations on the parties to the Governing Agreements..

A.    **The Mortgage Loan Purchase And Sale Agreement**

241.    The MLPA is a contract between either the originator and the sponsor, or the sponsor and the depositor.   The MLPA governs the terms of the sale of the mortgage loans acquired for securitization.   In its capacity as "seller" under the MLPA, the originator or sponsor makes extensive representations and warranties concerning the characteristics, quality, and risk profile of the mortgage loans.

242.    The seller's typical representations and warranties in the MLPAs include, *inter alia*, the following: (i) the information in the mortgage loan schedule is true and correct in all material respects; (ii) each loan complies in all material respects with all applicable local, state and federal laws and regulations at the time it was made; (iii) the mortgaged properties are lawfully occupied as the principal residences of the borrowers unless specifically identified otherwise; (iv) the borrower for each loan is in good standing and not in default; (v) no loan has a LTV ratio of more than 100%; (vi) each mortgaged property was the subject of a valid appraisal; and (vii) each loan was originated in accordance with the underwriting guidelines of the related originator.   To the extent mortgages breach the seller's representations and warranties, the mortgage loans are worth less and are much riskier than represented.

243.    Under the MLPAs, upon discovery or receipt of notice of any breach of the seller's representations and warranties that has a material and adverse effect on the value of the mortgage loans in the trusts or the interests of the certificateholders therein, the seller is obligated

to cure the breach in all material respects. The MLPAs do not specify what constitutes "discovery" of a breach or what evidence must be presented to the seller in providing notice of a breach.

244. If a breach is not cured within a specified period of time, the seller is obligated to either substitute the defective loan with a loan of adequate credit quality, or repurchase the defective loan at a specified purchase price (the "Repurchase Price") equal to the outstanding principal balance and all accrued but unpaid interest on the loan to be paid to the Trust. For breaches related to a mortgage loan or acquired property already sold from the Trust (for example, as a result of foreclosure), the seller must pay to the Trust the amount of the Repurchase Price that exceeds the net liquidation proceeds received upon the sale of the mortgage loan or acquired property.

245. The repurchase provisions ensure that the Trust need not continue to hold mortgage loans for which the seller breached its representations and warranties. Thus, the repurchase provisions transfer from the Trusts to the sellers the risk of any decline, or further decline, in the value of those mortgage loans.

246. Under the MLPAs, the demanding party must merely show that the breach has a material and adverse effect on the value of the mortgage loans in the Trusts or the interests of the Certificateholders in the loans. The seller's cure, substitute and repurchase obligations do not require any showing that the seller's breach of representations caused any realized loss in the related mortgage loan in the form of default or foreclosure, or that the demanding party prove reliance on servicing and origination documents.

247. Upon the sale of the mortgage loans to the Trust, the rights under MLPAs, including the sellers' representations and warranties concerning the mortgage loans, were

assigned to HSBC, as Trustee for the benefit of the Trust and all the Certificateholders, in accordance with the PSAs.

**B.**     **The Pooling And Servicing Agreements**

248.     The PSAs are contracts between, among others, the depositor, the servicer, and HSBC, as Trustee, which govern the Trusts that issued certificates.  Plaintiffs, as investors in the Trusts, are third party beneficiaries of the PSAs.

249.     The PSAs for each of the Trusts are substantially similar and memorialize (i) the transfer and conveyance of the mortgage loans from the depositor to the Trust; (ii) the Trusts' issuance of beneficial certificates of interests in the Trusts to raise the funds to pay the depositor for the mortgage loans; and (iii) the terms of those certificates.

**1.**     **HSBC's Duties And Obligations Under The PSAs**

250.     The PSAs set forth HSBC's contractual duties and obligations, which are substantially similar for each Trust governed by a PSA.  Further, upon information and belief, HSBC employed the same general set of policies and procedures to oversee and manage the Trusts regardless of variations among the PSAs.

251.     Most importantly, each of the PSAs requires that HSBC acquire and protect the trust corpus for the benefit of Certificateholders.[2]

252.     The PSAs also require HSBC to oversee and enforce the sellers' and the servicers' obligations.  In performing these contractual obligations, HSBC is required to act in the best interests of and for the protection of the Trusts and their Certificateholders.  Certificateholders, unlike the trustee, have no direct contact with the sellers and servicers and have no ability to influence or examine the servicers' decisions.  Moreover, under the PSAs, Certificateholders do

_____

[2] This duty typically is expressed in Section 2.2 of the PSAs.

not have the right to directly enforce the responsible party's representations and warranties or the servicers' duties, absent satisfaction of the collective action provisions.  Thus, Certificateholders must rely on HSBC to protect their interests.

253.   The PSAs require the depositor to deliver to and deposit with, or cause to be delivered to and deposited with, HSBC, the mortgage files, which must at all times be identified in the records of HSBC as being held by or on behalf of the Trust.  Furthermore, the PSAs require HSBC to acknowledge receipt of the mortgage files on behalf of the Trust and to acknowledge that all mortgage pool assets, mortgage files and related documents and property held by it at any time are held by it as trustee of the Trust.

254.   Once the mortgage files are in HSBC's possession, the PSAs require HSBC to ensure that the underlying mortgage loans were properly conveyed to the Trusts, and that the Trusts have perfected enforceable title to the mortgage loans by reviewing the mortgage files for each of the mortgage loans.  HSBC is required to review each mortgage file within a certain time period after the "Closing Date" and deliver to the depositor a certification that all documents required have been executed and received.

255.   If HSBC identifies any defect in a mortgage loan file for an underlying mortgage loan contained in a Trust, HSBC must promptly notify either the servicer or depositor, and that party shall promptly notify the applicable seller of the defect and take appropriate steps on behalf of the Trust to enforce such seller's obligation to correct or cure the defect or repurchase or substitute such mortgage loan.

**a)      Duty To Provide Notice Of<br>Breaches And To Enforce Putback Rights**

256.   Under the PSAs, HSBC is entrusted to ensure that mortgage loans in the Trusts were properly underwritten, were of a certain risk profile, and had characteristics of a certain

quality as represented by the sellers in the MLPAs.  The Trusts were assigned all of the rights under the MLPAs pertaining to the mortgage loans, including the right to put back loans that breached the sellers' representations and warranties.

257.    To protect the Trusts and all Certificateholders, the PSAs require HSBC to give prompt written notice to all parties to the PSA upon its discovery of a breach of a representation or warranty made by the seller in respect of the mortgage loans that materially and adversely affects the value of any mortgage loan or the interests of the Certificateholders in any loan, and to take such action as may be necessary or appropriate to enforce the rights of the Trusts with respect to the breach.[3]

**b)**    **HSBC's Duties Regarding The Servicers**

258.    Under the PSAs, HSBC, as Trustee, has certain duties with respect to enforcing the obligations of the servicers, whose authority and responsibilities are delegated by HSBC.  In particular, the PSAs set forth HSBC's obligations upon occurrence of an "Event of Default," which is defined as a specified failure of the servicer to perform its servicing duties and cure this failure within a specified time period.  The PSAs identify several types of failures by the servicer that may give rise to an Event of Default.   Such failures include, breach of servicer representations and warranties and failure to observe or perform in any material respect any other covenants or agreements, which continues unremedied for no more than thirty to sixty days after written notice of such failure shall have been given to the servicer by the trustee requiring the

---

[3] With modest variation among the PSAs, this duty typically is expressed in Sections 2.3 and 2.8 of the PSAs.

same to be remedied, or knowledge of such failure by a "Servicing Officer" of the servicer, whichever is earlier.[4]

259.    The remedies for uncured servicer Events of Default include termination of the servicer and reimbursement for trust assets lost as a result of the servicers' violations.   As detailed herein, HSBC did not perform its duties to monitor the servicers and did not initiate any action against the servicers for the benefit of the Trusts and Certificateholders.

### c)        Duties Upon Knowledge Of An Event Of Default

260.    The PSAs impose additional obligations upon HSBC once a responsible officer of HSBC has knowledge of the occurrence of an Event of Default.  *First*, HSBC must give written notice to the relevant servicer of the occurrence of such an event within the specified time period after HSBC obtains knowledge of the occurrence.  *Second*, within sixty to ninety days after the occurrence of any Event of Default, HSBC is required to provide written notice to all Certificateholders of the Event of Default, unless the Event of Default has been cured or waived. *Third*, and most importantly, the PSAs require HSBC to exercise the rights and powers vested in it by the PSA using the same degree of care and skill as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.[5]

261.    HSBC's failure to give notice to the servicers of an Event of Default does not prevent the triggering of an Event of Default should HSBC's failure result from its own negligence or willful misconduct.

---

[4] These duties are typically expressed in Section 7 of the PSAs.

[5] This duty is typically expressed in Section 8.1 of the PSAs.

## 2. The Servicers' Duties And Obligations Under The PSAs

262.     The PSAs also establish the servicers' duties and obligations to the Trusts and all Certificateholders.  In essence, the servicers' contractual role is to manage the mortgage loans for the benefit of the Trust and its Certificateholders.[6]

### a) Duty To Provide Notice Of Breaches And To Enforce Putback Rights

263.     The PSAs require the servicers to notify all parties to the PSAs if the servicers discover a breach of any of the seller's representations and warranties that adversely and materially affects the value of the mortgage loan or the interests of the Trusts.  The PSAs generally require the servicers, on behalf of the Trusts, to enforce the sellers' obligation to repurchase, substitute, or cure such defective mortgage loans or mortgage loan files.

264.     The servicers are greatly disincentivized to enforce these contractual duties related to the sellers' repurchase obligations.  The servicer is selected by the sponsor, and therefore risks losing future business and becoming adverse to the seller if it vigilantly enforces the seller's repurchase obligations.  Additionally, the servicers often are affiliates of the sellers because in connection with the sale of a loan pool, the seller typically retains the loan servicing rights for its own servicing division.  In addition, due to the fact that the servicers' affiliates, in their capacity as sellers, likewise sold loans in breach of specific representations and warranties to other RMBS trusts and face similar repurchase liability, the servicers were disincentivized from enforcing these contractual duties.

265.     Consequently, it is crucial that the trustee monitor the servicer to ensure that the servicer is enforcing the Trusts' repurchase rights against the sellers so that the Trusts hold

---

[6] The servicer duties described below are generally found in Section 3 of the PSAs.

mortgage loans of the same credit quality and characteristics as bargained for. Moreover, where the servicers fail to enforce the Trusts' repurchase rights, the trustee must step in and exercise the Trusts' rights.

**b) Duty To Perform Prudent And
Customary Servicing Practices**

266.    The PSAs require the servicers to service and administer the mortgage loans for and on behalf of the Trusts and the Certificateholders (i) in the same manner in which they service and administer similar mortgage loans for their own portfolio or for other third parties, giving due consideration to customary and usual standards of practice of prudent institutional mortgage lenders servicing similar loans; (ii) with a view to maximizing the recoveries with respect to such mortgage loans on a net present value basis; and (iii) without regard to, among other things, the right of the servicers to receive compensation or other fees for its services under the PSA, the obligation of the servicers to make servicing advances under the PSA, and the servicers' ownership, servicing or management for others of any other mortgage loans.

267.    In truth, the servicers' financial interests in managing the Trusts' loans often diverge from those of the Trusts. Servicers typically pay upfront for mortgage servicing rights. To make a profit, servicers must recoup their outlay based on their net servicing income (i.e., gross servicing income minus servicing costs). The amount of servicers' compensation in the form of servicing fees, float, and retained interests varies based on factors beyond the servicers' control, particularly mortgage prepayment speeds, which are largely a function of interest rates. Accordingly, a servicer's ability to maximize its net servicing income depends in large part on its ability to levy ancillary fees and to control servicing costs. For this reason, servicers are incentivized to aggressively pursue ancillary fees and to pursue loss mitigation strategies that

minimize costs, even if they are inconsistent with – or contrary to – the interests of the Trusts and the Certificateholders.

268.    Accordingly, it is essential that the Trustee takes action where it learns of imprudent servicing activities to ensure that servicers: (i) maintain accurate and adequate loan and collateral files so as not to prejudice the interests of the Trusts and the Certificateholders in the mortgages by fostering uncertainty as to the timely recovery of collateral; and (ii) avoid incurring unnecessary servicing fees to maintain mortgaged property.

### c)  Duty To Perform Prudent Foreclosure Practices

269.    The PSAs require the servicers to use their best efforts, consistent with accepted servicing practices, to foreclose upon or otherwise comparably convert the ownership of properties securing the mortgage loans as they come into and continue in default and as to which no satisfactory arrangements can be made for collection of delinquent payments.  Moreover, the PSAs contemplate that foreclosures and liquidations of defaulted mortgages will proceed forthwith and in accordance with applicable law, provided the documentation is in order, as a matter of fairness to all parties.

270.    In truth, the servicers' financial interests in managing loans often diverge from those of the Trusts.  For example, to minimize the costs of foreclosures, servicers from 2007 through 2010 pervasively cut corners in the discharge of their servicing duties at the expense of the accuracy, reliability and currency of loan documents and information.

271.    Thus, it is essential that trustees the Trustee takes action where it learns of imprudent foreclosure practices subsequent to borrower defaults to ensure the servicers function in a way that maximizes value for the Trusts and the Certificateholders.

### d)  Duty To Perform Prudent Servicing Advances

272.    The PSAs provide that the servicers may recover servicing advances.  Servicers are required to advance monthly P&I and taxes and insurance payments on delinquent loans.  Servicers also advance legal fees, maintenance, and preservation costs on properties that have already been foreclosed and become wholly owned by the Trust (or "REO"), rather than sold to a third party.  Servicers are able to recover these advances from the net proceeds of the property when sold.

273.    Under the PSAs, the servicer's advancing obligations are subject to a deemed non-recoverability standard where the servicer has the right to curtail additional advances based on a reasonable analysis that the servicer could not otherwise recover its advances based on projected, probable net liquidation proceeds.  Thus, if a servicer believes that the P&I advances will exceed the net proceeds of a foreclosure on the mortgaged property, the servicer generally has the right to cease making the P&I advances and to look to the rest of the Trust's loan pool for recovery of any excess paid.  This means that servicers' P&I advances are functionally the most senior claim on the Trusts and the servicers get paid **first** before any Certificateholder.  As explained by Ocwen, a major subprime servicer: "Most of our advances have the highest reimbursement priority (i.e., they are on 'top of the waterfall') so that we are entitled to repayment [from loan proceeds] before any interest or principal is paid on the bonds."[7]  In the majority of cases, the servicer may recover advances in excess of loan proceeds from pool-level proceeds.  Additionally, under the PSAs, the servicers are only entitled to recoup customary, reasonable and necessary out-of-pocket costs and expenses incurred in the performance by the servicer of its servicing obligations.

---

[7]  Ocwen, Annual Report (Form 10-K) at 40 (Mar. 13, 2008), *available at* http://www.sec.gov/Archives/edgar/data/873860/000101905608000419/ocn_10k07.htm.

274.   In practice, servicers are incentivized to abuse their advancing obligations by incurring unnecessary or inflated expenses related to delinquent loans because those advances are the senior-most claims on the Trusts and will almost always be recoverable.

275.   Thus, it is critical that trustees monitor the servicers and, in particular, servicing advances to ensure servicers do not manipulate the recoverable and "reasonable and necessary" designations to their own advantage and to the Trusts' detriment.

### C.   The Indentures And Sale Servicing Agreements

276.   The minority of the trusts have a different structure—they issued notes pursuant to an indenture (collectively, the "Indentures") on which HSBC serves as indenture trustee.  A separate agreement, such as a Sale and Servicing Agreement ("SSA"), governs other terms of these transactions.  As evinced below, although there are some differences between the PSA and Indenture structures, with regard to this Complaint, both the nature of the claims asserted and HSBC's duties and obligations are similar under the two structures.

277.   Indentures and Sale Servicing Agreements govern the minority of Trusts that issued mortgage-backed notes.  The Indentures are contracts between, among others, the Trust, as issuer, and HSBC, as Trustee.  In this agreement, the issuer (i.e., the Trust) pledges the mortgage loan assets of the Trust to HSBC, the Indenture Trustee.  HSBC accepts the pledge of the mortgage loans and holds the assets of the Trust in trust for the Noteholders.  The Trust, in turn, issues the notes to investors.

278.   The Indentures set forth duties on the part of the Trust as issuer.  Such duties, which must be punctually performed and observed, include taking all action necessary or advisable to cause the Trust or the Indenture Trustee to: (i) enforce any of the rights to the mortgage loans; and (ii) preserve or defend title to the Trust Estate and the rights of the Indenture Trustee and the Noteholders in such Trust Estate against the claims of all persons and parties.

279.     The Indentures set forth HSBC's contractual duties and obligations, which are substantially similar if not identical to HSBC's contractual duties and obligations in the PSAs. For example, as pledgee of the mortgage loans, HSBC, as Indenture Trustee, has the benefit of the representations and warranties made by the sellers in the MLPAs.  If a responsible officer of HSBC has actual knowledge of any breach of representation or warranty made by the Seller in the MLPA, HSBC shall promptly notify the Seller of the breach and the Sellers' obligation to cure such defect or repurchase or substitute for the related mortgage loan.

280.     Like the PSAs, the Indentures impose similar obligations on the trustee following an "Event of Default."  However, pursuant to the Indenture, only the conduct of the issuer, the Trust, can constitute an Event of Default.  An Event of Default occurs under the Indenture, when, among other things, a default occurs in the observance or performance of any covenant or agreement of the Trust made in the Indenture, and such default is not cured within a specified period of time after notice is given to the Trust by HSBC or to the Trust and HSBC by a requisite number of Noteholders.  The Indentures define a "default" as "[a]ny occurrence which is or with notice or the lapse of time or both would become an Event of Default."

281.     Once HSBC has actual knowledge of an Event of Default, HSBC must enforce the rights of the Noteholders, whether for the specific performance of any covenant, agreement or right under the Indenture, or to enforce any other proper remedy or legal or equitable right vested by law.  In carrying out these post-Event of Default duties, HSBC must exercise its rights and obligations under the Indenture using the same degree of care and skill as a prudent person would, under the circumstances, in the conduct of his or her own affairs.

282.     The SSAs are contracts between, among others, the depositor, the trust (typically a Delaware statutory trust), as issuer, HSBC, as Indenture Trustee, and the master servicer.  The

SSAs contain substantially similar if not identical provisions to the PSAs.  Like the PSAs, the SSAs call for the depositor's conveyance of mortgage loans to the Trust in which the notes participate and establish the rights and obligations of the master servicer for the notes.

283.   Like the PSAs, the SSAs for each of the Trusts are substantially similar and provide for nearly identical obligations on the part of master servicers with respect to servicing the mortgage loans, including covenants (i) to provide notice of seller breaches; (ii) to administer the mortgage loans consistently with industry practice; (iii) to use reasonable efforts to collect all payments owed on the mortgage loans, including with respect to foreclosure, and to follow the same collection procedures it follows for servicing mortgage loans in its own portfolio; and (iv) to make proper servicing advances.

284.   The SSAs also define "Master Servicer Events of Default," which include a failure to observe or perform material covenants and agreements set forth in the SSA to be performed by the master servicer, which materially affects the rights of the Noteholders, and such failure continues unremedied for a specified period after written notice was given.  If a Servicer Event of Default occurs under the SSA which a responsible officer of HSBC, as Indenture Trustee, has received written notice or has actual knowledge of, HSBC must immediately terminate the Master Servicer and either substitute in as master servicer or find a successor.  HSBC must also give prompt written notice to all Noteholders of Servicer Event of Defaults.

## IX.   THE TRUSTS SUFFERED FROM PERVASIVE BREACHES OF REPRESENTATIONS AND WARRANTIES BY THE SELLERS

285.   Each of the Trusts' loan pools contained a high percentage of loans that materially breached the sellers' representations and warranties, which adversely affected the value of those mortgage loans and the Trusts' and Certificateholders' rights in those mortgage loans.

Specifically, the representations and warranties regarding the originators' compliance with underwriting standards and practices, owner occupancy statistics, appraisal procedures, LTV and combined loan-to-value ("CLTV") ratios were systemically and pervasively false. The falsity of these representations and omissions is demonstrated by the high default rates of the mortgage loans, the plummeting credit ratings of the RMBS and certificates, the results of investors' forensic reviews and re-underwriting of loans within the Trusts in other litigation, and evidence highlighting the originators' abandonment of underwriting standards.

      **A.**     **High Default Rates Of The Mortgage**
                **Loans And Plummeting Credit Ratings**
                <u>**Are Indicative Of Massive Seller Breaches**</u>

286.    The extremely high default rates of the mortgage loans within the Trusts and the decline in the credit ratings of the RMBS to below investment grade are strong evidence of the originators' misrepresentation of the credit quality and characteristics of the mortgage loans they sold to the Trusts.

287.    The Trusts have experienced payment problems significantly beyond what was expected for loan pools that were properly underwritten, and which contained loans that actually had the characteristics originators represented and warranted.  For example, as of January 2009, across all of the Trusts, approximately 28% of the mortgage collateral was delinquent. Within certain labels, such as Deutsche Bank-label Trusts, over 36% of the mortgage collateral was delinquent.  Moreover, an astounding 25% or more of the relevant mortgage loans were delinquent in over half of the Trusts. Further, nearly 63% of the Trusts had delinquency rates above 20% for the mortgage loans remaining in the Trusts.

288.    Not only have the mortgage loans experienced extraordinary rates of delinquency and default, but the ratings of the RMBS supported by them have significantly deteriorated.

Because of the high delinquency, foreclosure, and default rates of the underlying mortgage loans, more than 85% of all certificates within the Trusts have been downgraded.

289.    The economic downturn cannot explain the abnormally high percentage of defaults, foreclosures, and delinquencies observed in the loan pools ultimately backing the certificates. Loan pools that were properly underwritten and containing loans with the represented characteristics would have experienced substantially fewer payment problems and substantially lower percentages of defaults, foreclosures, and delinquencies. The significant rating downgrades experienced by the RMBS are also strong evidence that they were improperly underwritten, and that they did not have the credit risk characteristics the sellers represented and warranted.

**B.      The Systemic Disregard Of Underwriting
         Standards Was Pervasive During The Relevant Period**

290.    It is well documented that during the height of the mortgage and securitization boom in the U.S. market between 2004 and 2008, originators of residential mortgage loans sold and securitized loans in RMBS in violation of their stated underwriting guidelines and in breach of the representations and warranties provided to the purchasers of the loan pools.

291.    Government reports and investigations and newspaper reports have uncovered the extent of pervasive abandonment of underwriting standards. The Permanent Subcommittee on Investigations in the United States Senate ("PSI") released a report detailing the causes of the financial crisis. Using Washington Mutual Bank as a case study, the PSI concluded through its investigation:

> Washington Mutual was far from the only lender that sold poor quality mortgages and mortgage backed securities that undermined U.S. financial markets. The Subcommittee investigation indicates that Washington Mutual was emblematic of a host of financial institutions that knowingly originated, sold, and securitized billions of dollars in high risk, poor quality home loans. These lenders were not

the victims of the financial crisis; the high risk loans they issued became the fuel that ignited the financial crisis.[8]

292.    The Financial Crisis Inquiry Commission ("FCIC") issued its final report in January 2011 that detailed, among other things, the collapse of mortgage underwriting standards and subsequent collapse of the mortgage market and wider economy.[9] The FCIC Report concluded that there was a "systemic breakdown in accountability and ethics." "Unfortunately − as has been the case in past speculative booms and busts − we witnessed an erosion of standards of responsibility and ethics that exacerbated the financial crisis." *Id*. at xxii. The FCIC found:

> [I]t was the collapse of the housing bubble − fueled by low interest rates, easy and available credit, scant regulation, and toxic mortgages − that was the spark that ignited a string of events, which led to a full-blown crises in the fall of 2008. Trillions of dollars in risky mortgages had become embedded throughout the financial system, as mortgage-related securities were packaged, repackaged, and sold to investors around the world.

*Id*. at xvi.

293.    During the housing boom, mortgage lenders focused on quantity rather than quality, originating loans for borrowers who had no realistic capacity to repay the loan. The FCIC Report found "that the percentage of borrowers who defaulted on their mortgages within just a matter of months after taking a loan nearly doubled from the summer of 2006 to late 2007." *Id*. at xxii. Early payment default is a significant indicator of pervasive disregard for underwriting standards. The FCIC Report noted that mortgage fraud "flourished in an environment of collapsing lending standards . . ." *Id*.

---

[8] *Wall Street And The Financial Crisis: Anatomy Of A Financial Collapse*, United States Senate Permanent Subcomm. on Investigations, 112th Cong. 50 (2011).

[9] *Final Report Of The National Commission Of The Causes Of The Financial And Economic Crisis In The United States*, Fin. Crisis Inquiry Comm'n (2011) ("FCIC Report").

294.     Recent landmark settlements between the government and major financial institutions have further detailed the systemic and pervasive disregard of underwriting standards by lenders during the relevant time period, and have confirmed that these practices infiltrated the Trusts.  For example, on November 19, 2013, the Justice Department, along with federal and state regulators, announced a $13 billion settlement with JPMorgan − the largest settlement with a single entity in American history − to resolve federal and state civil claims arising out of the packaging, marketing, sale and issuance of 1,128 RMBS offerings by JPMorgan, Bear Stearns and Washington Mutual prior to January 1, 2009, including forty-four of the Trusts.  As part of the settlement, JPMorgan acknowledged that it regularly included loans within the securitizations "***that did not comply*** with the originator's underwriting guidelines" and breached the originator's representations and warranties.

295.     On July 14, 2014, the Justice Department, together with federal and state regulators, announced a $7 billion settlement with Citigroup Inc. to resolve federal and state civil claims related to Citigroup's conduct in the packaging, securitization, marketing, sale and issuance of 633 RMBS offerings issued prior to January 1, 2009, including twenty-seven of the Trusts.   The settlement included an agreed upon statement of facts wherein Citigroup acknowledged that significant percentages of the mortgage loans within the securitizations contained material defects.

296.     On August 21, 2014, the Justice Department, together with federal and state regulators, announced a $16.65 billion settlement with Bank of America Corporation, BoA, and Banc of America Mortgage Securities, as well as their current and former subsidiaries and affiliates (collectively, "Bank of America") to resolve federal and state civil claims related to Bank of America's conduct in the packaging, securitization, marketing, sale and issuance of

2,000 RMBS offerings issued prior to January 1, 2009, including sixty-seven of the Trusts.  The settlement included an agreed upon statement of facts wherein Bank of America acknowledged that that significant percentages of the mortgage loans within the securitizations contained material defects.

### C.     There Is Evidence Of Widespread Breaches Of Representations And Warranties By The Specific Originators That Sold Loans To The Trusts

297.     Much like other RMBS trusts of the same vintage, the Trusts have been materially and adversely impacted by the loan origination industry's rampant underwriting failures.  The originators' systemic and pervasive sale to the Trusts of residential mortgage loans in breach of representations and warranties is confirmed through several federal and state government investigations and published reports, well publicized news reports, and public and private enforcement actions that have described rampant underwriting failures throughout the period in which the Trusts were created and, more specifically, failures by the same originators whose mortgage loans were sold to the Trusts.

298.     A summary of testimonial and documentary evidence as to each of the major originators of the mortgage loans to the Trusts is set forth below.

### 1.  Wells Fargo

299.     Wells Fargo originated approximately $56.2 billion of residential mortgage loans sold the Trusts.   Wells Fargo's origination practices have been the subject of numerous governmental investigations and reports and private RMBS lawsuits.  For example, the FCIC Report revealed, for the first time, findings in a confidential 2005 "peer group" study of mortgage practices at six companies, including Wells Fargo, conducted by examiners from the Federal Reserve and other agencies.  Notably, the study observed "a very rapid increase in the volume of [] irresponsible loans, very risky loans" by Wells Fargo and the five other lenders, and

that a "large percentage of their loans issued were subprime and Alt-A mortgages, and the underwriting standards for these products had deteriorated."  FCIC Report at 172.  The FCIC Report further revealed that the Federal Home Loan Mortgage Corporation ("Freddie Mac") put back $1.2 billion in ineligible mortgage loans to Wells Fargo during 2009 and 2010, while the Federal National Mortgage Association ("Fannie Mae") put back $2.3 billion in ineligible mortgage loans to Wells Fargo from 2007 through 2010.  *Id.* at 225.

300.    Wells Fargo's systemic violations of its representations and warranties regarding the credit quality of the loans it originated have been the subject of several highly publicized RMBS lawsuits.  For instance, in *General Retirement System of the City of Detroit v. The Wells Fargo Mortgage Backed Securities 2006-AR18 Trust, et al.,* No. 09-cv-01376 (N.D. Cal. Mar. 27, 2009), the court found that the private investor plaintiffs had adequately pled that "variance from the stated [underwriting] standards was essentially [Wells Fargo's] norm" and that this conduct "infected the entire underwriting process."  *In re Wells Fargo Mortgage-Backed Certificates Litig.*, 712 F. Supp. 2d 958, 971-72 (N.D. Cal. 2010).  In 2011, Wells Fargo agreed to pay $125 million to settle the litigation.  The FDIC made similar allegations in *FDIC v. Chase Mortgage Finance Corp., et al.*, No. 12-cv-6166 (S.D.N.Y. Aug. 10, 2012), contending that Wells Fargo and other originators overstated the values of properties so much that virtually every representation about the LTV ratios of the loans was untrue or misleading.

301.    The results of loan file reviews conducted by investors have further confirmed Wells Fargo's abandonment of its underwriting standards and pervasive and systemic breach of material representations and warranties regarding the quality and characteristics of the loans it originated.  For example, in *FHFA v. Citigroup Inc., et al*., No. 11-cv-6196 (S.D.N.Y. June 28, 2012), the FHFA reviewed 1,851 loan files in the CMLTI 2006-WF1 and CMLTI 2006-WF2

securitizations.  Wells Fargo, the largest originator of loans in the Trusts, originated all of the loans in these two trusts.  The FHFA found that a stunning 79% of the reviewed mortgage loans in these securitizations were not underwritten in accordance with the underwriting guidelines or otherwise breached the representations contained in the transaction documents.  *See FHFA v. Citigroup, et al.*, No. 11-cv-6196, Amended Compl. ¶136.

302.   In addition, there is ample public evidence of Wells Fargo's failure to originate loans in compliance with federal and state law.  For example, on July 20, 2011, the Federal Reserve announced that it had levied a record $85 million fine against Wells Fargo for pushing borrowers with good credit into expensive subprime mortgages and falsifying loan applications. Similarly, in late 2012, the U.S. Attorney for the Southern District of New York claimed that Wells Fargo engaged in a "longstanding and reckless trifecta of deficient training, deficient underwriting and deficient disclosure, all while relying on the convenient backstop of government insurance."  *Manhattan U.S. Attorney Files Mortgage Fraud Lawsuits Against Wells Fargo Bank, N.A. Seeking Hundreds of Millions of Dollars in Damages for Fraudulently Certified* Loans, U.S. Attorney's Office Southern District of New York (Oct. 9, 2012).

## 2.   **Fremont**

303.   Fremont originated approximately $31.5 billion of residential mortgage loans sold to the Trusts.  As detailed below, Fremont systemically originated loans in violation of its underwriting guidelines and in breach of the representations and warranties.  By 2009-2011, this became readily apparent to all players in the mortgage industry, including the Defendant. Fremont's systemic and pervasive origination of defective loans was well documented through government investigations, investor litigation, and national news reports.  For example, the OCC "Worst Ten in the Worst Ten" list included Fremont as ***the sixth worst mortgage originator*** based on 2005-2007 loan originations as of March 29, 2009.

304.    Beginning in 2009, Fremont's origination practices have been the subject of numerous governmental investigations and reports. For example, the FCIC Report discusses how the credit rating agency, Moody's Investors Service ("Moody's"), created an independent surveillance team in 2004 in order to monitor previously rated deals.  The Moody's surveillance team began to see a rise in early payment defaults in mortgages originated by Fremont in 2006 and downgraded several securities with underlying Fremont loans or put them on watch for future downgrades. Moody's chief credit officer remarked that Moody's had never had to put on watch deals rated in the same calendar year.  In 2007, in an unprecedented move, Moody's downgraded 399 subprime mortgage-backed securities that had been issued in 2006 and put an additional thirty-two securities on watch.  Moody's noted that about 60% of the securities affected contained mortgages from one of four originators, one of which was Fremont.  FCIC Report at 221-22.

305.    According to the FCIC Report, when securitizers kicked loans out of securitization pools, some originators simply put those loans into new pools.  Roger Ehrnman, Fremont's former regulatory compliance and risk manager, told the FCIC that Fremont had a policy of putting loans into subsequent pools until they were kicked out three times.  FCIC Report at 168.

306.    Senators Carl Levin and Tom Couburn's April 13, 2011 "Wall Street And The Financial Crisis:  Anatomy Of A financial Collapse" report (the "Senate Report") also paints Fremont in a negative light, noting that Fremont was a lender "well known within the industry for issuing poor quality loans."  Senate Report at 11.  In March of 2007, Fremont, once the nation's fifth-largest subprime mortgage lender, stopped originating subprime loans after receiving a cease and desist order from the FDIC.  *Id.* at 45, 237; FCIC Report at 233.  The cease

and desist letter "exposed the existence of unsafe and unsound subprime lending practices" by Fremont when it determined that Fremont had been operating with "a large volume of poor quality loans" and maintained "unsatisfactory lending practices." Senate Report at 45, 238. Finally, in June of 2008, shortly after the FDIC filed a second public enforcement action against the bank, Fremont declared bankruptcy. *Id.* at 238.

307.     In June of 2009, the Attorney General of Massachusetts reached a $10 million settlement with Fremont in order to redress, among other things, Fremont's predatory lending practices. *Attorney General Martha Coakley Reaches $10 Million Settlement with Subprime Lender Fremont Investment and Loan*, Attorney General of Massachusetts Press Release (June 9, 2009). According to the Attorney General Office's complaint, Fremont was selling risky loan products that it knew were designed to fail, such as 100% financing loans and "no documentation" loans. *See Massachusetts v. Fremont Inv. & Loan and Fremont Gen. Corp.*, No. 07-4373 (Sup. Ct. Mass. Suffolk Oct. 4, 2007).

308.     In an amended complaint filed by the Federal Housing Finance Agency ("FHFA") on December 21, 2011, *FHFA v. UBS Americas, Inc. et al.*, No. 11-cv-05201 (S.D.N.Y. Dec. 21, 2011), the FHFA alleged: A confidential witness who previously worked at Fremont in its system operations and underwriting sections stated that Fremont consistently cut corners and sacrificed underwriting standards in order to issue loans. He noted that "Fremont was all about volume and profit," and that when he attempted to decline a loan, he was regularly told "you have signed worse loans than this." The same witness also said that employees at Fremont would create documents that were not provided by the borrowers, including check stubs and tax documents, in order to get loans approved. The confidential witness stated that Fremont regularly hired underwriters with no experience, who regularly missed substantial numbers of answers on

internal underwriting exams. He explained that like many Fremont employees, he quit because he was uncomfortable with the company's practices.  Amended Compl. ¶333; *see also NCUA v. UBS Sec., LLC*, No. 13-cv-6731 (S.D.N.Y. Sept. 23, 2013) Compl. ¶176.  On July 25, 2013, the FHFA announced that it had reached an agreement to settle the case for $885 million.  *FHFA Announces Settlement with UBS*, Federal Housing Finance Agency Press Release (July 25, 2013).

309.    Investor litigation also exposed Fremont's improper origination practices.   In *Cambridge Place Investment Management Inc. v. Morgan Stanley, et al.*, No. 10-2741 (Suffolk Cnty. Sup. Ct. July 9, 2010), plaintiffs based much of their case on sixty-three confidential witnesses who testified in court documents about the reckless lending practices that dominated the subprime market during the real estate boom.  Fremont, according to the lawsuit, regularly approved loans with unrealistic stated incomes − such as pizza delivery workers making $6,000 a month.  *Id.* Compl. ¶175; *see also NCUA v. UBS Sec., LLC*, No. 13-cv-6731.  Compl. ¶175.

### 3.    GreenPoint

310.    GreenPoint is another prolific originator of loans sold to the Trusts – originating approximately $10.7 billion in mortgage loans.   It is well documented that GreenPoint systematically disregarded its underwriting standards, granted exceptions in the absence of compensating factors, required less documentation, and granted no-documentation or limited-documentation loans to individuals without sound credit histories.

311.    Indeed, in November 2008, *Business Week* magazine reported that GreenPoint's employees and independent mortgage brokers targeted borrowers who were less able to afford the loan payments they were required to make, and many of the borrowers had no realistic ability to pay back the loans.  Likewise, GreenPoint was identified by the OCC as the seventh worst mortgage lender in Stockton, California, and the ninth worst in both Sacramento, California, and

Las Vegas, Nevada. In the OCC's 2009 "Worst Ten in the Worst Ten" Report, GreenPoint was listed as third worst in Modesto, California, fourth worst in Stockton, Merced, and Vallejo-Fairfield-Napa, California, sixth worst in Las Vegas, Nevada; and ninth worst in Reno, Nevada.

312. Loan file reviews of GreenPoint-originated loans sold to RMBS trusts during the period 2004 through 2008 conducted by monoline insurers and RMBS trustees have confirmed GreenPoint's pervasive breaches of mortgage loan representations and warranties. Monoline insurer MBIA's forensic review of loan files pertaining to a Bear Stearns securitization primarily containing GreenPoint-originated mortgage loans revealed a breach rate of 88%. In a similar action against GreenPoint, monoline insurer CIFG Assurance North America, Inc. reviewed 110 loans and found that 90 (or 82%) of the loans failed to comply with one or more of the representations and warranties. *See CIFG Assurance N. Am., Inc. v. GreenPoint Mortg. Funding, Inc.*, Index No. 653449/2012 (N.Y. Sup. Ct. Mar. 4, 2013) Compl. ¶38.

313. Similarly alarming breach rates in securitizations containing GreenPoint-originated mortgage loans have been confirmed in RMBS trustee putback lawsuits. For example, in *U.S. Bank National Association v. GreenPoint Mortgage Funding, Inc*., Index No. 600352/2009 (N.Y. Sup. Ct. filed Apr. 22, 2009), a consultant's investigation concluded that 93% of the loans that GreenPoint sold contained errors, omissions, misrepresentations, and negligence related to origination and underwriting. The investigation found that GreenPoint loans suffered from serious defects including pervasive breaches of representations and warranties concerning credit scores debt-to-income and LTV ratios, and the borrower's intent to occupy the mortgaged property.

### 4. Countrywide

314. Countrywide is among the largest originators of loans underlying the Trusts at issue – originating approximately $10.2 billion in mortgage loans. It is beyond dispute that

Countrywide was one of the worst, most notorious loan originators from 2004 through 2008, routinely abandoning all underwriting standards and requirements while pumping billions of dollars of toxic loans into the United States RMBS securitization market. Indeed, the OCC ranked Countrywide the fourth worst mortgage originator as of March 29, 2009, and blamed the lender for 10,254 foreclosures in the worst ten metro areas based on 2005-2007 originations.

315. Countrywide's deplorable origination practices and abandonment of its underwriting standards have been exposed by highly publicized government investigations and reports. For example, the FCIC Report noted that as early as September 2004, "Countrywide executives recognized that many of the loans they were originating could result in 'catastrophic consequences.' Less than a year later, they noted that certain high-risk loans they were making could result not only in foreclosures but also in 'financial and reputational catastrophe' for the firm. But they did not stop." FCIC Report at xxii. The Countrywide executives' concerns regarding its defective loan pools came to full fruition. The FCIC Report states that in January 2011, Bank of America settled Fannie Mae's and Freddie Mac's claims relating to ineligible Countrywide-originated loans by paying more than $2.5 billion. In addition, from 2007 through 2010, Fannie Mae put back $6.9 billion in loans to Bank of America, despite the fact that its random sample review of 2% to 5% of the loan pools revealed higher rates for delinquent loans. *See* FCIC Report at 225.

316. The Senate Report similarly addressed Countrywide's systemic violations of underwriting guidelines resulting in billions of dollars of defective loans originated during the same time period as the Countrywide loans securitized in the Trusts. For example, the Senate Report disclosed that after reviewing loans purchased from Countrywide, Goldman Sachs found

that about 50% of the loans reviewed were candidates for "return to the lender."  Senate Report at 487.

317.    Countrywide's origination practices have also been the focus of regulatory enforcement actions.  For example, in June 2009, the SEC filed an enforcement action against the three most senior Countrywide executives, including Chief Executive Officer ("CEO") Angelo Mozilo ("Mozilo"), charging them with fraudulently misleading investors by representing that Countrywide had issued loans primarily to "prime" or low risk borrowers, when it had actually originated increasingly risky loans that senior executives knew would result in substantial defaults and delinquencies.  The SEC's investigation and enforcement action uncovered telling evidence regarding the quality and characteristics of Countrywide-originated loans.  For example, in a March 28, 2006 email from Mozilo to Countrywide's President David Sambol and others, Mozilo stated that Countrywide's 100% LTV (also known as 80/20) subprime product is "the most dangerous product in existence and there can be nothing more toxic . . ." In October 2010, the SEC announced that Mozilo would pay a then-record $22.5 million penalty to settle the SEC charges.

318.    As a result of Countrywide's abusive origination practices, Countrywide-originated loans have been the subject numerous high profile RMBS fraud suits, including Countrywide-originated loans sold to the Trusts.  For example, in *Federal Home Loan Bank Seattle v. Barclays*, No. 10-cv-00139 (W.D. Wash.), the Federal Home Loan Bank of Seattle sought to rescind its purchase and sale of certificates from BCAP 2007-AA5, one of the Trusts, which is backed by residential mortgage loans originated by Countrywide.  Federal Home Loan Bank of Seattle alleged, among other things that the Countrywide-originated loans violated

stated underwriting guidelines in that widespread untrue statements were made regarding LTV and CLTV ratios, borrower FICO scores and debt-to-income ratios, and owner occupancy status.

319.    Countrywide-originated loans have also been the subject of numerous putback demands as a result of pervasive, systemic breaches of representations and warranties.  As of October 2010, Bank of America, which acquired Countrywide in January 2008, had received more repurchase requests than any other bank, ***due almost exclusively to Countrywide's systematic abandonment of sound underwriting practices***.  Likewise, in June 2011, Bank of America announced an $8.5 billion settlement with trustee The Bank of New York Mellon, resolving, among other things, all claims that Countrywide violated its representations and warranties when it sold loans pertaining to over 530 RMBS trusts and putting the world, including HSBC, on notice of the magnitude of Countrywide's fraudulent conduct.  In January 2014, New York Supreme Court Justice Barbara Kapnick partially approved the settlement, resolving putback claims for 530 Countrywide RMBS trusts.

320.    Loan file reviews of Countrywide-originated loans sold to RMBS trusts from 2004 through 2008 conducted by monoline insurers provide additional evidence of Countrywide's pervasive, systemic breaches of representations and warranties.  For example, Syncora, an insurance company that insured some Countrywide securitizations, re-reviewed defaulted loans in the securitizations that it insured to determine whether the loans had been originated in accordance with Countrywide's representations. Syncora found that 75% of the loans it reviewed "were underwritten in violation of Countrywide's own lending guidelines, lack any compensating factors that could justify their increased risk, and should never have been made."   Similarly, monoline insurer MBIA's re-underwriting review of Countrywide securitizations during this period revealed that almost 90% of defaulted or delinquent loans in the

Countrywide securitizations showed material discrepancies from underwriting guidelines, such as lack of key documentation, invalid or incomplete appraisals, fraud on the face of the loan applications and misrepresentations regarding borrower income, FICO score, debt-to-income ratio, and CLTV ratios.

### 5.   Option One

321.   Option One, now known as Sand Canyon and a subsidiary of H&R Block, Inc. ("H&R Block"), also originated a significant amount of mortgage loans sold to the Trusts – approximately $5.5 billion.  According to the OCC, Option One was the sixth worst mortgage originator based on the rate of subprime and Alt-A mortgage foreclosures in the ten metropolitan areas experiencing the highest foreclosure rates from 2005 through 2007.

322.   Option One's rampant underwriting abuses have garnered the attention of both state and federal enforcement actions.  For instance, on June 3, 2008, the Attorney General for the Commonwealth of Massachusetts filed an action against Option One, and its past and present parent companies, for their unfair and deceptive origination and servicing of mortgage loans. According to the Massachusetts Attorney General, since 2004, Option One had "increasingly disregarded underwriting standards . . . and originated thousands of loans that [Option One] knew or should have known the borrowers would be unable to pay, all in an effort to increase loan origination volume so as to profit from the practice of packaging and selling the vast majority of [Option One's] residential subprime loans to the secondary market."   The Massachusetts Attorney General alleged that Option One's agents and brokers "frequently overstated an applicant's income and/or ability to pay, and inflated the appraised value of the applicant's home," and that Option One "avoided implementing reasonable measures that would have prevented or limited these fraudulent practices." On August 9, 2011, the Massachusetts Attorney General announced that H&R Block had agreed to settle the suit for approximately

$125 million.  *See* Massachusetts Attorney General Press Release, "*H&R Block Mortgage Company Will Provide $125 Million in Loan Modifications and Restitutions*," (Aug. 9, 2011). Similarly, in April 2012, H&R Block agreed to pay more than $28 million to resolve SEC claims that Option One originated and securitized faulty mortgages, but failed to tell investors it might be unable to make good on obligations to repurchase faulty mortgages without assistance.

323.    Loan file reviews of Option One-originated loans sold to RMBS trusts during the period 2004 through 2008 conducted in connection with private RMBS litigation have confirmed Option One's pervasive breaches of representations and warranties.  For example, in connection with a recent putback action brought against Option One, RMBS Master Servicer Homeward Residential, Inc. conducted a review of a sample of 392 Option One loans that showed that Option One "breached its representations and warranties with respect to "*almost 7 out of every 10 of those loans.*"  Indeed, cognizant of its deficient origination practices, Option One has sued American Home Mortgage Servicing for providing electronic copies of loan files to trustees and insurers seeking to bring new claims or demands to repurchase loans or strengthen existing cases.

### 6.    New Century

324.    New Century originated approximately $4.2 billion in mortgage loans included in the Trusts at issue here.  As of March 29, 2009, New Century was ranked as the worst mortgage originator by the OCC's "Worst Ten in the Worst Ten" list based on originations from 2005 to 2007.  Multiple highly publicized government investigations and lawsuits exposed New Century's improper loan origination practices and pervasive noncompliance with its underwriting guidelines.

325.    New Century's systemic origination of defective loans during the same time period as the New Century loans were originated and sold to the Trusts were detailed in the FCIC

Report and the Senate Report. The Senate Report found that "[s]ubprime lenders like . . . New Century Financial Corporation . . . were known for issuing poor quality subprime loans." Senate Report at 21. The Senate Report identified "a number of [New Century's] harmful mortgage practices, including 'increasing loan originations, without due regard to the risks associated with that business strategy'; risk layering in which it issued high risk loans to high risk borrowers, including originating in excess of 40% of its loans on a stated income basis; allowing multiple exceptions to underwriting standards; and utilizing poor risk management practices that relied on the company's selling or securitizing its high risk mortgages rather than retaining them." *Id*. at 236.

326.   The FCIC Report concluded that "New Century − once the nation's second-largest subprime lender − ignored early warnings that its own loan quality was deteriorating and stripped power from two risk-control departments that had noted the evidence." FCIC Report at 157. For instance, "[i]n a June 2004 presentation, the Quality Assurance staff reported they had found severe underwriting errors, including evidence of predatory lending, [federal] and state violations, and credit issues, in 25% of the loans they audited in November and December 2003. In 2004, Chief Operating Officer and later CEO Brad Morrice recommended these results be removed from the statistical tools used to track loan performance, and in 2005, the department was dissolved and its personnel terminated." *Id*.

327.   Such massive underwriting failures led to high default rates and eventually New Century's collapse. "By December 2006, almost 17% of its [New Century's] loans were going into default within the first three months after origination." *Id*. According to the Bankruptcy Court Examiner for New Century, Michael J. Missal, "New Century had a brazen obsession with increasing loan originations, without due regard to the risks associated with that business strategy

. . . .  Although a primary goal of any mortgage banking company is to make more loans, New Century did so in an aggressive manner that elevated the risks to dangerous and ultimately fatal levels." Final Report of Michael J. Missal, Bankruptcy Examiner, *In re New Century TRS Holdings, Inc.*, No. 07-10416 (KJC) (Bankr. Del. Feb. 29, 2008), *available at* http://graphics8.nytimes.com/packages/pdf/business/Final_Report_New_Century.pdf.     ("New Century Bankruptcy Report".)

328.   The New Century Bankruptcy Report also found that, in June 2005, New Century's Internal Audit Department audited the company's loan origination process at its Sacramento wholesale fulfillment center and found that 45% of the loans had improper RESPA disclosures, 32% of the loans did not have approval stipulations fully satisfied, 39% of the loans had noted exceptions with income calculations and/or verification of income, and 23% had appraisal exception problems.  *Id*. at 152.

329.   New Century's poor underwriting practices and defective loans have also been the subject of well publicized lawsuits brought on behalf of government agencies.  In December 2009, the SEC charged three former New Century executives, including the CEO, "with fraudulent accounting that misled investors about the company's finances." Senate Report at 236. The SEC alleged that the New Century executives were "downplaying the riskiness of the company's loans and concealing their high delinquency rates."   The complaint stated that, although New Century had represented itself as a prudent subprime lender, it "soon became evident that its lending practices, far from being 'responsible,' were the recipe for financial disaster." *Id*.  In July 2010, the New Century executives settled with the SEC for about $1.5 million.

330.    The results of loan file reviews conducted by investors have further confirmed New Century's pervasive and systemic breach of material representations and warranties regarding quality and characteristics of the loans it originated.  For example, in *FHFA v. HSBC North America Holdings, Inc., et al.*, No. 11-cv-06189 (S.D.N.Y. June 28, 2012), the FHFA reviewed a sample of loan files in the HASC 2005-I1 and HASC 2006-NC1 securitizations. New Century originated all of the loans in these two trusts.  The FHFA found that 17.53% of the loans in HASCC 2005-I1 and 18.12% of the loans in HASC 2006-NC1 had LTV ratios over 100%.  *FHFA v. HSBC, et al.*, No. 11-cv-06189, Amended Compl.  ¶113.

### 7.    **WMC**

331.    WMC originated approximately $3.7 billion in loans included in the Trusts at issue here. As detailed below, WMC systemically originated loans in violation of its underwriting guidelines and in breach of the representations and warranties.  By 2009 through 2011, this became readily apparent to all players in the RMBS industry.  WMC's systemic and pervasive origination of defective loans was well documented through government investigations, investor and insurer litigation, and national news reports.  For example, the OCC's "Worst Ten in the Worst Ten" list included WMC, a subsidiary of GE Money Bank, FSB, as ***the second worst mortgage originator*** based on 2005-2007 loan originations as of March 29, 2009.

332.    On September 2, 2011, the FHFA sued GE alleging that the company made inaccurate statements about the quality of loans underlying the securities, including those issued in 2005 by WMC.  *See Fed. Hous. Fin. Agency v. Gen. Elec. Co.*, No. 11-cv-07048 (S.D.N.Y. Oct. 6, 2011).  In *FHFA as Conservator for the Federal Home Loan Mortgage Corp. v. WMC Mortgage LLC,* No. 13-cv-00584 (S.D.N.Y. Jan. 25, 2013), the FHFA's allegations that WMC misrepresented approximately $1 billion in mortgages it pooled and sold were sustained by the court.  Investigations in 2011, 2012 and 2013 identified problems among at least 55% of the

loans, and these problems include loan documentation that understated credit risk by overvaluing properties or misstating their purpose.  These FHFA actions were widely publicized.  *See, e.g., GE Says FHFA Filed Mortgage-Security Suit Without Warning*, Bloomberg (Sept. 7, 2011); *FHFA Says Settlement Reached With GE In Mortgage Case*, Reuters (Jan. 23, 2013).

333.    Bond insurance companies also filed actions to recoup losses arising from WMC's fraudulent loan originations.  For example, in *PMI Mortgage Insurance Co., et al. v. WMC Mortgage Corp., et al.*, No. BC381972 (L.A. Sup. Ct. Jan. 4, 2008), WMC and GE were sued for loans made in violation of the stated underwriting standards.  There, a review of loans found "a systemic failure by WMC to apply sound underwriting standards and practices." Reviewing a sample of the nearly 5,000 loans in the pool, PMI identified 120 "defective" loans for which borrowers' incomes and employment were incorrect or where the borrower's intention to live in the home was incorrect.  *The New York Times* reported on this action.  *See If Everyone's Finger-Pointing, Who's to Blame?* N.Y. Times (Jan. 22, 2008).

334.    PMI filed another lawsuit against WMC in September 2009 after a review of WMC's mortgage loan files found that WMC "followed few, if any, objective standards or criteria in underwriting [mortgage loans] and showed little concern, if any, for any borrower's ability to repay."  *PMI Mortg. Ins. Co. v. WMC Mortg. Corp.*, No. BC381972 (L.A. Super. Ct.). According to PMI's complaint, a review of a sample of thousands of WMC-originated loans revealed that WMC "breached various representations and warranties [attesting that,] *inter alia*, the loan-to-value ratio at the time of origination was greater than 100%; fraud, errors, misrepresentations, or gross negligence took place on the part of WMC . . . ; the loans did not comply with WMC's own underwriting standards at the time of origination; certain documents were missing; and/or WMC had failed to utilize a methodology in underwriting the loans that

employed objective mathematical principles designed to determine that, at the time of origination, the borrower had the reasonable ability to make timely payments on the [m]ortgage [l]oans." According to the PMI complaint, the investigation "demonstrate[d] a systemic failure by WMC to apply sound underwriting standards and practices which cuts across all of the [loans in the securitization]." In the defective loans, the investigation discovered "unreasonable stated income and/or misrepresentations of income and/or employment by the borrower." Moreover, nearly a quarter of the loans sampled were shown to contain "misrepresentations of occupancy by the borrower."

335.    So-called "putback" actions by trustees against WMC further show the pervasive and systemic breaches of representations and warranties. In *MASTR Asset Backed Securities Trust 2006-HE3 v. WMC Mortgage Corp., et al.*, No. 11-cv-02542 (Dist. Minn. Sept. 2, 2011) U.S. Bank, as trustee, alleged that WMC falsely assured purchasers that the loans were creditworthy, but more than 45% of the $555 million in the original loan balance had been liquidated and more than 30% of the remaining loans were delinquent. A review of a $550 million pool of mortgages booked by WMC and another subprime lender found inflated borrower incomes, missing documents and other "material breaches" in 150 loan files out of a sample of 200 – a "stunning 75 percent failure rate."

336.    Similarly, in *J.P. Morgan Mortgage Acquisition Trust, Series 2006-WMC4, by The Bank of New York Mellon, solely in its capacity as the Securities Administrator v. WMC Mortgage LLC*, Index No. 654464/2012 (N.Y. Sup. Ct. Dec. 24, 2012) the plaintiff trustee alleged that a review revealed more than 3,000 mortgages originated by WMC with "material and adverse" breaches of information regarding characteristics of the loans, including misrepresentations as to the occupancy of the owner and the "defects" included "repeated failure

to adhere to sound underwriting practices, a blatant disregard for a borrower's ability to repay the loan, and intentional ignorance of warning signs of fraud"). These types of putback actions against WMC were widely reported on by the national media. *See*, *e.g.*, *WMC Mortgage, Equifirst Sued by Trustee Over Mortgage Loans*, Bloomberg (Sept. 6, 2011); and *WMC Mortgage Sued By Trust Administrator In N.Y. Court*, Bloomberg (Dec. 21, 2012).

337.    WMC's improper loan originating practices have been the subject of investigation and regulatory enforcement actions as well. For example, in June 2008, the Washington State Department of Financial Institutions, Division of Consumer Services filed a Statement of Charges and Notice of Intention to Enter an Order to Revoke License, Prohibit From Industry, Impose Fine, Order Restitution and Collect Investigation Fees against WMC Mortgage and its principal owners individually. The Statement of Charges included a review of eighty-six loan files, which revealed that at least seventy-five loans (or more than 88%) were defective or otherwise in violation of Washington state law. Among other things, the investigation uncovered that WMC had originated loans with unlicensed or unregistered mortgage brokers, understated amounts of finance charges on loans, understated amounts of payments made to escrow companies, understated annual percentage rates to borrowers and committed many other violations of Washington state deceptive and unfair practices laws.

### 8.    <u>American Home</u>

338.    American Home originated approximately $3.5 billion in mortgage collateral included in the Trusts, representing 5.3% of all of the Trusts' mortgage loan collateral. American Home's lending practices landed it in the 2009 "Worst Ten in the Worst Ten" Report, appearing in the top ten in six of the ten worst metropolitan areas (4th in both Fort Pierce-Port St. Lucie, Florida, and Fort Myers-Cape Coral, Florida; 7th in Vallejo-Fairfield-Napa, California;

8th in Las Vegas, Nevada; 9th in Stockton-Lodi, California; and 10th in Bakersfield, California). *See* 2009 "Worst Ten in the Worst Ten" Report.

339.    In April 2009, the SEC filed fraud charges against the former top executives of American Home's parent company, American Home Investment Corp., for their role in misleading investors regarding American Home's systematic disregard of sound underwriting standards and risky lending practices that led to the lender's bankruptcy in August of 2007. According to Robert Khuzami, Director of the SEC's Division of Enforcement, "'[t]hese senior [American Home] executives did not just occupy a front row seat to the mortgage meltdown - *they were part of the show.'*" American Home's former CEO paid $2.5 million to settle the SEC's fraud charges.

340.    In May 2009, an economics reporter for *The New York Times* published a news report recounting his experience in obtaining a loan from American Home. The reporter, Edmund Andrews, revealed how American Home actively concealed and omitted negative information on his loan application in order to qualify him for a loan. Andrews reported:

> As I quickly found out, American Home Mortgage had become one of the fastest-growing mortgage lenders in the country. One of its specialties was serving people just like me: borrowers with good credit scores who wanted to stretch their finances far beyond what our incomes could justify. In industry jargon, we were "Alt-A" customers, and we usually paid slightly higher rates for the privilege of concealing our financial weaknesses.
>
> . . .
>
> [The American Home loan officer] called back the next morning. "Your credit scores are almost perfect," he said happily. "Based on your income, you can qualify for a mortgage of about $500,000." What about my alimony and child-support obligations? No need to mention them. What would happen when they saw the automatic withholdings in my paycheck? No need to show them. If I wanted to buy a house, [the American Home loan officer] figured, it was my job to decide whether I could afford it. His job was to make it happen. "I am here to enable dreams," he explained to me long afterward. [The American Home loan officer]'s view was that if I'd been unemployed for seven years and didn't have a dime to my name but I wanted a house, he wouldn't question my prudence. "Who

am I to tell you that you shouldn't do what you want to do? I am here to sell money and to help you do what you want to do. At the end of the day, it's your signature on the mortgage - not mine."

Edmund L. Andrews, *My Personal Credit Crisis*, N.Y. Times, May 17, 2009, at MM46. Not surprisingly, shortly after obtaining the AHM loan – a loan the reporter could not afford – the reporter defaulted.

341.   On January 14, 2010, American Home settled a class action lawsuit brought by investors for $37.25 million for misrepresenting itself as a conservative lender. *See In re Am. Home Mortg. Sec. Litig.*, No. 07-md-1898 (E.D.N.Y.). In the Amended Class Action Complaint, investors in American Home common/preferred stock alleged that the company was a high risk lender, promoting quantity of loans over quality by targeting borrowers with poor credit, violating company underwriting guidelines, and providing incentives for employees to sell risky loans, regardless of the borrowers' creditworthiness. Based on statements from more than thirty-three confidential witnesses, including former American Home employees, and internal company documents, investors alleged that American Home management told underwriters not to decline a loan, regardless of whether the loan application included fraud, and that underwriters were consistently bullied by sales staff when underwriters challenged questionable loans. *See* Am. Class Action Compl. ¶¶120-21.

### 9.   **IndyMac**

342.   IndyMac originated approximately $3.8 billion of residential mortgage loans sold to the Trusts.   IndyMac's systemic and pervasive origination of loans that breached representations and warranties concerning adherence to stated underwriting guidelines was well documented through federal investigations and reports, investor litigation, insurer lawsuits, and news media sources.   For example, the OCC's "Worst Ten in the Worst Ten" list included

IndyMac as the eleventh worst mortgage originator based on 2005 through 2007 loan originations as of March 29, 2009.

343.    Litigation brought by federal agencies exposed IndyMac's loan origination failures.  On October 4, 2012, the National Credit Union Administration ("NCUA") sued Credit Suisse and IndyMac in connection with the packaging and sale of $715 million in residential mortgage-backed securities and alleged IndyMac systematically abandoned the stated underwriting guidelines in the offering documents, making the mortgage-backed securities significantly riskier than indicated.  *See Nat'l Credit Union Admin. Bd. v. Credit Suisse (USA) LLC, et al.*, No. 12-cv-02648 (Dist. Kan. Oct. 4, 2012).

344.    On July 6, 2011, the FDIC filed the action *Federal Deposit Insurance Corp. v. Michael Perry*, No. 11-cv-05561 (C.D. Cal. Jul. 6, 2011) against the lender's former Chairman and Chief Executive on claims that he overloaded the Pasadena thrift with risky and fraudulent home loans before it collapsed in July 2008.  In *Securities and Exchange Commission v. S. Blair Abernathy*, No. 11-cv-01308 (C.D. Cal. Feb. 11, 2011), the SEC alleged that despite receiving monthly internal reports revealing that 12% to 18% of IndyMac's loans contained misrepresentations regarding important loan and borrower characteristics, no such disclosure was made in the offering documents.  These types of actions were widely followed by news media. *See, e.g.*, *The FDIC Claims An IndyMac Victory*, Bloomberg Businessweek (Dec. 10, 2012); *Former IndyMac CEO Michael Perry to Pay $1 Million in Settlement*, L.A. Times (Dec. 15, 2012).

345.    *MBIA Insurance Corp. v. IndyMac Bank, F.S.B., et al.*, No. 09-cv-01011 (D.D.C. May 29, 2009) involved IndyMac securitized mortgage loans from 2006 and 2007 wherein the plaintiff bond insurer MBIA sought to be indemnified for the losses it incurred when borrowers

defaulted and investors made claims under their insurance policies because IndyMac's deceptions led MBIA into issuing the policies.

346.    Similarly, a class action lawsuit brought by two pension fund investors on May 14, 2009, alleged that IndyMac failed to meet its own underwriting guidelines on certain securitized mortgage loans and failed to disclose the risks of mortgage-backed securities.  *See In re IndyMac Mortgage-Backed Sec. Litig.*, No. 09-cv-04583 (S.D.N.Y. May 14, 2009).

        **D.**     **The Systemic Disregard Of**
               **Prudent Securitization Standards**
               <u>**Was Pervasive During The Relevant Period**</u>

347.    It is equally well documented that between 2004 and 2008, the sponsors that securitized the residential mortgages and transferred them into the RMBS trusts – including the Trusts at issue here − failed to conduct adequate due diligence reviews of the mortgage pools to ensure the mortgage loans were of the same credit quality as represented and complied with federal and state law, as well as that the purported mortgaged property's appraised value was accurate.

348.    As the FCIC Report noted:

> The Commission concludes that firms securitizing mortgages failed to perform adequate due diligence on the mortgages they purchased and at times knowingly waived compliance with underwriting standards. Potential investors were not fully informed or were misled about the poor quality of the mortgages contained in some mortgage-related securities. These problems appear to have been significant.

FCIC Report at 187.

349.    As made clear in the FCIC Report, in their zeal to keep the securitization machine going and at the behest of originators, RMBS sponsors and their third party due diligence providers failed to analyze adequate sample sizes of the loan pools, sometimes reviewing as little as 2%-3% of the entire loan pools.  Moreover, when the sponsors and their due diligence firms identified high percentages of mortgage loans in their sample reviews as deficient, sponsors

pervasively "waived in" mortgage loans to preserve their business relationships with the originators or to keep the defective loans off their own books. Consequently, by 2011, it was equally apparent to all players in the United States mortgage and securitization industry that the mortgage loans deposited in RMBS trusts issued between 2004 and 2008 materially breached the sponsors' representations and warranties.

      **E.**    **There Is Evidence Of Widespread**
                **Breaches Of Representations And**
                <u>**Warranties By The Specific Sponsors Of The Trusts**</u>

350.    As with other RMBS trusts of the same vintage, the Trusts have been materially impacted by the sponsors' faulty securitization practices. The sponsors' systemic and pervasive sale of residential mortgage loans in the Trusts in breach of representations and warranties is confirmed through several federal and state government investigations and published reports, well publicized news reports, and public and private enforcement actions that have described endemic due diligence failures throughout the period in which the Trusts were created and, more specifically failures by the same sponsors whose mortgage loans were deposited into the Trusts. A summary of testimonial and documentary evidence as to each of the major sponsors of the mortgage loans to the Trusts is set forth below.

             **1.**        <u>**Wells Fargo Bank, N.A.**</u>

351.    Wells Fargo Bank, N.A. sponsored approximately $71.8 billion of mortgage loans deposited into fifty-one of the Trusts issued under the WFALT, WFHET, and WFMBS shelves. It was clear that by January 1, 2009, Wells Fargo had dumped large percentages of toxic loans within the Wells Fargo-label Trusts. By this time, these securitizations were averaging delinquency rates of over 13.8%, with nine trusts experiencing delinquency rates in excess of 30%, including WFHET 2006-1, WFHET 2006-2, WFHET 2006-3, WFHET 2007-1, and WFHET 2007-2, which each had delinquencies of over 50% of its entire loan pool. As a result

of these severe delinquencies, the Wells Fargo-label Trusts' losses began to mount.  For example, between 2009 and 2011 collateral losses among the Wells Fargo-label Trusts jumped from approximately $707.1 million to $2.7 billion, representing a staggering ***285% increase***.  As of November 1, 2014, these trusts have suffered collateral losses of approximately $4.7 billion.

352.     There is widespread evidence of pervasive breaches of seller representations and warranties in Wells Fargo-sponsored RMBS, including detailed allegations in securities cases against Wells Fargo, such as *In Re Wells Fargo Mortgage-Backed Certificates Litigation*, 09-1376 (N.D. Cal.), where Wells Fargo agreed to pay $125 million to settle the action.  This action and others have suggested systemic and pervasive deficiencies in Wells Fargo's underwriting practices, which led to inaccurate representations and warranties regarding LTV ratios and owner occupancy.

353.     RMBS lawsuits involving the same Wells Fargo-label Trusts at issue here have exposed Wells Fargo's inadequate systemic securitization abuses.  For example, in August 2012, the FDIC, as receiver for the now-defunct Alabama-based Colonial Bank ("Colonial"), sued Wells Fargo and twelve other large banks for misrepresentations in connection with the sale of residential mortgage-backed securities to Colonial.  The complaint alleged that Wells Fargo made material misrepresentations in the offering documents regarding loan-to-value ratios, owner occupancy rates, compliance with appraisal standards, and loan issuance practices.  *See Fed. Deposit Ins. Corp. as Receiver for Colonial Bank v. Chase Mortg. Fin. Corp., et al*., No. 12-cv-6166 (S.D.N.Y. Aug. 10, 2012).  According to the FDIC, with respect to two Wells Fargo-label offerings at issue here, WFMBS 2007-4 and WFMBS 2007-7, Wells Fargo made material untrue or misleading statements about owner occupancy percentages, LTV ratios, underwriting

standards, and/or early payment defaults for 51.0% of the loans in WFMBS 2007-4 and 55.3% of the loans in SFMBS 2007-7.

354.    Similarly, in *Texas County and District Retirement System v. J.P. Morgan Securities, et al.*, No. D-1-GN-14-000998 (Tex. Dist. April 3, 2014), a pension fund conducted a forensic review of the 115 offerings, including WFMS 2006-AR10, a Wells Fargo-label trust.  In WFMS 2006-AR10, the offering documents represented that 100% of the mortgages in the pool were owner occupied and only 1.71% of the mortgages had a LTV greater than 80%.  Contrary to these representations, the forensic analysis revealed that only 87.69% of the homes were owner occupied, and 28.87% of the loans had a LTV greater than 80%.

355.    In *Federal Home Loan Bank of Atlanta v. Countrywide*, No. 11-cv-00489 (N.D. Ga. Feb. 1, 2011), the plaintiff performed an "eye-opening" forensic review of thirty offerings, two of which, WFMBS 2006-8 and WFMBS 2006-AR14, were sponsored by Wells Fargo and are at issue here.  The Federal Home Loan Bank of Atlanta found that in its sample of more than 21,000 loans "over 58% of the appraised property values in this sample were overstated by 5% or more."  Moreover, the analysis revealed that although the offering documents for all thirty offerings represented that no loans had a LTV at origination over 100%, of the "more than 21,000 loans the Bank analyzed, over 2,490 had an AVM value (at the time of origination) that was less than the amount of the original mortgage (i.e., a LTV over 100%)."

356.    In a similar action brought by the Federal Home Loan Bank of Indianapolis, *Federal Home Loan Bank of Indianapolis v. Banc of America*, No. 1:10-cv-01463 (S.D. Ind. Nov. 15, 2010), the bank conducted a forensic review of thirty-two offerings, including four Wells Fargo-label offerings at issue here (WFMBS 2006-10, WFMBS 2007-10, WFMBS 2007-11, and WFMBS 2007-4).  For all four of the securitizations, Wells Fargo represented that no

loan in the pool had a LTV ratio over 100%, but the review revealed that 9.02%, 14.29%, 17.39%, and 8.33% of the loans, respectively, had a LTV greater than 100%. The review also revealed that the owner occupancy percentages were understated by 2.17% for WFMBS 2006-10 and 2.30% for WFMBS 2007-11.

357.    Lastly, in *Deutsche Zentral-Genossenschaftsbank AG v. The Goldman Sachs Group, Inc., et al.*, No. 653134/2012 (N.Y. Sup. Ct. Apr. 5, 2013), investors conducted a forensic review of eight offerings, including WFHET, a Wells Fargo-label offering at issue here. With respect to WFHET, the plaintiffs found that 3.2% of the loans sampled had a LTV/CLTV over 100%, when it was represented as 0%, and that the owner occupancy percentage was overstated by 24.7%.

### 2.    Deutsche Bank

358.    Deutsche Bank, through its affiliates, was a significant seller of loans to the Trusts.  Its lending affiliates, Mortgage IT and Chapel, originated over $5.6 billion in mortgage loans securitized in the Trusts.  Additionally, its securitization arm, DB Structured Products, Inc., sponsored approximately $59.6 billion of mortgage loans deposited into sixty-five of the Trusts issued under the ACE, DBALT, DMSI and MHL shelves.  The Deutsche Bank-label Trusts have been marked by extremely poor performance.  By January 1, 2009, the Deutsche Bank-label Trusts were averaging delinquency rates of over 37%, with twelve trusts experiencing delinquency rates in excess of 50%, including ACE 2006-FM2, which had delinquencies of over 69% of its entire loan pool.  As a result of these severe delinquencies, the Deutsche Bank-label Trusts' losses began to mount.  For example, between 2009 and 2011 collateral losses among the Deutsche Bank-label Trusts doubled from approximately $3.8 billion to $7.8 billion.  As of November 1, 2014, these Trusts have suffered collateral losses of approximately $10.9 billion, representing over 18% of the securitizations' total original face value.

359.    The Deutsche Bank-label Trusts' abject performance is easily explained through Deutsche Bank's abusive securitization practices and widespread misrepresentation of the credit quality of the loan pools it sold to RMBS Trusts.  For example, Deutsche Bank was specifically criticized in the FCIC Report for failing to devote a sufficient amount of resources to its due diligence arm.  *See* FCIC Report at 168.  Similarly, Clayton Holdings ("Clayton") – a major provider of third-party due diligence services – provided trending reports to the FCIC.  These reports revealed that in the period from the first quarter of 2006 to the second quarter of 2007, 34.9% of the mortgage loans Deutsche Bank submitted to Clayton to review in RMBS groups were rejected by Clayton as falling outside the applicable underwriting guidelines.  Of the mortgage loans that Clayton found defective, 50% of the loans were subsequently waived in by Deutsche Bank without proper consideration and analysis of compensating factors.

360.    Deutsche Bank's abusive securitization practices were also the subject of both federal and state government investigations.  In particular, the Nevada Attorney General initiated a confidential investigation into Deutsche Bank's residential mortgage acquisition and securitization business centering on whether mortgage lenders made potential misrepresentations to consumers who took out mortgage loans which were purchased and securitized by Deutsche Bank.  Deutsche Bank was forced to pay the state of Nevada $11.5 million to settle the matter. *See In the Matter of: DB Structured Products, Inc.*, No. A-13-690144-B, Assurance of Discontinuance (D.C. Nev. Oct. 14, 2013).  Likewise, on July 21, 2010, the Financial Industry Regulatory Authority ("FINRA") fined Deutsche Bank $7.5 million for misrepresenting delinquency data in connection with the issuance of subprime securities.  *See FINRA Fines Deutsche Bank Securities $7.5 Million For Negligent Misrepresentations Related To Subprime Securitizations*, FINRA News Release (July 21, 2010).

361.     RMBS lawsuits involving the same Deutsche Bank-label Trusts at issue here or substantially similar Deutsche Bank securitizations of the same vintage and involving the same loan product type have exposed Deutsche Bank's systemic securitization abuses.  For example, on September 2, 2011, the FHFA filed suit against Deutsche Bank as sponsor of forty securitizations, including eight Deutsche Bank-label Trusts at issue here: ACE 2005-AG1, ACE 2006-CW1, ACE 2006-FM2, ACE 2006-HE1, ACE 2006-NC2, ACE 2006-NC3, MHL 2007-1 and ACE 2006-OP2.  The FHFA alleged that in connection with the offering of these securities, Deutsche Bank made untrue or misleading statements regarding the mortgage loans' LTV ratios, owner occupancy status, and compliance with underwriting guidelines.  *See FHFA v. Deutsche Bank AG, et al.*, No. 1:11-cv-06192 (S.D.N.Y. Sept. 2, 2011).  In the FHFA's analysis of the quality of the loans included in these offerings, it consistently found that 20% or more of the loans in these offerings had LTV ratios of over 100% and that non-owner occupied properties had been repeatedly understated by 10% or more, including the eight Deutsche Bank-label Trusts at issue.  As further support for its allegations of Deutsche Bank's systematic misreporting of owner occupancy and LTV statistics, FHFA's complaint highlighted government and private investigations into the originators' underwriting practices, revealing widespread abandonment of the originators' reported underwriting guidelines during the relevant period, the collapse of the certificates' credit ratings, and the surge in delinquencies and defaults in the mortgages in the Deutsche Bank securitizations.

362.     In *Federal Home Loan Bank v. Ally Financial, Inc.,* No. 1:11-cv-10952 (D. Mass. May 26, 2011), Federal Home Loan Bank of Boston conducted a forensic analysis of four Deutsche Bank-label Trusts at issue here, DBALT 2006-AR3, DBALT 2006-AR4, DBALT 2006-AR5 and DBALT 2007-AR1.  Federal Home Loan Bank of Boston found that Deutsche Bank

underreported the percentage of loans with greater than 90% by between 24%-30% for these securitizations, and underreported the number of loans with greater than 100% LTV ratios by between 8% and 16%.[10]

363.    Similarly, in *Massachusetts Bricklayers and Masons Trust Fund v. Deutsche Alt-A Securities*, No. 2:08-cv-03178 (E.D.N.Y. May 24, 2010), investors reviewed a sample of loans from two Deutsche Bank-label Trusts at issue here, DBALT 2006-AB4 and DBALT 2006-AR5, and found that Deutsche Bank understated the LTV ratio in 44% and 51% of the sampled loans for each trust.

### 3.      Lehman

364.    Lehman sponsored approximately $15 billion of mortgage loans securitized in thirteen of the Trusts under the LMT and SARM shelves.  Lehman acquired the mortgage loans either from Lehman's own loan origination affiliates and subsidiaries, Aurora and BNC Mortgage ("BNC"), whose underwriting abuses are well documented, or in direct purchases (including in auctions) from third-party loan originators, some of which are among the most notorious lenders, including GreenPoint, Countrywide Home Loans, Inc., IndyMac, Wells Fargo Bank, First Franklin, EquiFirst Mortgage, and Aegis Mortgage.  By January 1, 2009, it was evident that the credit quality of underlying loan collateral for Lehman-label Trusts did not match Lehman's and originators' representations and warranties.  At this time, nearly 20% of all the loans within the Lehman Trusts were delinquent.  Moreover, the Lehman Trusts had incurred realized losses of approximately $130.3 million by January 1, 2009 and over $441 million by

---

[10] Federal Home Loan Bank of Boston also found alarming breach rates within LUM 2006-6 and LUM 2007-2, securitizations which are the subject of this action.

January 1, 2011.  As of November 1, 2014, the Lehman Trusts have suffered staggering realized losses of approximately $644.7 million.

365.    Lehman's faulty due diligence practices with respect to RMBS securitization is well known to HSBC.  Lehman's "due diligence" principally occurred not during the underwriting phase of the offering, but while Lehman was inspecting smaller bulk loans for possible purchase from third-party loan originators after successfully bidding on the loans at auction. Accordingly, at that stage, there was a disincentive for Lehman to reject, or "kick-back," loans as non-compliant with stated guidelines since the originator would be less likely to select Lehman as the winning bidder in future auctions. Indeed, according to the FCIC Report, in connection with securitizing loans, Lehman used Clayton to perform due diligence services. Clayton found that 26% of the total loans underwritten by Lehman failed to meet the underwriting standards, but that Lehman waived its right to reject 37% of these non-conforming loans, and included them in the RMBS it securitized anyway.  Further, the motto among Lehman's residential mortgage-backed securities origination sales group became "there are no bad loans only badly priced loans" – meaning loans found not to comply with underwriting guidelines were generally not rejected, but simply negotiated to be purchased more cheaply.

366.    Over the past six years, Lehman's securitization practices have been the focus of several, significant RMBS lawsuits.  For example, in their Consolidated Securities Class Action Complaint filed on February 23, 2009, in *In re Lehman Brothers Mortgage-Backed Securities Litigation*, No. 08-CV-6762 (S.D.N.Y.), the class plaintiffs described in detail Lehman's faulty due diligence practices in securitizing loans in in Lehman-label trusts issued under, among other shelves, the SARM shelf.

367.   The results of file reviews conducted by investors further confirmed Lehman's faulty due diligence practices and pervasive and systemic breach of material representations and warranties regarding quality and characteristics of the loans it securitized.  For example, in *In re Countrywide Financial Corp.,* No. 11-ML-02265-MRP (Aug. 20, 2012), AIG's loan level analysis of SARM 2005-18, one of the Lehman-label Trusts at issue here, demonstrated that the originators and Lehman overstated the percentage of owner occupied properties by 20.94%.

368.   In 2008, Lehman filed for bankruptcy protection.   U.S. Bank National Association, Wilmington Trust Company, Wilmington Trust, National Association, Law Debenture Trust Company of New York, and Deutsche Bank National Trust Company, in their capacity as trustee, separate trustee or indenture trustee for 405 Lehman-sponsored trusts that are not at issue here (collectively, the "Lehman Bankruptcy RMBS Trustees") have since filed proofs of claims in the Lehman bankruptcy proceedings asserting that Lehman was liable to these trusts for breaches of representations and warranties concerning all one million of the underlying mortgage loans.   In connection with submitting these claims, the Lehman Bankruptcy RMBS Trustees undertook a re-underwriting and a detailed review of a nearly 5,000 loan sample in 255 of the 405 Lehman trusts that suffered a loss.  The Lehman Bankruptcy RMBS Trustees' experts found breaches of representations and warranties in approximately 57% of the sampled loans—a startlingly high number.   Based in part on the 57% breach rate, the Lehman Bankruptcy RMBS Trustees have sought to increase the reserves for these trusts' representation and warranty claims against Lehman by more than double to $12.143 billion.

### 4.    Nomura

369.   Nomura, through its affiliate Nomura Credit & Capital, Inc., sponsored $13.9 billion in mortgage loans deposited into twenty of the Trusts under the NAA and NHELI shelves. The Nomura-label Trusts have been plagued by severe delinquencies and losses.  By January 1,

2009, Nomura-label Trusts were averaging delinquency rates of over 36%, including NHELI 2005-FM1, where over 60% of the loan pool was delinquent. In turn, the Nomura-label Trusts' losses grew between 2009 and 2011 from approximately $1.3 billion to $2.4 billion. Indeed, by 2011, as a result of the toxic loans Nomura dumped into NAA 2007-S1, over 20% of the loans had been written off. As of November 1, 2014, the Nomura-label Trusts have suffered collateral losses of approximately $2.5 billion, representing nearly 18% of the securitizations' total original face value.

370. Nomura's deficient due diligence practices are well known. For example, Clayton's trending reports revealed that in the period from the first quarter of 2006 to the first quarter of 2007, 37.85% of the mortgage loans Nomura submitted to Clayton to review in RMBS groups were rejected by Clayton as falling outside the applicable underwriting guidelines. Of the mortgage loans that Clayton found defective, 58% of the loans were subsequently waived in by Nomura without proper consideration and analysis of compensating factors and included in securitizations.

371. Over the past three years, Nomura has also been a defendant in at least six significant RMBS lawsuits. Forensic investigations and loan level reviews conducted by plaintiffs in these actions have confirmed the pervasive breaches of representations and warranties in Nomura-label RMBS. For example, on September 2, 2011, the FHFA filed suit against Nomura alleging Nomura made untrue or misleading statements regarding the mortgage loans' LTV ratios, owner occupancy status, and compliance with underwriting guidelines in connection with seven Nomura-sponsored securitizations. *See FHFA v. Nomura Holding Am. Inc. et al.*, No. 11-cv-6201 (S.D.N.Y. Sept. 2, 2011). The FHFA's review of at least 1,000 randomly selected mortgage loans from each trust revealed that for each securitization, Nomura

understated the percentage of non-owner occupied properties by more than 5%, and for some securitizations by more than 10%.  In addition, the percentage of mortgage loans with a LTV ratio over 100% was over 10% in all but one of the securitizations, and over 19% in two of the securitizations.

372.    In *Prudential v. Nomura*, No. L571012 (Sup. Ct. N.J. Aug. 1, 2012), Prudential's forensic analysis revealed that, for the NHELI 2006-FM1 securitization, Nomura had overstated the percentage of owner occupied properties by over 12%.  Moreover, Prudential's forensic analysis revealed that 77.96% of the mortgage loans had a CLTV greater than 80%, over 10% more than the amount represented.

373.    In *CMFG Life Insurance v. Nomura Securities International*, No. 13-cv-578 (W.D. Wis. Aug. 15, 2013), CMFG conducted a forensic review of NAA 2006-AF1, a Nomura-label offering at issue here.  In its analysis of 893 of the 1,656 loans backing its certificate, CMFG found that 62.3% of the loan had a LTV ratio greater than 100%, contrary to the represented 0%, and that the percentage of owner occupied properties was overstated by 11.83%.

374.    Similarly, in *Federal Home Loan Bank v. Ally*, No. 1:11-cv-10952 (D. Mass.), Federal Home Loan Bank of Boston conducted a forensic analysis of one Nomura-label Trust at issue here, NAA 2007-1.  Federal Home Loan Bank of Boston found that Nomura underreported the percentage of loans with LTV ratios greater than 90% by 37.5%, and underreported the number of loans with greater than 100% LTV ratios by 18.44%.

### 5.    Merrill Lynch

375.    Merrill Lynch, through its affiliate Merrill Lynch Mortgage Lending, sponsored more than $11.2 billion mortgage loans securitized in sixteen of the Trusts under the MANA, MLCC, MLMBS, and MLMI shelves.  By January 2009, it was clear that the underlying loan collateral for the Merrill Lynch-label Trusts was not of the credit quality Merrill Lynch

represented and warranted.  At this time, these Trusts' averaged delinquencies of 20%, with five of the Trusts experiencing delinquencies exceeding 30% of the current loan pool, including MANA 2007-A1 where over 45.6% of the loans were delinquent.  As a result of these severe delinquency rates, the Merrill Lynch-label Trusts experienced staggering write downs, as realized losses rose from $263 million in January 2009 to $795 million in January 2011.  As of November 1, 2014, these Trusts have suffered collateral losses of approximately $1.4 billion, meaning that over 12% of the Trusts' loan pool have been written off.

376.    Highly publicized government reports and RMBS litigation have exposed Merrill Lynch's improper securitization practices.  For instance, Clayton's trending reports showed that in the period from the first quarter of 2006 to the second quarter of 2007, 23% of the mortgage loans that Merrill Lynch submitted to Clayton to review in RMBS pools were rejected by Clayton as falling outside the applicable underwriting guidelines.  Of the mortgage loans that Clayton found defective, 32% were subsequently waived in by Merrill Lynch without proper consideration and analysis of compensating factors.

377.    Over the past five years, Merrill Lynch's false representations regarding the quality and characteristics of the mortgage loans it securitized have been the focus of several significant RMBS individual and class actions.  For example, in *FHFA v. Merrill Lynch*, No. 11-cv-06202, (S.D.N.Y. June 13, 2012) Amended Compl., a case involving four offerings at issue here (MANA 2007-A1; MANA 2007-A2; MLMI 2006-A3; OWNIT 2005-5), a loan level review found that the percentages of non-owner occupied properties were understated between six to ten percentage points, thus materially understating the risk.  Moreover, the review revealed that at least 4.32% of the mortgage loans for each securitization had a LTV ratio over 100%, and for most securitizations this figure was much larger.  Indeed, for sixty-three of the securitizations,

more than 10% of the mortgages had a true LTV ratio over 100% and for twenty securitizations, the data review revealed that more than 20% of the mortgages had a true LTV ratio over 100%.

378.    The FHFA's findings are supported by RMBS trustee led putback actions against Merrill Lynch in its capacity as sponsor.  For example, in *Merrill Lynch Mortgage Investors Trust, Series 2006-RM4, et al. v. Merrill Lynch Mortgage Lending, Inc. et al.*, Index No. 654403/2012 (N.Y. Sup. Ct. Dec. 18, 2012), U.S. Bank, N.A., as Trustee filed an action against Merrill Lynch as sponsor of the MLMI 2006-RM4 and MLMI 2006-RM5 trusts for Merrill Lynch's breach of its repurchase obligations in connection with loans violating representations and warranties.  A forensic review of more than 1,000 loans from each of these trusts revealed that at least 73% of the loans in MLMI 2006-RM4 and 76% of the loans in MLMI 2006-RM5 breached representations and warranties in a manner that materially and adversely affected the value of the mortgage loans and the interest of the Certificateholders in the loans.  Despite finding these severe deficiencies in the Merrill Lynch loan pools at issue in that case, HSBC has done nothing to protect Certificateholders against the same deficiencies in Merrill Lynch loan pools underlying the Trusts at issue here.

379.    Forensic reviews of the Merrill Lynch-label Trusts have corroborated litigants' allegations of Merrill Lynch's securitization abuses and provide strong evidence of Merrill Lynch's and the originators' breach of their representations and warranties to all of the Merrill Lynch Trusts.  In *In re Countrywide Financial Corp. Mortgage-Backed Sec. Litig.*, No. 12-CV-04316 (C.D. Cal. Aug. 24, 2012), plaintiffs performed a forensic review of twenty-seven offerings, two of which are Merrill Lynch-label offerings at issue here.  With respect to MANA 2007-A2, the forensic review revealed that 22.3% of the loans had a LTV ratio greater than 100%, contrary to the represented 0%, and that the owner occupancy percentage was understated

by 23.2%.  For MANA 2007-AF1, the review showed that 35.9% of the loans had a LTV ratio greater than 100%, contrary to the represented 0%, and that the owner occupancy percentage was overstated by 22.1%.

380.     Similarly, in *Prudential v. Bank of America*, No. 2:13-cv-01586 (D. N.J. Mar. 14, 2013), Prudential performed a forensic review of thirty offerings and found a "staggering" number of materially defective loans in every offerings, including one Merrill-Lynch-label offering at issue here. In MLMI 2005-WMC5, the forensic review revealed that 39.88% of the loans had at least one material defect.  These material defects included, among other things, a misrepresentation of owner occupancy percentages and LTV ratios.  For instance, 16.56% of the loans in MLMI 2005 WMC-1 had a LTV ratio greater than 100%, and the owner occupancy percentage was overstated by 13.17%.

## X.  HSBC KNEW THAT THE TRUSTS WERE FILLED WITH DEFECTIVE LOANS

381.     There is ample evidence that beginning in 2009 and by 2011, HSBC "discovered" that each of the Trusts' loan pools contained high percentages of mortgage loans that materially breached the originators' and sponsors' representations and warranties regarding their credit quality.  As discussed above, since 2009, there has been a steady stream of public disclosures regarding the originators' systemic underwriting abuses and the sponsors' faulty securitization practices.  However, apart from the highly publicized government investigations, reports and enforcement actions, as well as high profile RMBS litigation involving the originators and sponsors, as explained below there is a plethora of additional evidence demonstrating HSBC's and its responsible officers' knowledge that the Trusts' loan pools contained high percentages of mortgage loans that materially breached seller representations and warranties.

A.     **The Trusts' Poor Performance**

382.    HSBC and its responsible officers had discovered by 2009 that the Trusts' loan pools were afflicted by severe and pervasive breaches of seller representations and warranties by virtue of the Trusts' abject performance.   It was evident by January 2009, that given the extremely high mortgage loan default rates within the Trust loan pools the mortgage loans sold to the Trusts were not as the sellers had represented and warranted.   For example, in January 2009, almost 75% of the Trusts had double-digit mortgage loan default rates.   Over 50% of the Trusts had mortgage loan default rates is excess of 25%, with 110 of the Trusts (40%) having default rates greater than 35%.   Incredibly, 37 of the Trusts (14%) had default rates in excess of 50%, while at least three Trusts had mortgage loan default rates of over 65% - nearly two of every three loans were in default.

383.    These high default rates were no surprise to HSBC by January 2009.   Among other things, HSBC, as Trustee, published monthly remittance reports, that were publicly filed with the SEC on Form 10-D, outlining the credit performance of the mortgage loans in the Trusts.   Moreover, the delinquency rates had been steadily rising up to and through 2009.   By about July 2008, the first harbingers of the violations of the representations and warranties regarding the credit quality of the loans started to appear.   The Trustees' monthly reports started to show increases in the trends of loan delinquencies, and by January 2009, these trends had become pronounced.



384.    HSBC was also provided regular reports regarding loan modifications granted by the servicers to borrowers that failed to timely make P&I payments on their loans to the Trusts. In general, loan modifications change the terms of the original mortgage contract agreed to by the lender and borrower, typically to ease the borrower's monthly payment obligation so the borrower may remain current and avoid default.  Loan modifications often include changes to the loan's interest rate, term and/or outstanding principal.  As with delinquency rates, the extent of loan modifications is indicative of breaches of representations and warranties for at least two reasons.   First, escalating loan modifications correlate to misstated borrower income and creditworthiness.   Second, the servicers' decisions to modify rather than foreclose on loans indicates that the underlying collateral is not adequate security to satisfy the outstanding balance because the original LTV ratio (or CLTV ratio) was not as represented because the appraised property value was misstated and additional liens encumbered the mortgaged property.

385.   As indicated below, loan modifications in the Trusts dramatically increased beginning in early 2009, providing HSBC further information regarding the systemic breaches of representations and warranties in the Trusts:



B.   **Credit Rating Downgrades Of The
      Certificates Further Support The Sellers' Problems**

386.   At the time of securitization, all of the Trusts' senior tranches were rated "investment grade."  Bond rating firms, such as Standard & Poor's, use different designations consisting of upper- and lower-case letters 'A' and 'B' to identify a bond's credit quality rating. "AAA" and "AA" (high credit quality) and "A" and "BBB" (medium credit quality) generally are considered investment grade. An investment grade rating signifies that the bond has a relatively low risk of default and are judged by the rating agencies as likely to meet payment obligations such that banks and institutional investors are permitted to invest in them.  Credit ratings for bonds below investment grade designations (i.e., "BB", "B", "CCC", etc.) are considered low credit quality, and are commonly referred to as "junk bonds."

387.    However, as public disclosures revealed the originators' and sponsors' systemic underwriting and securitization abuses and HSBC began reporting severe collateral losses in the performance of the mortgage loans in the Trusts, the Trusts' certificates' credit ratings were drastically downgraded.  By December 31, 2009, over 75% of the senior tranches in the Trusts had been downgraded at least once.  Across all Trusts, over 80% of all certificates had been downgraded by at least one ratings agency.  Further, 60% of the senior certificates had been downgraded to junk bond status.

### C.    HSBC Discovered Widespread Seller Breaches Of Representations And Warranties In Its Capacity As Servicer

388.    In addition to acting as a trustee, HSBC was among the largest mortgage loan servicer to the RMBS industry during the relevant period.  Many of these loans were originated and sponsored by the same mortgage loan sellers to the Trusts, such as Option One, New Century, Countrywide, Wells Fargo and GreenPoint.  In connection with servicing these loan sellers' loans, HSBC was in a front row seat to view mortgage loan sellers' abusive underwriting and securitization practices.  For example, as servicer to these other RMBS trusts containing loan pools originated and securitized by the same mortgage loan sellers to the Trusts, HSBC prepared monthly reports for the trustees detailing the similarly poor performance of these loan pools.  Additionally, as servicer, HSBC knew of the credit agencies' similar downgrading of these trusts as result of the poor credit quality of these same originators' and sponsors' loan pools.  Further, in servicing and administrating the loans, including during the modification process, HSBC examined the loan files of mortgage loans originated and sponsored by these entities and in the process discovered systemic and pervasive breaches of representations and warranties in the loan pools.

389.     Because the problems HSBC discovered regarding these common originators and sponsors in its capacity as servicer to other RMBS trusts revealed systemic and pervasive violation of underwriting and securitization guidelines, HSBC knew that these same defective underwriting and securitization practices applied to the Trusts.

**D.     HSBC Was Named In RMBS Litigation Involving Common Loan Sellers' Systemic Abandonment Of Underwriting Guidelines**

390.     HSBC's knowledge of pervasive breaches of representations and warranties by the originators and sponsors at issue herein is also demonstrated by HSBC's involvement in significant RMBS litigation in its capacity as securitization underwriter.

391.     For example, on September 2, 2011, the FHFA, as conservator for Fannie Mae and Freddie Mac, filed lawsuits against seventeen of the largest financial institutions involved in the packaging, marketing and sale of RMBS that Fannie Mae and Freddie Mac purchased during the period from 2005 to 2007, including HSBC and its affiliates.[11]  Fifteen of the FHFA's actions were concentrated before Southern District of New York Judge Denise L. Cote for coordinated pretrial proceedings, thereby allowing HSBC access to the pleadings and discovery in each of these cases.

392.     Each of the FHFA's complaints alleged that the defendants falsely represented that the underlying mortgage loans complied with certain underwriting guidelines and standards, including representations that significantly overstated the borrowers' capacity to repay their

---

[11]  Complaints were filed against the following lead defendants, in alphabetical order: Ally Financial Inc. f/k/a GMAC, LLC; Bank of America Corporation; Barclays Bank PLC; Citigroup, Inc.; Countrywide Financial Corporation; Credit Suisse Holdings (USA), Inc.; Deutsche Bank AG; First Horizon National Corporation; General Electric Company; Goldman Sachs & Co.; HSBC North America Holdings, Inc.; JPMorgan Chase & Co.; Merrill Lynch & Co. / First Franklin Financial Corp.; Morgan Stanley; Nomura Holding America Inc.; The Royal Bank of Scotland Group PLC; and Société Générale.

mortgage loans and the percentage of loans secured by owner occupied properties.  The FHFA further alleged that defendants materially understated the loan-to-value ratios of the underlying loans.

393.    To support its allegations regarding defendants' misrepresentations regarding the credit quality and characteristics of the underlying loan collateral, the FHFA's complaints highlighted the severe delinquencies, immense collateral losses and staggering credit downgrades suffered by both the securitizations at issue in its cases and all RMBS in general of this vintage.  Significantly, the FHFA's actions involved at least nineteen of Trusts at issue in this action.[12]

394.    In addition, the FHFA provided highly detailed summaries of the evidence and testimony obtained through federal and state investigations, enforcement actions and reports revealing both industrywide abuses by the mortgage loan originators and sponsors during this period, and widespread breaches of representations and warranties by specific originators and sponsors in connection with RMBS trusts.  These financial institutions included many of the largest mortgage loan sellers to the Trusts, such as Wells Fargo, Fremont, Lehman, GreenPoint, Countrywide, Deutsche Bank, Option One, Nomura, and Merrill Lynch.

395.    Moreover, FHFA cited the results of its own forensic review of loan level data for a sampling of hundreds of thousands of mortgage loans and reunderwriting of thousands of loan files from these securitizations, including nineteen of the Trusts. The data review revealed systemic and pervasive misrepresentations regarding owner occupancy and LTV ratios in each of

------

[12] These nineteen Trusts are: ACE 2005-AG1; ACE 2006-CW1; ACE 2006-FM2; ACE 2006-HE1; ACE 2006-NC2; ACE 2006-NC3; MHL 2007-1; ACE 2006-OP2; NHELI 2007-1; NHELI 2006-HE3; FHLT 2006-E; FHLT 2006-A; FHLT 2006-D; SGMS 2006-FRE1; SGMS 2006-OPT2; OOMLT 2007-HL1; FHLT 2006-C; FHLT 2005-D; and FHLT 2005-E.

the securitizations, including the Trusts at issue here and other securitizations involving the same sponsors to the Trusts, same RMBS labels, same RMBS shelves, same vintage, same loan product type, or the same originators.

396.    Given the FHFA's detailed allegations and HSBC's active participation in the FHFA actions as a named defendant, HSBC and its responsible officers had actual knowledge that the Trusts' loan pools contained high percentages of loans that materially and adversely affected the Trusts and Certificateholders' interests in those loans.

397.    As described in further detail below, in addition to the FHFA actions, HSBC and its affiliates have been named in several other actions alleging that originators and sponsors industrywide during the relevant period, including major originators of loans sold to the Trusts, systematically abandoned their stated underwriting guidelines.   The evidence and testimony perpetuated in these actions provide further support for HSBC's knowledge of the presence of defective loans in the Trusts.

###    E.    HSBC Received Written Notice Of Pervasive And Systemic Seller Breaches From Financial Guaranty Insurers

398.    HSBC also discovered that the Trusts' loan pools contained high percentages of mortgage loans that materially breached the originators' and sponsors' representations and warranties through its involvement in financial guaranty insurer litigation involving these same originators and sponsors, in its capacity as either trustee or master servicer.

399.    Financial guaranty insurers provide financial guaranty insurance for RMBS issued from many of the Trusts.   Under the Governing Agreements for these insured RMBS, the mortgage loan sellers to the Trusts made numerous representations and warranties concerning quality and origination practices for the mortgage loans.   The Governing Agreements for the insured RMBS also create a repurchase protocol pursuant to which the monoline insurers must

provide notice of a breach of representation and warranty to the responsible mortgage loan seller and the parties to the Governing Agreement (including the Trustee), in order to compel the responsible mortgage loan seller to repurchase loans that breach representations and warranties.

400.    Monoline insurers have initiated numerous lawsuits against responsible mortgage loan sellers for breach of their representations and warranties.  Prior to filing suit against the originators and/or sponsors, the monoline insurers (unlike certificateholders) were often able to obtain access to the specific loan files or conduct a forensic loan level review of the loans, which showed systemic and pervasive breaches of the representations and warranties.  Plaintiffs are informed and believe that consistent with the repurchase protocol under the trusts' governing documents, HSBC was notified of these sellers' systemic and pervasive breaches of representations and warranties in either its capacity as master servicer or trustee of the other RMBS trusts.

401.    The monoline insurers' findings from loan level reviews set forth both in their breach notices and subsequent publicly available lawsuits made HSBC and its responsible officers aware of the systemic violation of underwriting and related standards in the mortgage securitization industry between 2004 and 2008 vintage, as well as informed them of specific originators' and sponsors' systemic and pervasive practice of misrepresenting the credit quality and characteristics of the mortgage loans they were selling to keep the RMBS machine running.

402.    For example, in *Ambac Assurance Corporation v. Nomura Credit & Capital, Inc. et al.*, Index No. 651359/2013 (N.Y. Sup. Ct. Apr. 15, 2013), Ambac, a Wisconsin-based monoline insurer, wrote insurance relating to two 2007 Nomura securitizations, consisting of adjustable-rate, first-lien mortgage loans originated by various mortgage lenders.  Ambac alleged that, similar to the Nomura-label Trusts at issue here, that there were extremely high defaults

among the mortgage loans.  In light of the high default rates, Ambac retained a third-party consultant that reviewed over 1,800 of the mortgage loans from these trusts and found that, in over 95% of them, one or more of Nomura's mortgage loan representations was false when made.  Ambac alleged that "[t]he breaches identified evince gross malfeasance, misconduct, and negligence in connection with the origination of the loans that [Nomura] pooled, reflecting a wholesale abandonment of any attempt to gauge the ability and willingness of borrowers to repay their obligations."  Ambac alleged that it "sent twelve notifications to [Nomura] and HSBC, the Trustee for both Trusts, informing them of the over 1,700 Identified Defective Loans uncovered by the forensic reunderwriting."

403.   Because these monoline insurers' findings from loan level reviews set forth both in their breach notices and subsequent publicly available lawsuits reflected these common mortgage loan sellers' systemic and pervasive violation of underwriting and securitization guidelines, HSBC discovered that these same defective underwriting and securitization practices applied equally to all of the other Trusts containing loans originated and securitized by these same originators and sponsors.

### F.    HSBC And Its Responsible Officers Received Written Notice From Certificateholders Of Pervasive And Systemic Seller Breaches

404.   HSBC, in its capacity as trustee to many Trusts at issue herein, as well as RMBS trusts that are not the subject of this action but which are secured by loans originated and sponsored by the very same entities that originated and sponsored the loans underlying the Trusts at issue herein, has repeatedly received notice from Certificateholders of pervasive and systemic violations of representations and warranties by the loan sellers.   Based on the sheer volume of the defective mortgage loans identified, together with the systemic and pervasive faulty origination and securitization practices complained of in the Certificateholders' breach notices,

HSBC and its responsible officers knew that the Trusts' loan pools similarly contained high percentages of defective mortgage loans.

405.    For example, on October 17, 2011, a group of major institutional mortgage investors in several dozen RMBS trusts sponsored by Citigroup or its affiliates alleged widespread violations of representations and warranties contained in the Governing Agreements for sixty-eight RMBS trusts sponsored by Citigroup from 2005 to 2008 (the "Citibank Putback Initiative"), including three of the Trusts at issue herein.  The trustees for these Citigroup-sponsored trusts, which were instructed to investigate these breaches of representations and warranties, are HSBC, U.S. Bank, and Wells Fargo.  On April 7, 2014, Citigroup announced that it had reached an agreement with the investor group to resolve representation and warranty repurchase claims.  Under the agreement, Citigroup agreed to make a binding offer to the trustees to pay $1.125 billion to the trusts, plus certain fees and expenses.  According to Citigroup's press release announcing the agreement, the sixty-eight trusts covered by the agreement issued in the aggregate $59.4 billion of RMBS "and represent all of the trusts established by Citi's legacy Securities and Banking business during 2005-2008 for which Citi affiliates made representations and warranties to the trusts."  The trustees' approval of the settlement remains pending.

406.    The Citibank Putback Initiative identified and seeks to compel the repurchase of large quantities of loans originated by many of the same lenders that also originated large quantities of the loans sold to the Trusts, including Wells Fargo ($56.2 billion of loans sold to the Trusts) and GreenPoint ($10.7 billion of loans sold to the Trusts). This initiative additionally identified and seeks recovery of losses relating to servicing deficiencies by many of the same major servicers of loans backing the Trusts, including Wells Fargo (original servicer to $231.4 billion of loans sold to the Trusts).

407.    On December 16, 2011, a group of major institutional mortgage investors in hundreds of RMBS trusts sponsored by JPMorgan or its affiliates issued written instructions to HSBC, Wells Fargo, The Bank of New York Mellon ("HSBC"), Deutsche Bank, and U.S. Bank, as trustees, to open investigations into large numbers of ineligible mortgages in the loan pools securing those trusts and deficient servicing of those loans (the "JPMorgan Putback Initiative"). The notices covered more than $95 billion of RMBS issued by JPMorgan from 2005 to 2007, including nine trusts for which Deutsche Bank serves as trustee.  Less than two years later, Wells Fargo and the other trustees were presented with a $4.5 billion settlement offer covering 330 JPMorgan-sponsored RMBS trusts.  On August 1, 2014 and October 2, 2014, all of the trustees involved in the JPMorgan Putback Initiative, including HSBC, accepted JPMorgan's $4.5 billion offer for the vast majority of the 330 trusts included in the offer and petitioned the Supreme Court of the State of New York for approval of the settlement.  .

408.    The JPMorgan Putback Initiative identified and seeks to compel the repurchase of large quantities of loans (i) originated by many of the same lenders that also originated large quantities of the loans sold to the Trusts, including Wells Fargo ($56.2 billion of loans sold to the Trusts) and Fremont ($31.5 billion of loans sold to the Trusts); and (ii) securitized by the same investment banks and financial institutions that sponsored the Trusts, including Luminent Mortgage ($3.7 billion) and Morgan Stanley ($454 million, collectively, $4.15 billion of sponsored Trusts).  In addition, the JPMorgan Putback Initiative identified and seeks recovery of losses relating to servicing deficiencies by many of the same major servicers of loans backing the Trusts, including Wells Fargo (original servicer to $231.4 billion of loans sold to the Trusts).

409.    On January 5, 2012, a group of major institutional mortgage investors in several dozen RMBS trusts sponsored by Wells Fargo or its affiliates issued written instructions to

HSBC and U.S. Bank, as trustees, to open investigations into large numbers of ineligible mortgages in the loan pools securing those trusts and the deficient servicing of those loans (the "Wells Fargo Putback Initiative"). The notices covered more than $19 billion of RMBS issued by Wells Fargo from 2005 to 2007, including at least sixty of the Trusts at issue herein.

410.    The Wells Fargo Putback Initiative identified and seeks to compel the repurchase of large quantities of loans (i) originated by many of the same lenders that also originated large quantities of the loans sold to the Trusts, including Wells Fargo ($56.2 billion of loans sold to the Trusts) and Deutsche Bank  ($5.8 billion of loans sold to the Trusts); and (ii) securitized by the same investment banks and financial institutions that sponsored the Trusts, including Wells Fargo ($71.8 billion of sponsored Trusts). In addition, the Wells Fargo Putback Initiative identified and seeks recovery of losses relating to servicing deficiencies by many of the same major servicers of loans backing the Trusts, including Wells Fargo (original servicer to $231.4 billion of loans sold to the Trusts).

411.    Similarly, on or about January 20, 2012, the FHFA provided written notice to Fernando Acebedo, a Vice President of HSBC, of Deutsche Bank's pervasive breaches of representations and warranties in its capacity as sponsor of the ACE 2006-HE2 offering.  The FHFA's letter attached a schedule identifying 190 loans with specific defects and demanded that HSBC "enforce the obligation of the Sponsor to repurchase such Subject Loans" following expiration of the "90-day Repurchase Period" of the PSA because, according to the FHFA, none of the identified breaches concerning the subject loans were curable.

412.    Thereafter, on or about April 26, 2012, Mr. Acebedo and Susie Moy, a Senior Vice President of HSBC again received written notice of sponsor Deutsche Bank's pervasive breach of representations and warranties. Specifically, Amherst Advisory & Management, LLC,

("Amherst"), a certificateholder of ACE 2006-FM1, sent a letter and an attached appendix identifying 449 defective loans from the offering and the specific breaches.  Over the course of the next several months, Amherst provided responsible officers of HSBC with notice of Deutsche Bank's breach of representation and warranties in connection with Deutsche Bank-sponsored trusts.

413.    As the previous examples illustrate, despite HSBC's actual notice of widespread loan defaults and breaches by the same originators, sponsors, and servicers that originated and sponsored the loans underlying the Trusts at issue here, HSBC failed to act in accordance with its obligations under the PSAs and the TIA to enforce the originators' and sponsors' obligations to cure, substitute, or repurchase defective mortgage loans and the servicers' obligations to follow proper servicing practices.

### G.    HSBC Has Selectively Asserted The Trusts' Repurchase Rights Against The Sellers In Bankruptcy Proceedings

414.    HSBC's knowledge of pervasive breaches of representations and warranties by the originators and sponsors at issue herein is also demonstrated by its own actions in 2009.  For example, in 2008, Lehman, a major originator and sponsor for the Trusts filed for bankruptcy.  In September 2009, HSBC filed claims in the bankruptcy action against Lehman for breaches of representations and warranties for at least 13 of the Lehman-label Trusts for breaches of representations and warranties as to all mortgage loans in each of those Trusts even though Lehman was not liable for all of the mortgage loans in most of those Trusts, and in fact there were many other solvent originators to those Trusts who had made representations and warranties for those mortgage loans and were thus liable for them. HSBC's "omnibus" claim for breach of representations and warranties as to all of the mortgage loans in all of those Trusts, including for mortgage loans that Lehman was not even potentially liable for, and in fact other

originators were, demonstrates HSBC's knowledge of pervasive breaches by all of the originators. Nonetheless, HSBC did not assert claims against Lehman for any of the Lehman-label Trusts at issue here.  Moreover, HSBC has not pursued any of the solvent originators to the Lehman-label Trusts to enforce representation and warranty claims as to the thousands of breaching mortgage loans in those Trusts.

### H.   HSBC Initiated Putback Litigation Against Many Of The Sellers

415.    In the aftermath of the financial crisis, HSBC participated in at least twenty-three actions to enforce putback rights for other RMBS trusts that involved the same originators, sponsors, sellers, and servicers as the Trusts at issue here.  Based on its involvement in these putback actions, which alleged pervasive and systemic breaches of representations and warranties by mortgage loan sellers to the Trusts, HSBC was aware of similarly pervasive and systemic breaches of representations and warranties in the Trusts. [13]

416.    For instance, between March 2012 and May 2013, HSBC, as trustee, filed at least sixteen complaints against Deutsche Bank in its capacity as sponsor of sixteen different trusts from the ACE and DBALT shelves.  In each of these actions, HSBC cited "forensic reviews" of the loan files associated with the mortgage loans held by the Trusts conducted prior to initiating suit.  In each case, that review revealed Deutsche Bank "dumped into the Trust a massive number of defective loans – loans that blatantly breached DBSP's representations and warranties." HSBC "asserted that Deutsche Bank's "*inaccuracies, misrepresentations, omissions, and other breaches were so fundamental and numerous as to preclude any notion that they were the result of mere inadvertence or accident*." To further bolster its allegations of seller breaches,

---

[13] Trusts at issue in the limited putback litigation pursued by HSBC are not included in this action, except for lawsuits that have been untimely filed by HSBC.

HSBC referenced government investigations and reports and private litigation establishing widespread abandonment of stated underwriting and securitization standards by common originators and Deutsche Bank.

417.    For example, in *ACE Securities Corporation, Series 2006-SL2 v. DB Structured Products, Inc.*, Index No. 650980/2012 (N.Y. Sup. Ct. Mar. 28, 2012), HSBC brought an action to enforce Deutsche Bank's repurchase obligations in connection with ACE 2006-SL2, a securitization that Deutsche Bank sponsored containing a large percentage of Fremont loans. HSBC alleged that its "investigations of over 1,600 of the Trust's Loans reveal[ed] that a stunningly high percentage of those analyzed – 99 percent – [were] in fact Defective Loans." HSBC explained that its finding were consistent with "[r]ecent government investigations, [which] revealed that Deutsche Bank, via its wholly owned subsidiaries DBSP and ACE, disregarded underwriting guidelines, and as a result made representations and warranties for mortgages that did not meet stated criteria in the governing documents." Compl. ¶31.  HSBC also acknowledged that "Fremont's originating practices were so poor, they were separately sued by both Morgan Stanley and Lehman Brothers for breach of contract arising out of Fremont's failure to repurchase loans that Fremont sold between 2004 and 2006." Compl. ¶37.

418.    In *Deutsche Alt-A Securities Mortgage Loan Trust v. DB Structured Products Inc.*, No. 12-cv-08594 (S.D.N.Y. Nov. 27, 2012), HSBC brought an action to enforce Deutsche Bank's breaches of representations and warranties in connection with DBALT 2006-OA1, a securitization containing 88.49% loans originated by Countrywide.  HSBC's forensic review revealed that 93% of the loan files reviewed showed breaches.  HSBC alleged:

> The breaches uncovered by the Forensic Review involve a high degree of borrower fraud and dishonesty concerning such core matters as borrower income, employment, occupancy of the subject property and other indebtedness. Put simply, the Forensic Review established that borrowers lied, with or without the

knowledge of [Countrywide and other loan originators], concerning how much money they owed, how much money they made, whether and where they worked, and where they lived. A handful of instances of such inaccuracies is perhaps to be expected. Hundreds of instances of borrower dishonesty is not.

419.     Similarly, between May 2012 and April 2013, HSBC, as Trustee, filed at least eight complaints against Nomura in its capacity as sponsor of eight different trusts from the NEHLI and NAA shelves due to "widespread and materially adverse breaches" of seller representations and warranties.   HSBC similarly relied on forensic reviews of the loans associated with the mortgage loans held by the Trusts conducted prior to initiating suit, revealing that Nomura systemically failed to provide accurate loan level information.   Specifically, HSBC's analysis showed breach rates in Nomura-label Trusts of over 80% and sometimes as high as 91.8%.   HSBC asserted that with respect to Nomura's securitizations, "[u]nderwriting guidelines were brushed aside, with loan originators abandoning minimum verification procedures and therefore leaving open the possibility of even greater risks being concealed."

420.     In short, the incredibly high rates of defaults cited by HSBC in support of certain putback actions demonstrates HSBC was well aware of the pervasive and systemic breaches of representations and warranties of the loans at issue here as well.

## XI.     THE TRUSTS SUFFERED FROM PERVASIVE SERVICER VIOLATIONS

421.     In the aftermath of the financial crisis, the mortgage loan servicing industry has received increased scholarly, popular, regulatory and political attention as a result of rampant servicing abuses by private-label RMBS servicers in connection with their administration of and foreclosing on mortgage loans backing private-label RMBS.

422.     Much like other private-label RMBS trusts of the same vintage, each of the Trusts suffer from ongoing Events of Default caused by the servicers' failure to observe and perform, in material respects, the covenants and agreements imposed on them by the PSAs.   The servicers'

breach of their covenants is confirmed through several federal and state government investigations and published reports, well publicized news reports, and public and private enforcement actions that have described RMBS servicers' systemic and pervasive deviation from usual, customary and lawful servicing practices in their administration mortgage and, more specifically, illegal and illicit servicing activities by the same servicers who service the loans held by the Trusts.

### A. The Servicers Failed To Give Notice Of Seller Breaches Of Representations And Warranties And Enforce The Sellers' Repurchase Obligations

423.    As with the Trustee, the PSAs require the servicers to give prompt written notice to all parties to the PSAs of a breach of a representation or warranty made by a seller in respect of the mortgage loans that materially and adversely affects the value of any mortgage loan or the interests of the Certificateholders in any such mortgage loan, upon the servicer's discovery of such breach.   Moreover, the servicers are required under the PSAs to enforce the sellers' obligation to repurchase, substitute, or cure such defective loans.

424.    In many cases, the servicers are affiliates of the sellers because in connection with the sale of a loan pool, the seller secured the retention of servicing rights to loans for its servicing division.   These servicers had actual knowledge of their affiliate mortgage loan sellers' abusive underwriting and securitization practices, and therefore had actual knowledge at the time of the Trusts' purchase of these loans that the sellers included high percentages of defective loans within the loan pools.   These servicers failed to notify parties to the PSAs of the discovery of mortgages that were in violation of applicable representations and warranties at the time they were purchased by the Trusts, and failed to enforce the sellers' repurchase obligations, despite their awareness of loans that were in violation of representations and warranties.

425.    Additionally, for the benefit of the Trusts, and pursuant to the PSAs, the sponsors acquired primary mortgage guaranty insurance ("PMI") policies for loans that had a LTV ratio in excess 80% which served as a "credit enhancement" in order to offer additional security to Certificateholders in the Trusts and to induce rating services to provide a higher credit rating for the Certificates, thereby making the Certificates more attractive to potential purchasers.  In the aftermath of the financial crisis, servicers have tendered claims to mortgage insurers under the PMI policies on the Trusts' behalf on defaulted loans.  The mortgage insurers have denied coverage, canceled or rescinded the mortgage insurance policies, or invoked policy exclusions for a high percentage of claims as a result of misrepresentations regarding the insured mortgage loans, including on the basis that the originator engaged in predatory lending or systemic fraud in the underwriting of the mortgage loans.  After these mortgage insurance claim denials, the servicers failed to observe or perform in a material respect their covenants and/or agreements under in the PSAs by failing to notify parties to the PSAs that the mortgage loan sellers violated representations and warranties at the time they sold loans to the Trusts..  Moreover, the servicers failed to tender the defective, defaulted loans to the sellers for repurchase.  Instead, the servicers charged the over-collateralized accounts for losses, causing damage to the Trusts and their Certificateholders.

426.    Further, as noted above, the servicers have regularly modified mortgage loans held by the Trusts.  Plaintiffs are informed and believe that in the process of modifying these mortgage loans, the servicers have discovered that specific loans breached applicable seller representations and warranties because the loan modification process involves scrutinizing the underlying origination and mortgage loan files, and any supplemental information provided by the borrower to assess the borrower's ability to pay.  Thus, in the process of performing loan

modifications, the servicers had to have discovered breaches of representations and warranties regarding the characteristics of the loan, the creditworthiness of the borrower, the adequacy of the collateral and the title status of the mortgages. Nevertheless, the servicers systemically failed to notify the other parties of these breaches.

427. As also set forth above, there has been widespread public evidence of the originators' abandonment of underwriting guidelines and the sponsors' faulty securitization practices that made the servicers aware of material seller breaches representations and warranties within the Trusts loan pools. Nevertheless, the servicers have not notified the other parties to the PSAs of these seller breaches or enforced the sellers' repurchase obligations.

428. The servicers' systemic and pervasive failure to give notice of the sellers' material breaches of representations and warranties and to enforce the sellers' repurchase obligations have materially affected the rights of the Trusts and all Certificateholders under the PSAs in that they have deprived the Trusts of mortgage loans of adequate credit quality, or alternatively funds representing the "Repurchase Price" under the PSAs, with respect to each defective mortgage loan.

**B.    The Servicers Have Violated
Their Prudent Servicing Obligations**

429. The PSAs require the servicers to service and administer the mortgage loans for and on behalf of the Certificateholders, and, consistent with the PSAs: (i) in the same manner in which they service and administer similar mortgage loans for their own portfolios or for other third parties, giving due consideration to customary and usual standards of practice of prudent institutional mortgage lenders servicing similar loans; (ii) with a view to maximizing the recoveries with respect to the mortgage loans on a net-present-value basis; and (iii) without regard to, among other things, the servicers' right to receive compensation or other fees for their

services under the PSAs, their obligation to make servicing advances under the PSAs, and their

ownership, servicing, or management for others of any other mortgage loans.

430.    High-profile class actions against the servicers have revealed violations of prudent

servicing practices.  For example, in June 2012, nationwide class actions were brought on behalf

of millions of homeowners against Wells Fargo, HSBC, Citibank N.A., JPMorgan Chase Bank

N.A., and Bank of America N.A., alleging that mortgage borrowers were overcharged for force-

placed insurance.  The borrowers specifically alleged that these servicers imposed force-placed

insurance policies that were far more expensive than market rates and received hundreds of

millions of dollars in clandestine commissions from the insurance companies writing the

policies.  The servicers' practice of imposing expensive force-placed insurance increased the

borrowers' monthly payments by a large amount.  As a result, homeowners who were already

behind in payments or were facing financial difficulties went into foreclosure.  The plaintiff

borrowers have also entered into several well publicized settlements with these servicers,

including settlements of $300 million with JPMorgan Chase, $110 million with Citibank, $32

million with Wells Fargo, and $19.3 million with HSBC.[14]  Plaintiffs are informed and believe

that these servicers and each of the other servicers to the Trusts have engaged in the same

violations of their prudent servicing obligations in servicing and administrating the mortgage

loans for the Trusts.

431.    Highly publicized government enforcement actions and settlements reached with

the servicers demonstrate that the servicers have systemically and pervasively violated these

---

[14] *Alfred Herrick, et al. v. JPMorgan Chase Bank N.A., et al.*, 13-21107 (S.D. Fla.), *Hall v. Bank of Am., N.A.*, 12-22700 (S.D. Fla.), *Lopez v. HSBC Bank USA N.A., et al.*, 13-21104 (S.D. Fla.), *Fladell v. Wells Fargo Bank N.A.*, 13-60721, (S.D. Fla.), and *Casey, et al. v. Citibank, N.A.*, 12-00820 (N.D.N.Y.).

prudent servicing obligations.  For example, in February 2012, forty-nine state attorneys general and the federal government announced a historic $25 billion joint state-federal settlement with the country's five largest mortgage servicers and their affiliates for misconduct related to their origination and servicing of single-family residential mortgages (the "National Mortgage Settlement"): (i) Wells Fargo & Company and Wells Fargo Bank, N.A..; (ii) Bank of America Corporation, Bank of America, N.A., BAC Home Loans Servicing, LP, Countrywide Financial Corporation, Countrywide Home Loans, Inc., Countrywide Mortgage Ventures, LLC, and Countrywide Bank FSB; (iii) Citigroup Inc., Citibank, N.A., and CitiMortgage, Inc.; (iv) J.P. Morgan Chase & Company and J.P. Morgan Chase Bank, N.A.; and (v) Residential Capital, LLC, Ally Financial, Inc., and GMAC Mortgage, LLC.

432.    In their corresponding complaint filed in March 2012, the state attorneys general and the federal government alleged that these servicers had engaged in unfair, deceptive, and unlawful servicing processes, including: (i) failing to timely and accurately apply payments made by borrowers and failing to maintain accurate account statements; (ii) charging excessive or improper fees for default-related services; (iii) failing to properly oversee third-party vendors involved in servicing activities on behalf of the banks; (iv) imposing force-placed insurance without properly notifying the borrowers and when borrowers already had adequate coverage; (v) providing borrowers false or misleading information in response to borrower complaints; and (vi) failing to maintain appropriate staffing, training, and quality-control systems.

433.    On October 2, 2013, Attorney General Eric T. Schneiderman ("Schneiderman") announced that he was suing Wells Fargo so that a federal judge would compel the bank to honor its commitments under the 2012 National Mortgage Settlement, which includes 304 servicing standards that participating servicers are required to adhere to, and which include standards that

are intended to make it easier for homeowners to seek loan modifications.  The servicing standards were incorporated into the National Mortgage Settlement to address longstanding complaints from consumers and advocates that servicers subject to the settlement, including Wells Fargo, consistently failed to provide fair and timely services to their customers.  Attorney General Schneiderman announced his intention to sue Wells Fargo and Bank of America after documenting hundreds of violations of the servicing standards outlined in the National Mortgage Settlement:

> The national mortgage settlement sets out more than 300 loan-servicing standards with which the banks are to comply.  However, in his warning letters to BofA and Wells Fargo, Schneiderman alleged that he had evidence from homeowners in the state that these servicers had repeatedly and persistently failed to follow basic rules like: providing written acknowledgement of receipt of a loan modification application within 3 business days; notifying the borrower of all missing documents or deficiencies in the application within 5 business days of receipt of the borrower's initial loan modification application; giving the borrower 30 days to submit missing documentation or correct a deficiency; and making a decision on a complete loan modification application within 30 days.

434.    On December 20, 2010, New Jersey Administrative Director of the Courts, Judge Grant, took the extraordinary step of issuing an administrative order requiring twenty-four loan servicers and RMBS trustees to file certifications demonstrating that there were no irregularities in the handling of their foreclosure proceedings.  The order was directed at, among others, Aurora, PHH, PNC (and therefore its Servicer National City) and SunTrust, all master servicers or servicers to the covered Trusts.  Also on December 20, 2010, the New Jersey Superior Court Chancery Division issued an order in *In the Matter of Residential Mortgage Foreclosure Pleading and Document Irregularities*, Docket No. F-595S3N10, directing six mortgage loan lenders and servicers implicated in residential mortgage loan foreclosure irregularities to show cause why the processing of their uncontested residential foreclosure filings should not be suspended.  Wells Fargo and Bank of America were two recipients of this show cause order.

435.    Moreover, in June 2010, the Federal Trade Commission ("FTC") filed a civil enforcement action against Countrywide Home Loans, Inc. and BAC Home Loans Servicing, LP (f/d/b/a Countrywide Home Loans Servicing, LP), a wholly owned subsidiary of Bank of America, National Association (collectively, "Countrywide/BAC") for their "unlawful acts and practices . . . in servicing mortgage loans." *See Fed. Trade Comm'n v. Countrywide Home Loans, Inc., et al.*, No. 10-cv-4193 (C.D. Cal. June 7, 2010).  In March 2008, before being acquired by Bank of America Corporation, Countrywide was ranked as the top mortgage servicer in the United States and had a servicing portfolio with a balance of approximately $1.4 trillion. In September 2009, after its acquisition of Countrywide, Bank of America was ranked as the nation's top mortgage servicer with a servicing portfolio of over $2.1 trillion. Countrywide/BAC are servicers for many of the Trusts. The FTC emphasized that many of the loans improperly serviced by Countrywide/BAC are the same "risky, high-cost loans that had been originated or funded by Defendants' parent company, Countrywide Financial Corporation . . . , and its subsidiaries . . . ."

436.    According to the FTC, when borrowers fell behind on their payments, Countrywide/BAC imposed a number of default-related services (such as property inspections and foreclosure-trustee services) "by funneling the work through a panoply of Countrywide subsidiaries." In its mortgage-servicing operation, Countrywide/BAC follows a so-called "vertical integration strategy" to generate default-related fee income.  Rather than obtain default-related services directly from third-party vendors and charge borrowers for the actual cost of these services, Countrywide/BAC formed subsidiaries to act as middlemen for default services. These subsidiaries exist solely to generate revenues for Countrywide/BAC and do not operate at arms-length with Countrywide/BAC. Countrywide/BAC and their subsidiaries – "[a]s a matter of

practice" – added substantial mark-ups to their actual costs for the services and then charged the borrowers the marked-up fees. The inflated fees were contrary to both prudent servicing standards and the mortgage contracts, which limit fees chargeable to the borrower to actual costs of the services and as are reasonable and appropriate to protect the noteholder's interest in the property and rights under the security instrument.

437.    Countrywide/BAC similarly breached servicing standards and mortgage contracts when servicing loans for borrowers who sought to save their homes through Chapter 13 bankruptcy. According to the FTC, Countrywide/BAC made various representations to those borrowers about their mortgage loans that were false or lacked a reasonable basis, and failed to disclose to borrowers during their bankruptcy cases when fees and escrow shortages and deficiencies accrued on their loans. After the bankruptcy cases closed and borrowers no longer had the protection of the bankruptcy court, Countrywide/BAC collected those amounts, including through foreclosure actions.

438.    Similarly, in December 2013, the Consumer Financial Protection Bureau ("CFPB"), authorities in forty-nine states, and the District of Columbia filed a proposed court order requiring the country's largest nonbank mortgage-loan servicer, Ocwen, and its subsidiary, Ocwen Loan Servicing, to provide $2 billion in first-lien principal reduction to underwater borrowers in order to compensate for years of systemic misconduct at every stage of the mortgage-servicing process. The Consent Order also covered two companies previously purchased by Ocwen, Litton Loan Servicing LP ("Litton") and Homeward Residential Holdings LLC (previously known as American Home Mortgage Servicing, Inc. or AHMSI). According to the CFPB and attorneys general's complaint, Ocwen violated state consumer law in a number of ways, including (i) failing to timely and accurately apply payments made by borrowers and

failing to maintain accurate account statements; charging borrowers unauthorized fees for default-related services; imposing force-placed insurance on consumers when Ocwen knew or should have known that they already had adequate home insurance coverage; and providing false or misleading information in response to consumer complaints.

439.    The servicers' systemic, pervasive failure to observe their prudent servicing obligations has materially impaired the rights of the Trusts and all Certificateholders under the PSAs in that the violations have exacerbated the Trusts' losses and have fostered uncertainty as to the timely recovery of collateral.

### C.    The Servicers Have Violated Their Foreclosure Obligations

440.    The PSAs require the servicers to use their best efforts, consistent with accepted servicing practices, to foreclose upon or otherwise comparably convert the ownership of properties securing mortgage loans that come into and continue in default and as to which no satisfactory arrangements can be made for collection of delinquent payments.   Moreover, the PSAs contemplate that foreclosures and liquidations of defaulted mortgages will proceed forthwith and in accordance with applicable law, provided the documentation is in order, as a matter of fairness to all parties.

441.    Highly publicized government enforcement actions and settlements reached with the servicers similarly have revealed the servicers have breached their foreclosure obligations. For example, in the fourth quarter of 2010, the Federal Reserve System, the OCC, and the OTC (collectively, the "Agencies") conducted on-site reviews of foreclosure processing at fourteen federally regulated mortgage servicers, which represented more than two-thirds of the servicing market. These servicers included Ally Bank/GMAC, Aurora, Bank of America, Citibank, EverBank, HSBC, JPMorgan Chase, MetLife, OneWest, PNC, Sovereign Bank, SunTrust, U.S. Bank, and Wells Fargo, many of which are servicers to the Trusts.  In April 2011, the Agencies

issued a joint report entitled "Interagency Review of Foreclosure Policies and Practices," summarizing the findings of their reviews and providing an overview of the potential impacts associated with instances of foreclosure processing weaknesses that occurred industrywide. Notably, the Agencies' reviews found "critical weaknesses in each of the servicers' foreclosure governance processes, foreclosure document preparation processes, and oversight and monitoring of third-party vendors, including foreclosure attorneys." Based on the deficiencies identified in these reviews and the risks of additional issues as a result of weak controls and processes, the Agencies initiated formal enforcement actions against each of the fourteen servicers subject to the review to address those weaknesses and risks. The enforcement actions detailed the weaknesses at each servicer and required each servicer, among other things, to conduct a more complete review of certain aspects of foreclosure actions that occurred between January 1, 2009 and December 31, 2010.

442. The OCC found in *In the Matter of Aurora Bank FSB*, No. NE-11-16, Consent Order (U.S. Office Thrift Supervision, Apr. 13, 2011), that, in connection with certain foreclosures of loans in its residential mortgage servicing portfolio, Aurora engaged in the following unsafe or unsound practices: "(a) filed or caused to be filed in state and federal courts numerous affidavits executed by its employees or employees of third-party service providers making various assertions, such as ownership of the mortgage note and mortgage, the amount of the principal and interest due, and the fees and expenses chargeable to the borrower, in which the affiant represented that the assertions in the affidavit were made based on personal knowledge or based on a review by the affiant of the relevant books and records, when, in many cases, they were not based on such personal knowledge or review of the relevant books and records; (b) filed or caused to be filed in state and federal courts, or in local land records offices, numerous

affidavits or other mortgage-related documents that were not properly notarized, specifically that were not signed or affirmed in the presence of a notary; (c) litigated foreclosure and bankruptcy proceedings and initiated non-judicial foreclosure proceedings without always ensuring that the promissory note and mortgage document were properly endorsed or assigned and, if necessary, in the possession of the appropriate party at the appropriate time; (d) failed to devote sufficient financial, staffing and managerial resources to ensure proper administration of its foreclosure processes; (e) failed to devote to its foreclosure processes adequate oversight, internal controls, policies, and procedures, compliance risk management, internal audit, third party management, and training; and (f) failed sufficiently to oversee outside counsel and other third-party providers handling foreclosure-related services." *In the Matter of Aurora Bank FSB*, No. NE-11-16, Consent Order (U.S. Office Thrift Supervision, Apr. 13, 2011).

443.    Similarly, as noted above, in March 2012, following an extensive investigation of Wells Fargo, Bank of America, Citigroup, Countrywide, J.P. Morgan Chase, Ally Financial, Inc., and GMAC Mortgage, LLC – some of the same servicers that service loans in the Trusts – the Justice Department, the Department of Housing and Urban Development, and forty-nine state attorneys general filed a complaint against these servicers and announced the $25 billion National Mortgage Settlement of the claims set forth in the complaint.  In the complaint, the attorneys general and federal government alleged that these servicers had engaged in wrongful conduct related to foreclosures, including failing to properly identify the foreclosing party, charging improper fees, preparing, executing, notarizing, or presenting false and misleading documents, and engaging in robosigning.

444.    Likewise, as noted above, in December 2013, following an extensive investigation of Ocwen and certain of its acquired entities, the CFPB, authorities in forty-nine

states, and the District of Columbia filed a complaint against Ocwen and announced a $2 billion

settlement of the claims stated in the complaint.  The CFPB's and attorneys general's complaint

alleged that Ocwen engaged in the same wrongful conduct related to foreclosures described in

the complaint against the servicers leading to the National Mortgage Settlement.

445.   In addition, private litigation has exposed the servicers' wrongful foreclosure

practices.  For example, homeowners from Queens and Brooklyn, who were at risk of losing

their homes to foreclosure, filed a federal class action lawsuit, charging that Aurora Loan

Services, Inc. (the second largest servicer of loans in the Trusts) their mortgage servicer, has

denied them access to the Obama Administration's Home Affordable Modification Program

("HAMP") for spurious reasons, and failed to provide them with notice so they may contest such

denials.  The lawsuit, *Edwards, et al. v. Aurora Loan Services, LLC, et al*, No. 09-cv-02100

(D.D.C. Nov. 9, 2011) was one of the first law-suits to challenge a mortgage servicer for breach

of contract by failing to review mortgage loans of eligible homeowners for HAMP and to

provide a procedure to contest denial.

446.   Moreover, in a California class action that has survived a motion to dismiss,

plaintiffs alleged that Aurora Loan Services foreclosed on homes without any notice that loan

modifications were denied and without allowing borrowers access to any cure method despite

promises in an agreement to do so.  *Mauder, et al. v. Aurora Loan Services, LLC*, No. 10-cv-

03383 (N.D. Cal. Aug. 2, 2010) Class Action Compl. ¶2.

447.   Servicers have also frequently wrongfully foreclosed on properties owned by

military servicemembers who were protected under the Servicemembers Civil Relief Act

("SCRA").  Based on a federal-government complaint accusing Countrywide Home Loans

Servicing LP of violating the SCRA on approximately 160 properties, Countrywide agreed to

pay $20 million to the victims. *United States v. BAC Home Loans Servicing, LP F/K/A Countrywide Home Loans Servicing, LP And Any Successors In Interest*, No. 11-cv-04534 (C.D. Cal. May 26, 2011) Consent Order ¶18.



Sources: RealtyTrac, Moody's Analytics

448. The servicers have also routinely kept defaulted mortgages on their books, rather than foreclose or liquidate them.  Indeed, in several states, the average days for delinquent loans in foreclosure in the Trusts have doubled or quadrupled.

449. The servicers' delay in foreclosing has allowed the servicers to charge unearned and unwarranted servicing fees, as well as unauthorized fees for default-related services, on mortgages that would have been liquidated but for the servicers' breach of their duties.  For example, in the complaint that led to the National Mortgage Settlement discussed above, the federal government and forty-nine states accused Wells Fargo, Citigroup, Bank of America, J.P. Morgan Chase, Countrywide, and Ally Financial, Inc. (many of which were servicers of loans in the Trusts) of unfair and deceptive practices in the discharge of their loan servicing activities for,

among other things, "*charging excessive or improper fees for default-related services.*" *United States, et al. v. Bank of America, et al.*, No. 12-cv-0361, (D.D.C. Mar. 12, 2012) Compl. ¶51.

450.    The servicers' systemic and pervasive violations of their foreclosure obligations have materially impaired the rights of the Trusts and all Certificateholders under the PSAs in that the Trusts have incurred costs of remedying procedural errors and re-filing affidavits and other foreclosure documents.  The Trusts have also been forced to bear costs related to disputes over note ownership or authority to foreclose, and to allegations of procedural violations through the use of inaccurate affidavits and improper notarizations.  The Trusts have further incurred losses as a result of delays or other damages caused by the weaknesses in the servicers' foreclosure processes.

### D.    The Servicers Have Violated Their Modification Obligations

451.    The PSAs provide that the servicers may agree to a modification of any mortgage loan only in specified circumstances.  When modifications are required to remedy predatory lending violations, the PSAs require the seller – not the Trusts or the Certificateholders – to bear the costs to cure the violations.

452.    The servicers have breached the PSAs by agreeing to modify loans held in the Trusts to settle predatory lending claims made by various attorneys general against their parent companies while breaching their obligation to demand that the offending mortgage sellers (their parent companies) bear the costs of curing the violations, as well as the expenses reasonably incurred in enforcement of the sellers' obligation to cure predatory mortgages.  For instance, in October 2008, Attorney Generals in eleven states announced a landmark, $8.68 billion settlement of predatory lending claims against Countrywide Home Loans, Countrywide Financial Corporation, and Full Spectrum Lending.  The settlement enabled eligible subprime and pay-option mortgage borrowers whose loans were serviced by Countrywide to obtain loan

modifications valued at up to $3.4 billion worth of reduced interest payments and, for some borrowers, reduction of their principal balances.

453.    The servicers have also breached the PSAs by agreeing to modify loans held in the Trusts to settle claims by various attorneys general related to the servicers' wrongful servicing and foreclosure practices.  For example, in meeting their payment obligations with respect to the National Mortgage Settlement, the settling servicers received credit for writing down principal of, and providing forbearance for, mortgage loans held by the Trusts.

454.    The servicers' violations of their loan modification obligations have materially impaired the rights of the Trusts and all Certificateholders under the PSAs in that the servicers and their parent companies have been unjustly enriched to the detriment of the Trusts and Certificateholders by using Trust collateral to settle claims that were not, and could never be, made against the Trusts.

### E.    The Servicers Have Abused Their Servicing Advances Obligations

455.    The PSAs provide that the servicers are to advance P&I on a loan only if they determine that the advance payment is recoverable.  The PSAs further provide that the servicers may only recover servicing advances that are customary, reasonable, and necessary out-of-pocket costs and expenses incurred in the servicers' performance of their servicing obligations.  The servicers have abused their advancing obligations to enrich themselves to the direct detriment of the Trusts.  In particular, the servicers have manipulated the "recoverable" designation to their advantage.  During low-interest-rate environments, the servicers have designated severely delinquent loans as recoverable so that the loans would be kept in the Trusts' loan pools and the servicers could continue to earn their servicing fees on the loans, which exceed the relatively low cost of financing the advances on these delinquent loans.  When interest rates have increased, however, the servicers have strategically switched the mortgage loans' designation from

recoverable to unrecoverable.  The switch in designation enables the servicers to recoup all prior advances as a senior claim of the Trusts.

456.    The servicers' manipulation of the "recoverable" designation was illustrated in the May 2013 remittance reports for many of the Trusts.  Following the Federal Reserve's May 11, 2013 announcement of its plan for tapering its bond-buying program, interest rates quickly shot up.  In a transparent response to the increase in the cost of financing their advances, the servicers switched the designation from recoverable to unrecoverable for an unprecedented amount of delinquent mortgage loans within the Trusts.  Specifically, the servicers wrote down over $500 million in May 2013 alone, representing a 52.3% increase over the prior reporting period.  The servicers' massive write downs are particularly suspicious, given that the mortgaged property values had been steadily rising for the past twelve months.



457.    The Trusts and their Certificateholders are harmed by the servicers' manipulation of the "recoverable" designation because the Trusts incur more interest-rate risk exposure than expected since the servicers' recoverability designations are strategically determined as a

function of interest rates, as opposed to the value of the mortgaged property as required under the PSAs.

458.    The servicers' abuse of their advancing obligations is further illustrated by their increasing use of "unrecognized forbearances."  The servicers modify delinquent mortgage loans by granting forbearances to the borrowers for extended periods of time which act to reduce the principal amounts of the mortgage loans.  The forbearances allow the servicers to lower their advanced principal payments on the loans.  Nevertheless, the servicers do not formally write down the loan balances or make any recognition on the Trusts' accounts.  Thus, the mortgage loans remain in the Trusts at full value, thereby allowing the servicers to earn full servicing fees, which are calculated as a percentage of the total principal amount of the mortgage loans in the Trusts' loan pools, although the mortgage loans are accruing interest at a lower principal amount and without the servicers having to make any advances.

459.    According to a Credit Suisse study, unrecognized forbearances in the Trusts totaled approximately $500 million as of April 2013.[15]  At least 207 of the Trusts had some amount of unrecognized forbearance, and at least sixteen of these Trusts had unrecognized forbearance amounts exceeding 3% of the Trust's current collateral balance:

**Top 10 HSBC Trusts by Share of Current Balance Forborne**

| | Offering | Original Face Amount | Then Current Balance | Estimated Unrecognized Forbearance | Unrecognized Forbearance as % of Current Balance |
|---|---|---|---|---|---|
| | Data as of April 2013 distributions. 1st lien only | | | | |
| 1 | ACE 2005-ASP1 | $522,792,584 | $83,970,442 | $5,686,594 | 6.77% |
| 2 | CARR 2007-HE1 | $384,437,480 | $202,752,212 | $11,696,292 | 5.77% |
| 3 | SGMS 2006-OPT2 | $813,345,795 | $288,207,543 | $16,565,071 | 5.75% |
| 4 | FHLT 2005-E | $2,118,037,100 | $396,548,706 | $21,765,981 | 5.49% |

---

[15] Credit Suisse estimates that, as of April 2013, unrecognized forbearances on non-agency RMBS deals issued after 2000 (first lien only) totaled around $8.3 billion.

| | | | | | |
|---|---|---|---|---|---|
| 5 | OOMLT 2007-HL1 | $794,245,622 | $282,177,982 | $13,454,146 | 4.77% |
| 6 | ACE 2006-OP2 | $892,105,501 | $257,437,651 | $11,692,666 | 4.54% |
| 7 | LUM 2006-7 | $792,898,000 | $275,844,227 | $11,903,090 | 4.32% |
| 8 | ACE 2006-ASP3 | $728,556,220 | $161,977,644 | $6,329,960 | 3.91% |
| 9 | ACE 2006-OP1 | $1,107,055,226 | $274,204,859 | $10,572,114 | 3.86% |
| 10 | SARM 2007-9 | $532,007,422 | $207,725,380 | $7,673,050 | 3.69% |

Source: Credit Suisse, Loan Performance

460. The servicers' pervasive use of unrecognized forbearances harms the Trusts and their Certificateholders since the Trusts pay higher servicing fees to the servicers and are not informed in a timely manner about impairments to mortgage loans in the underlying loan pools.

461. Despite the requirement that servicing advances were to be incurred only for reasonable and necessary out-of-pocket costs, the servicers instead utilized affiliated vendors – which marked up their charges to a level 100% or more above the market price – to provide services related to the preservation, restoration, and protection of mortgaged property, in a fraudulent, unauthorized, and deceptive effort to supplement their servicing income.

## XII. HSBC HAS KNOWN OF SERVICER VIOLATIONS PLAGUING THE TRUSTS

462. There is ample evidence that, beginning in early 2009 and continuing to the present, HSBC and its responsible officers have known of the above described widespread and severe failures on the part of the servicers to observe or perform in material respects their obligations under the PSAs. Preliminarily, as discussed above, since 2009 and continuing to the present there has been a steady stream of public disclosures regarding the servicers' violations. Nevertheless, apart from the highly publicized government investigations, reports and enforcement actions, as well as high profile litigation involving the servicers, as explained below there is a host of additional evidence demonstrating HSBC and its responsible officers' knowledge that the servicers have materially breached their contractual obligations.

A. **HSBC Itself Was Involved In**
**Government Enforcement Actions And**
**Litigation Stemming From The Servicers' Violations**

463.     HSBC and its responsible officers knew of the servicers' improper servicing practices because, as described in greater detail below, HSBC and its affiliates, in their capacity as servicers to other RMBS trusts, were targets together with many of the servicers for the Trusts in highly publicized governmental investigations, prosecutions and settlements.   For example, along with thirteen other of the nation's largest servicers, the Agencies similarly found deficiencies in HSBC's servicing and foreclosure processes.   Accordingly, the Agencies brought a formal enforcement action against HSBC, and HSBC participated in a joint settlement including Aurora, Bank of America, Citibank, Goldman Sachs, HSBC, JPMorgan Chase, MetLife Bank, Morgan Stanley, PNC, Sovereign, SunTrust, and U.S. Bank. HSBC's involvement in such proceedings would have made it acutely aware of the deficiencies of each of the other servicers subject to these actions.

464.     HSBC and its responsible officers also knew of the servicers' improper servicing practices through its involvement in litigation highlighting servicing failures, such as in judicial foreclosure proceedings exposing the servicers' failure to correct irregularities in the chain of title.  *See Davenport v. HSBC Bank USA*, 739 N.W.2d 383, 385 (Mich. Ct. App. 2007) (holding that the foreclosure must be vacated when the bank "did not yet own the indebtedness that it sought to foreclose"); *HSBC Bank U.S.A. Nat'l Ass'n v. Miller*, 889 N.Y.S.2d 430, 433 (Sup. Ct. 2009) (holding that a mortgagee's assignee lacked standing to foreclose because the mortgagee did not hold the promissory note at the time the complaint was filed); and *Pasillas v. HSBC Bank USA*, 255 P.3d 1281 (Nev. 2011) (holding that non-judicial foreclosures could not proceed under the Nevada foreclosure-mediation statue when a party seeking foreclosure was neither the holder of the note nor the assignee beneficiary of the deed of trust).

465.    Similarly, in *HSBC Bank USA v. Palladino*, 2011 Ill. App. 2d No. 08-CH-4548, the court reversed summary judgment, noting that, "there are genuine issues of material fact with respect to whether there was an assignment of the mortgage and note from Fremont to HSBC Bank."  HSBC was also unsuccessful in a foreclosure action in New York state court where the judge found that the "continuation of this action by plaintiff HSBC, with its false statements of fact, the use of robosigners, and the disingenuous affirmation of Mr. Cassara, appears to be frivolous . . . .  It is clear that the instant motion for an order of reference "is completely without merit in law" and "asserts material factual statements that are false."  *HSBC Bank USA, N.A. v. Taher*, 32 Misc. 3d. 1208(A), 932 N.Y.S. 2d 760 (N.Y. Sup. Ct. Kings Co. 2011).

466.    Finally, in *HSBC Bank USA v. Beirne*, 212-Ohio-1386 (Ohio App. Ct. 9th Dist. Mar. 30, 2012), summary judgment granted in favor of HSBC was reversed.  "In the affidavit which was attached to the supplement to the motion for summary judgment, Mr. Spradling averred that HSBC had been assigned the loan on June 5, 2009, and that '[a] true and correct copy of the Assignment was attached to the Complaint filed by HSBC.'  However, a review of the complaint and the exhibits attached thereto reveals that there was no evidence that the note had been assigned to HSBC.  Moreover, an assignment dated June 5, 2009, could not have been attached to the complaint which was filed on May 11, 2009."  *Id*.

467.    These and other public enforcement actions and private litigation highlighting the servicers' improper servicing practices were well known throughout the RMBS industry, including by HSBC and the other principal financial crisis-era trustees.  For example, in October 2010 Deutsche Bank – which serves as trustee for more than 1,000 RMBS trusts – issued a notice to all RMBS certificateholders in trusts for which Deutsche Bank served as trustee confirming Deutsche Bank's awareness of ongoing government investigations into improper

servicing practices.  Deutsche Bank's notice acknowledged that it had been "widely reported in the news media" that "several major U.S. loan servicers" had "suspended certain foreclosures in some or all states" due to allegations and investigations regarding "defects in foreclosure practices, procedures and/or documentation."  Also in October 2010, Deutsche Bank sent an "urgent and time sensitive" memorandum to all servicers of mortgage loans included in any RMBS trust for which Deutsche Bank acts as trustee.  In the memorandum, Deutsche Bank discussed "an urgent issue requiring your [the servicers] immediate attention" – specifically, the same "serious . . . defects in foreclosure practices, procedures and/or documentation" discussed in Deutsche Bank's notice to certificateholders.  The memorandum referred to the expansive scope of the reported servicer deficiencies, and admitted that foreclosure abuses such as the execution and filing by servicers or their agents of documents containing untrue assertions of fact "would constitute a breach of that Servicer's obligations under the [PSAs] and applicable law."

### B. HSBC And Its Responsible Officers Received Written Notice From Certificateholders Of Pervasive And Systemic Servicer Breaches

468.    In its capacity as trustee to other RMBS trusts that are not the subject of this action, HSBC and its responsible officers received written notice from certificateholders of the same systemic servicing violations described above perpetrated by the very same servicers for the Trusts.   Based on the systemic and pervasive practices complained of in the certificateholders' breach notices, HSBC and its responsible officers knew that the servicers were engaged in the same wrongful conduct in connection with their servicing of the loans for the Trusts.

469.    For example, on December 16, 2011, investors provided notice to HSBC and four other RMBS trustees of, among other things, master servicer violations by JPMorgan Chase and JPMorgan Chase predecessor entities (Bear Stearns and WaMu) in connection with $95 billion of

RMBS issued by various affiliates of JPMorgan Chase from 243 trusts issued between 2005 and 2007 under the BALTA, BSABS, BSARM, BSMF, CFLX, CHASE, JPALT, JPMAC, JPMMT, PRIME, SACCO, SAMI, WAMU, and WMALT labels.  The investors demanded that HSBC open an investigation of ineligible mortgages and deficient servicing of these loans.  The December 16, 2011 notice put HSBC on notice of systemic deficient servicing practices by JPMorgan Chase and its affiliates, some of the largest servicers for the Trusts.  Indeed, as discussed above, this same investor group reached an agreement with JPMorgan Chase that calls for the payment of $4.5 billion in cash to the 330 trusts issued under these JPMorgan Chase RMBS labels to settle mortgage repurchase and servicing claims, as well as for the implementation of substantial servicing changes to mortgage loans in the covered trusts to rectify the pervasive servicing deficiencies by JPMorgan and its affiliates.  On August 1, 2014 and October 2, 2014, all of the trustees involved in the JPMorgan Putback Initiative – including HSBC – accepted JPMorgan's $4.5 billion offer for the vast majority of the 330 trusts included in the offer and petitioned the Supreme Court of the State of New York for approval of the settlement.

470.   As noted above, on January 5, 2012, a group of investors provided notice to HSBC and U.S. Bank, as Trustees, of mortgage loans in breach of seller representations and warranties in pools securing over $19 billion of RMBS issued by various affiliates of Wells Fargo in forty-eight trusts from the WFALT, WFMBS, and WMLT shelves ("January 5, 2012 Notice").  In addition to advising HSBC of ineligible loans, the investor group issued instructions to HSBC to open an investigation into deficient servicing of those loans.  On September 9, 2012, that same group issued notice to Wells Fargo, identifying specific servicing covenants in PSAs that Wells Fargo have failed to perform.  The September 9, 2012 letter alleges that each of these

failures has materially affected the rights of the Certificateholders and constitutes an ongoing Event of Default in the servicer's performance under the relevant PSAs.  Plaintiffs are informed and believe that HSBC received a copy of the September 9, 2012 letter.

471.    Despite HSBC's actual notice of widespread loan defaults and breaches, as the two examples above illustrate, HSBC failed to act in accordance with its obligations under the Governing Agreements and TIA to enforce the originators' and sponsors' obligations to cure, substitute or repurchase defective mortgage loans.

**C.    HSBC Had Knowledge Of The
Servicers' Failures Through The
Monthly Servicer And Remittance Reports**

472.    HSBC and its responsible officers also knew of the servicers' improper servicing practices through the servicers' servicing reports and the monthly remittance reports HSBC itself published.  These reports detailed the Trusts' increasing loan modifications, staggering losses, and write-downs due to the poor credit quality of the loans, but did not reflect the servicers' actions to enforce the sellers' repurchase obligations.   The reports similarly reflected the servicers' abuse of servicing advances.

**XIII.   HSBC FAILED TO DISCHARGE ITS
CRITICAL PRE- AND POST-DEFAULT DUTIES**

473.    Despite HSBC's knowledge of the Trusts' high default rates and poor performance, breaches of representations and warranties made by the originators, sellers, depositors, and sponsors, and servicer violations, HSBC failed to perform its duties as Trustee to protect the Trusts and Certificateholders.

**A.    Failure To Enforce The Trusts' Repurchase Rights**

474.    As set forth above, beginning in 2009 and continuing to the present, HSBC and its responsible officers discovered the Trusts contained loans that materially breached the sellers'

representations and warranties, which adversely affected the value of those mortgage loans and the Trusts' and Certificateholders' interests in those mortgage loans.  HSBC further knew that the servicers had failed to take appropriate steps to enforce the sellers' obligations to cure, replace or repurchase the affected loans, and that the failure on the part of the servicers to take appropriate steps against the sellers was material.

475.    HSBC breached its contractual and statutory duties under TIA and was negligent by failing to (i) provide notice to the servicers and/or the responsible sellers upon its discovery of these breaches, and (ii) take any action to enforce the sellers' repurchase of the defective mortgage loans.

**B.    Failure To Provide Notice
To The Servicers Of Events Of Defaults**

476.    As set forth above, beginning in 2009 and continuing to the present, HSBC and its responsible officers knew of failures on the part of the servicers to observe or perform in material respects their covenants or agreements in the PSAs, including the servicers' (i) failure to give notice to the other parties of seller breaches of representations and warranties upon discovery thereof and enforce the sellers' repurchase obligations; (ii) violations of prudent servicing obligations; (iii) violations of foreclosure obligations; (iv) violations of modification obligations; and (v) improper servicing advances.  These breaches by the servicers constituted "Events of Defaults" as defined by the PSAs.  HSBC knew that these servicers' breaches were material.

477.    HSBC breached its contractual and statutory duties under TIA and was negligent by failing to provide notice to the servicers of these Events of Defaults or terminating the servicers.

C.     **Failure To Act Prudently Subsequent
       <u>To The Uncured Events Of Defaults</u>**

478.   As set forth above the Events of Default occurred, remained uncured for the requisite period of time and are continuing.  Consequently, under the PSAs, HSBC had and continues to have the obligation to exercise the rights and powers vested in it by the PSAs, and to use the same degree of care and skill in its exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

479.   A prudent person would have taken action to protect the Trusts and its Certificateholders from the known seller breaches of representations and warranties by exercising all of its rights under the PSAs to enforce the sellers' repurchase obligations, including timely conducting an investigation to determine all of the materially breaching mortgage loans and suing the sellers for specific performance to compel their repurchase of those loans.  HSBC breached its contractual, statutory and fiduciary duties and was negligent by failing to act prudently and taking these actions.

480.   A prudent person would have also taken action to protect the Trusts and its Certificateholders from the known servicer violations by exercising all of its rights under the PSAs to enforce the servicers' prudent servicing obligations, including ensuring that all Events of Defaults were cured, terminating the servicers, substituting itself in as the substitute servicer or replacing the servicers, and enforcing the servicers obligations to reimburse the Trusts for losses caused as a result of their breaches through suit if necessary.  HSBC breached its contractual, statutory and fiduciary duties and was negligent by failing to act prudently and taking these actions.

### D. Failure To Provide Notice To The
### Certificateholders Of The Uncured Events Of Defaults

481.    As set forth above the Events of Default occurred, remained uncured for the requisite period of time and are continuing.  Consequently, under the PSAs, HSBC also had and continues to have the obligation to provide all Certificateholders with notice of these Events of Default.

482.    HSBC had no good faith reason for failing to provide notice of these Events of Defaults to the Certificateholders and, by failing to provide Certificateholders with notice of these Events of Default, HSBC breached its contractual, statutory and fiduciary duties and was negligent.

### XIV. HSBC FAILED TO PROTECT THE TRUSTS
### FOLLOWING THE INSOLVENCY OF CERTAIN SPONSORS

483.    HSBC failed to adequately protect the Trusts after the Sponsors of certain Trusts filed for bankruptcy or otherwise became insolvent.  In these instances, HSBC only acted to assert the Trusts' rights when it was in HSBC's interests and only to the extent consistent with HSBC's interests.  In particular, HSBC failed to adequately and comprehensively pursue relief against numerous solvent third parties that were also contractually liable under the PSAs for servicing violations or representation and warranty violations.  Finally, HSBC failed to provide notice of seller defaults, Events of Defaults, and otherwise notify Certificateholders of information known only to HSBC that was necessary for Certificateholders to take action to protect their rights and avoid or mitigate losses.

484.    HSBC has failed to adequately protect the Trusts against pervasive violations in the servicing of loans collateralizing Trusts sponsored by failed entities.  Loans collateralizing these Trusts have been serviced (and continue to be serviced) by third parties unaffiliated with the bankrupt or insolvent sponsors.  As discussed herein, servicers have independent duties and

obligations under the PSAs, and their liability for breach of those duties and obligations is untethered to solvency of the sponsor.

485.    For example, Wells Fargo is a major servicer of loans securitizing Fremont-sponsored RMBS at issue in this action.  While Fremont filed for bankruptcy in 2008, Wells Fargo continues to service approximately $16.1 billion of loans that Fremont sponsored.  There is ample evidence that Wells Fargo engaged in rampant, industry-wide servicing abuses in connection with loans backing private-label RMBS, including these Fremont Trusts.  Among other things, Wells Fargo was one of the fourteen federally regulated mortgage servicers against whom the Federal Reserve, the OCC, the FDIC, and the OTS initiated formal enforcement actions against, which resulted in a Consent Order against Wells Fargo based on comprehensive interagency findings of serious abuses and "critical weaknesses" in its servicing and foreclosure processes.  Despite HSBC's knowledge of such systemic and pervasive servicing abuses by solvent third party servicers, including Wells Fargo, HSBC failed to adequately protect the rights of Fremont-sponsored Trusts against solvent servicers.

486.    In addition, HSBC also has not pursued representation and warranty claims against solvent originators for thousands of breaching mortgage loans backing Trusts sponsored by failed entities.  Examples of such solvent third party sellers of loans to bankrupt sponsors include Bank of America/Countrywide, Wells Fargo/Wachovia, and GreenPoint, which collectively sold over $3.1 billion of loans securitizing Trusts sponsored by Lehman at issue in this action.

487.    HSBC also failed to discharge its contractual and statutory obligations concerning Trusts sponsored by failed entities by neglecting to provide written notice to Certificateholders of Events of Default arising from pervasive breaches of representations and warranties by the

sellers and extensive servicer violations, including with respect to deficient loans sold by solvent responsible parties. Proper notice would have enabled Certificateholders to, among other things, determine whether to take independent or collective action to protect their interests against such breaches of representations and warranties, including against solvent responsible parties and others engaged in abusive securitization practices.

488. Finally, HSBC has taken certain actions on behalf of the Trusts and Certificateholders in isolated bankruptcies of sponsors or originators by submitting proofs of claim in the bankruptcy proceedings. For example, HSBC submitted proofs of claim in the bankruptcy of ResCap in 2013. However, HSBC did so because such action enabled HSBC to create the appearance of enforcement, but required only minimal effort or expense from HSBC with little legal risk, while simultaneously providing a vehicle for HSBC to seek broad liability releases and exculpation. Indeed, the broad settlement reached in the ResCap bankruptcy covering 570 trusts was the product of a hard-fought initiative led by certificateholders—not the trustees that ultimately approved the deal and benefitted from its releases and other provisions. Submitting claims also created no business risk to HSBC because the seller's failure meant that HSBC could selectively enforce the Trusts' repurchase rights without fear of losing valuable repeat business, alienating new sources of business, or provoking claims in response against HSBC for its own liability as a seller for other RMBS.

## XV.  HSBC FAILED TO PROTECT THE TRUSTS DUE TO ITS CONFLICTS OF INTEREST

489. HSBC failed and unreasonably refused to discharge its critical pre- and post-default duties owed to the Trusts and all Certificateholders because acting to diligently protect the interests of the Trusts would have conflicted with its own interests.

### A. HSBC Was Economically Beholden To The Mortgage Loan Sellers

490. Trustees are selected by the sponsor, which is often an affiliate of the servicer. While HSBC was charged with representing the interests of the Trusts and all Certificateholders, it was economically beholden to the sponsors. Indeed, HSBC had close, repeat business relationships with most, if not all, of the sponsors for the Trusts. For example, HSBC received over 30% of its private-label residential mortgage securitization trusteeship appointments from just two banks: Wells Fargo and Lehman, based on the cumulative original face value of the offerings. And, the entirety of these banks' servicing business was conducted by their respective affiliates: Wells Fargo Bank (100%) and Aurora Loan Services Inc. (100%). Accordingly, HSBC was incentivized to not require servicers to take necessary action because these servicers were affiliated with the sponsors that provided valuable trustee appointments. In short, HSBC failed to protect the Trusts because it did not want to risk losing significant business from these sponsors.

### B. HSBC Was Engaged In The Same Wrongful Servicing Activities

491. HSBC failed and unreasonably refused to take action to protect the Trusts and Certificateholders against seller breaches and servicer violations because it would have exposed that HSBC itself was engaged in the same servicing misconduct in its role as servicer for other RMBS trusts.

492. As noted above, during the fourth quarter of 2010, the Federal Reserve, the OCC, the FDIC, and the OTS conducted on-site reviews of the adequacy of controls and governance over servicers' foreclosure processes at HSBC. The reviews uncovered significant problems in foreclosure processing at HSBC, including "critical weaknesses in [HSBC's] foreclosure

governance processes, foreclosure document preparation processes, and oversight and monitoring of third-party vendors, including foreclosure attorneys."[16]

493.    On April 13, 2011, based on the deficiencies in the review and the risk of additional issues as a result of weak controls and processes, the Federal Reserve Board initiated formal enforcement actions against HSBC North America Holdings, Inc. and HSBC Finance Corporation, the corporate parent and affiliate of HSBC, respectively, requiring them to address HSBC's pattern of misconduct and negligence related to deficient practices in residential mortgage loan servicing and foreclosure processing.[17]   According to the Federal Reserve Board's press release, "[t]hese deficiencies represent significant and pervasive compliance failures and unsafe and unsound practices at [HSBC]." The enforcement action required HSBC to remediate deficiencies in its residential mortgage loan servicing and foreclosure processing practices.

494.    As part of the enforcement action, HSBC North America Holdings, Inc. and HSBC Finance Corporation entered into a consent order with the Federal Reserve Board, which found that the HSBC Mortgage Servicing Companies had engaged in "unsafe or unsound practices in residential mortgage servicing and in the Bank's initiation and handling of foreclosure proceedings."

495.    In addition, the OCC entered into consent orders with HSBC and several other servicers, including HSBC and Aurora (the "OCC Consent Orders").  In the OCC Consent Order with HSBC, the government found, among other things, that beginning in 2009 HSBC filed false

---

[16]  Interagency Review of Foreclosure Policies and Practices (Apr. 2011), *available at* http://www.federalreserve.gov/boarddocs/rptcongress/interagency_review_foreclosures_201104 13.pdf.

[17] The nine other institutions targeted by the Federal Reserve Board's enforcement actions were Bank of America Corporation; Citigroup Inc.; Ally Financial Inc.; JPMorgan Chase & Co.; MetLife, Inc.; The PNC Financial Services Group, Inc.; SunTrust Banks, Inc.; U.S. Bancorp., and Wells Fargo & Company.

or otherwise defective affidavits in connection with foreclosure proceedings and failed to exercise adequate oversight, internal controls, policies, and procedures, compliance risk management, internal audit, third party management, and training for its foreclosure-related services.  The enforcement action required extensive fixes to HSBC's mortgage servicing and foreclosure processes.   The order also required HSBC to retain independent consultants to conduct a comprehensive review of foreclosure activity by these servicers in 2009 and 2010.

496.   On January 18, 2013, HSBC settled with the Federal Reserve and the OCC and agreed to provide $249 million to end the case-by-case review of HSBC's servicing practices. HSBC agreed to pay $96 million to eligible borrowers who lost their homes to foreclosure in 2009 and 2010 and to provide $153 million in other assistance, including loan modifications and forgiveness of deficiency judgments, to settle the Federal Reserve and OCC's charges in connection with the unsafe and unsound mortgage servicing and foreclosure practices.

497.   Likewise, several consumer suits have revealed HSBC's pattern and practice of imposing improper servicing fees on borrower, including *Lopez v. HSBC Bank USA N.A., et al.,* No. 13-cv-21104 (S.D. Fla. Mar. 28, 2013), where HSBC was forced to pay $32 million to settle borrower claims for imposing force-placed property insurance on borrowers at inflated rates.

498.   Due to the fact that HSBC itself was engaging in the same illicit and improper acts as the servicers for the Trusts, HSBC failed to enforce the servicer violations, or even alert the Certificateholders to the servicers' misconduct.

C.   **HSBC Originated**
      **And Sponsored Defective Loans**

499.   HSBC was also a leading sponsor of private-label mortgage-backed securities and securitized hundreds of millions of dollars of loans that breached applicable representations and warranties.  HSBC, a principal subsidiary of HSBC, sponsored thirty-five RMBS offerings under

the HASC, HALO and, HFCHC labels that were collateralized by a total of over $27 billion in certificates issued from trusts ("HSBC-Sponsored Trusts").  Many of the same entities that acted as sellers through their affiliate companies acted in the capacity as servicer or trustee for the HSBC-Sponsored Trusts, including HSBC.

500.    Many of the underlying residential mortgage loans for HSBC-Sponsored Trusts were originated and serviced by HSBC affiliates.  In addition, HSBC acquired loans for its securitizations from mortgage originators that later became known as some of the worst in the industry, including First Franklin, Option One, New Century, WMC, and Countrywide, among others.  As a mortgage loan seller, both as an originator and sponsor, HSBC made representations and warranties to the HSBC-Sponsored Trusts regarding the quality and characteristics of the mortgage loans.

501.    Widespread public evidence demonstrates pervasive violations of seller representations and warranties in the HSBC-Sponsored Trusts.  For example, a comprehensive loan level analysis of various HSBC-Sponsored Trusts conducted by the FHFA revealed that up to 13.26% of mortgage loans in the HSBC-Sponsored Trusts breached owner occupancy representations and warranties, and that up to 39.51% of mortgage loans in the HSBC-Sponsored Trusts breached certain LTV representations and warranties.  *FHFA v. HSBC N. Am. Holdings, Inc. et al.*, No. 1:11-cv-06189 (S.D.N.Y Sept. 2, 2011) Compl. at ¶¶96, 100.  Other securities suits have similarly demonstrated that significant numbers of mortgage loans sold into the HSBC-Sponsored Trusts breached representations and warranties.  *See*, *e.g.*, *Deutsche Bank Nat'l Trust Co. v. HSBC Bank USA*, *N.A.*, Index No. 652001/2013 (N.Y. Sup. Ct. Nov. 12, 2013) (finding that approximately 45% of the loans analyzed were determined to be in breach of one or more representations and warranties).  In addition, there is widespread evidence of deficient

underwriting practices by the third party originators that supplied loans for the HSBC-Sponsored Trusts.

502.    Accordingly, because HSBC itself faced enormous repurchase liability for billions of dollars of loans it originated, sponsored and sold to the HSBC-Sponsored Trusts in breach of representations and warranties, HSBC failed and unreasonably refused to take any action against the sellers for the Trusts, or even notify the Certificateholders of servicer misconduct.

### D.    HSBC Refused To Discharge Its Duties In Order To Preserve Profits

503.    HSBC was also conflicted because discharging its critical pre- and post-default duties owed to the Trusts and the Certificateholders would have necessarily diminished profits. Specifically, such conduct would have directly impaired HSBC's profits by increasing costs and expenses while revenue remained unchanged.  Indeed, rather than act pursuant to its proscribed contractual, statutory, and common law duties, HSBC failed and unreasonably refused to enforce the sellers' repurchase obligations and servicers' prudent servicing requirements in order to avoid the associated transactional costs of exercising the Trusts' rights against these entities – or provoke the servicers to shine the light on HSBC's own wrongful conduct.

504.    For example, prior to a "default" under the TIA or an "Event of Default" under the PSAs, HSBC had minimal ministerial duties to perform.[18]  Following a default under the TIA or Event of Default under the PSAs, however, HSBC's obligations expand such that it must act as a prudent person.  This requirement carries with it significant and more costly responsibilities, including seeking direction from the certificateholders regarding the appropriate actions it should take on behalf of the trusts.  However, fulfilling these greater duties increases costs while

---

[18] New York common law still imposed certain non-waivable duties on HSBC both before and after a "default" under the TIA or an "Event of Default" under the PSAs.

HSBC's compensation under the PSAs – a fixed fee rate based on the unpaid principal balance of the trust (typically less than one basis point) – would remain unchanged.

505.     Additionally, the occurrence of an Event of Default could lead to the termination of the master servicer, which would have profound financial implications on HSBC.   If the master servicer were terminated, HSBC would have to retain a successor master servicer or substitute itself in as the master servicer.   The compensation that HSBC or the successor master servicer could obtain would be heavily restricted.   For example, typical – and more lucrative – servicing income, such as float, excess spread, and ancillary fees are prohibited for a successor master servicer under the PSAs.   Nevertheless, HSBC or the successor master servicer would be required to hold regulatory capital against the servicing rights.

506.     Further, the occurrence of a default under the TIA or an Event of Default under the PSAs requires HSBC to provide notice of these defaults to the certificateholders.   In addition to alerting certificateholders to seller and servicer violations, the default notice would expose HSBC's negligence in carrying out its ministerial duties, including its failure to receive, process, maintain and hold all or part of the mortgage loan files as required under the PSAs. Consequently, HSBC's providing notice to the certificateholders of defaults could lead to potential liability or its removal as trustee of the Trusts.

507.     Accordingly, the increased duties, costs, and liability risks associated with enforcing the Trusts' rights against seller and servicer violations would make HSBC's trusteeships less profitable and possibly unprofitable.   For these reasons, HSBC failed and unreasonably refused to enforce the Trusts' rights against the sellers and servicers.

## XVI.   CAUSATION

508.     HSBC's failure and unreasonable refusal to enforce the Trusts' rights against the sellers and servicers, and its violations of its other contractual, statutory, fiduciary and

independence duties, along with its negligence, have directly and proximately caused billions of dollars in Trust assets to waste away.  The mortgage loans conveyed to the Trusts did not comply with seller representations and warranties, but were instead of a lower quality, which increased the risk of defaults in the principal and interest payments owed to the Trusts.  Moreover, servicer violations have exacerbated the Trusts' losses.  Had HSBC performed its duties as Trustee, in particular had it adequately enforced the obligations of the sponsors and originators to cure, substitute, or repurchase mortgage loans that breached the representations and warranties, it would have prevented the Trusts from incurring substantial losses and Trust assets from wasting away.  Had HSBC enforced the Trusts' rights against servicers for reimbursement of losses caused by their misconduct as required, it would have benefited the Trusts and their Certificateholders.

## XVII.  DAMAGES

509.    The Trusts have incurred substantial damages attributable to HSBC's breaches of its contractual, statutory, fiduciary, and common law duties.  In particular, the Trusts' loan pools are filled with loans of inadequate credit quality, which increased the risk of delinquency.  As a result of the loans' poor credit quality, the Trusts have experienced enormous delinquency rates, collateral write-downs, and losses, and have incurred and continued to incur significant losses in connection with servicer violations.  Damages incurred by the Trusts and caused by the Trustee's violation of law will be the subject of expert testimony for proof at trial.

# XVIII.  **CAUSES OF ACTION**

## FIRST CAUSE OF ACTION

### BREACH OF CONTRACT
**(In The Right Of The Trustee And On Behalf Of The Trusts Against HSBC)**

510.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

511.    The PSAs are valid contracts that memorialize the issuance of certificates of beneficial interests in the Trusts, and establish HSBC's contractual duties and obligations, in its capacity as Trustee, to the Trusts and all their respective Certificateholders.  Each of the relevant contractual provisions is substantively similar if not identical in all of the PSAs, and imposes substantially the same if not identical duties and obligations on HSBC in its capacity as Trustee.

512.    The Trusts and each of the Plaintiffs have performed all of the conditions, covenants, and promises required in accordance with each of the PSAs.

513.    Under each PSA, HSBC owed a duty to the Trusts and all Certificateholders (i) to give prompt written notice to all parties to the PSA of a breach of a representation or warranty made by the seller in respect of the mortgage loans that materially and adversely affect the value of any mortgage loan or the interests of the Certificateholders in any mortgage loan, upon HSBC's discovery of the breach; and (ii) to take such action with respect to the breach as may be necessary or appropriate to enforce the rights of the Trusts with respect to the breach.

514.    As set forth above, HSBC materially breached each PSA by (i) failing to provide prompt written notice to all parties to the PSA and related responsible parties of breaches of the sellers' mortgage loan representations and warranties, upon HSBC's discovery of the breaches; and (ii) failing to enforce the sellers' obligation to repurchase, substitute, or cure the defective mortgage loans.

515.    In addition, the PSAs required HSBC, upon an "Event of Default," to (i) provide written notice to all Certificateholders of the Event of Default within sixty days of its occurrence, unless the Event of Default was cured or waived; and (ii) exercise the rights and powers vested in HSBC by the PSA using the same degree of care and skill as a prudent person would exercise under the circumstances in the conduct of such person's own affairs.

516.    The PSAs define an "Event of Default" to include the failure by the servicer to observe or perform in any material respect the covenants or agreements by the servicer set forth in the PSA, which continues unremedied for no more than thirty to sixty days after written notice of the failure has been given to the servicer by the trustee requiring the failure to be remedied, or actual knowledge of the failure by a "Servicing Officer" of the servicer, whichever is earlier.

517.    Events of Default have occurred, remained uncured for the applicable period of time, and are continuing as a result of the servicers' failure to observe and perform, in material respects, the covenants and agreements imposed on them by the PSAs.

518.    The servicers have failed and refused to do the following, each of which has materially impaired the rights of the Trusts and all Certificateholders:

(a)    Breaches of Representations and Warranties.  As with the Trustee, the PSAs required the servicers to give prompt written notice to all parties to the PSAs of a breach of a representation or warranty made by the seller in respect of the mortgage loans that materially and adversely affects the value of any mortgage loan or the interests of the Certificateholders in any mortgage loan, upon the servicer's discovery of the breach.  The servicers have failed to give notice to the other parties of the following information, which has exacerbated losses experienced by the Trusts:

-143-

(i)     although servicers often modify mortgage loans, and in the process of doing so have discovered that specific loans breached applicable representations and warranties, the servicers have not notified the other parties of these breaches;

(ii)    although there has been widespread public evidence of pervasive breaches of applicable representations and warranties, and although the servicers have been specifically notified by insurers and Certificateholders of these pervasive breaches, the servicers have not notified the other parties to the PSAs (including HSBC) of these breaches; and

(iii)   although aware of specific mortgage loans that breach applicable representations and warranties, the servicers have failed to enforce the sellers' obligation to repurchase, substitute, or cure the defective loans as required under the PSAs.

(b)     <u>Violation of Prudent Servicing Obligations.</u>  The PSAs require the servicer to service and administer the mortgage loans for and on behalf of the Certificateholders, and, consistent with the PSAs, (i) in the same manner in which it services and administers similar mortgage loans for its own portfolio or for other third-parties, giving due consideration to customary and usual standards of practice of prudent institutional mortgage lenders servicing similar loans; (ii) with a view to maximizing the recoveries with respect to the mortgage loans on a net-present-value basis; and (iii) without regard to, among other things, the servicer's right to receive

compensation or other fees for its services under the PSA, the servicer's obligation to make servicing advances under the PSA, and the servicer's ownership, servicing, or management for others of any other mortgage loans.  In violation of their prudent-servicing obligations under the PSAs, the servicers have:

(i)     failed to maintain accurate and adequate loan and collateral files in a manner consistent with prudent mortgage-servicing standards;

(ii)    failed to timely and accurately apply payments made by borrowers and maintain accurate account statements;

(iii)   failed to demand that the sellers cure deficiencies in mortgage records when deficient loan files and lien records are discovered;

(iv)    imposed force-placed insurance when the servicers knew or should have known that borrowers already had adequate coverage;

(v)     incurred completely avoidable and unnecessary servicing fees and servicing advances to maintain the mortgaged properties; and

(vi)    prejudiced the interests of the Trusts and the Certificateholders in the mortgages by fostering uncertainty as to the timely recovery of collateral.

(c)     <u>Violation of Foreclosure Obligations</u>. The PSAs require the servicers to use their best efforts, consistent with accepted servicing practices, to foreclose upon or otherwise comparably convert the ownership of properties securing mortgage loans that come into and continue in default and as to which no satisfactory arrangements can be made for collection of

delinquent payments.  Moreover, each of the PSAs contemplates that foreclosures and liquidations of defaulted mortgages will proceed forthwith and in accordance with applicable law, provided the documentation is in order, as a matter of fairness to all parties.  Despite these covenants, the servicers have:

(i)     continued to keep defaulted mortgage loans on their books, rather than foreclose or liquidate the loans, in order to wrongfully maximize their servicing fees, at the expense of the Trusts' and Certificateholders' best interests, including the right to recover from pool or financial guaranty insurance policies;

(ii)    failed to maintain records in an accurate, appropriate, and adequate manner, which has impeded the process of foreclosure and liquidation of defaulted mortgages and caused wholly avoidable delays that have injured the Trusts and Certificateholders;

(iii)   continued to charge unearned and unwarranted servicing fees on mortgages that would have been liquidated but for the servicers' breach of their duties, as well as unauthorized fees for default-related services; and

(iv)    failed to place the interests of the Trusts and Certificateholders before their own interests.

(d)    <u>Violation of Modification Obligations</u>. The PSAs provide that the servicers may agree to a modification of any mortgage loan only in specified circumstances.  When modifications are required to remedy

predatory lending violations, the PSAs require the seller – not the Trusts or the Certificateholders – to bear the costs to cure the violations. The servicers have breached the PSAs by agreeing to modify loans held in the Trusts to settle predatory lending claims made by various attorneys general against their parent companies while breaching their obligation to demand that the offending mortgage sellers (their parent companies) bear the costs of curing the violations, as well as the expenses reasonably incurred in enforcing the sellers' obligation to cure predatory mortgages. The servicers have also unjustly enriched their parent companies by using Trust collateral to settle claims that were not, and could never be, made against the Trusts, in a manner that has materially and adversely affected the interests of the Certificateholders. The servicers have therefore failed:

(i)     to demand that the originators and sponsors comply with their obligation to cure or repurchase predatory and ineligible loans that the servicers agreed to modify in the attorneys general settlements; and

(ii)    to deliver to the trustees a certification of a servicing officer that all requirements have been satisfied with respect to the modified mortgage loan.

(e)     <u>Improper Servicing Advances</u>. The PSAs provide that the servicers may recover servicing advances that are customary, reasonable, and necessary out-of-pocket costs and expenses incurred in the performance by the servicer of its servicing obligations, including but not limited to the cost of

the preservation, restoration, and protection of a mortgaged property. Despite the requirement that servicing advances be incurred only for reasonable and necessary out-of-pocket costs, the servicers instead utilized affiliated vendors – which marked up their services to a level 100% or more above the market price – to provide services related to the preservation, restoration, and protection of mortgaged property, in a fraudulent, unauthorized, and deceptive effort to supplement the servicers' servicing income.

519.    HSBC and its responsible officers had knowledge of these and other defaults by the servicers through, among other things, public reports, lawsuits, exception reports, remittance reports, and the increasing delinquency and loss rates for the Trusts. Nevertheless, HSBC failed to deliver written notices to the servicers of the defaults or terminate the servicers. Similarly, HSBC failed to provide Certificateholders with notice of these Events of Default. By failing to take these actions, HSBC materially breached the PSAs.

520.    These Events of Default occurred, remained uncured for the requisite period of time, and are continuing. Consequently, under the PSAs, HSBC had and continues to have the obligation to exercise the rights and powers vested in it by the PSAs, and to use the same degree of care and skill in their exercise as a prudent person would use under the circumstances in the conduct of the person's own affairs.  A prudent person would have exercised all of the trustee's rights to recover for these Events of Default, and would have done so promptly. By failing to take this action, HSBC materially breached the PSAs.

521.    HSBC's material breaches of the PSAs have directly and proximately caused damages to the Trusts in that they have deprived the Trusts of valuable remedies and allowed

billions of dollars in Trust assets to waste away.  For example, had HSBC protected the rights of the Trusts by enforcing the sellers' obligation to cure, repurchase, or substitute mortgage loans affected by breaches of representations and warranties, the Trusts would have received either cured or substituted mortgage loans of adequate credit quality or funds representing the "Repurchase Price" with respect to each defective mortgage loan.  HSBC's inaction with respect to the sellers has allowed the Trusts to be filled with defective mortgage loans of poor credit quality that have increased the severity of the Trusts' losses.  Similarly, had HSBC enforced the servicers' prudent servicing obligations, the Trusts would have been able to avoid incurring unnecessary losses and expenses.  HSBC's inaction with respect to the servicing violations has exacerbated losses experienced by the Trusts.

522.    HSBC's material breaches of the PSAs have injured all Certificateholders, including Plaintiffs, in that they have diminished the value of the certificates held by the Certificateholders and have prevented the Certificateholders from protecting the rights of the Trusts.

## SECOND CAUSE OF ACTION

**VIOLATION OF THE TRUST INDENTURE ACT OF 1939, 53 STAT. 1171**
**(In The Right Of The Trustee And On Behalf Of The Trusts Against HSBC)**

523.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

524.    Congress enacted the TIA, to ensure, among other things, that investors in certificates, bonds, and similar instruments have adequate rights against, and receive adequate performance from, the responsible trustees.

525.    Each of the PSAs is an "indenture," and HSBC is an "indenture trustee," within the meaning of the TIA. 15 U.S.C. § 77ccc(7), (10).  As noted above, each of the PSAs is

substantially similar and imposes substantially the same duties on HSBC in its capacity as Trustee.  Moreover, the TIA applies to and is deemed to be incorporated into each of the PSAs and the related Trusts. 15 U.S.C. § 77ddd(a)(1).  HSBC has violated multiple provisions of the TIA.

526.    First, the TIA requires that, before default, the indenture trustee be liable for any duties specifically set out in the indenture. 15 U.S.C. § 77000(a)(1).  As set forth above, HSBC has failed to comply, in good faith, with numerous duties specifically assigned to it by each of the PSAs, including the duties:

(a)     to provide prompt written notice to all parties to the PSA and related responsible parties of breaches of the sellers' representations and warranties, upon HSBC's discovery of the breaches;

(b)     to enforce the sellers' obligations to repurchase, substitute, or cure defective mortgage loans; and

(c)     to enforce the servicers' obligations to observe and perform covenants and agreements set forth in the PSAs, including requiring the originators and sponsors to perform their respective obligations and to service and administer the mortgage loans in accordance with applicable law and customary and usual standards of practice of mortgage lenders and loan servicers.

527.    By failing to comply with these specific duties, HSBC violated the TIA.

528.    In addition, the TIA requires HSBC to inform Certificateholders of defaults within ninety days after their occurrence. 15 U.S.C. § 77ooo(b) (citing 15 U.S.C. § 77mmm(c)). Here, there were numerous defaults, including (i) the failure of originators and sponsors to repurchase

or substitute defective or nonconforming loans in the Trusts; and (ii) the failure on the part of the servicers to observe and perform covenants and agreements set forth in the PSAs, including requiring the originators and sponsors to perform their respective obligations and servicing and administering the mortgage loans in accordance with applicable law and customary and usual standards of practice of mortgage lenders and loan servicers. Given the great importance of those defaults to the Certificateholders' interests, HSBC had no good-faith reason for failing to provide notice of those defaults. Accordingly, by failing to provide this notice, HSBC violated the TIA.

529.   Second, in the case of default, the TIA requires HSBC to exercise its rights and powers under the PSA as a prudent person would, under those circumstances, in the conduct of the person's own affairs. 15 U.S.C. § 77000(c).  Again, given the obvious importance of the defaults set forth in the preceding paragraph, which impaired the rights of the Trusts, any prudent person under those circumstances would have exercised all of the trustee's rights to, among other things, enforce the sponsors' and originators' obligation to repurchase, substitute, or cure defective mortgage loans, and a prudent person would have exercised those rights promptly. Indeed, with the number of delinquent and defaulting mortgages in the Trusts increasing, as a result, *inter alia*, of these defects, the Trusts could only have been protected from the resulting losses through the Trustee's prompt exercise of those rights, which were designed precisely to limit the number of delinquent and defaulting mortgages in the Trusts. By failing to exercise its rights in those circumstances, HSBC violated the TIA.

530.   HSBC's violations of the TIA have directly and proximately caused damages to the Trusts in that they have deprived the Trusts of valuable remedies and allowed billions of dollars in Trust assets to waste away. For example, had HSBC protected the rights of the Trusts by enforcing the originators' and sponsors' obligation to cure, repurchase, or substituted

mortgage loans affected by breaches of representations and warranties, as it was contractually obligated to do under the PSAs, the Trusts would have received either cured or substitute mortgage loans of adequate credit quality or funds representing the "Repurchase Price" of the defective mortgage loans. HSBC's inaction with respect to the originators and sponsors has allowed the Trusts to be filled with defective mortgage loans of poor credit quality and significant documentation deficiencies that have increased the severity of the Trusts' losses. Similarly, had HSBC enforced the servicers' servicing obligations, the Trusts would have been able to avoid unnecessary losses. HSBC's inaction with respect to the servicers has exacerbated losses experienced by the Trusts.

531.    HSBC's violations of the TIA have injured all Certificateholders, including Plaintiffs, in that they have diminished the value of the certificates held by the Certificateholders and have prevented the Certificateholders from protecting the rights of the Trusts.

**THIRD CAUSE OF ACTION**

**NEGLIGENCE − BREACH OF PRE-DEFAULT DUTY OF INDEPENDENCE**
**(In The Right Of The Trustee And On Behalf Of The Trusts Against HSBC)**

532.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

533.    Under New York law, HSBC, as Trustee, had extra-contractual, pre-default duties to the Trusts and all certificateholders. These duties include the absolute, unwaivable duty to give the Trusts and their Certificateholders undivided loyalty, free from any conflicting self-interest. Trustees like HSBC must discharge their obligations "with absolute singleness of purpose" because of the inability of the Trusts and dispersed Certificateholders to enforce their rights. This common law duty to avoid conflicts of interest applies notwithstanding the terms of the instrument that purports to define the duties of the Trustee.

534.    Under each of the PSAs, HSBC holds the loans for the benefit of the Trusts and all Certificateholders, including Plaintiffs.

535.    Under each of the PSAs, HSBC had the discretion to enforce the sellers' repurchase obligations and to prevent the servicers from engaging in activities outside of customary and usual standards of practice of prudent mortgage servicers with respect to any mortgage loans that HSBC held for the benefit of the Trusts and the Certificateholders.

536.    As alleged in detail above, HSBC knew of seller breaches of representations and warranties and that the servicers were engaging in activities outside of customary and usual standards of practice of prudent mortgage servicers with regard to their servicing and administration of the mortgage loans in the Trusts.

537.    Alleged herein, however, HSBC was economically beholden to the sellers. In addition, in their capacity as originator and sponsor with regard to other mortgage loans and RMBS trusts, HSBC's affiliates had sold loans in breach of specific representations and warranties to RMBS trusts in which many of the same sellers and servicers or their affiliates were serving as servicers or trustees.

538.    Because HSBC was economically beholden to the sellers and faced repurchase liability for the sale and securitization of its own loans in breach of its representations and warranties, HSBC has failed to take any action against the servicers, or even notify the Certificateholders that the servicers were engaged in misconduct.

539.    HSBC's negligent breach of its pre-default duty of independence has directly and proximately caused damages to the Trusts. For example, had HSBC not been conflicted, it would have enforced the sellers' repurchase obligations and exercised its discretion to prevent the servicers from engaging in activities outside of customary and usual standards of practice of

prudent mortgage servicers with respect to the mortgage loans in the Trusts. HSBC's inaction has relieved the sellers of their repurchase liability, and allowed the servicers to charge improper fees that have been passed along to the Trusts and to delay in foreclosing on mortgage loans, which has increased the costs of foreclosure.

540.    HSBC's negligent breaches of its pre-default duty of independence have injured all Certificateholders, including Plaintiffs, in that they have diminished the value of the certificates held by the Certificateholders and have prevented the Certificateholders from protecting the rights of the Trusts.

## FOURTH CAUSE OF ACTION

### BREACH OF FIDUCIARY DUTY – DUTY OF CARE
### (In The Right Of The Trustee And On Behalf Of The Trusts Against HSBC)

541.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

542.    Under New York law, after the occurrence of an Event of Default, HSBC's duties expanded to include a fiduciary duty owed to the Trusts and all Certificateholders. This fiduciary duty included the obligation to exercise its contractually conferred rights and powers in good faith and to bring all available claims for the benefit of the Trusts and the Certificateholders following an Event of Default. Following the Events of Default described above, HSBC breached its fiduciary duties to the Trusts and all Certificateholders in several respects.

543.    First, HSBC, in its capacity as Trustee, had standing to bring claims against the sellers of loans to the Trusts for breach of their representations and warranties under the Governing Agreements.  At the time of the Events of Default, meritorious claims existed against the sellers for breach of their representations and warranties under the Governing Agreements. HSBC, however, failed to promptly enforce the sellers' obligation to cure, repurchase, or

substitute mortgage loans that had defective mortgage files or were affected by breaches of the sponsors' and originators' representations and warranties, including by filing suits on behalf of the Trusts against the sponsors and originators. Moreover, HSBC failed to provide notice to the Certificateholders of the breaches or of its intention not to enforce the originators' and sponsors' obligation to cure, repurchase, or substitute the loans with defective mortgage files and breaches of representations and warranties.

544.    HSBC's failure to promptly enforce the originators' and sponsors' obligation to cure, repurchase, or substitute mortgage loans with defective mortgage files and mortgage loans affected by breaches of the originators' and sponsors' representations and warranties, as well as its failure to provide notice to the Certificateholders of its intention not to promptly enforce the originators' and sponsors' obligation to cure, repurchase, or substitute mortgage loans with defective mortgage files and mortgage loans affected by breaches of the originators' and sponsors' representations and warranties, constituted breaches of HSBC's fiduciary duty to the Trusts and to all Certificateholders.

545.    Second, HSBC, in its capacity as Trustee, presently has standing to bring meritorious claims against the servicers to enforce the servicers' obligations to observe and perform covenants and agreements set forth in the PSAs, including to service and administer the mortgage loans in accordance with applicable law and customary and usual standards of practice of mortgage lenders and loan servicers. HSBC, however, has refused and continues to refuse to enforce the servicers' obligations to observe and perform covenants and agreements set forth in the PSAs, including by filing suits on behalf of the Trusts against the servicers for compensatory and injunctive relief for harm caused to the Trusts as a result of servicing violations. Moreover, HSBC failed to provide notice to the Certificateholders of the servicing violations or of its

intention not to enforce the servicers' obligations to observe and perform covenants and agreements set forth in the PSAs. HSBC's failure to enforce the servicers' obligations to observe and perform covenants and agreements set forth in the PSAs, as well as its failure to provide notice to the Certificateholders of the servicing violations or of its intention not to enforce the servicers' obligations to observe and perform covenants and agreements set forth in the PSAs, constituted breaches of HSBC's fiduciary duty to the Trusts and to all Certificateholders.

546.    HSBC's breach of its fiduciary duty has directly and proximately caused damages to the Trusts. Specifically, the Trusts' injury includes the loss of verdicts, settlements, or awards, and the interest that the Trusts would have recovered against the sellers and servicers but for HSBC's breach of its fiduciary duty.

547.    HSBC's breaches of its fiduciary duty have injured all Certificateholders, including Plaintiffs, in that they have diminished the value of the certificates held by the Certificateholders and have prevented the Certificateholders from protecting the rights of the Trusts.

<u>**FIFTH CAUSE OF ACTION**</u>

**NEGLIGENCE – DUTY OF CARE**
**(In The Right Of The Trustee And On Behalf of the Trusts Against HSBC)**

548.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

549.    Under New York law, after the occurrence of an Event of Default, HSBC owed duties to the Trusts and all Certificateholders, which included the obligation to bring all available claims for the benefit of the Trusts and the Certificateholders. Following the Events of Default described above, HSBC breached its duties to the Trusts and to all Certificateholders in several respects.

550.    First, HSBC, in its capacity as Trustee, had standing to bring claims against the sellers of loans to the Trusts for breach of their representations and warranties under the Governing Agreements. At the time of the Events of Default, meritorious claims existed against the sellers for breach of their representations and warranties under the Governing Agreements. HSBC, however, negligently failed to promptly enforce the sellers' obligation to cure, repurchase, or substitute mortgage loans that had defective mortgage files or were affected by breaches of the sponsors' and originators' representations and warranties, including by filing suits on behalf of the Trusts against the sponsors and originators. Moreover, HSBC negligently failed to provide notice to the Certificateholders of the breaches or of its intention not to enforce the originators' and sponsors' obligation to cure, repurchase, or substitute the loans with defective mortgage files and breaches of representations and warranties.

551.    HSBC's failure to promptly enforce the originators' and sponsors' obligation to cure, repurchase, or substitute mortgage loans with defective mortgage files and mortgage loans affected by breaches of the originators' and sponsors' representations and warranties, and failure to provide notice to the Certificateholders of the breaches or of its intention not to promptly enforce the originators' and sponsors' obligation to cure, repurchase, or substitute mortgage loans with defective mortgage files and mortgage loans affected by breaches of the originators' and sponsors' representations and warranties, constituted negligence.

552.    Second, HSBC, in its capacity as Trustee, presently has standing to bring meritorious claims against the servicers to enforce the servicers' obligations to observe and perform covenants and agreements set forth in the PSAs, including to service and administer the mortgage loans in accordance with applicable law and customary and usual standards of practice of mortgage lenders and loan servicers. HSBC, however, has refused and continues to refuse to

enforce the servicers' obligations to observe and perform covenants and agreements set forth in the PSAs, including by filing suits on behalf of the Trusts against the servicers for compensatory and injunctive relief for harm caused to the Trusts as a result of servicing violations. Moreover, HSBC negligently failed to provide notice to the Certificateholders of the servicing violations or of its intention not to enforce the servicers' obligations to observe and perform covenants and agreements set forth in the PSAs. HSBC's failure to enforce the servicers' obligations to observe and perform covenants and agreements set forth in the PSAs, as well as its failure to provide notice to the Certificateholders of the servicing violations or of its intention not to enforce the servicers' obligations to observe and perform covenants and agreements set forth in the PSAs, constituted breaches of its duty to the Trusts and all Certificateholders.

553.    HSBC's negligence has directly and proximately caused damages to the Trusts. Specifically, the Trusts' injury includes the loss of verdicts, settlements, or awards, and the interest that the Trusts would have recovered against the originators and sponsors but for HSBC's negligence.

554.    HSBC's negligence has injured all Certificateholders, including Plaintiffs, in that it has diminished the value of the certificates held by the Certificateholders and has prevented the Certificateholders from protecting the rights of the Trusts.

### SIXTH CAUSE OF ACTION

**BREACH OF FIDUCIARY DUTY –
BREACH OF POST-DEFAULT DUTY OF INDEPENDENCE
(In The Right Of The Trustee And On Behalf Of The Trusts Against HSBC)**

555.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

556.    Under New York law, HSBC, as Trustee, had extra-contractual, post-default duties to the Trusts and all Certificateholders. These duties include the absolute, unwaivable duty to

give the Trusts and their Certificateholders undivided loyalty, free from any conflicting self-interest. Trustees like HSBC must discharge their obligations "with absolute singleness of purpose" because of the inability of the Trusts and dispersed Certificateholders to enforce their rights. This common law duty to avoid conflicts of interest applies notwithstanding the terms of the instrument that purports to define the duties of the Trustee.

557.    Under each of the PSAs, HSBC holds the loans for the benefit of the Trusts and all Certificateholders, including Plaintiffs.

558.    Under each of the PSAs, HSBC had the discretion to enforce the sellers' repurchase obligations and to prevent the servicers from engaging in activities outside of customary and usual standards of practice of prudent mortgage servicers with respect to any mortgage loans that HSBC held for the benefit of the Trusts and the Certificateholders.

559.    As alleged in detail above, after Events of Default, HSBC knew of seller breaches of representations and warranties and that the servicers were engaging in activities outside of customary and usual standards of practice of prudent mortgage servicers with regard to their servicing and administration of the mortgage loans in the Trusts.

560.    As alleged herein, however, HSBC was economically beholden to the sellers. In addition, in their capacity as originator and sponsor with regard to other mortgage loans and RMBS trusts, HSBC's affiliates had sold loans in breach of specific representations and warranties to RMBS trusts in which many of the same sellers and servicers or their affiliates were serving as servicers or trustees.

561.    Because HSBC was economically beholden to the sellers and faced repurchase liability for the sale and securitization of its own loans in breach of its specific representations

and warranties, HSBC has failed to take any action against the servicers, or even notify the Certificateholders that the servicers were engaged in misconduct.

562.    HSBC's breach of its post-default fiduciary duty of independence has directly and proximately caused damages to the Trusts. For example, had HSBC not been conflicted, it would have enforced the sellers' repurchase obligations and exercised its discretion to prevent the servicers from engaging in activities outside of customary and usual standards of practice of prudent mortgage servicers with respect to any mortgage loans. HSBC's inaction has relieved the sellers' of their repurchase liability, and allowed the servicers to charge improper fees that have been passed along to the Trusts and to delay in foreclosing on mortgage loans, which has increased the costs of foreclosure.

563.    HSBC's breaches of its post-default fiduciary duty of independence have injured all Certificateholders, including Plaintiffs, in that they have diminished the value of the certificates held by the Certificateholders and have prevented the Certificateholders from protecting the rights of the Trusts.

**XIX.    CLASS ACTION ALLEGATIONS**

564.    Alternatively, in the event the Court does not permit this action to proceed as a derivative action, Plaintiffs bring this action as a class action on behalf of themselves and a class consisting of all current owners of certificates in the Trusts (the "Class") that have suffered damages as a result of HSBC's misconduct alleged herein.   Excluded from the Class are Defendant HSBC, the Sellers and the Servicers, and, for each of them, their respective officers and directors, legal representatives, successors or assigns, and any entity in which they respectively have or had a controlling interest.

565.    The members of the Class are so numerous that joinder of all members is impractical.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained though appropriate discovery, Plaintiffs believe that there are at least hundreds of members of the proposed Class.  Record beneficial owners and other members of the Class may be identified from records maintained by HSBC or third parties and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

566.    Plaintiffs' claims are typical of the claims of the members of the Class as (i) Plaintiffs and the members of the Class all own certificates in the Trusts and held them at or after the time of HSBC's misconduct; (ii) all the claims are based upon the Governing Agreements, which are substantially in the same form, common law and the TIA; (iii) HSBC's alleged misconduct was substantially the same with respect to all class members; (iv) and all class members suffered similar harm as a result.  Thus, all members of the class are similarly affected by HSBC's statutory, contractual, and common law breaches and violations that are alleged of herein.

567.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and asset-backed securities litigation.

568.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- Whether HSBC breached its contractual and common law duties to Plaintiffs and the Class under the Governing Agreements.

-161-

- Whether HSBC violated the TIA.

- Whether and to what extent Plaintiffs and members of the Class have suffered damages as a result of HSBC's breaches of its statutory, contractual, and common law duties and the proper measure of damages.

569.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable.  There will be no difficulty in the management of this action as a class action.

## XX.    <u>RELIEF REQUESTED</u>

**WHEREFORE**, Plaintiffs demand judgment as follows:

(a)    Determining that this action is a proper derivative action maintainable under law and that demand is excused;

(b)    Awarding to the Trusts money damages against HSBC for all losses suffered as a result of HSBC's breaches of contractual, statutory, common law, and fiduciary duties, and HSBC's negligence;

(c)    Requiring HSBC to take corrective actions, including taking all necessary actions to reform and improve its internal policies and procedures to comply with its Trustee obligations under the PSAs and applicable laws, and to protect the Trusts and the Certificateholders from a repeat of the damaging events described herein;

(d)    Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses;

(e)    In the event the Court determines that this action is not a proper derivative action, determining that this action is a class action pursuant to Fed. R. Civ. P. Rule 23; and

(f)    Granting any other and further relief that the Court deems just and proper.

## XXI.   JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: November 24, 2014

BERNSTEIN LITOWITZ BERGER
    & GROSSMANN LLP

_____
JEROEN VAN KWAWEGEN

JEROEN VAN KWAWEGEN (JV 1010)
JAI CHANDRASEKHAR (JC 3789)
1285 Avenue of the Americas, 38th Floor
New York, NY  10019
Tel:   (212) 554-1400
Fax:   (212) 554-1444

BERNSTEIN LITOWITZ BERGER
    & GROSSMANN LLP

_____
BLAIR A. NICHOLAS

BLAIR A. NICHOLAS
TIMOTHY A. DELANGE
BENJAMIN GALDSTON
BRETT M. MIDDLETON
DAVID R. KAPLAN
LUCAS E. GILMORE
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel:   (858) 793-0070
Fax:   (858) 793-0323

*Counsel for Plaintiffs*