LAW OFFICES
# WILLIAMS & CONNOLLY LLP

725 TWELFTH STREET, N.W.
WASHINGTON, D. C. 20005-5901
(202) 434-5000
FAX (202) 434-5029

EDWARD REDDINGTON
(202) 434-5063
ereddington@wc.com

EDWARD BENNETT WILLIAMS (1920-1988)
PAUL R. CONNOLLY (1922-1978)

July 8, 2016

Via ECF

Honorable Sarah Netburn
Thurgood Marshall Courthouse
United States District Court

    Re:    *Coordinated RMBS Trustee Actions Against HSBC Bank USA, NA*, Nos. 14-cv-08175; 14-cv-09366; 14-cv-10101; 15-cv-02144; 15-cv-10032; 15-cv-10096

Dear Judge Netburn:

    I write in response to Plaintiffs' July 5, 2016 letter. After receiving millions of non-responsive documents, HSBC raised concerns with Plaintiffs' still-incomplete productions. Plaintiffs chose to defend their actions by engaging in a revisionist history of the parties' approach to using search terms. Contrary to Plaintiffs' assertions, the parties always contemplated a responsiveness review. Such a review is routinely performed in litigation and ensures that litigants do not employ document dumps to shift the cost of review to their opposing party or hide documents by burying them in volumes of data.

    To temporarily divert attention from their own production deficiencies,[1] Plaintiffs speculated that HSBC failed to produce responsive documents. This speculation is without merit. HSBC explained to Plaintiffs during the parties' July 5 meet and confer that HSBC did not withhold documents based on relevance. Instead, as is normal in litigation, HSBC conducted a review for responsiveness based on the Plaintiffs' document requests and HSBC's objections. With respect to documents that hit on search terms but were not responsive, counsel explained that these documents generally fell into three categories: (1) documents mentioning the financial institutions that performed various roles in the bellwether trusts (the "Bellwether Entities") but in non-RMBS contexts; (2) routine corporate trust administration documents involving non-Bellwether trusts; and (3) non-responsive documents like personal emails.

---

[1] On January 6, 2016, the Court directed all of the parties to run the same search terms. Jan. 6, 2016 Hr'g Tr. (Ex. 1) at 49:2-5, 52:10-14, 52:23-25. Since the June 29 hearing, HSBC has learned that Plaintiffs made numerous unilateral and undisclosed modifications to the Court-ordered terms. These modifications are significant. This is but one of several problems with Plaintiffs' productions that Plaintiffs sought to avoid discussing at the June 29 hearing. HSBC intends to take this issue up with Plaintiffs and to seek relief from the Court if necessary.

WILLIAMS & CONNOLLY LLP

Honorable Sarah Netburn
July 8, 2016
Page 2

Significantly, during the meet and confer counsel for Plaintiffs identified approximately ten categories of hypothetical documents and asked whether HSBC's review would have excluded those categories from production. For every single category, counsel for HSBC explained that HSBC's review protocol would <u>not</u> have excluded such documents. Thus, Plaintiffs cannot identify a single category of documents that they believe should have been produced but was not.

Unable to identify any missing document categories, Plaintiffs attempt to make much of the Court's comment that there could be a problem if HSBC's review screened out 75% of the documents that hit on search terms. But, in fact, a 20% response rate is quite high considering that (1) HSBC's corporate trust department provides services in many areas besides RMBS; (2) HSBC provides services in many more RMBS trusts—approximately 450—than are at issue here; (3) the Bellwether Trusts make up only 5% of the RMBS trusts for which HSBC acts as trustee; and (4) the many "Bellwether Entities" that figure prominently in the search terms, such as Morgan Stanley, Bank of America, and Deutsche Bank, play roles in many commercial transactions. As a result, and as HSBC predicted, search terms focused on such entities produced mostly non-responsive documents for unrelated transactions.

I.  **Plaintiffs' Representations to the Court Concerning the Search Term Protocol Were Inaccurate.**

The process of using search terms to narrow the universe of documents before undertaking a review for responsiveness is standard practice and is endorsed by courts and commentators alike. As the Sedona Conference Best Practices Commentary explains:

> Of course, the use of automated search methods is not intended to entirely eliminate the need for manual review; indeed, in many cases, both automated and manual searches will be conducted, with initial automated searches used for culling down a universe of material to more manageable size (or prioritizing documents), followed by a secondary manual review process.

*The Sedona Conference Best Practices Commentary on the Use of Search & Information Retrieval Methods in E-Discovery*, 15 Sedona Conf. J. 217, 244 (2014) (eds. Jason R. Baron & Maura R. Grossman). Courts in this district likewise have endorsed this practice. *See, e.g.*, *Chen-Oster v. Goldman, Sachs & Co.*, 2014 WL 716521, at *1 (S.D.N.Y. Feb. 18, 2014) (denying a request to produce all documents returned by agreed-to search terms); *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 432 (S.D.N.Y. 2004). Plaintiffs' own authority recognizes this same principle. *Royal Park* Dkt. No. 157 at 2 ("search terms may assist in reducing the volume of information that must be further reviewed for relevance").

Although Plaintiffs represented to the Court that the parties agreed to "just produce all the documents that were responsive to the search terms," June 29, 2016 Hr'g Tr. (Ex. 2) at 34:5-7, or alternatively to do an undefined "light" responsiveness review, *id.* at 22:25-23:2, in reality the parties always understood and agreed that search terms would yield only a first cut of documents

WILLIAMS & CONNOLLY LLP

Honorable Sarah Netburn
July 8, 2016
Page 3

and that further review for responsiveness would be necessary.  For example, HSBC articulated this in its October 23, 2015 counterproposal and its November 6, 2015 letter to the Court.  *See* Ex. 3 (Oct. 23, 2015 letter from E. Reddington), at 2; Ex. 4 (Nov. 6, 2015 letter from E. Reddington), at 3.  More importantly, *Plaintiffs* consistently said that they likewise would be conducting a responsiveness review.  For example, counsel for NCUA and counsel for Phoenix Light both wrote to HSBC separately that "*For the avoidance of doubt, we will review documents identified by the search protocol* described above *for* (i) privilege; (ii) confidentiality; *and (iii) responsiveness*."  Ex. 5 (Nov. 25, 2015 email from Counsel for NCUA); Ex. 6 (Nov. 30, 2015 email from Counsel for Phoenix Light) (emphasis added); *see also* Ex. 7 (Dec. 7, 2015 email from Counsel for NCUA) (verbatim statement); Ex. 8 (Oct. 27, 2015 letter from Counsel for Royal Park) at 6 (stating that they are willing to consider search terms if the volume and relevance of documents hitting the terms was "reasonable for Royal Park to *review* and produce" (emphasis added)).  In fact, in another trustee case employing search terms to help identify potentially responsive documents, the BlackRock Plaintiffs told this Court in May that they had "*reviewed* millions of documents" hitting on search terms and only "produced 320-something thousand."  *BlackRock Allocation Target Shares v. Wells Fargo Bank, NA*, No. 14-cv-9371-RMB-SN, May 19, 2016 Hr'g Tr. (Ex. 9) at 8:10-14 (emphasis added).  Thus, everyone understood there would be a responsiveness review.

## II.     HSBC's Review Process Was Thorough and In Accordance with the Federal Rules.

HSBC responded more than a year ago to Plaintiffs' document requests.  When objecting, HSBC told Plaintiffs specifically what HSBC would produce in response to the request, which is the accepted practice under the Federal Rules.  Fed. R. Civ. P. 34(b)(2)(C), advisory committee's note to 2015 amendment.  Plaintiffs moved to compel only on one set of objections—HSBC's objection to searching for responsive documents outside its corporate trust department, CTLA.  In granting limited relief by ordering HSBC to provide a handful of non-CTLA custodians, Judge Scheindlin was clear that she did not want to dispense with the already-ordered Bellwether process and that HSBC did not need to produce documents about loans and trusts not in this case.  *See, e.g.*, June 24, 2015 Hr'g Tr. (Ex. 10) at 5:8-21; Sep't 4, 2015 Hr'g Tr. (Ex. 11) at 25:19-22, 32:15-16, 33:2-6.

To conduct its review, HSBC engaged the services of a well-regarded e-discovery vendor, Consilio, who employed attorneys in the United States.  The review attorneys were provided with background material, including Plaintiffs' requests, HSBC's responses and objections, and a written review protocol.  Under the supervision of Williams & Connolly attorneys, the review attorneys reviewed the documents that hit on the Court-ordered search terms, as well as family members.  There were quality assurance teams at Consilio and Williams & Connolly that conducted second-level reviews.

The review did not include a further screen for relevance.  Instead, review attorneys determined whether the document was responsive to Plaintiffs' requests, subject to HSBC's objections.  With respect to documents specific to the 24 Bellwether Trusts, HSBC's reviewers were instructed to mark as responsive all documents in the context of HSBC's role as trustee.

WILLIAMS & CONNOLLY LLP

Honorable Sarah Netburn
July 8, 2016
Page 4

With respect to documents not specific to a Bellwether Trust, HSBC's reviewers were instructed to determine responsiveness based on Plaintiffs' requests and HSBC's objections. To ensure that certain categories of documents that Plaintiffs had requested during meet-and-confer calls were marked responsive, HSBC's review protocol specifically identified certain categories of documents as responsive even if not related to a Bellwether Trust. These categories included: (1) documents relating to HSBC's policies and procedures as trustee; (2) marketing and promotional materials for CTLA; (3) documents relating to internal CTLA committees responsible for overseeing trustee duties; (4) organizational charts; (5) documents evidencing or alleging breaches or failures by the third parties who played roles in the Bellwether Trusts, such as originators, sponsors, servicers, and master servicers; and (6) documents evidencing HSBC's purported general knowledge of RMBS market problems.

### III.    HSBC's Production Was Robust and the Response Rate Was as Expected Given the Nature of the Search Terms.

It is well-recognized in the law and in e-discovery practice that, when not targeted narrowly, search terms can be an inefficient, imprecise and overbroad tool. "Traditional keyword searches identify all documents containing a specified term regardless of context, often capturing many documents irrelevant to the user's query. . . . The problem of the relative percentage of 'false positives' or noise in the data is potentially huge, amounting in some cases to enormous numbers of files which must be searched to find responsive documents." *The Sedona Conference Best Practices Commentary, supra* at 233.

From the outset, HSBC attempted to get Plaintiffs to agree to narrower search terms to better target potentially responsive documents. In an effort to avoid disputes, HSBC compromised on terms, but the compromise terms were far closer to what Plaintiffs wanted than to HSBC's original proposal. For example, the final search terms required HSBC to review any document that included the words (1) "government" or "regulatory"; and (2) "report" or "action," so long as one of those words was within 50 words of any of 63 well-known financial institutions listed in Exhibit C. In the same vein, the final terms required HSBC to review any document that included the word "mortgage" within 25 words of the word "claim," so long as one of those words was within 50 words of the Exhibit C terms. Similarly, the terms required HSBC to review any document that included the words (1) "servicer," "originator," or "underwriter,"; (2) "know" or "knew"; and (3) "discover," "learn" or "find," so long as one of those words was within 50 words of the Exhibit C terms.

In short, the search terms simply were never the targeted terms that Plaintiffs claimed them to be. As a result, they hit on approximately 1.1 million documents (including families), most of which were not responsive. This is not new information. HSBC explained during the February hearing that the terms were hitting over a million documents and that they would return many non-responsive ones, including basic administrative documents for non-Bellwether Trusts and documents having nothing to do with RMBS trustee work. Feb. 18, 2016 Hr'g Tr. (Ex. 12) at 32:11-33:5.

WILLIAMS & CONNOLLY LLP

Honorable Sarah Netburn
July 8, 2016
Page 5

After the review was complete, HSBC produced responsive, non-privileged documents on a rolling basis. In doing so, HSBC made a robust production. Plaintiffs have received 119,121 documents totaling 1,984,889 pages. Because HSBC's corporate trust department administers many trusts that are not at issue in this case and does work that is unrelated to RMBS, the overall production rate in relation to documents reviewed is not surprising given the nature of the search terms employed. Moreover, unlike Plaintiffs' production, HSBC's production is comprised of documents that are actually responsive to Plaintiffs' requests.

With respect to the Bellwether Trusts, Plaintiffs have received virtually every non-privileged document related to HSBC's administration. With respect to "common" servicers, originators, and sponsors, the Plaintiffs did not receive every document relating to such third parties—doing so would undo the Bellwether process. But, consistent with HSBC's objections and the understanding the parties reached through the meet and confer process, non-privileged documents were produced if they discussed alleged criticisms of these third parties or evidenced HSBC's purported knowledge of their alleged breaches under the Agreements.

Plaintiffs have suggested they are not getting such documents. *See, e.g.*, June 29, 2016 Hr'g Tr. (Ex. 2) at 24:11-17, 24:22-23, 33:7-12. Plaintiffs are wrong. Plaintiffs have received over 35,000 documents that hit on Exhibits B-E of the search term protocol—the terms that relate to non-Bellwether-Trust-specific issues. For example, attached at Exhibit 13, is a document that was marked responsive and produced. The document does not relate to a Bellwether Trust, but references Litton Servicing. Litton is one of nearly two dozen servicers that performed servicing in some Bellwether Trusts. The document involves an inquiry about a potential local ordinance violation. This document was produced on the assumption that Plaintiffs might argue the inquiry implicitly criticized Litton's servicing. This reflects the low bar used for documents referencing purported criticisms of the "Bellwether Entities."

By contrast, non-responsive documents included documents not related to RMBS, as well as day-to-day administration documents for non-Bellwether trusts, such as routine property inquiries, transactional documents, and requests for powers of attorney. These categories comprised the vast majority of documents hit by the search terms, and thus account for the responsiveness rate. If Plaintiffs had done the review they said they would do, their responsiveness rate would be similar.

* * * * * * *

Plaintiffs' characterization of the process the parties agreed to undertake with respect to the review of documents that hit on search terms was inaccurate. Their speculation that HSBC is taking too narrow a view of responsiveness is unfounded. After many months of review, at significant time and expense, HSBC has made a thorough production of responsive documents. This is not only all the law requires—it is exactly what the law requires.

WILLIAMS & CONNOLLY LLP

Honorable Sarah Netburn
July 8, 2016
Page 6

                                          Sincerely,

                                          Edward Reddington

Attachments

cc: All counsel via ECF