# EXHIBIT B

```
                                                              1
     G6trroyc

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ----------------------------x

3    ROYAL PARK INVESTMENTS
     S.A./N.A., et al.
4
                    Plaintiffs,
5                                          14 CV 8175 (LGS)
             v.                            14 CV 9366 (LGS)
6                                          15 CV 2144 (LGS)
     HSBC BANK USA NATIONAL
7    ASSOCIATION,
                                           Conference
8                   Defendant.

9    ----------------------------x

10                                         New York, N.Y.
                                           June 29, 2016
11                                         4:00 p.m.

12   Before:

13             HON. SARAH NETBURN

14                                         District Judge

15


16             APPEARANCES
17

18   ROBBINS GELLER RUDMAN & DOWD LLP
          Attorneys for Royal Park Investments plaintiffs
19   BY:  CHRISTOPHER WOOD

20

     WOLLMUTH MAHER & DEUTSCH LLP
21        Attorneys for Phoenix Light and Commerzbank plaintiffs
     BY:  STEVEN S. FITZGERALD
22        NIRAJ PAREK

23

     KOREIN TILLERY LLP
24        Attorneys for NCUA Board plaintiffs
     BY:  JOHN A. LIBRA
25        MAX GIBBONS
```

G6trroyc

1           APPEARANCES

2
KELLOGG, HUBER, HANSEN, TODD, EVANS & FIGEL, PLLC
3       Attorneys for NCUA Board plaintiffs
BY:  SCOTT ATTAWAY
4

5  BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP
        Attorneys for BlackRock plaintiffs
6  BY:  BENJAMIN GALDSTON
        LUCAS E. GILMORE
7

8  MILLER & WRUBEL P.C.
        Attorneys for Triaxx plaintiffs
9  BY:  CHARLES R. JACOB III

10

WILLIAMS & CONNOLLY LLP
11      Attorneys for Defendant
BY:  EDWARD C. REDDINGTON
12       KEVIN M. HODGES
         ERIC C. WIENER
13       NOAH M. WEISS

14

15

16

17

18

19

20

21

22

23

24

25

3

G6trroyc

1           (Case called)

2           THE COURT:  Good afternoon.  Thank you for being here.

3           I have the three letters regarding the scheduling

4    dispute on a going-forward schedule, the letter from HSBC dated

5    June 15th, another that came in yesterday dated June 28th, and

6    then the plaintiff's response on June 20th.

7           I have some thoughts about what I think is appropriate

8    in this case, and I also have some questions.  I have more

9    questions related to some of this expert discovery issue.  I'm

10   hoping I can get a little bit more information to better

11   understand what makes sense here.

12          Why don't I take the lead for a moment and tell you

13   what I'm thinking.  I see that there is some dispute about

14   whether or not the plaintiffs have fully complied with their

15   discovery obligations.  The plaintiffs seem to believe that

16   they have or will be in the very near future.  The defendants

17   have some concern about whether that is accurate.

18          My thinking is to allow you all to go through some of

19   those documents.  It sounds like the defendants have received a

20   significant volume of documents in the last month, so it may be

21   premature to start assuming that documents aren't there.  They

22   may be there, you maybe just haven't gotten to them yet.

23          My thinking about how to move forward assumes that

24   there will be a little bit more time in the coming weeks to

25   finalize the document discovery, which isn't to say that

G6trroyc

1   depositions can't begin now if people think it is appropriate.

2   But I think we can factor in a few more weeks to allow both

3   parties to satisfy one another that they have fully complied

4   with the document production.  What I would like to do is to

5   set August 1 as a deadline to submit a letter to me if there

6   are ongoing disputes so that we can address that in the first

7   half of August.

8          I recognize that this case is highly complex, that

9   there is a lot at stake monetarily, that there are a number of

10   trusts that we are dealing with even if we are narrowing it to

11   the bellwethers, and that within those trust there are volumes

12   and volumes of loans.  I continue to believe, notwithstanding

13   that, given all of the lawyers in the room and all of the money

14   that the parties are investing in this litigation, that six

15   months is an appropriate amount of time for depositions.

16          I'm going to allow people to pull me off the ledge if

17   you want, but what I am proposing is that we have all of fact

18   discovery end in early March: that is, March 1st.  The way I

19   come to that number, to give you the rationale in my thinking,

20   is it gives you the remainder of the summer to finalize the

21   document production.  That, again, isn't to say that

22   depositions shouldn't begin before September 1st.  It's only to

23   say that I am allowing for the possibility that there is

24   ongoing production and ongoing disputes that will need Court

25   intervention.

5

G6trroyc

1          I appreciate and expect that the majority if not all

2     of the document production should have happened by now.  I

3     understand that Commerzbank and Triaxx are a little bit late to

4     the party.  I understand that they are going to produce by the

5     middle of August, if not before then, and they should be doing

6     a rolling production if they can.

7          In evaluating these letters and thinking about this in

8     advance of today's conference, I am inclined to issue a March 1

9     cutoff for all fact discovery, which, depending on how you

10    slice it, gives you eight months from now or gives you a couple

11    more weeks to finish document production and gives you six

12    months for depositions.  That seems to me a fair and reasonable

13    way to resolve a case of this magnitude and significance.

14          Why don't I ask Mr. Reddington first.  I know that you

15    are seeking more time than that.  If you want to try and

16    persuade me that June 9, as you propose, is really necessary,

17    I'll hear you out.

18          MR. REDDINGTON:  Thank you, your Honor.  Our over-

19    arching goal with this scheduling modification is accomplish

20    two things.  The first is whatever schedule modification is put

21    in place has to be realistic.  The parties have to have a

22    reasonable chance of actually being able to comply with it.  I

23    would submit, your Honor, that our schedule is more realistic

24    than what's been proposed by the plaintiffs.  Even the

25    compromise that you have suggested may not be enough.  Here's

6

G6trroyc

1    why.

2          First of all, we have 48 million pages of documents

3    already.  The plaintiffs are not substantially complete or many

4    of the plaintiffs are not substantially complete with their

5    productions.  By our count, we are missing more than a hundred

6    custodians.  Some of the plaintiffs didn't produce ESI data as

7    they were supposed to produce under the court order, so maybe

8    there are some additional custodians that are in there that

9    they will be able to point us to when they produce the data.

10   In any event, we know there are lots of custodians missing.

11         THE COURT:  Do you know that or do you suspect that?

12         MR. REDDINGTON:  We know that.

13         THE COURT:  Have you had confirmation from the

14   plaintiffs?

15         MR. REDDINGTON:  No.  But our vendor can look in our

16   documents and they can, by cross-referencing the ESI data that

17   we do have -- we have some ESI data, we just don't have it

18   all -- they can rule in and rule out certain custodians.  So we

19   know there are a number of custodians missing.

20         There is another category where we think they are

21   missing, but we don't have their ESI data.

22         THE COURT:  For those custodians that you know are

23   missing based on your vendor analysis, have you had any

24   communication with the relevant plaintiff to ask what's going

25   on?

7

G6trroyc

1           MR. REDDINGTON:  Not since we filed our letters, no.

2    I will note that the custodians that are missing are not

3    insignificant custodians.  They are some of what we think are

4    the most relevant custodians in the case.

5           When we came back to the Court in February, we had a

6    dispute over custodians.  With plaintiff PIMCO, as an example,

7    the Court ordered that we could select 15 custodians.  They had

8    already offered up 5, so we picked 10 other custodians from

9    PIMCO that we wanted.  By our analysis, not one of those 10 is

10   somebody whose custodial files has yet been produced, and

11   several of those are obviously very important custodians who we

12   had to go to the Court and fight specifically over to get.  So

13   these are significant custodians and a significant number that

14   is missing.

15          So we have missing custodians, we have ESI data that's

16   not been provided.

17          We also have from our analysis lots of documents that

18   have been produced that do not hit on the agreed-to and ordered

19   search terms.  We have been able to do some high-level analysis

20   of that.  Obviously, it is 48 million pages that we are talking

21   about.  But when we look at those documents, we see a lot of

22   things that probably never should have been produced because it

23   is, quite frankly, junk.

24          It is things like mass emailings from Bloomberg.  It's

25   newsletters that really have nothing to do with the specifics

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

8

G6trroyc

1   of this case.  There's lots of totally irrelevant documents.  I

2   brought some examples, but I won't bore the Court with them.

3   We've got lasagna menus from the plaintiffs.  We have emails

4   about Casper the Ferret.  We have a screenplay from a budding

5   screen writer.  There's a lot of junk embedded in those

6   48 million pages.  Unfortunately, it takes time to get through

7   those pages.

8         The first goal of a schedule modification is to do

9   something that is realistic.  The second goal is to do

10  something that doesn't prejudice any party.  The problem with

11  plaintiffs' productions are under the current schedule HSBC is

12  being prejudiced on both sides.  Right now we can't even begin

13  to get ready for our depositions because the plaintiffs'

14  productions are in such a mess.  On the other end, once

15  depositions get going, if we don't have the right documents and

16  they haven't produced the right documents, how can we begin to

17  take depositions on the same schedule as them?  That's

18  obviously a concern of ours.

19        THE COURT:  You are an experienced litigator, so I'm

20  not telling you anything you don't already know.  You will have

21  to try this case without having full satisfaction that you have

22  canvassed every single corner of discovery here, and you will

23  probably end up taking some depositions without fully digesting

24  all of the documents that you might want to.  That isn't to say

25  that you should approach the depositions in an irresponsible

9

G6trroyc

1   way, but at a certain point you need to jump in.

2          HSBC asked for a significant amount of documents.  I'm

3   not blaming them or saying it was inappropriate.  We have had

4   lots of litigation over this, so I've ruled.  But you've got

5   your volume of documents.  It shouldn't be as junky as you're

6   claiming that it is.  I don't know whether that is true or not

7   or what percentage or if you are pulling out the fun ones.  In

8   any event, at a certain point you just need to jump in.

9          My concern is that we are just going to keep kicking

10  the can because you will never feel like the time is right.

11         MR. REDDINGTON:  I don't disagree with your

12  inclination that at some point you have to jump in.  First of

13  all, these documents are not complete, so we don't even have a

14  complete set of documents yet.  The second issue is the way

15  they have been produced, we can't jump in.  It takes weeks to

16  even load the volume of some of these productions.

17         The way they have all come in, about 50 percent or

18  more, right around 40 to 50 percent of their productions came

19  within the last month.  We started back at the beginning of the

20  year trying to understand their productions by using computer-

21  assisted review.  It's an iterative process.  The problem is

22  every time they produced another million pages to us, we

23  couldn't continue with that same computer-assisted review, we

24  had to start over from scratch.  Then here we are now within a

25  month of the document production deadline.

G6trroyc

1          To remind the Court, the plaintiffs told the Court at

2     least four times -- in November, when we were still in front of

3     Judge Scheindlin; in January, when we were in front of you; and

4     February and April, when we were in front of you -- that they

5     thought they were just about substantially complete or would be

6     substantially complete soon.  Since that time, they produced 40

7     percent or more of their productions in the last month of

8     discovery.  We are talking millions of pages of documents.

9          So, jumping in isn't as easy as it sounds.  To

10    actually work with the documents, they have to be loaded, they

11    have to be analyzed, they have to be sorted.  We can't even do

12    that right now.  That's one of the problems with just jumping

13    in.

14         In a normal case, you would have a more reasonable

15    process.  Parties would produce documents on a schedule, there

16    would be some period of time where they could evaluate those

17    documents, there would probably be meet and confers with them

18    where they follow up on things about the documents, and then

19    they would begin their depositions being reasonably informed

20    and with a reasonable set of documents.  They might not have

21    every document, but they would at least have a reasonable set

22    of documents.

23         Here I would submit that given the complexity of this

24    case and given the size and given the issues at stake, we

25    should not want to deviate from that sort of normal process.

G6trroyc

1    We should still have the time to analyze the documents, to

2    understand them, and to let the federal rules work the way they

3    were designed.

4           THE COURT:  I'm assuming six months for depositions is

5    a reasonable amount of time.  I know there are a lot of them to

6    be had, but there are a lot of lawyers here, so I think six

7    months is enough time.  Backing out, how much time do you need?

8    My March 1 schedule was giving you two months to ride the

9    plaintiffs and get whatever documents you think you haven't

10   gotten, get in touch with me, and I will act promptly so we can

11   get rulings if there are disputes about what's been turned over

12   or not.

13          I know in one of the letters you proposed a deposition

14   because you think you're not getting everything.  I think we

15   might be a little premature on that, but maybe at some point in

16   the near future that is necessary.  That gives you two months

17   for this process.  Even if you don't have everything, you

18   probably have a lot to begin this process of sorting and

19   reviewing.  Why isn't two months enough time before you start a

20   deposition on September 1?

21          MR. REDDINGTON:  A couple of things.  First of all, we

22   don't think they are even close to being done.  If we are

23   missing a hundred-plus custodians and they are the key

24   custodians in the case, we think we are going to get a lot more

25   documents over the next two months.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

G6trroyc

1            THE COURT:  Isn't it only 112 that were ordered to be

2    searched?

3            MR. REDDINGTON:  239, your Honor.  112 is what we

4    thought we were missing in our first letter.  Since that time

5    we have had several million pages of additional documents

6    produced to us and we found five other custodians.  Right now

7    we believe the number of custodians we are missing is 107.  So

8    there's a lot of custodians missing.

9            Second of all, we have tried to evaluate the

10   productions based on the agreed-to search terms.  What we found

11   is they produced a lot of stuff that doesn't hit on the search

12   terms, and there are lots of search terms for which we see

13   either no or very few documents.  That raises questions in our

14   minds about whether or not the parties are actually running the

15   agreed-to search terms that were ordered by this Court.

16           We have some concerns about that because in a

17   meet-and-confer with one of the other plaintiffs -- it was the

18   Triaxx plaintiffs, who obviously are behind the other

19   plaintiffs because they came into this case late -- they

20   circulated to us their view of what the ordered search terms

21   were, and there were deviations in those terms from what we

22   understood the ordered terms were.

23           Additionally, Phoenix Light tells us they don't have

24   employees, most of their decisions would have been done through

25   collateral managers.  So we have had to go out to their

G6trroyc

1  collateral managers and issue third-party subpoenas to them to

2  try to get documents out of their collateral managers.  Some of

3  the collateral managers have sort of said as an aside that they

4  didn't think the parties were running the same search terms.

5  We were in negotiations with the collateral managers over what

6  search terms we wanted them to run.

7          When we look at the high-level data that we have and

8  see search terms not in there, search terms that we believe

9  were ordered by the Court not in there, we think maybe they are

10  not running the right search terms.  That's obviously got to

11  get worked out before we know if their productions are complete

12  even two months down the road.

13          Again, we think we are going to get a lot of documents

14  in the next two months.  Even after we get those documents

15  we've got to evaluate them and see if they are what they are

16  supposed to be.  And it takes a long time to go through those

17  documents.

18          Move to the depo side for a second.  On the depo side,

19  under the deposition protocol the parties potentially could

20  take 125 depositions in this case.  Maybe we won't take that

21  many at the end of the day, but that's what at the beginning

22  the parties planned as a possibility.  That doesn't even count

23  third-party depositions.  Remember, all these trusts have a lot

24  of third parties that the plaintiffs rely upon to make their

25  allegations.  They say the problems are the servicers didn't do

14

G6trroyc

1   what they were supposed, to, the originators didn't do what

2   they were supposed to do.  Those third parties are separate and

3   above that 125 deposition total.  If you were to take 125

4   depositions plus some unknown number of third parties -- there

5   are about 20 business days in a month.  If you were to take all

6   those depositions, if you took a deposition on every day of the

7   month for the next six months, you still wouldn't be able to

8   complete 125 depositions.  Of course, if we are going to be

9   realistic, I think it is highly unlikely the parties are

10  actually going to going to take one deposition a month.

11              THE COURT:  A day.

12              MR. REDDINGTON:  I'm sorry.  One a day.

13              THE COURT:  I think it is highly likely they will take

14  one deposition a month.

15              MR. REDDINGTON:  Not going to take one a day for sure.

16  As an example, more than two months ago we, HSBC, noticed seven

17  depositions of the plaintiffs.  They were supposed to take

18  place this month.  They were all canceled by the plaintiffs.

19  Some as late as a week out from their depositions, we were

20  informed those dates didn't work for the plaintiffs.  So even

21  with two months' notice, we weren't able to accomplish the

22  depositions that we had tried to notice.

23              I don't know how long it's going to actually take to

24  do the depositions.  But if our goal is to be realistic and not

25  prejudice anyone, I think six months is probably not going to

G6trroyc

1    be it and we are going to be back here at some point in the

2    future having the discussion further.

3             THE COURT:  Whatever schedule I set is going to be the

4    final schedule.

5             MR. REDDINGTON:  That's the problem.  I don't want to

6    represent to you that I think six months is going to work when

7    I really don't think it is, your Honor.

8             THE COURT:  Who do you think is the worst offender as

9    far as the lack of document production?

10            MR. REDDINGTON:  They all have different issues, your

11   Honor.

12            THE COURT:  Give me just one.

13            MR. REDDINGTON:  The worst offender is the BlackRock

14   plaintiffs.

15            THE COURT:  Mr. Galdston, lucky you.  Why don't you

16   tell me where you think you are on document production.

17            MR. GALDSTON:  Let me say I strongly disagree with a

18   number of the statements that Mr. Reddington may have, not

19   surprisingly, made.  I share the Court's concern about

20   continuing to kick the can down the road.  We have made an

21   incredible effort to make productions on behalf of the

22   plaintiffs in this case.  As your Honor is aware, HSBC recently

23   added approximately 20 new custodians.  That does take time.

24            THE COURT:  I'm going to interrupt you.  I have no

25   doubt that you have made an incredible effort and I'm

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

16

G6trroyc

1  intimately aware of where you are in discovery.  Tell me where

2  you are in production.

3          MR. GALDSTON:  We have produced approximately

4  5½ million documents.  We have prioritized productions from the

5  plaintiff entities that have the largest the financial interest

6  in the case, that hold most of the bellwether trusts.  We have

7  some additional productions that are remaining for various

8  custodians that have been recently added as well as --

9          THE COURT:  Approximately how many custodians have not

10 you not produced for?

11         MR. GALDSTON:  I don't know that exact number at this

12 point.

13         THE COURT:  Is that 40 or 4?

14         MR. GALDSTON:  It's more in the 4 range.  I don't know

15 the exact number, so I'm hesitant to make a representation to

16 the Court.

17         THE COURT:  Do you have a sense of when you will be

18 100 percent completed with discovery?

19         MR. GALDSTON:  We looked at this very carefully, our

20 2-month, 60-day extension that we proposed.

21         THE COURT:  You propose that you complete discovery

22 August 12 and then there are just 6 months.  Whatever remains,

23 you could produce it all August 12th?

24         MR. GALDSTON:  Correct, your Honor.

25         THE COURT:  Then you propose all the depositions

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

17

G6trroyc

1    happen within the next 6-month period?

2              MR. GALDSTON:  That's correct, your Honor.  We

3    actually had had a number of discussions with Judge Scheindlin

4    on this point and represented previously that we thought 5 or 6

5    months was sufficient to complete the deposition discovery.

6    That was back in November of last year, I believe.  At the time

7    HSBC raised no objection to that suggestion.  I'm a little bit

8    surprised.

9              I do want to highlight one other issue which the Court

10   has raised.  We are hearing about this for the very first time

11   in connection with today's hearing.  None of these issues were

12   raised with us prior to the letters that were submitted.  If

13   they have concerns about the character or the quality of our

14   productions, this comes as a complete surprise to us.  We

15   really haven't had an opportunity to analyze or respond to

16   these issues.

17             I will represent to the Court that we are using the

18   search terms that we were ordered to search.  We are searching

19   the custodians that we were ordered to search.  If HSBC is

20   dissatisfied with the character of the productions, they really

21   only have themselves to blame.

22             These documents, I will tell the Court, are responsive

23   to their requests, they are responsive to the search terms.  We

24   have consulted with our vendor and confirmed that they are in

25   fact applying the search terms uniformly.  There is no

18

G6trroyc

1    selective process being deployed here.

2           There are, as with any production, anecdotally oddball

3    documents that slip through and get into the production that

4    may contain a recipe or a screenplay.  I'm sure it would come

5    as no surprise that we have dozens of similar documents that

6    HSBC has produced.  So that really is of no concern here.

7           But the idea that somehow we are producing junk is

8    really just a fallacy.  These are the very same documents that

9    we informed HSBC we did not believe were relevant to the case

10   but nevertheless they insisted be produced.

11          THE COURT:  Why is it going to take you another six

12   weeks to finish document production?  That's what you are

13   proposing, till the middle of August.  That's six weeks from

14   now.

15          MR. GALDSTON:  Correct.

16          THE COURT:  What happened?  Originally, the deadline

17   production was mid June.

18          MR. GALDSTON:  We had 20 new custodians recently

19   added.  It takes time to collect their documents and produce

20   them.

21          THE COURT:  It will take six weeks from today to

22   produce those?

23          MR. GALDSTON:  Correct, your Honor, to collect,

24   review, process, and produce.

25          THE COURT:  Okay.  Do any other plaintiffs want to

19

G6trroyc

1   speak about their document production, particularly those that

2   think that maybe they have a fair amount left to go?

3            MR. FITZGERALD:  Your Honor, for Phoenix Light, we are

4   substantially complete.  We wanted to point out to your

5   Honor --

6            THE COURT:  "Substantial" is a term that maybe has

7   different meanings to different people.  Can you give me a

8   little bit more meat on the bones?  What do you mean by

9   substantially complete?

10           MR. FITZGERALD:  We have completed.  We are continuing

11  to review our privilege log and finalize that.  Sometimes some

12  documents get off the privilege log and they will get produced.

13           THE COURT:  You have gone through your custodians.

14  Once you have done this privilege review, you are about ready

15  to make a production?

16           MR. FITZGERALD:  Actually, we don't plan on making a

17  production, but we will if we determine that documents need to

18  come off that privilege log.

19           THE COURT:  So that's substantial completion?

20           MR. FITZGERALD:  Yes, your Honor.  We wanted to point

21  out that there were some assertions in HSBC's first letter with

22  regard to the Phoenix Light production, we think with regards

23  to all the plaintiffs' production, that HSBC has admitted were

24  just flatly wrong.  It highlights something your Honor brought

25  up.  This should have been hashed out among the parties before

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

20

G6trroyc

1   we came to the Court with this.

2          The first we heard about it was in the letter.  They

3   had to retract several statements they made, particularly with

4   regard to Phoenix Light.  We pointed out that they have had

5   these five custodians for almost a year and they asserted to

6   your Honor that they hadn't been produced.  So the accuracy of

7   the assertions they are making is highly questionable.

8          I thought the procedure that your Honor mentioned or

9   proposed made a lot of sense: that we meet and confer and we

10  come to your Honor on August 1st with any disputes.  That makes

11  a lot of sense.

12         With regard to Commerzbank, we are working through our

13  document production, but we are on a different schedule.  Our

14  substantial completion goal is in August.

15         THE COURT:  August 11.

16         MR. FITZGERALD:  Right.

17         THE COURT:  You are going to stand by that?

18         MR. FITZGERALD:  Yes, we should, your Honor.

19         THE COURT:  Good.  Thank you.  Yes?

20         MR. WOOD:  Christopher Wood on behalf of Royal Park.

21  I would like to echo the concerns about representations made by

22  HSBC in its letter.  With respect to Royal Park, they claim

23  that there were eight custodians that we agreed to for which we

24  hadn't produce documents.  We went back and looked at it, and

25  none of those custodians were actually agreed-upon custodians.

G6trroyc

1   So I'm very concerned about the accuracy of those

2   representations.

3        With respect to Royal Park's production, I think we

4   are also substantially complete, quote-unquote.  What I mean by

5   that is there are a number of foreign language documents which

6   are being translated, which have to be reviewed, as well as

7   some privilege issues that we are finishing.  We think that the

8   deadlines that the plaintiffs have proposed are reasonable, at

9   least from our perspective.

10        I guess we will have to wait and see if HSBC has

11   actually done their production.  I don't think we have received

12   any privilege logs from them yet, so we haven't had a chance to

13   evaluate that.  And there may be additional discovery disputes

14   that come up.

15        THE COURT:  Thank you.

16        MR. LIBRA:  Your Honor, John Libra on behalf of the

17   NCUA Board.  We have been open with HSBC with respect to our

18   productions.  Their letter indicates that we have produced from

19   nearly all of the custodians that we proposed.  We have run

20   search terms through those documents and been producing them to

21   HSBC.  I don't think there is a real concern there.

22        There is one issue with one of the credit unions who

23   purchased some of the certificates in the case as a whole, but

24   none of the certificates in the bellwether trusts where we have

25   had some issues, because they were conserved back in 2010.  The

22
G6trroyc

1    NCUA has been attempting to decrypt the hard drives that the

2    credit unions had.  This has taken some additional time.

3         We expect to be able to work through these issues.  We

4    have one now that we think we can open.  We have talked about

5    that with HSBC, so I don't think it will come as a surprise to

6    them that there will be some additional productions from that

7    credit union.  We have made productions from the paper

8    documents that we had from that credit union, so there is not

9    an entire absence of production there.

10        We are working through the issues.  I don't want to

11   use the term "substantial," either, but within the schedule

12   proposed by the plaintiffs, we will be able to meet that and

13   produce what we have agreed to produce.

14        There is one issue we would like to raise with the

15   Court here today that goes to some of these issues.  As other

16   plaintiffs have mentioned, some of these things haven't really

17   been raised before, so we haven't had a chance to fully discuss

18   them with HSBC.

19        I think there may be sort of a fundamental misunder-

20   standing between the parties as to how this process of

21   producing documents ought to be going.  I can speak for my

22   client NCUA Board, and I have discussed with the other

23   plaintiffs, what we have been doing to produce documents as it

24   relates to these search terms.

25        What we have done is collected our universe of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

G6trroyc

1   documents and run the search terms across those, and then done

2   what I would call light review for responsiveness, and also for

3   privilege of course.  As a result, certain things do slip

4   through, recipes, other odd pieces of information.

5          Our understanding about the scope of this process and

6   what the Court was ordering us to do was that we should be

7   taking the results of those searches terms and essentially

8   presuming that those were responsive documents that ought to be

9   produced in this litigation.  Otherwise, what was the point of

10  this whole vigorous back-and-forth over what these terms were

11  going to be and who the custodians were going to be, if there

12  was then going to be some additional hardcore what I would call

13  relevance review of those documents?

14         From what we have reviewed thus far from HSBC's

15  production and from our conversations with them, we have a

16  strong suspicion that there's been a much more involved

17  responsiveness review/relevance review of those documents that

18  were the result of these search terms.  We want to raise that

19  issue with the Court.

20         We have been trying to get an answer from HSBC as to

21  what level of review they have been performing on the results

22  of these searches, and we haven't been able to get a straight

23  answer from them.  What we have heard here in court, what we

24  have seen in the documents, and what we have heard from them in

25  our back-and-forth on these issues doesn't leave us very

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

24

G6trroyc

1   confident that they have been actually producing what are the

2   responsive documents that we believe are relevant.

3          What we think is happening here is that they are

4   taking the search term documents and then applying their own

5   subjective test as to what is relevant to those, and then

6   producing that smaller set of documents.  As you know, we have

7   been in here a number of times and we are obviously on

8   completely different sides of the earth as to what is relevant

9   here in these lawsuits.

10         We don't think it is appropriate for HSBC to be

11  applying that level of review to these documents.  We think as

12  a result of it, we haven't been receiving what we are entitled

13  to receive that we need in order to prove our case.  I'll give

14  you a couple of quick examples.

15         One would be a discussion of a certain servicer or a

16  certain originator that doesn't specifically refer to a bell-

17  wether trust.  We think those documents are being screened out

18  of this process, not turned over to us.  They may argue, hey,

19  that's not relevant, but in our view of these cases it is

20  extremely relevant to show that HSBC discovered problems within

21  these trusts with these originators, with these servicers.

22         Another example is documents that would speak to

23  various policies about repurchasing documents.  It is true they

24  have produced some of their formal policies, but as we

25  understand it, documents that discuss more generally, emails

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

G6trroyc

1    between various employees that talk about repurchase protocols,

2    that type of thing, we don't think those have been produced.

3    We think those have been screened out based on HSBC's

4    subjective view that that material isn't relevant.

5            You have heard from Mr. Reddington and HSBC about the

6    various deficiencies they see in our productions.  I think I

7    can speak for all the plaintiffs in saying that we have tried

8    to adhere to running the searches.  We are trying to weed out

9    as much junk as we can, but we have a large volume of material,

10   so certain things are going slip through and be produced.

11           Speaking personally for our client, we would rather

12   have them give us too much and we can search through it and

13   figure out what is junk and what is not, than get way too

14   little.  From what we have seen, we are getting way too little

15   here.  We would ask the Court and HSBC to clarify what kind of

16   review they are doing of these documents, and we would ask the

17   Court to give us some guidance on what we ought to be doing

18   here.

19           I am hesitant to wait until August to come in with

20   these type of issues because this is really a fundamental

21   issue.  If there has been this deeper level of review on these

22   documents and we haven't been receiving the responsive hits to

23   our search terms that we went back and forth to negotiate,

24   that's a big problem and that is going to push out the schedule

25   even further.  So, to the extent there has been this more

G6trroyc

1    in-depth review going on, we would ask the Court to order HSBC

2    to turn over the broader universe of documents that resulted

3    when they ran those search terms.

4          We are not asking them to turn over material they

5    consider privileged, but we don't think it is appropriate for

6    there to be sort of a responsiveness/relevance type of review.

7    That's an issue we think is appropriate for the Court to take

8    up today, and we would like to hear what HSBC has to say on

9    that.

10         THE COURT:  That is an issue I wish had been raised

11   several months ago.  Maybe you didn't identify it at that time.

12   I agree with you that it is a fundamental issue and seems

13   highly complex if we find that people are doing things

14   differently.  Mr. Reddington, why don't I give you an

15   opportunity to respond.

16         MR. REDDINGTON:  I'm not sure where to respond, since

17   I'm hearing this for the first time today.  I guess I would say

18   he's not entitled to everything that hits on a search term if

19   it is not relevant and responsive.  It has never been my

20   experience that that is what search terms are for.

21         Search terms are designed to find documents that might

22   be relevant, and then a review has to be done to determine

23   whether in fact they are actually relevant and responsive to

24   requests.  If plaintiffs are not doing that -- it is my

25   understanding that they would be doing that or they should be

27

G6trroyc

1   doing that.  That might go a long way to explaining why we have

2   48 million pages of junk and can't even assess their

3   productions.

4           I mentioned I brought some sample documents.  Not all

5   of it is lasagna, not all of it is screenplays.  Almost 50

6   percent or more of some of these plaintiffs' productions are

7   Bloomberg emails and newsletters that might talk about in very

8   high generalities the banking industry or RMBS issues but

9   actually have nothing to do with this case.

10          It would take an incredible amount of labor and work

11  to wade through that junk to actually find what is relevant and

12  responsive to a case that is supposed to be about something

13  that an indenture trustee did in specific trusts with respect

14  to specific loans.  This is the first time I'm hearing that the

15  plaintiffs think there is nothing to be done other than run

16  search terms and produce documents.

17          If you recall, your Honor, back when we had these

18  fights about search terms, HSBC principally was arguing for

19  narrower search terms as the parties negotiated this protocol,

20  and we ultimately had to come to the Court in January and

21  February to resolve that, mostly by ordering the narrower

22  terms.

23          There would be no reason to worry about the terms if

24  there wasn't going to be a review.  If you weren't going to

25  review the documents, you could produce 3 million documents and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

28

G6trroyc

1    it would take no time.  Only if you are going to review the

2    terms, review the documents to identify what is actually

3    relevant and responsive does the number of documents matter.

4    That's the way it's supposed to work.

5         They don't have an entitlement to things that aren't

6    relevant.  They don't have an entitlement to things that aren't

7    responsive.  In fact, parties shouldn't want that stuff.

8    That's our problem here.  They are producing a bunch of stuff

9    that has nothing to do with this case.

10        MR. LIBRA:  Your Honor, I think you just heard from

11   HSBC what our exact concern is.  Mr. Reddington keeps saying

12   they are reviewing for responsiveness and relevance.  We have

13   fundamentally different views of what is relevant here.  You

14   have heard Mr. Reddington in court in the past take a look at a

15   document that described a servicer and say, I don't think that

16   is relevant.  Well, we do.  We are entitled to know what is

17   going on behind the scenes in order for that determination to

18   be made.

19        THE COURT:  This is a problem that is as old as

20   litigation, right?  In every litigation, one party asks the

21   other party for responsive documents and there is an assumption

22   that officers of the court are reviewing documents, and

23   producing appropriate non-privileged responsive documents.

24        I agree that the advent of ESI discovery doesn't

25   change the obligation to review for relevancy, and the concept

G6trroyc

1    here was that we identify search terms that are likely to

2    generate the most relevant documents.  It may be that we don't

3    pick the right terms and there are some hot documents, as you

4    call them, that are not being captured.  That's the problem

5    with these massive volumes of documents, that there is a

6    sifting process through the search terms.

7          That doesn't necessarily mean that there is what

8    people call a document dump, where you produce every single

9    document.  Maybe you all were of the view that that was the

10   better course, but I don't know that there was a guarantee or a

11   promise or an obligation on the part of HSBC to just produce

12   whatever its hits provided.

13         The terms were broad.  That was part of the disputes

14   that we had in the first instance and part of the narrowing

15   that I tried to do so that we could focus in on what was truly

16   going to be responsive to the discovery demands.  That was the

17   goal there.  But I don't think you had any right to just get

18   everything that was produced by the report.

19         MR. LIBRA:  Your Honor, the issue from our point of

20   view is we don't know what is being held based on HSBC's

21   decision that something is irrelevant to the case.  We have no

22   way of evaluating how much information is being filtered out on

23   this relevance review versus how much information exists.

24         THE COURT:  Isn't that true in a slip-and-fall case?

25   That always happens.  There's always one side doing a relevance

G6trroyc

1    review, and sometimes the party seeking the document knows that

2    there is a document out there and they don't get it, and then

3    they can call the lawyer out for being overly ungenerous with

4    its relevance review.

5            But the mere speculation that their relevance review

6    is unfair, without any basis.  I don't know what I'm supposed

7    to do with that, quite frankly.  I'm not going to spend my time

8    reviewing these documents.  I'm not sure what to do with that

9    information.

10           MR. LIBRA:  Your Honor, I think at a minimum we are

11   entitled to know what material they are withholding based on a

12   relevance standard.

13           THE COURT:  Their answer is going to be we are

14   producing documents relevant to your discovery demand, I

15   assume.

16           MR. LIBRA:  They have run the searches.  We agreed

17   upon those searches.  Those are supposed to identify the

18   responsive documents here to our document requests and their

19   document requests.  There is an additional review, an

20   additional determination going on now as to whether or not

21   these documents are relevant.

22           If they are withholding something that is responsive

23   because it hit upon a search term but they think it is not

24   relevant, I think we are entitled to know what that is so we

25   can challenge it.  We have no other means of knowing what

31

G6trroyc

1    documents may exist.  We suspect there are many because there

2    are obviously issues with other trusts.  There are obviously

3    issues with non-bellwether trusts that discuss the conduct of

4    these originators.

5          THE COURT:  What are you asking me to do?  If I ask

6    Mr. Reddington, what narrowing are you doing once you have

7    culled together the presumptively relevant documents from the

8    search, my assumption is his answer is going to be, we then

9    review the documents to make sure that they are responsive to

10   the document demands.

11         The search terms are not the document demands.  The

12   search terms are just a way to get to responsive documents.

13   Then the production is responsive to the document demands.  He

14   is going to say, I looked at what the document demands were and

15   I decided whether these were responsive.  I assume that's what

16   he is going to say.  What are you going to do with that

17   information?

18         MR. LIBRA:  We would be able to challenge this

19   determination on HSBC's part that these documents are not

20   relevant to the case if we had some kind of a log or other

21   means of identifying and reviewing some of those documents.

22         Perhaps one way to get at that would be to know all of

23   the various parties here have pulled together a universe of

24   documents from their custodians and also from relevant network

25   drives and various other places to come up with the broader

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

32

G6trroyc

1   universe of documents in this case.  We have all then applied

2   our search terms to that universe of documents, and then that

3   has resulted in the sort of universe of documents that are

4   presumptively responsive.  That's a concrete identifiable

5   universe of documents.  There is then the documents that have

6   been produced.

7          At a minimum, we need to know out of that smaller set,

8   the set that resulted from running the search terms, how many

9   of those have been produced to us.  If it's an extremely small

10  number, that is evidence to me that there is a very high level,

11  very detailed level of additional review that's going on before

12  we see any documents.

13         THE COURT:  Except that they say that half of the

14  documents you produced are Bloomberg reports or lasagna

15  recipes.

16         MR. LIBRA:  Your Honor, they have asked for

17  essentially everything having to do with our RMBS investments.

18  Those Bloomberg messages are certainly something having to do

19  with all of the plaintiffs' RMBS investments.  That's why we

20  produced them.  In fact, we had a discussion with HSBC and said

21  if you don't want them, we will try and pull them out.  But

22  they are responsive.

23         We think they are irrelevant, of course.  We think the

24  vast majority of the material that we have been producing to

25  them is irrelevant.  We think this case should be focused on

33

G6trroyc

1    what HSBC didn't do with respect to protecting investors in

2    these trusts.  We don't think what our plaintiffs did matters

3    at all.  That doesn't mean we get to withhold it all from them.

4    We still need to produce it.  It's responsive to their

5    requests, and it can form a foundation of their defenses in

6    this case.

7          We just ask for the same in return, that we get the

8    documents we think are responsive.  We can have an argument

9    later about whether or not the conduct of a servicer that

10   wasn't servicing a particular bellwether trust is relevant to

11   our case.  But we ought to be entitled to see that material and

12   attempt to use it to prove our claims here.

13         I think we are only getting a sliver of what has been

14   hit upon the search terms.  So really at a minimum what I am

15   asking for, your Honor, is to at least order HSBC to tell us

16   what that universe was of the documents that resulted from

17   running the search terms and tell us how that compares to what

18   they have produced.

19         MR. GALDSTON:  May I add just one thought?

20         THE COURT:  After your colleague.

21         MR. WOOD:  On behalf of Royal Park, in response to

22   what Mr. Reddington said, his suggestion that he had not

23   understood that we were turning over documents responsive to

24   search terms is completely contrary to the agreement that we

25   reached with his colleagues.

G6trroyc

1          We specifically discussed this earlier in the year,

2     whether or not Royal Park was doing a relevancy review.  They

3     were concerned about the scope of what we think is relevant or

4     not, and we told them that the easiest way to deal with this is

5     we would just produce all the documents that were responsive to

6     the search terms and not do that relevance review, and they

7     specifically agreed to that.

8          Mr. Reddington, perhaps they are not talking on their

9     side, but I'm slightly upset that he would make a

10    representation that he hadn't understood, at least from Royal

11    Park, that that's what they were doing, because that's what

12    they agreed to.  Frankly, we expected that that's what they

13    would be doing too.  So we are a little surprised by that.

14         THE COURT:  Thank you.

15         MR. GALDSTON:  A few details to add to what Mr. Libra

16    ably addressed.  We now live in a modern technological world,

17    massive amounts of information, and most courts abide by and

18    follow the Sedona principles.  Judge Scheindlin has co-authored

19    a handbook on e-discovery that embraces this very same concept.

20    Search terms are intended to reduce the need for manual review.

21    That is a fundamental tenet.  That is what we attempted to do

22    here.

23         We did not impose our view.  While we objected to

24    objected to many of the requests that HSBC propounded and we

25    felt in our view they were not relevant to any party's claim or

35

G6trroyc

1   defense, we did not impose our view of that relevance in

2   screening out the documents that they nevertheless specifically

3   requested.

4          The Bloomberg reports, these same things they are now

5   calling junk, the very same documents they asked us for, we

6   objected to producing.  Nevertheless, we did not impose in

7   secret our screen of what we think is relevant or not relevant.

8   That's where the disconnect is.  We are entitled to know, and I

9   believe they are obligated to tell us, what documents they are

10  withholding based on their view of relevance, which we disagree

11  with.

12         THE COURT:  Here is what I'm going to do.

13         MR. FITZGERALD:  One more thing, your Honor.  You

14  raised one point that I think is interesting.  What Mr.

15  Reddington is saying is they are doing a responsiveness and a

16  relevance review.  Our position is they should be doing a

17  review for responsiveness only.  They make the subjective

18  determination on top of that with respect to relevance.  I

19  would like to hear a representation from Mr. Reddington of what

20  the review is, your Honor.

21         THE COURT:  This is an issue that seems like there may

22  be, given what counsel from Royal Park has said, maybe not full

23  information that Mr. Reddington has.  It sounds like this is an

24  issue that is new to the parties.  I want you to discuss this

25  among yourselves immediately.  It may be that a conversation

                                                              36
     G6trroyc

1    can be had.  It may be that what he is describing is not as

2    heavy a review as the plaintiffs fear.  It may be what counsel

3    for Royal Park was saying has actually been borne out and that

4    they haven't been doing this kind of a relevance review.

5              I think in the first instance you all should speak and

6    see what the world is.  I'm going to ask you to send me a

7    letter jointly a week from today and let me know where things

8    stand.  I'll get you all on the phone right away and we will

9    resolve the issue.  Let's get a letter in July 5th.  You should

10   be speaking this week.  I know it's a holiday week, but

11   hopefully all can speak.

12             MR. GALDSTON:  Your Honor, one point of clarification

13   on process.  I know your Honor's rules and procedures do not

14   permit reply letters.  But there seems to be an ongoing

15   practice of submitting several replies.  When you say a joint

16   letter, it's just one letter, correct?

17             THE COURT:  Correct.

18             MR. GALDSTON:  No replies, correct?

19             THE COURT:  Correct.  You all talk and just tell me

20   your positions.

21             MR. GALDSTON:  Thank you.

22             THE COURT:  I'll throw this out there.  It may be that

23   you talk and agree with one another and everybody is doing the

24   right thing.  Then the joint letter can be easy, saying we

25   worked this out, we don't think there is a problem.  If what

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

37

G6trroyc

1   you learn is that HSBC has been significantly filtering the

2   documents in a way that you think is fundamentally unfair, I

3   will hear from you all and probably get you on the phone, and

4   I'll make a direction as to what I think is appropriate.

5            MR. REDDINGTON:  Your Honor, may I address one point?

6            THE COURT:  Yes.

7            MR. REDDINGTON:  I think it is a good idea for the

8   parties to meet and confer about this.  There is some

9   information that we need from the plaintiffs as well for that

10  meet and confer, so I ask that they be asked to do that, to

11  give us that information.

12           First of all, to understand what search terms are

13  actually being used here, I would ask that all parties

14  circulate the terms they are running so that we can then

15  compare them and see if there are any disputes or any daylight

16  between what the parties think the operative terms are.

17           Second, since we believe based on our review of the

18  documents that there are many custodians missing, and I have

19  heard today that the other side doesn't think that's the case,

20  can we ask the plaintiffs to identify specifically the

21  custodians for whom they have been ordered or agreed to produce

22  documents and for which they are still doing that, so we are at

23  least on common ground on those two relatively basic issues?

24           THE COURT:  The letter I want on July 5th is just

25  going to be about HSBC's review.  That's what I want to focus

38

G6trroyc

1   on right now.  If it turns out that you guys are running this

2   through a filter that is blocking 75 percent of the hit

3   results, I'm going to have a big issue I have to deal with.  So

4   let's tee that up right away.

5          Everybody should be up front about where they are on

6   discovery.  There is no hiding the ball here.  It sounds to me,

7   based on what I have heard, that many of the plaintiffs are

8   undergoing final privilege reviews or other tail-end document

9   reviews.  It sounds like the BlackRock plaintiffs have maybe a

10  more substantive review that they are undergoing.

11         Mr. Galdston, if you can identify which custodians you

12  are still in the process of reviewing, it would be helpful,

13  just so they don't think you have forgotten these custodians

14  and they know exactly what is there.  There is no reason for

15  hide the ball here.

16         I agree with the principle that there should be full

17  disclosure back and forth, but the thing I want to resolve most

18  immediately is this question about whether there is some unfair

19  filtering going on by HSBC for its production.  For now the

20  July 5 deadline is for a letter related to HSBC's review of the

21  documents that it culls from the agreed-upon search terms.

22         In the next week or so all of the plaintiffs should

23  also be providing in writing to HSBC what search terms they are

24  running so everybody can be satisfied they are running the

25  correct search terms; in as much as detail as possible what

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

39

G6trroyc

1  custodians have not yet been searched or are in the process of

2  being searched so that when HSBC reviews their review and finds

3  that Joe Smith is not there, they don't think Joe Smith has

4  just been forgotten, they understand that Joe Smith is being

5  reviewed as we speak.

6         I'm satisfied that there is a lot of work to do still.

7  I'm not going to give you until June 9th.  It's too far away.

8  I will give you another month from when I came to the bench.

9  In honor of this case, I'm going to close fact discovery on

10  April Fool's Day, which is April 1st, Friday, April 1st.

11  That's a real date.

12         Let me talk about expert reports.  I have a question.

13  Is Mr. Fitzgerald here?

14         MR. FITZGERALD:  Yes.

15         THE COURT:  You wrote the letter.  You mention in the

16  letter that you had originally proposed a protocol for the

17  reunderwriting to streamline that expert review and analysis.

18  I will betray my ignorance that I am not fully familiar with

19  what the reunderwriting review process is, but I have a pretty

20  good sense.  I have read what I think is the leading case on

21  it, so I have a pretty good sense.  I want to hear what the

22  protocol was that you had proposed that HSBC rejected.

23         MR. FITZGERALD:  Absolutely, your Honor.  We had

24  proposed that we enter into a loan file reunderwriting protocol

25  similar to the one that was used in the FHFA litigation before

G6trroyc

 1    Judge Cote.  Those protocols provide that the parties were

 2    collaboratively to collect loan files at the outset, exchange

 3    or collect the loan tapes, so they could identify the loans,

 4    identify any samples that the parties would use, identify the

 5    guidelines the parties agreed were the guidelines, get an

 6    agreement by the parties that the loan files were the actual

 7    complete loan files.  Those are very time-consuming matters.

 8    If there is agreement on that up front, I can tell you it cuts

 9    the process down considerably.

10          THE COURT:  You would agree, just so that I understand

11    the process, that these 500 loans would be the sampling that

12    everybody is going to say look at, and you would agree that

13    these are the guidelines that we are all going to measure these

14    loans up against?  Is that the concept?

15          MR. FITZGERALD:  Exactly, your Honor.  That's exactly

16    the concept.  We have found that extremely useful.  I think

17    defendants would admit that it was useful too.  Maybe not these

18    defendants, because they rejected it out of hand, they had no

19    interest in doing it at all.  Their cry now that it is going to

20    take a long time for them to rebut our reports is disingenuous

21    too.  We've gone ahead and told them what our sample is.  We

22    have told them what loans we are going to look at.

23          THE COURT:  They already know what loans you are going

24    to look at?

25          MR. FITZGERALD:  They already know what loans we are

G6trroyc

1    looking at, your Honor.  This issue has been litigated multiple

2    times in this case.  Judge Scheindlin decided the appropriate

3    time for rebuttal reports after opening reports for both sides,

4    for both parties.  She gave it a lot of thought.  She didn't

5    accept our proposal.  She didn't accept HSBC's proposal.  She

6    reached her own conclusion, entered that order.  You carried

7    that through in your subsequent scheduling order.  We think it

8    is the right staging and it is fair.

9             This bellwether process was meant to streamline

10   things.  It wasn't meant to slow things down.  If they wanted

11   to cooperate at the beginning, they could have.

12            THE COURT:  The sampling that you have identified for

13   the loans, that is set in stone?

14            MR. FITZGERALD:  We have provided them the list of

15   loans.  If we need to change the sample, we'll let them know.

16            THE COURT:  That's what you are operating on?

17            MR. FITZGERALD:  That's what we are operating under

18   now.  Another fallacy in their argument, they tipped their hand

19   in their letter that they intend to challenge our ability to

20   sample despite the case law that's out there that finds that

21   sampling is an acceptable form of evidence.  If they are just

22   going to challenge us on our ability to sample at all, they

23   don't need time at all.  They can do that right away.

24            THE COURT:  That's helpful.  Who from the defendants

25   wants to reply?  Mr. Reddington.  You need to delegate better.

42

G6trroyc

1          MR. REDDINGTON:  Maybe so.  Your Honor, the issue is

2     much more complicated than what you just heard from Mr.

3     Fitzgerald.  Let me start with the basics.  This is not a case

4     like a typical RMBS case.  This is not a case that is brought

5     against a sponsor.  This is not a case that's brought against

6     an originator.  This is a case that is brought against an

7     indenture trustee.  The indenture trustee had nothing to do

8     with the original origination and underwriting of any of the

9     loans in this case.  The indenture trustee made zero

10    representations and warranties about the underlying loans in

11    this case.

12         THE COURT:  I'm going to stop you for a second.  These

13    are all perfectly legitimate arguments, but they seem like they

14    are arguments on the merits.  If the plaintiffs want to prove

15    their case by doing the sampling and setting forth all of the

16    ways in which the loans were deficient, maybe they will win,

17    maybe they will lose, but if they decide that's the expert that

18    they are going to go forward with, the only question for us

19    right now is not whether that's enough for them to win or lose

20    their case, but how you are going to respond.

21         What the plaintiffs are suggesting, what Mr.

22    Fitzgerald is suggesting, is that you may be only challenging

23    that that is an illegitimate way to prove your case, which is

24    just a legal argument.

25         What I understood from your letters was that you were

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

G6trroyc

1   then going to go through these loans yourself and say no, no,

2   loan 642 actually did comply with these guidelines and, so it

3   wasn't a deficient loan or an improper loan, or whatever the

4   terminology would be, and you would be hiring an expert to

5   challenge the plaintiffs' expert view that the loans were

6   inadequate.  If you are not going doing that, why do you need

7   so much time?

8           MR. REDDINGTON:  I think we would be doing both, your

9   Honor.  The first issue, under Second Circuit precedent, it is

10  not clear at all that sampling is appropriate.

11          THE COURT:  Fair enough.  Point 1 of your brief.

12          MR. REDDINGTON:  Today is the first time I have heard

13  that they have identified their sample to us.  Under the

14  original scheduling order back when Judge Scheindlin was still

15  in the case, there was a time that was set aside for the

16  plaintiffs to identify loans for further review, including if

17  necessary reunderwriting.

18          We don't know what that review is they are doing.

19  Maybe it's reunderwriting, maybe it's a sample, maybe it's a

20  sample of a sample.  The only thing that was required under the

21  scheduling order is to identify loans for potential further

22  review.

23          They sent us that information just this month.  There

24  are 7600 or 7700 loans in that schedule.  We don't know whether

25  they intend to reunderwrite all 7600.  We don't know if they

44

G6trroyc

1   intend to reunderwrite some portion of that 7600.  Whatever

2   they are going to do, we have to be able to evaluate that and

3   challenge that.  If they are going to be doing a reunder-

4   writing, then we certainly will be doing some reunderwriting as

5   well.

6           THE COURT:  Why can't I ask you all to agree to some

7   protocol?  I came to the bench thinking this was something I

8   was going to do, but it sounds like it was something proposed

9   in the first instance.  Why can't you all work together and

10  agree that this is a sample of loans you are going to do?

11          Your view is six weeks isn't enough time.  It is

12  almost July 1st.  You will have 9 months or whatever it is to

13  start that process.  Ideally, you could all agree on what the

14  appropriate guidelines are, that these are the sort of

15  standards that everybody is reviewing these loans against.  Why

16  can't you agree to something like that?

17          MR. REDDINGTON:  The protocol they proposed, your

18  Honor, was a nonstarter.  Basically, the protocol they proposed

19  was for HSBC to do all their work for them.  Their basic

20  proposal was you guys go out and get the loan files, you guys

21  go out and get the underwriting guidelines, then you certify to

22  us which underlying guidelines you think apply to the loans,

23  and then we will go forward with that as the protocol.  That

24  was their proposal, which is of course preposterous.

25          They have the burden of proof here.  We have no basis

G6trroyc

1   to decide without some sort of expert which the appropriate

2   underwriting guidelines were, where the loan files are.  That's

3   all their burden.  That was their proposal.

4           Could there be some other more reasonable proposal?

5   Perhaps.  I think the question is going to become, what does

6   that sample look like?  Again, we don't concede that sampling

7   is even appropriate in a case against an indenture trustee.

8           THE COURT:  But you said that if they are going to do

9   sampling, you are going to challenge it.  It doesn't really

10  matter to me whether or not you are going to make a legal

11  argument and whether it is a winning legal argument.  That

12  doesn't matter for my purpose now.

13          My purpose is to figure out how much time is really

14  fair for you to respond to their reunderwriting expert report.

15  What I'm hearing now is that they have already told you, maybe

16  it was 6 months ago, maybe it was today, which loans they are

17  going to use.

18          It seems to me that the better course would be for

19  everybody to agree that those 7,700 loans is correct or maybe

20  the number should be smaller or maybe the number should be

21  larger, and for you all to agree that there are certain

22  guidelines that we all accept are the appropriate guidelines

23  against which we should measure these, and then you both go on

24  your ways.  Then everybody has the same amount of time and an

25  equal opportunity to prepare the reunderwriting.  That seems to

G6trroyc

1      me the fairest way to proceed.

2              MR. REDDINGTON:  Certainly if they were to tell us

3      soon, as soon as they can, these are the loans that we are

4      going to be reunderwriting, we could use that then to figure

5      out how much time is necessary for a rebuttal report.  For

6      example, if they are really going to reunderwriting 7600 loans,

7      I would be surprised if that's true.  If they are telling us

8      that today, every loan takes two to four hours to reunderwrite,

9      so you can do the math and figure out that you have a lot of

10     time that would have to go into that underwriting.

11             If we learn that day, we would have some ability to

12     prepare for that.  If we don't know that until we get their

13     expert report, we are at a huge disadvantage.  I think the

14     first requirement would be for them to identify as early as

15     possible the actual specific loans they say are in their sample

16     and that they are going to reunderwrite.

17             The issue of agreeing on guidelines that is a much

18     more complicated issue that would be hard to do in part because

19     these loans -- again, this is a little different case.

20     Typically, cases are brought within one trust or they are

21     brought within trusts that are related in the sense that they

22     either came out of the same shelf, had the same sponsor, were

23     originated around the same time.  That's not the case here.

24             We have 300 trusts in which there are hundreds of

25     different originators, there are dozens of different sponsors,

47

G6trroyc

1  there are literally potentially hundreds of different under-

2  writing guidelines that could apply to any particular loan.

3  And all of those guidelines by the way, your Honor, had

4  exceptions to them that the originators were entitled to use to

5  deviate from the guidelines.

6       So, asking the party that doesn't have the burden, who

7  didn't originate the loans, and who doesn't possess the loan

8  files to stipulate to particular guidelines, it's a big ask.

9  It's a stretch.

10       THE COURT:  If you all could negotiate for fewer

11  loans -- that's a big number.  7,600 whatever it is, is an

12  enormous number.  Is it possible for you all to have a

13  conversation in the coming days, weeks, about how many loans

14  should be the sampling and agree that you will work within that

15  sampling, which is to say that neither party will challenge the

16  number of loans within the sampling, everybody will agree that

17  it is a reasonable sampling?

18       I'm not saying everyone will agree that sampling is

19  the correct way to do it as a matter of law, but simply that

20  there will be no challenge to an expert's conclusion from one

21  side or the other that the sampling is too small.  Is that

22  something that the parties could in theory agree upon?

23       MR. FITZGERALD:  Your Honor, I haven't spoken to all

24  my plaintiff colleagues, but for Phoenix Light and Commerzbank,

25  we would be open to that, and I suspect the other plaintiffs

48

G6trroyc

1    would as well.

2         Your Honor, I think Mr. Reddington glossed over one

3    aspect of the loan file reunderwriting protocol, and that was

4    the collection of loan files which they have a contractual

5    right to.  That's why we did ask them to exercise that right.

6    They wouldn't exercise that right, which is why we have had to

7    subpoena everybody.

8         The reason that it's helpful to have agreement on the

9    loan file is so it eliminates any dispute as to whether the

10   loan file was complete or not.  That way the experts know

11   exactly what they need to analyze.  That's a very helpful part

12   of the protocol.

13        THE COURT:  It seems to me you all should be able to

14   agree on an appropriate sampling, both the size and whatever

15   loans should be in there, and that you should be able to agree

16   on what the complete files are.  It seems like the ship has

17   sailed a bit on whether or not HSBC is going to provide those

18   loans to you because it sounds like 18 months ago they said

19   they were not and now you have gone ahead and located them

20   yourself.  Whether that is true or not doesn't really matter to

21   me.  It seems to me that the outstanding issues right now are

22   what is the loan size, what loans are in that loan sampling,

23   and whether or not each loan file is complete.  Those seem to

24   be issues that you all should be able to agree upon.

25        I understand Mr. Reddington's argument that agreeing

49

G6trroyc

1  upon what are the guidelines may be complex.  I'll just throw

2  out to you that if it's complex for everybody in this room to

3  figure out, I don't know how you think a jury is going to

4  evaluate this.  It seems to me that you are all better served

5  to agree upon what are the appropriate guidelines.

6        I don't know how Judge Schofield is going to instruct

7  a jury as to if you have competing experts, how she is going to

8  give them any guidance.  You should be thinking about things

9  like this.  It seems to me wise now to agree, and compromise if

10  necessary, on certain guidelines so that you can at least give

11  a standard that the court and jury can apply rather than

12  fighting over that as well.

13        You should be able to work this out.  Given the

14  schedule that I am proposing, which is now closing fact

15  discovery on April 1st, if you can spend the next month

16  finalizing these terms, HSBC will be in a much fairer position

17  to submit its expert report along the schedule that was

18  initially in the scheduling order.

19        Yes, sir?

20        MR. JACOB:  Charles Jacob on behalf of Triaxx Trust.

21  In the spirit of full disclosure -- we informed HSBC's counsel

22  of this in our early meet-and-confers -- Triaxx only holds one

23  of the bellwether trusts.  The bellwether trusts, quite

24  unfortunately in our view, were selected before we came became

25  part of the coordinated cases.  So we have one.  Triaxx does

G6trroyc

1   not see the need for sampling.  As to the one bellwether trust

2   that we hold, we are going to identify all the loans that we

3   think are defective and will inform counsel of what those are,

4   about 300.

5           THE COURT:  Okay.

6           MR. JACOB:  The reason is simple, your Honor.  We

7   understand they are going to challenge sampling from a legal

8   point of view, and we don't want to be bothered with that.  We

9   are not going to go that route.  Our case is a little different

10   than the big putative class actions in that regard.

11           THE COURT:  Okay.  As always, I leave you all with a

12   lot of work to do.  I want a letter on July 15th on where we

13   are on HSBC's production.

14           I'm trying to get off the bench, but now I have one

15   other thing I want to ask about.  In HSBC's proposal there was

16   a class certification date that was proposed and there was

17   nothing there from the plaintiffs.  Is that because the

18   plaintiffs don't think that that is appropriate or they don't

19   want to talk about it now?

20           MR. GALDSTON:  Your Honor, we are happy to talk about

21   it.  At the time the letters were submitted, it was our

22   expectation that plaintiffs would file their opening briefs on

23   July 11 per the original schedule.  In light of some of the

24   issues that have been raised today, we certainly are willing

25   and will defer to the Court as to what a reasonable adjustment

51

G6trroyc

1    to the schedule might be in light of some of the issues that

2    have been raised today.  Certainly we think that the date

3    proposed by HSBC is unnecessarily prolonged and truly

4    inconsistent with rule 23's directive that the class

5    certification motion be made at an early practicable time.

6            MR. WOOD:  BlackRock and the Royal Park plaintiffs are

7    the only cases styled as class actions.  Judge Schofield's last

8    order left that date, the July 11th date, as it was.  She was

9    going to schedule a pre-motion conference on what the class

10   cert. that the parties submitted last week, but I think she put

11   that off so we could have this discussion now.  I assume she is

12   still going to have that conference and wants to talk about how

13   the class certification or perhaps what the motions look like.

14   From our perspective, we think that the current date is

15   appropriate and there is no reason to change it.

16           THE COURT:  I think she is going to handle it, so I

17   don't think we need to discuss it further.  I just wanted to

18   see where we were here.  I think she is going to have the

19   conference.

20           I am going to issue a scheduling order with April 1 as

21   the close of fact discovery.  It is not a date that is going to

22   be extended.  Everybody should working toward that.  I want to

23   get a letter from you all, one letter from the defendants and

24   the plaintiffs jointly, on August 1.  Please do your best to be

25   as brief as possible, but I know there may be a lot of issues

52

G6trroyc

1   there.

2        Whatever is outstanding on the document discovery, if

3   there are any outstanding disputes there, the plaintiffs should

4   be identifying to HSBC with specificity what remains to be done

5   and what is a realistic time for disclosure of those documents.

6   Nothing should be produced beyond August 11th.  And you should

7   be working to do a rolling production.  Let HSBC know what

8   remains with specificity, please.  And if there are any ongoing

9   discovery disputes relating to the documents, that should come

10  in on the 1st.

11       The other thing I want you to discuss is this issue

12  with respect to expert discovery.  I believe strongly that

13  there should be an agreement here and that that will streamline

14  the process.  It makes perfect sense to me that everybody can

15  agree on which loans are to be reviewed and reach an agreement

16  on the completeness of the loan files.

17       In addition, I think you should all be discussing very

18  seriously having agreement on the guidelines.  I appreciate Mr.

19  Reddington's argument that that is part of his defense, that

20  each one is different.  Maybe there can be agreement with

21  respect to each trust that is in the bellwether as to what the

22  guidelines should be.  I think it presents very significant

23  trial issues.  If you are having to argue to a jury what are

24  the appropriate guidelines here, I think it is going to be

25  incredibly difficult.  So, on the 1st of August, if you can

53

G6trroyc

1  also report to me where you are on those issues.

2       I think that is all for us now.  I'm going to be

3  speaking with the Royal Park folks tomorrow, but I will let you

4  talk with my deputy to confirm.  I think we are going to be

5  speaking tomorrow on our outstanding issue.

6       Anything further?

7       MR. GALDSTON:  Nothing from the BlackRock plaintiffs,

8  your Honor.

9       MR. FITZGERALD:  No, your Honor.

10      MR. LIBRA:  No, your Honor.

11      MR. REDDINGTON:  Nothing from us, your Honor.

12      THE COURT:  Good.  Have a good July 4th weekend and

13 safe travels home everybody.

14      (Adjourned)

15

16

17

18

19

20

21

22

23

24

25