# EXHIBIT H

1

F498BLAC

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   -------------------------------x
     ROYAL PARK INVESTMENTS SA/NA,
 3   et al.,

 4              Plaintiffs,

 5         v.                          14 Cv. 8175 (SAS)

 6   HSBC BANK USA, NATIONAL ASSOCIATION,

 7              Defendant.
     -------------------------------x
 8   BLACKROCK BALANCED CAPITAL
     PORTFOLIO (FI), et al.,
 9
                Plaintiffs,
10
11         v.                          14 Cv. 9366 (SAS)

     HSBC BANK USA, NATIONAL ASSOCIATION,
12
                Defendant.
13   -------------------------------x
     PHOENIX LIGHT SF LIMITED, et al.,
14
                Plaintiffs,
15
16         v.                          14 Cv. 10101 (SAS)

     HSBC BANK USA, NATIONAL ASSOCIATION,
17
                Defendant.
18   -------------------------------x
     NATIONAL CREDIT UNION
19   ADMINISTRATION BOARD, et al.,

20              Plaintiffs,

21         v.                          15 Cv. 2144 (SAS)

22   HSBC BANK US, NATIONAL ASSOCIATION,

23              Defendant.
     -------------------------------x
24                                     April 9, 2015
                                       4:35 p.m.
25
```

2

F498BLAC

1    Before:

2                          HON. SHIRA A. SCHEINDLIN

3                                          District Judge

4                          APPEARANCES

5    ROBBINS GELLER RUDMAN & DOWD LLP
          Attorneys for Royal Park Plaintiffs
6    BY:  CHRISTOPHER M. WOOD
          JENNIFER N. CARINGAL
7
     BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP
8         Attorneys for BlackRock Plaintiffs
     BY:  TIMOTHY A. DeLANGE
9
     WOLLMUTH MAHER & DEUTSCH LLP
10        Attorneys for Plaintiffs Phoenix Light and NCUA
     BY:  DAVID H. WOLLMUTH
11        MELISSA FINKELSTEIN
          DANIELLE D'AQUILA
12
     WILLIAMS & CONNOLLY LLP
13        Attorneys for Defendants
     BY:  KEVIN M. HODGES
14        ANDREW W. RUDGE

15   MAYER BROWN
          Attorneys for Defendant HSBC
16   BY:  MICHAEL O. WARE
          JENNIFER M. ROSA

17

18

19

20

21

22

23

24

25

3

F498BLAC

1              (Case called)

2              THE COURT:  I have got four different cases and four

3     different plaintiffs' lawyers.

4              So I guess the first thing to say is I would like to

5     coordinate the discovery among the four cases as defendants

6     propose.

7              Does anybody disagree with that?

8              MR. DeLANGE:  Your Honor, Timothy DeLange on behalf of

9     the BlackRock plaintiffs.

10             We don't disagree with coordinating schedules.  In

11    fact, you will notice the schedules that plaintiffs submitted

12    were all the same schedule.  We have met and conferred.

13             THE COURT:  I didn't receive that many different ones.

14    I thought I just got Phoenix Light and BlackRock.

15             MR. DeLANGE:  I believe you got one from Royal Park as

16    well.

17             THE COURT:  And they are all the same?

18             MR. DeLANGE:  They are all the same schedule.

19             THE COURT:  Basically, what you are saying is I didn't

20    get one yet from NCUA.

21             MS. D'AQUILA:  That's correct, your Honor.  You have

22    not received one yet.

23             THE COURT:  But it's a newer case.  It's 15 Cv. 2144,

24    right?

25             MS. D'AQUILA:  That's right.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

4

F498BLAC

1                THE COURT:  That's the first thing I wanted to say.  I

2        would like to try and coordinate.

3                The second thing I wanted to say is, if there is no

4        automatic stay under the PSLRA, then there is no stay of

5        discovery pending the outcome of motions to dismiss.  I never

6        do that.  What I do sometimes is get the document discovery

7        rolling but don't start the depositions until after I have

8        ruled on the motions to dismiss.  But I am not even sure that's

9        wise here if some are decided and some are pending.

10               I also saw something in the proposed orders that was

11       troubling, something about there is not going to be any

12       coordination of experts and the defense is expecting every one

13       of the four plaintiffs have completely different experts on the

14       identical subjects.  If that's true, that's not acceptable.

15               Why aren't the plaintiffs coordinating on experts?

16               MR. DeLANGE:  On behalf of the BlackRock plaintiffs,

17       we have 277 trusts at issue.  The other cases have less trusts

18       at issue.  And there is a large amount of overlap between these

19       cases but not complete overlap.

20               THE COURT:  I didn't ask for complete identity of

21       experts, but on some issues it's identical.  Some of the topics

22       that you told me you would have experts on in these proposed

23       orders are the same.  Mortgage loan origination practices or

24       something.  I can go through and read it out.

25               Here it is.  Plaintiffs anticipate that expert

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F498BLAC

1    testimony will be necessary for issues including, but not

2    limited:

3              US residential mortgage loan industry.  There is no

4    difference from one plaintiff to another on the mortgage loan

5    industry.

6              The mortgage securitization process.  Totally common.

7              Duties, standards of care, and practices of an RMBS

8    trustee.  Common.

9              Servicing of mortgage loans.  Common.  Damages may be

10   separate.

11             So there are some that are absolutely identical and

12   you are going to have to coordinate.  I am not going to have

13   four experts talking about the US residential mortgage loan

14   industry.

15             MR. DeLANGE:  No objection from the BlackRock

16   plaintiffs, provided that it is understood that there may be

17   different issues in our cases or different issues in the other

18   plaintiffs' cases.

19             THE COURT:  When there are different issues, I will

20   hear about why there has to be experts.  The Court has control

21   here.  The Court is not going to have a case with 50 experts.

22   It's not going to happen.  It's just not going to happen.

23             MR. DeLANGE:  Understood.

24             THE COURT:  I am going to say no for years and then

25   you can get a verdict and complain, but you are not going to

6

F498BLAC

1   have 50 experts.  We are just not going to do it.

2          I notice, in fact, that two of the plaintiffs are with

3   the same firm.  So you're going to have to coordinate on common

4   topics, such as US residential mortgage loan industry.  If you

5   won't, you won't have an expert on it.  That's all.  I don't

6   need an expert on it anyway.  Some fact witness knows all about

7   the residential mortgage loan industry, and I bet they are

8   going to talk about it.  So I am not sure it requires an expert

9   at all.

10         Who are you again?

11         MR. WOOD:  Mr. Wood on behalf of Royal Park, your

12  Honor.

13         I don't think we ever represented to defendants that

14  we were not willing to coordinate on experts.  I think the

15  little conversation we had was that we hadn't figured out

16  exactly who we would be using yet.  I don't think there is any

17  disagreement that we will coordinate where we can.

18         THE COURT:  That's what I am here to tell you today.

19  When I see the proposed areas and eventually names, I am going

20  to give you a hard time if you don't coordinate on simple

21  things, like the US residential mortgage loan industry.  There

22  is one overarching person, if you want to hire them, to talk

23  about what that industry is, or how the securitization process

24  works.  Get together and think about it.

25         MR. WOOD:  Understood.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F498BLAC

1              THE COURT:  Therefore, they won't be telling me they

2      have got to respond to 40 different experts.  That was the

3      point.  Somewhere on this schedule it says, well, they are not

4      coordinating so maybe we will face ten each and we will have to

5      respond to 40 reports.  No.

6              But where there is a unique issue, I understand your

7      point, Mr. DeLange, and that will be fine.  But I have control

8      of that.

9              MR. DeLANGE:  Understood, your Honor.

10             THE COURT:  Before you waste a lot of money, let me

11     hear what you have in mind.

12             So I have touched on this idea of a stay.  I have

13     touched on experts.

14             Then there is the number of depositions.  I saw in the

15     defense proposal something about 50 and they want 50.  I have

16     got to figure out which proposal is which but somewhere I know

17     I read that.

18             MR. WOOD:  I think that was correct.

19             THE COURT:  I remember the 50 and 50, but now I would

20     just like to find their proposal.

21             Here it is.  Williams & Connolly, right?

22             MR. HODGES:  That's right.

23             THE COURT:  I found it.  Give me a minute.

24             It says, HSBC proposes that plaintiffs be permitted to

25     take up to 50 deps in the aggregate and that HSBC be permitted

8

F498BLAC

1    to take a total of up to 50 deps in the aggregate.

2            I can see why HSBC might actually need to do that,

3    because they are dealing with four different institutions, and

4    they need to find out what people knew and when they knew it

5    and how they decided to invest and all the rest of it.  At

6    least I could see 40 almost automatically, ten per plaintiff,

7    but I don't know why you guys would get 50 in aggregate in

8    return.  It's all HSBC.  You have one defendant here, right?

9            MR. DeLANGE:  It is one defendant.  Plaintiffs'

10   proposal, we propose 30 depositions.

11           THE COURT:  What I am trying to say is it's not equal.

12   They are facing four unique plaintiffs.  People have different

13   knowledge of each of those plaintiffs and they do different

14   decisions on how to invest and different diligence and

15   different everything.  They need ten, at least, per case.

16   That's 40.  But you don't need, just because they get 40, I

17   want 40.  That's not what life is.  It's not, I want what they

18   get.  You have one defendant.  Why do you need 30, 40 or 50?

19           MR. DeLANGE:  We have multiple third parties -- loan

20   originators, the sponsors, the servicers -- and they differ

21   between the varying trusts.  So if you look at three witnesses,

22   potentially there is overlap.  But if you have got ten trusts

23   that all have different originators, different sponsors,

24   different servicers, and you need to establish your case

25   through evidence and testimony, then you're going to need them.

9

F498BLAC

1          THE COURT:  But then we are in real trouble.  You

2      don't have ten trusts, you have 277.  You're going to have

3      2,000 depositions?  No.

4          MR. DeLANGE:  We are not going to.  That's why we

5      proposed 30, because there is overlap between sponsors and

6      originators in trust, but there is not complete overlap.

7          So we are going to need depositions from multiple

8      originators, from multiple sponsors, from multiple servicers,

9      in addition to depositions from HSBC and their witnesses.

10          THE COURT:  Let's start off by saying that with

11     respect to HSBC, again, coordination is required.  It's like a

12     mini MDL.  Four cases, you can only depose the HSBC people

13     together.

14          MR. DeLANGE:  Plaintiffs have agreed to that.

15          THE COURT:  You can't do HSBC people over and over.

16     One deposition for the 30(b)(6) person, one deposition for the

17     CFO or whatever you decide.  Whoever you're deposing, it is one

18     time for the four cases, right?

19          MR. DeLANGE:  That's correct, your Honor.

20          If I could address one issue on the depositions of the

21     plaintiffs.

22          THE COURT:  Yes.

23          MR. DeLANGE:  At least with respect to my clients and

24     the BlackRock case, as the Court is aware, we have asserted

25     these claims derivatively.  If that is upheld on the motion to

F498BLAC

1    dismiss that's currently pending, we will proceed derivatively,

2    and the plaintiffs' knowledge and their investment practices

3    doesn't really become an issue.  They can certainly enter into

4    discovery of our clients.  We are prepared to do that.  But

5    having ten depositions of each of our clients about what they

6    invested in, why they invested in it, is not relevant under a

7    derivative.  It's really, did they hold the securities at the

8    time the conduct is at issue and are they current holders.  I

9    am not sure that having 50 depositions, at least in that

10   situation, makes sense.

11              THE COURT:  I will hear from Mr. Hodges.

12              MR. HODGES:  I just want to point out that there are

13   actually more than four plaintiffs.  In the BlackRock case,

14   there are 184 named plaintiffs.  Now, they can be broken down

15   into ten separate groups of funds, but in some of the other

16   cases they are suing in a representative capacity so it's a lot

17   more than four.  Frankly, we proposed 50.  If we were to just

18   take the 30(b)(6) of named plaintiffs, we wouldn't even come

19   close.  So I just wanted to explain the rationale behind it.

20              THE COURT:  What about what Mr. DeLange just said

21   about the derivative case, and so it's irrelevant to investment

22   history or strategy or knowledge.  He says that's all

23   irrelevant.

24              MR. HODGES:  We disagree with that.  We think there

25   are issues in the case that would be implicated by a fact

11

F498BLAC

1    deposition of some of the plaintiffs.  Even taking Mr.

2    DeLange's statement as correct, when these certificate holders

3    made their investments, when they held them, how long they held

4    them, and individualized proof of damages will all be relevant

5    to the case.

6              THE COURT:  Why don't we bifurcate damages?

7              MR. HODGES:  We could do that, your Honor.

8              THE COURT:  We need to get some way to move more

9    rapidly towards class certification and/or summary judgment.

10             Let's talk about class certification.  How many of

11   these cases have class allegations?

12             MR. WOOD:  We have class allegations, Royal Park.

13             MR. DeLANGE:  The BlackRock complaints assert class

14   allegations in the alternative.

15             THE COURT:  What does that mean?  In the alternative,

16   what does that mean?

17             MR. DeLANGE:  That means if ultimately it's found, as

18   defendants indicated they were going to challenge whether or

19   not we can bring these claims derivatively, which we think is

20   appropriate, if the Court finds we are not able to bring them

21   derivatively on behalf of the trust, then we are going to

22   pursue those claims under class action on behalf of the

23   investors.

24             THE COURT:  But if you can bring them derivatively,

25   then no need for a class?

12

F498BLAC

1          MR. DeLANGE:  Correct.

2          THE COURT:  You're pursuing a class action, period.

3          MR. WOOD:  That's correct, your Honor.  And it wasn't

4    in our statement, but we are perfectly willing to file our

5    motion for class cert within 60 days of an order from the Court

6    on the motion to dismiss.

7          MR. WOLLMUTH:  If the Court is curious, NCUA, the

8    government's claims, all direct individual actions, as are the

9    Phoenix Light claims.

10         THE COURT:  So neither of you have class.

11         MR. WOLLMUTH:  No class, no derivative.

12         THE COURT:  You're the only class then.

13         MR. WOOD:  Our complaint alleges class.

14         THE COURT:  Of the four right now, you're really the

15   only one pursuing the class action.

16         MR. WOOD:  I think that's right.

17         THE COURT:  The other thing I saw -- again, I think it

18   was in the defense proposal -- and I didn't like it was

19   something like, you should move for class certification X date

20   and then they serve requests for production.  They have 30 days

21   to serve it and you have 45 days to answer it.  That's not the

22   right order.  I rather get the discovery first and then make

23   the motion, because otherwise the motion gets to be a year old

24   before you can even turn to it.  I don't like the discovery

25   after the motion.  They know you have pled class allegations.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

13

F498BLAC

1    Do the discovery you need now.

2            So let's begin at the beginning.  The beginning is,

3    are we having initial disclosures here?  I thought the

4    plaintiffs proposed it.  I can't remember whether defendants

5    did.

6            MR. WOOD:  I think we were in agreement on April 15

7    for initial disclosures.

8            THE COURT:  Is that right?

9            MR. HODGES:  All parties are in agreement.

10           THE COURT:  Then the document requests come when?

11           MR. WOOD:  The plaintiffs collectively had proposed

12   that initial document requests be served on April the 17th.  I

13   believe that the defendants had proposed that they not be

14   served until two weeks after a ruling on class cert.

15           THE COURT:  No, I am not going to do that at all.  The

16   point is to make the document requests as early as possible.  I

17   didn't think April 17 made a whole lot of sense, only because

18   you need to formulate your document requests after you see what

19   you get.  Ordinarily, I would do it a couple of weeks after

20   initial disclosures.  Since you're getting initial disclosures

21   April 15, I would say initial document requests should be made

22   by April 29, all parties, defense and plaintiffs.  All

23   plaintiffs, everybody, serve document requests.

24           I realize that they will cover many subjects.  They

25   will cover class cert issues.  They will cover merits issues.

F498BLAC

1    I am not bifurcating class cert and merits.  Again, given that

2    there are two direct actions, one potential derivative action,

3    and only one of these four is class, I can't put off merits

4    discovery for a year.  So the requests for production served on

5    April 29 should be on all issues.  All issues, no bifurcation

6    of class and merits or anything else.  Just all issues.

7         Now, once they are served on April 29, I can

8    understand it's a big case and they are not going to be

9    produced in 30 days.  So I thought I saw some July date

10   proposed, which is three months from service, but I was hoping

11   more for two months.

12        MR. DeLANGE:  That July date was from the plaintiffs'

13   proposal.  That was our date to complete.

14        THE COURT:  The outside date, but you hope for a

15   rolling production.

16        MR. DeLANGE:  And we had a date when the rolling

17   production was to commence.

18        THE COURT:  That's too early.  If you're not getting

19   them until April 29, I wouldn't think that the rolling

20   production would begin until, let's say, May 22, and then

21   complete by July 24.  That would be my hope.

22        MR. HODGES:  Your Honor, I understand your desire to

23   get the case moving quickly.

24        THE COURT:  The case is.

25        MR. HODGES:  I think the enormity of this case cannot

F498BLAC

1    be stressed enough.  This is not like another RMBS case to the

2    Court.  We have 277 trusts.  We have a million mortgage loans

3    at issue.  There are 73 separate servicers and master

4    servicers.  There are 116 originators.

5           THE COURT:  So is this unprecedentedly large or have

6    other judges dealt with the exact same enormity?

7           MR. HODGES:  Other cases involving RMBS have involved

8    a specific claim against a specific party.

9           THE COURT:  What is the biggest one anybody knows of?

10          MR. HODGES:  There are other cases like this that are

11   in the courthouse now, but there are not cases of this enormity

12   prior to this time.

13          THE COURT:  Do plaintiffs agree with that?

14          MR. DeLANGE:  Your Honor, no, I don't agree with that.

15   There are some very large put-back cases that were brought.

16          THE COURT:  There were large what?

17          MR. DeLANGE:  Large put-back cases.

18          THE COURT:  I can't hear that word.

19          MR. DeLANGE:  Put-back.  To put back mortgages to the

20   originators and the sponsors.  There is an enormous one that

21   was brought against Countrywide and Bank of America.

22          THE COURT:  Where?

23          MR. DeLANGE:  It was in state court.  Ultimately it

24   settled, but they had an Article 77 proceeding going through

25   the settlement, and was it a fair and reasonable settlement,

F498BLAC

1   and there was an enormous amount of discovery that occurred in

2   that case.

3          THE COURT:  Is that the one that Judge Kapnick had?

4          MR. DeLANGE:  No.  That was Judge Kapnick.

5          THE COURT:  I said Kapnick.

6          MR. DeLANGE:  I'm sorry.  I thought you said Kaplan.

7          THE COURT:  No, I said Kapnick.  I have been reading

8   about that.  There was just an appellate division decision.  I

9   saw that.

10         MR. DeLANGE:  That's exactly right.

11         So, admittedly, this case is large, but I don't

12  believe it's unprecedented that it's not a case that we can

13  manage and conduct discovery.

14         THE COURT:  The reason I asked if you can come up with

15  one that was like it is because I might want to see what was

16  done in a similar case.  And you really don't know of one in

17  the federal courts or certainly the Southern District of New

18  York or other federal court that has dealt with the numbers he

19  just threw out.  The aggregate size of this certainly sounded

20  large.  He said a million loans.  He said 173 something.  He

21  can read all those numbers again, but there was a whole host of

22  numbers that made it sound very, very unprecedented.

23         So, I will ask you again, do you know of one that

24  coordinated so much discovery?

25         MR. DeLANGE:  Not in the Southern District of New

F498BLAC

1    York.

2            THE COURT:  How about another federal court?

3            MR. DeLANGE:  No.  I was giving you the example of the

4    cases I was aware of.

5            THE COURT:  You gave me that one case.

6            MR. DeLANGE:  There is another put-back case against

7    JP Morgan that is going through the same process.  There is a

8    settlement, an agreed upon settlement, and now there is

9    discovery into that.  So there is discovery proceedings that

10   are being conducted, have been conducted in cases involving

11   similar issues that are at issue here.

12           THE COURT:  I remember the one before Judge Kapnick,

13   it had to do with an objector to the settlement.  It probably

14   was limited to the issue that that objector raised which is a

15   very different thing.  There is no instant settlement on the

16   horizon.

17           Is that right, Mr. Hodges?

18           MR. HODGES:  Not to my knowledge, your Honor.

19           THE COURT:  So we have to go through the process.

20           So, given the unprecedented size of the production

21   that is going to be made in response to requests, we do have to

22   think about the best way to produce, both in how much time and

23   in what format.  What format are we thinking of?  Surely, we

24   are all beyond the era of paper.  Will there be a virtual

25   repository in a cloud that would be password access for all of

18

F498BLAC

 1   you in one repository?  Have you thought about something like

 2   that?

 3         MR. WOOD:  I think that is the kind of discovery

 4   format that would be useful here.  I think one reason why you

 5   perhaps saw separate statements from all the parties is

 6   because, while we did propose a coordinated schedule and we are

 7   committed to doing that, we have three certificates in our

 8   case.  So I understand that there are a lot of certificates in

 9   that case, but our case is going to be a lot simpler.

10         THE COURT:  Which is yours again?

11         MR. WOOD:  The Royal Park case.  We have three

12   certificates.  It's certainly not unprecedented.

13         THE COURT:  Three is not a million.

14         MR. WOOD:  That's right.

15         So to the extent that there are any extraordinary

16   measures being taken, I am not sure it would be necessary in

17   our action.

18         THE COURT:  This happens in MDLs all the time, that

19   the smaller cases are stuck with the schedule that accommodates

20   the larger cases, and sometimes people are unhappy and think an

21   MDL is a black hole.  The little cases say, if I were out of

22   this MDL, I could get this done in a year, but because I am in

23   it, it is going to take four years.  So I am familiar with that

24   complaint that the smaller cases are kind of stuck in the big,

25   big tent.  I understand the problem you're going to have.

F498BLAC

1            Yes.  Which one are you?

2            MR. WOLLMUTH:  We are NCUA and Phoenix Light.

3            THE COURT:  Right.

4            MR. WOLLMUTH:  Our firm represents both.

5            Your Honor, I think that this is a large case, but not

6     unprecedented in scope.  While I can't direct the Court to one

7     that is similar, because these trustee cases are emerging at

8     this time --

9            THE COURT:  I realize that.  I had a diagram at one

10    point of all the -- I thought it was BlackRock, but all the

11    BlackRock cases against all the different defendants, and there

12    was a question of whether they could all be coordinated within

13    the court.  And the decision was made not to do that.  I don't

14    remember the rationale, but that was the court -- the court as

15    a whole, not me.  There was a decision made not to coordinate.

16    So I remember when they all came in.

17           MR. WOLLMUTH:  So what I was going to offer, your

18    Honor, if it is helpful, while I think the discovery is quite

19    meaningful, we have learned a lot now seven years into the

20    crisis.

21           THE COURT:  I was hoping you weren't going to say

22    seven years in the lawsuit because I was going to say where was

23    I.

24           MR. WOLLMUTH:  There is no mystery that there were

25    some difficult Countrywide loans, some difficult JP Morgan

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

F498BLAC

1    loans.  So there is a lot of wheel reinventing that will not

2    need to be done here.

3          Also, the ways that you kind of take discovery in

4    these kinds of cases, regarding selection of loans and the

5    quality of the loans and how they were handled, that also has

6    been travelled in cases of related subject matter but different

7    formats.

8          THE COURT:  You do some sampling, you take ten out of

9    100 or five out of 200 samples.

10          MR. WOLLMUTH:  Exactly.  So I could paint a very bad

11    parade of horribles for the discovery in this case if delay was

12    my objective, and I could paint a more streamlined view if that

13    was my objective, and I think that there is a reasonable middle

14    ground.

15          MR. HODGES:  If I may, the delay is not my objective;

16    it is to be realistic.

17          THE COURT:  What the suggestion is, if there's 277

18    trusts, for example, in the BlackRock case, the suggestion is

19    being made that the Court and parties together pick a

20    bellwether, I guess, or sample trusts and don't even have

21    discovery on the remainder.  Up front we have discovery on 27

22    or 15, pick a representative sample, and you do full-blown

23    discovery on those cases and hold up on all the others.

24          Again, that's a well-developed technique in MDLs.  I

25    have got an MDL case for over a decade.  We do that all the

21

F498BLAC

1    time.  Because if it is an environmental case, sometimes

2    there's 2,000 wells and we pick 20 or 30 as a representative of

3    the others, and we do full discovery on those 30 wells, full

4    motion practice, and then everybody knows essentially what is

5    going to happen.

6           So, I don't know if you can group these 277 into

7    buckets, and then from each bucket pick five loans, and then we

8    would be getting somewhere with how to move discovery forward

9    and maybe motion practice.

10          MR. DeLANGE:  Your Honor, the BlackRock plaintiffs

11   have not discussed that concept, and we have not discussed that

12   concept with HSBC.

13          THE COURT:  If you did discuss it, it would take us

14   down from this parade of horribles of a million loans -- give

15   me that list again -- a million loans, 177 something.

16          MR. HODGES:  I would be happy to.  There are 194 named

17   plaintiffs.  There are nearly a million loans, just shy of a

18   million; there are 73 servicers or master servicers who are

19   involved in these trusts; there are 53 sponsors or sellers; and

20   there are 116 loan originators.

21          What is unique about this case, why I say it's

22   unprecedented, is because the actions of any one of those third

23   parties is not what is at issue.  We are not asking some loan

24   originator to buy back the loans.  The allegation is that the

25   trustee is responsible for any alleged breach by any party who

22

F498BLAC

1   was involved in these trusts.  So I think the scope of the

2   allegations itself is what is unprecedented.

3           MR. DeLANGE:  Your Honor, if I may, and I want to get

4   back to the sampling of trusts, and I just want to clarify what

5   Mr. Wollmuth was describing that has happened in other cases

6   and other cases of a similar nature.  The parties have sampled

7   loans within a trust, not a sampling of only part of the case.

8   So if you have 5,000 loans that are in a trust, you only sample

9   100 for example.

10          THE COURT:  Here we have 277 trusts.  So even if you

11  just did five loans per trust, you're doing a thousand and

12  you're going to delay your own case for two years.  So I am

13  just asking you to consider my suggestion of seeing if the 277

14  could be reduced to five buckets, because they are similar by

15  originator, I heard there are only 53 -- I may have mixed up

16  the figures but something was only 53.

17          Which was the number that was 53?

18          MR. HODGES:  The sponsors and the sellers.

19          THE COURT:  Sponsors were 53, originators were 161 or

20  something.

21          MR. HODGES:  116.

22          THE COURT:  Given that, maybe there are some buckets

23  that could be figured out, and we could take full discovery on

24  some trusts in each bucket, or within a trust so many loans per

25  trust, or we could do both.  We can do selecting loans per

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

23

F498BLAC

 1    trust, and we can try doing what I say, which is only some of

 2    the 277 trusts.  Otherwise, you're making your own bed and it's

 3    not a comfortable bed.

 4           Now, it's true that if you were to lose the derivative

 5    issue and have to go to class, we can rethink that if need be.

 6    But Mr. Wood has only got three trusts so he doesn't need to do

 7    any of this to get the discovery in full on all three and move

 8    on to class cert.

 9           So you're 277 trusts.

10           How many are you, Mr. Wollmuth?

11           MR. WOLLMUTH:  Between 40 and 50.

12           THE COURT:  In which case?

13           MR. WOLLMUTH:  That's combined between NCUA and

14    Phoenix Light.

15           Your Honor, just one thing I wanted to say.  We, like

16    Mr. DeLange, will need to speak with the client of course, but

17    we are supportive of the idea.  I think it can be productive.

18    The Court may realize this already, but I just wanted to share,

19    this is exactly what the trustees themselves are already doing.

20    You had mentioned the settlement before Justice Kapnick.  That

21    was a one-size-fits-all percentage recovery across all trusts.

22    Likewise, the separate trustees that are involved in the JP

23    Morgan settlement that is currently pending before Justice

24    Friedman, likewise, while each trust will have somewhat

25    individual characteristics, it's a settlement that applies

24

F498BLAC

1    across --

2            THE COURT:  That's great if there is a chance of

3    negotiating an early settlement here, but those are sort of

4    unique because they are cart before horse or something like

5    that.  They settled early and then you have to figure out how

6    to distribute the settlement.  I don't know how they reached

7    the settlement before the discovery.

8            Who was the defendant in Countrywide?

9            MR. WOLLMUTH:  Bank of New York was the trustee.  I

10   think most of the trustees are in the pending JP Morgan

11   settlement.

12           THE COURT:  Most of the trustees here?

13           MR. WOLLMUTH:  HSBC I believe is one of the trustees

14   supporting that settlement.  But it's US Bank and all the

15   usual -- there is a relatively small universe of trustees.

16           All I am saying is, the procedure of looking across, I

17   wasn't referring to the settlement piece, but --

18           THE COURT:  But that's what made it unique.

19           MR. WOLLMUTH:  -- the concept of testing across many

20   trusts is not unfamiliar to the parties.

21           THE COURT:  I get that.  But it's helpful if you're

22   working together.  As I remember the settlement, everybody was

23   aligned against the objector.  So everybody got together, so to

24   speak, to defeat the objector.  We are not there yet.  We are

25   adversarial.  The back table and the front table aren't

25

F498BLAC

1   together.

2           MR. DeLANGE:  I will just bring it all the way back to

3   where we started with the Court's suggestion of choosing a

4   sampling of trusts within the 277.

5           THE COURT:  And a sampling of loans within --

6           MR. DeLANGE:  Correct.  And it's really an issue for

7   my case as opposed to my other plaintiffs' cases.

8           THE COURT:  I don't know, 40 to 50 is a lot too.  If

9   you discovered them in full, that's a lot of documents.

10          MR. DeLANGE:  To answer one outstanding question, you

11  asked if we could put our trust into buckets.

12          THE COURT:  I did.

13          MR. DeLANGE:  The short answer to that is, yes,

14  absolutely.  And I can't give you a definitive bucket as I

15  stand here today --

16          THE COURT:  I didn't ask you to.

17          MR. DeLANGE:  -- but we can certainly put them into

18  buckets, and I am more than happy to meet and confer with HSBC

19  on the trusts that go into the buckets, why they are in the

20  buckets, and which trust we conduct full discovery on.

21          THE COURT:  Let's try that idea.  Let's think about a

22  virtual document repository so productions are made only once

23  and are made electronically and are made in a common format.

24  In the electronic era we have to consider form of production

25  too, and obviously it has to be a searchable form, and you want

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

26

F498BLAC

1    to share with one another's tech people what form is going to

2    be good for everybody.  One form, one platform, one review

3    area.  We can't be doing it differently by plaintiff and the

4    defendant wants to produce only once.

5           Then there is going to be some production from

6    plaintiffs too, right?  So, again, you will want the defendant

7    to specify in what format it wants to receive documents.

8           The rules contemplate doing it that way anyway.  The

9    2006 rules say, in your request you should specify how you want

10   things produced.  So when you serve these document requests on

11   April 29, think about the form of production, because we don't

12   need that in this case.  One of the terrible things I do from

13   time to time, because I speak so much on the subject, is this

14   always looking-back disputes because people were not clear

15   about the form, and then it comes in in some disorganized way

16   and it's years of disputes.  What a waste of judicial time and

17   everybody else, and the money and time of the lawyers.  So

18   given the expertise in this room, we can get it right forward,

19   not looking backward.  So please be very conscious of one form

20   of production all around.

21          It doesn't have to be the same for plaintiff and

22   defendant, but I am saying when defendant produces, it's

23   whatever all plaintiffs want, and when plaintiffs produce, it's

24   what defendants want, unless there is a real dispute about it.

25   There shouldn't be.  You should be able to get together on

27

F498BLAC

1   that.  Certainly, the defendants are using experts to pull it

2   together.  I suspect you are too.

3          Where are we up to in briefing schedules on motions to

4   dismiss?  Do we have schedules on everybody's motions or only

5   some motions?

6          MR. DeLANGE:  On behalf of the BlackRock plaintiffs,

7   the motions to dismiss are fully briefed.

8          THE COURT:  Your 12(b)(6) part.

9          MR. DeLANGE:  Correct.

10          THE COURT:  We took care of 12(b)(1).

11          MR. DeLANGE:  As you may recall, the 12(b)(6) motion

12   was a joint motion as to Phoenix Light, Royal Park, and

13   BlackRock.

14          THE COURT:  That's all done.

15          MR. DeLANGE:  The one outstanding is the NCUA.

16          MR. HODGES:  There is actually a wrinkle to BlackRock,

17   your Honor.  If you will recall, briefing as to the BlackRock

18   trusts only involved the indenture trust.  There are 244 PSA

19   trusts.

20          What we would propose doing, for the sake of

21   convenience and simplicity, is to file a letter motion where we

22   incorporate by reference our arguments in the pending 12(b)(6)

23   motion to the 244 PSA trusts in BlackRock.

24          THE COURT:  What you're saying is it raises the same

25   issues and it doesn't need separate briefing.

28

F498BLAC

1          MR. HODGES:  Correct.  With respect to the 244 PSA

2     trusts, that is correct.

3          THE COURT:  So, basically, your letter will just say,

4     the outward pending motion will control these also.

5          MR. HODGES:  Correct, your Honor.

6          THE COURT:  So three of them are scheduled.

7          Now, what are we doing about NCUA?

8          MS. D'AQUILA:  For NCUA, we recently received a letter

9     from the defendants and they proposed a briefing schedule, and

10     we have no objections to their proposed schedule, which is very

11     similar in time to the same schedule set forth in the other

12     plaintiffs' actions.

13          THE COURT:  Similar in terms of?

14          MS. D'AQUILA:  In terms of length of time.

15          THE COURT:  So what is the proposal again?

16          MS. D'AQUILA:  The motion to dismiss on behalf of the

17     defendant would be submitted on April 27.  NCUA's opposition

18     would be May 18.  And the defendant's replies would be June 1.

19          THE COURT:  That's reasonable.  OK.

20          That's a 12(b)(6) also?

21          MR. HODGES:  That's a 12(b)(6).

22          THE COURT:  Does it raise the same issues as the

23     pending 12(b)(6) though?

24          MR. HODGES:  I take that back.  There are standing

25     issues and there are additional issues that are unique to NCUA.

F498BLAC

```
 1              THE COURT:  How about the ones that are common?  Can't
 2     your letter on the 244 trusts, that we will live with the
 3     ruling that you make in the pending motion, to the extent that
 4     you would raise those issues in the NCUA case, can we say that
 5     the ruling will govern that too and you will only brief the
 6     non-duplicative issues?
 7              MR. HODGES:  We will do that, your Honor.
 8              THE COURT:  The letter will cover that too.  So what
 9     the briefing will be on April 27 is anything that's not raised
10     in the pending 12(b)(6).  Whatever is raised there will be
11     covered in the decision.
12              MR. HODGES:  We do expect to have some unique issues.
13              THE COURT:  You said that.  But not a repeat of what
14     you say is deficiencies.
15              MR. HODGES:  Correct, your Honor.
16              THE COURT:  Which takes us back to the class
17     certification issues.  I am not going to schedule that until
18     the document production is complete.  Maybe even some
19     depositions that are targeted to class cert issues if needed.
20              So I am not going to be setting that early on.  The
21     request for production, as I said, should include the issues
22     you want to raise, or either side wants to raise on class cert,
23     and then maybe the parties will sit down -- basically you,
24     Mr. Wood, sit down with Mr. Hodges, or one of the group
25     there -- and talk about what would be the minimum deps needed
```

F498BLAC

1    to be ready to adjudicate the class cert motion.  Then we can

2    get a briefing schedule that just goes brief to brief to brief

3    and we are ready.  But the idea that we would bifurcate the

4    merits doesn't really work in today's new world of class cert.

5    There's always overlap now and there's always some experts that

6    actually have to be discovered as part of the class cert

7    effort.  That's sort of the new post Comcast world.

8            MR. WOOD:  Understood.

9            THE COURT:  So that may include some expert discovery,

10   some Daubert challenges, all of that before we can finalize

11   class cert.  So I am not prepared to set that date today.  I

12   think we are just going to stop at the document phase and then

13   have a status conference.

14            So it seems like a half hour ago we were talking about

15   the rolling production beginning, I think I said May 22.  I

16   still like that.  But Mr. Hodges said, it wasn't at all

17   realistic to say, and all documents by June 26, that's just not

18   realistic.

19            So, falling back to your proposed date, did somebody

20   propose July 24 or something like that?

21            MR. DeLANGE:  That was the plaintiffs' proposed date.

22            THE COURT:  What do you say to that, Mr. Hodges?

23            MR. HODGES:  I say that is still very, very

24   aggressive, and I think it's going to be particularly

25   aggressive for plaintiffs, to be quite honest.

F498BLAC

```
1          THE COURT:  Three months from when the requests come

2    in?

3          MR. HODGES:  I do, your Honor.  I think it's going to

4    be a lot of documents to produce, to review, to process.

5          THE COURT:  Actually, we don't know that now because

6    until plaintiffs consider the suggestions made at today's

7    conference, with respect to the sampling, buckets, and all

8    that, until they think about that, maybe that would reduce the

9    volume such that July 24 becomes realistic.  So maybe we don't

10   set the cutoff until we have a status conference a couple of

11   months after the requests are out, and people have met and

12   conferred and talked about form and talked about a single

13   repository and how to arrange it, and then we can set a cutoff.

14   So maybe it doesn't make sense to set a cutoff today.  Instead,

15   I think I should set a conference for late June, which is two

16   months after the service, and see where we are.

17         Does that sound acceptable?

18         MR. HODGES:  It does, your Honor.

19         MR. DeLANGE:  Setting the conference sounds

20   acceptable.  The one clarification that I would like to add is

21   we did put in a date to commence the production of documents.

22         THE COURT:  I agreed.  I don't know what you put, but

23   I said May 22.

24         MR. DeLANGE:  That's what I have down.  I just want to

25   make sure that date still holds.
```

32

F498BLAC

```
1          THE COURT:  I think you should produce what you can.
2     There are some that are low-hanging fruit.  There's always some
3     that are easier than others.  Once you agree on a form and how
4     to do it and where to do it, you should begin to do it.  I
5     agree.  And that's one of the things we can discuss at the
6     conference in June.  If I hear from you that you haven't gotten
7     a single document, that's not good.  And if I hear from them
8     that you haven't produced a single document, that's not good.
9     So that's why, if the requests go out in April, I am going to
10    have the conference two months later, I should have some sense
11    of how it's going.
12          What is it, Mr. Wollmuth?
13          MR. WOLLMUTH:  Your Honor, does it make any sense to
14    try to see if the parties can narrow the inquiry as to how
15    there can be buckets made or samples drawn so that we can
16    perhaps submit to the Court before we are next together the
17    areas where we have commonality and areas where we are apart?
18          THE COURT:  Of course.  That's what I thought you
19    would be doing in the next two months, is meeting and
20    conferring on exactly that.
21          MR. WOLLMUTH:  Thank you, your Honor.
22          THE COURT:  I am just looking for a June date.
23          How about Wednesday, June 24 at 4:30?  Is that OK?
24          MR. HODGES:  It is, your Honor.
25          THE COURT:  I will just call it a status.  In fact, I
```

33

F498BLAC

1    will call it discovery status.  By then, actually, even the

2    last motion will be in, the one that is fully submitted.

3            So that's 4:30 on June 24.

4            I will issue an order that's limited to the dates I

5    have set here and no more.  I won't go through all of this

6    stuff yet.  We will see how we progress and talk about it again

7    in June.  We won't have any depositions till then at all.  But

8    you will be thinking, Mr. Wood, about who and how many you need

9    directed to class cert.  And I guess Mr. Hodges and everybody

10   in the back table will think along the same lines, but they

11   won't need very many when we are talking about three trusts.

12   So we can discuss that at the June conference also, direct our

13   attention to what might be needed to get ready for the class

14   cert motion.

15           So, does anybody think we need to do more today?  I

16   can't think of any other topic except settlement.  I don't know

17   how those were reached in those other two cases, Countrywide

18   and JP Morgan, but I usually say in my run-of-the-mill cases

19   that I like to assign all my cases to either a magistrate judge

20   or the court of next mediation program for a settlement effort.

21   But this doesn't strike me as amenable to either of those two

22   choices just now.  If you folks want to be talking, you know

23   how to do it, directly or through a private mediation.  But

24   just to send you off to some court of next randomly selected

25   mediator doesn't make sense to me.  Even the magistrate judge,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

34

F498BLAC

1    since I am handling the discovery myself, that person would be

2    saying, OK, I am here to help you settle, but how do you settle

3    this before any discovery, or any sense of the scope of it, or

4    the motions to dismiss are decided.  So I think I will let that

5    go too for a while.

6            So I don't have any other topics.  Do you, folks?

7            MR. DeLANGE:  Nothing else from the BlackRock

8    plaintiffs, your Honor.

9            MR. WOLLMUTH:  Nothing further for NCUA and Phoenix

10   Light.

11           MR. HODGES:  Nothing from us.

12           THE COURT:  Thank you.  Good to see you all.

13           (Adjourned)

14

15

16

17

18

19

20

21

22

23

24

25