LAW OFFICES

# WILLIAMS & CONNOLLY LLP

725 TWELFTH STREET, N.W.

WASHINGTON, D. C. 20005-5901

(202) 434-5000

FAX (202) 434-5029

KEVIN M. HODGES
(202) 434-5221
khodges@wc.com

EDWARD BENNETT WILLIAMS (1920-1988)
PAUL R. CONNOLLY (1922-1978)

September 2, 2016

<u>Via ECF</u>
Honorable Sarah Netburn
Thurgood Marshall Courthouse
United States District Court

      Re:    *Coordinated RMBS Trustee Actions Against HSBC Bank USA, N.A.*, Nos. 14-cv-08175; 14-cv-09366; 14-cv-10101; 15-cv-02144; 15-cv-10032; 15-cv-10096

Dear Judge Netburn:

      We write to respond to Plaintiffs' August 25 letter in which Plaintiffs requested the Court enter a proposed loan re-underwriting protocol. HSBC respectfully submits that Plaintiffs' request is premature as the meet-and-confer process is not yet complete. Plaintiffs' proposed protocol also fails to include key provisions that are necessary for such a protocol to work as intended in these matters. The principal defects in Plaintiffs' proposal are summarized below.

      ***Staging of Expert Discovery.*** Re-underwriting thousands of loans in Plaintiffs' current 7,076 loan sample will entail exorbitant time and expense.[1] This effort and expense will result in unnecessary delay if, as HSBC believes is the case, Plaintiffs' proposed sample is defective or Plaintiffs' ultimately re-underwrite loans for which they will not be able to prove the required actual knowledge of a loan-by-loan breach.[2] There is no need for re-underwriting if Plaintiffs cannot carry their burden of proving HSBC had actual knowledge of alleged breaches and a legal

---

[1] Furthermore, Plaintiffs concede that they plan to re-underwrite different subsamples of loans using different experts. Pls. Ltr. at 4. Based on Plaintiffs' representations, it is also appears that Plaintiffs have selected their sub-samples using different methodologies. Pls. Ltr., Ex. J at 2-3 & n. 3. Thus, without rolling re-underwriting or a modification of the schedule, it would be impossible for HSBC to respond to the re-underwriting of loans from these multiple samples in the current six-week rebuttal period.

[2] Plaintiffs continue to ignore and misstate the burden they face in bringing their novel claims against an indenture trustee. In their most recent letter to the Court, they mischaracterize the knowledge standard they must show as "not demanding" and based on a "should have known" standard. Pls. Ltr. at 2-3. Their position is flatly inconsistent with controlling law in this Circuit, in New York appellate courts, and in the law of the case. *Ret. Bd. of the Policemen's Annuity & Benefit Fund of Chi. v. Bank of N.Y. Mellon*, 775 F.3d 154, 162 (2d Cir. 2014); *Commerce Bank v. Bank of N.Y. Mellon,* 36 N.Y.S.3d 63, 65 (1st Dep't July 5, 2016) (no duty to "nose to the source"); *Royal Park Invs. SA/NV v. HSBC Bank USA, Nat'l Ass'n*, 109 F.Supp.3d 587, 602-03 (S.D.N.Y. 2015).

WILLIAMS & CONNOLLY LLP

Honorable Sarah Netburn
September 2, 2016
Page 2

duty and ability to take effective remedial action. Staging discovery may eliminate entirely or at least significantly reduce the need to re-underwrite, which will both expedite the case and avoid unnecessary cost.

Moreover, re-underwriting a sample of loans is *not* a valid approach for proving Plaintiffs' claims against an indenture trustee. Unlike a case brought against a sponsor, Plaintiffs here must prove actual knowledge by the trustee of breaches of representations and warranties on a loan-by-loan, trust-by-trust basis. Plaintiffs must carry this same burden with respect to their novel servicing claims, which must be proven through actual knowledge of specific master servicing events of default. Plaintiffs seek to avoid this burden and recite a list of cases in support of the generic proposition that "sampling is appropriate in the context of re-underwriting in RMBS cases." Pls. Ltr. at 2. These cases are not on point. The cases that Plaintiffs cite are cases against a sponsor or loan originator, not an indenture trustee. In those cases, sampling was used to show that the sponsor or originator materially breached representations and warranties made about the quality of the loans. Here, the indenture trustee made no such representations and warranties, and merely identifying possible breaches will not suffice to advance Plaintiffs' claims. Instead, in a case against an indenture trustee, Plaintiffs must show not only that there was a breach in a specific loan, but also that the indenture trustee actually knew of that specific breach. This cannot be shown by sampling purported breaches of representations by a different party.

The best means to move this case toward resolution quickly and efficiently is to stage discovery so that the parties focus first on the core factual issue of actual knowledge and duty to act. Expert re-underwriting will at best create subjective testimony as to whether, in the expert's view, there were breaches by third parties. This testimony will not touch upon the core and threshold issue of whether the indenture trustee had actual knowledge or a duty to act. It will, however, be extraordinarily expensive, as the expert will need to review and opine upon thousands of individual mortgage loan files.

***Full Disclosure by Plaintiff of its Sampling Methodology.*** Should the Court decline to adopt a staged discovery approach, Plaintiffs should be required to provide HSBC with a full Rule 26 expert report concerning their sampling methodology *prior* to commencement of re-underwriting. This is the approach employed in the FHFA cases before Judge Cote. *Fed. Hous. Fin. Agency v. JPMorgan Chase & Co.*, 2012 WL 6000885, at *3 (S.D.N.Y. Dec. 3, 2012).[3] Plaintiffs have not made a meaningful disclosure concerning their sample, choosing only to provide high level information that shows that Plaintiffs intend to use different sub-samples, drawn based on different criteria, and most likely employing different methodologies in their re-

---

[3] Judge Cote not only required an expert report on sampling prior to re-underwriting, but she also provided an opportunity for a *Daubert* challenge to the sampling expert and methodology used. *FHFA*, 2012 WL 6000885, at *3 ("[T]he Court directed the plaintiff to file an expert report outlining its proposed methodology for sampling . . ." and "set a schedule for the defendants . . . to assert any challenge to that methodology pursuant to F.R.E. 702 and *Daubert*.").

**WILLIAMS & CONNOLLY LLP**

Honorable Sarah Netburn
September 2, 2016
Page 3

underwriting approaches.[4]  HSBC needs a professional and definite sampling disclosure to evaluate and potentially challenge Plaintiffs' sample(s) before the parties commence costly and time-consuming re-underwriting based on the sample(s).[5]  This information is clearly within Plaintiffs' possession now, and there is no good reason why they should be unable or unwilling to provide it.  Delay does not facilitate the parties' ability to discuss and implement a loan re-underwriting protocol.[6]

*Alleged Availability of Loan Files to HSBC.*  Plaintiffs' assertion that HSBC as the trustee has the "ability to obtain all the loan files for the mortgage loans" but "refuses to exercise its right to obtain [them] . . . to obstruct discovery" is inaccurate and misleading.  HSBC was not the originator of any loan in the at-issue trusts and, absent an unusual circumstance such as participation in litigation, would not possess or control the relevant loan files, underwriting guidelines or servicing files.  Plaintiffs' argument that HSBC has the right to obtain loan origination files, without resorting to the subpoena process, is based on a misreading of the trust PSAs and a deliberate obfuscation of the type of "loan file" that is required to engage in re-underwriting.  To make this argument, Plaintiffs conflate loan origination files, which would be held by originators and sponsors, with a narrower category of documents referenced in the PSAs called a "Mortgage File."

The "Mortgage File" is not the same as the loan origination file.  The "Mortgage File" refers to a subset of documents that are specifically defined in the PSAs and that consist principally of documents that are necessary to foreclose on a loan or convey title and which typically are held by the trust custodian.[7]  In contrast, the loan origination file is made up of all

---

[4] For example, Plaintiffs disclosed to HSBC that after a random sample was drawn for certain trusts the initial sample was then "supplemented" with loans with certain pre-identified targeted features, including supplementation of the Phoenix Light and NCUA samples "to include 100 non-performing loans," and supplementation of the Royal Park's sample for three trusts "to achieve a sample of 400 loans liquidated from the trust."  Pls. Ltr., Ex. J at 2-3 & n. 3.  Plaintiffs' disclosures also reveal that there are apparently divergent views among Plaintiffs about the necessary sample size per trust (400 for Royal Park versus 100 for the others) as well as sample selection ("non-paid in full for Blackrock, "non-performing loans" for NCUA and Phoenix Light, and "liquidated" for Royal Park).  *Id.*

[5] HSBC has been requesting this information since July.  *See* Exs. A–C (Letters from A. Rudge to B. Galdston dated July 13, 2016, July 28, 2016, and August 19, 2016).

[6] For example, Plaintiffs' current proposed loan protocol calls for HSBC to stipulate that it "agree[s] that the size and population of the Initial Sample Loans for each Bellwether Trust is statistically significant for purposes of the Parties respective expert reports . . . ," or state that it cannot so stipulate.  Absent a meaningful expert disclosure concerning the sample, HSBC most certainly will not be able or willing to provide such a stipulation, and it should not be asked to do so.

[7] *E.g.,* the mortgage, the note, assignments or modifications of the mortgage, and title insurance policies.  The loan origination file is much broader including things such as lending guidelines, loan approval forms, automated underwriting (AUS) reports, rate locks, borrower letters of explanation, evidence of

WILLIAMS & CONNOLLY LLP

Honorable Sarah Netburn
September 2, 2016
Page 4

the documents and other data sources used by the underwriter when originating the loan. The Mortgage File referenced in the PSA would not include all of the documents that are contained in the loan origination file. It is the loan origination file that is needed to re-underwrite a loan. Further, even if it were assumed that the "Mortgage File" contained all of the documents in a loan origination file, re-underwriting still could not be undertaken until the parties had gathered the applicable underwriting guidelines. The underwriting guidelines also typically will reside with the loan originators, not the trustee or the trust. Plaintiffs seek to conflate these two very different document categories for the same reasons they seek to conflate sampling in sponsor cases with sampling in trustee cases and actual knowledge with constructive knowledge—to avoid evidentiary burdens that likely will prove fatal to their novel claims.

*The Requirement to Coordinate Plaintiffs' Expert Reports.* At the beginning of these cases, the Court made its position clear that Plaintiffs would have to coordinate on topics susceptible to common opinions.[8] Sampling is one such topic, and Plaintiffs do not contest this in their letter, stating instead that they purportedly have "retained a single sampling expert" to do it. Pls. Ltr. at 4. Yet Plaintiffs also inconsistently have stated that they have drawn multiple samples based on divergent methodologies. HSBC is concerned, whether through one or several experts, that Plaintiffs are proceeding in a manner inconsistent with the Court's direction and which presumably will result in HSBC simultaneously having to respond to multiple reports and multiple expert methodologies, which will likewise delay the case or prejudice HSBC.

*Rolling Re-underwriting.* Plaintiffs appear to not oppose HSBC's request that re-underwriting disclosures be made by Plaintiffs on a rolling basis, which is consistent with the protocol entered by Judge Cote in the *FHFA* cases. One matter to be addressed still by the parties in the discussion of a loan file re-underwriting protocol is an appropriate schedule for rolling disclosures on pre-agreed dates so that inordinately large disclosures are not delayed to the end of the disclosure period.

For all of the above reasons, Plaintiffs' request that the Court enter Plaintiffs' draft protocol in its current form should be denied. HSBC will continue to meet and confer with Plaintiffs with a view towards submitting a joint protocol if possible, or HSBC's competing protocol, in advance of the next conference on September 21.

---

lending exceptions, various document and conditions checklists and underwriting worksheets, hazard insurance, all of which could be relevant to re-underwriting depending on the nature of the alleged finding.

[8] *See, e.g.,* April 9, 2015 Hearing Tr. at 4:10-7:11 ("So there are some that are absolutely identical and you are going to have to coordinate. I am not going to have four experts talking about the US residential mortgage loan industry.")

WILLIAMS & CONNOLLY LLP

Honorable Sarah Netburn
September 2, 2016
Page 5

                                         Respectfully submitted,

                                         */s/ Kevin M. Hodges*

                                         Kevin M. Hodges


Attachments

cc:     Counsel for all parties via ECF