UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

ROYAL PARK INVESTMENTS SA/NA,

       Plaintiff,     14-CV-08175 (LGS)(SN)

  -against-        **OPINION & ORDER**

HSBC BANK USA NATIONAL ASSOCIATION,

       Defendant.
------------------------------------------------------------X

------------------------------------------------------------X

BLACKROCK BALANCED CAPITAL
PORTFOLIO (FI), et al.,

       Plaintiffs,    14-CV-09366 (LGS)(SN)

  -against-

HSBC BANK USA,

       Defendant.
------------------------------------------------------------X

------------------------------------------------------------X

PHOENIX LIGHT SF LIMITED, et al.,

       Plaintiffs,    14-CV-10101 (LGS)(SN)

  -against-

HSBC BANK USA, NATIONAL ASSOCIATION,

       Defendant.
------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/10/2017

```
-----------------------------------------------------------------X
```

**NATIONAL CREDIT UNION**
**ADMINISTRATION BOARD, et al.,**

                              **Plaintiffs,**                       **15-CV-02144 (LGS)(SN)**

            -against-

**HSBC BANK US, NATIONAL ASSOCIATION,**

                              **Defendant.**

```
-----------------------------------------------------------------X
-----------------------------------------------------------------X
```

**COMMERZBANK A.G.,**

                              **Plaintiff,**                       **15-CV-10032 (LGS)(SN)**

            -against-

**HSBC BANK US, NATIONAL ASSOCIATION,**

                              **Defendant.**

```
-----------------------------------------------------------------X
-----------------------------------------------------------------X
```

**TRIAXX PRIME CDO 2006-1, et al.,**

                              **Plaintiffs,**                       **15-CV-10096 (LGS)(SN)**

            -against-

**HSBC BANK USA, NATIONAL ASSOCIATION,**

                              **Defendant.**

```
-----------------------------------------------------------------X
```

**SARAH NETBURN, United States Magistrate Judge:**

       This case is brought by dozens of certificateholders of residential mortgage-backed securities ("RMBS") trusts against the trustee, HSBC Bank USA, National Association

("HSBC"). The Court assumes the parties' familiarity with the case. The plaintiffs[1] seek leave to re-underwrite a sample of loans to establish pervasive breach rates across the underlying loans of the trusts at issue to prove liability and damages. HSBC opposes the motion because it believes the plaintiffs cannot prove their case through sampling but rather must prove each element of their claims on a loan-by-loan and trust-by-trust basis. A resolution of this question before re-underwriting findings have been produced is appropriate, given that the Court's decision will affect the number of loans that the parties' experts will re-underwrite, as well as the accompanying costs and time needed to re-underwrite those loans.

The Court heard oral argument on the subject on October 27, 2016, and thereafter ordered consolidated briefing to determine whether sampling is appropriate. Having reviewed the submissions, affidavits, and exhibits, the Court, by Order dated February 24, 2017, denied plaintiffs' motion to re-underwrite a sampling of loans. The Court's reasoning for that Order follows.

## BACKGROUND

The underlying claims arise from HSBC's role as trustee for 295 RMBS trusts. As trustee, HSBC owed certain "limited, contractual" duties to the certificateholders set forth in the governing agreements, generally identified as the pooling and servicing agreements ("PSAs" or the "Agreements") and other related agreements, including the Mortgage Loan Purchase Agreements and Servicing Agreements. Royal Park Investments SA/NV v. HSBC Bank USA, Nat'l Ass'n, 109 F. Supp. 3d 587, 595 (S.D.N.Y. 2015) ("Royal Park"). In general, an indenture trustee's duties are "strictly defined and limited to the terms of the indenture." Elliott Assocs. v. J. Henry Schroder Bank & Trust Co., 838 F.2d 66, 71 (2d Cir. 1988). An indenture trustee

---

[1] All of the plaintiff groups, with the exception of Triaxx, have expressed their desire to use sampling to prove their claims and damages.

undertakes no obligations other than those expressly set forth in the agreements. See id.; see also Cruden v. Bank of N.Y., 957 F.2d 961, 976 (2d Cir. 1992) (construing indentures as contracts in accordance with traditional contract interpretation principles); CFIP Master Fund, Ltd. v. Citibank, N.A., 738 F. Supp. 2d (S.D.N.Y. 2010) (the duties of RMBS trustees "are limited, administrative, and ministerial (rather than substantive) in nature").

The most pertinent of the governing agreements to this motion are the PSAs—the contracts between the loan depositor, the trust administrator, the trustee, and the loan servicer. The PSAs contain representations and warranties ("R&W") made by the depositors, sellers, sponsors, and originators attesting to the credit quality and other characteristics of the underlying mortgage loans and their origination. Pursuant to the PSAs, HSBC had specific duties with respect to enforcing the obligations of the loan sellers in the event of an R&W breach. For the purposes of this Opinion, the PSAs' relevant provisions and terms are largely identical. No party asserts that any variation between the PSAs would affect the outcome of the Court's decision.

Plaintiffs' claims against HSBC sound in contract. They are rooted specifically in Sections 2.03 and 8.01 of the PSAs. First, Section 2.03 provides in relevant part:

> Upon discovery or receipt of notice of any materially defective document in, or that a document is missing from, a Mortgage File or of a breach by the Seller of any representation, warranty or covenant under the Mortgage Loan Purchase Agreement in respect of any Loan that materially and adversely affects the value of such Loan or the interest therein of the Certificateholders, the Trustee shall promptly notify the Seller of such defect, missing document or breach and request that the Seller deliver such missing document, cure such defect or breach within 60 days from the date the Seller was notified of such missing document, defect or breach, and if the Seller does not deliver such missing document or cure such defect or breach in all material respects during such period, the Trustee shall enforce the obligations of the Seller under the Mortgage Loan Agreement to repurchase such Loan from the Trust Fund at the Purchase Price within 90 days after the date on which the Seller was notified of such missing document, defect or breach, if and to the extent the Seller is obligated to do so under the Mortgage Loan Purchase Agreement.

DBALT 2006-AR5 PSA § 2.03. Section 2.03 imposes two threshold requirements before HSBC must enforce the loan seller's repurchase obligation. HSBC must "discover[]" or obtain written notice of missing documentation in a mortgage file or an R&W breach. Id. And the breach or deficiency must "materially and adversely" affect the value of the particular loan. Id. Upon both requirements being satisfied, HSBC's specific obligations as trustee are triggered. HSBC must promptly notify the loan seller of the defect in the particular loan. If the seller fails to cure or repurchase the defective loan within 60 days, HSBC must then "enforce the obligations of the Seller under the Mortgage Loan Purchase Agreement to repurchase such Loan." Id. This remedy, also referred to as the "put-back" remedy, is the "sole remedy" in the event of an R&W breach. Id.

Without specifying particular loans, plaintiffs allege HSBC breached its Section 2.03 obligations when it "discovered" breaching loans that had a material and adverse effect and failed to require cure or repurchase. The parties dispute (1) the meaning of "discovery" for purposes of Section 2.03 and (2) the appropriate method of proving HSBC's breach of its Section 2.03 obligations. Plaintiffs argue that "discovery" requires only inquiry notice of breaches, which triggers HSBC's duty to investigate breaches, determine breach rates, and enforce the seller's repurchase obligation. HSBC responds that "discovery" requires plaintiffs to prove it had actual knowledge of breaches and that it had no duty, before the occurrence of a defined Event of Default, to investigate breaching loans. Regarding the method of proof for showing breach, plaintiffs argue that statistical sampling performed by their retained experts, rather than reviewing the entire universe of at-issue loans, has been allowed by other courts in this District and is appropriate in this context. According to plaintiffs, sampling will generate breach rates to the at-issue Trusts, as well as prove what a prudent person would have found if an investigation

5

of breaches had been performed. HSBC contends that plaintiffs must show it knew of loan-specific breaches with a material and adverse effect and that sampling cannot capture such loan-level specificity.

Second, with respect to plaintiffs' claims regarding Events of Default ("EOD"), an EOD is defined in the PSAs as a failure of the Master Servicer to perform its servicing duties in compliance with the governing agreements and to cure such failure within a 30 days. See DBALT 2006-AR5 PSA § 8.01(a)(ii). HSBC's obligations under Section 8.01 are triggered by actual knowledge or written notice of an EOD:

> For purposes of this Section 8.1, the Trustee shall not be deemed to have knowledge of a Master Servicer Event of Default unless a Responsible Officer of the Trustee assigned to and working in the Trustee's Corporate Trust Office has actual knowledge thereof or unless written notice of any event which is in fact such a Master Servicer Event of Default is received by the Trustee and such notice references the Certificates, the Trust or this Agreement.

DBALT 2006-AR5 PSA § 8.01. According to plaintiffs, in the aftermath of the housing and financial crisis, the failure of servicers to promptly notify HSBC upon their discovery of mortgage loan R&W breaches constituted an EOD. Plaintiffs further contend that HSBC obtained actual knowledge of such failures based on publicly available information. Once HSBC acquired actual knowledge or written notice of a defined EOD, the PSAs required it to assume heightened post-default responsibilities. Specifically, HSBC was to provide prompt, written notice of the EOD to noteholders. It was also required to "use the same degree of care and skill in its exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs." DBALT 2006-AR5 PSA § 9.1. According to plaintiffs, HSBC's failure to perform that investigation, to then uncover the existence and rate of defective loans, and finally to enforce repurchase was a breach of its obligation under Section 8.01 of the PSAs to act as a prudent person.

**DISCUSSION**

**I.      Rule 26 and Proportionality**

In general, statistical sampling is an accepted method of proving liability in this District, "including in cases relating to RMBS and involving repurchase claims." Assured Guar. Mun. Corp. v. Flagstar Bank, FSB ("Flagstar"), 920 F. Supp. 2d 475, 512 (S.D.N.Y. 2013); see, e.g., Assured Guar. Mun. Corp. v. DB Structured Prods., Inc., No. 650705/2010, 2014 WL 3282310, at *6, 8 (N.Y. Sup. Ct. 2014); Syncora Guarantee Inc. v. EMC Mortg. Corp., No. 09 Civ. 3106 (PAC), 2011 WL 1135007, at *6 n.4 (S.D.N.Y. 2011). But a court should not authorize the expense and burden of sampling if it is not "proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Indeed, it is a core function of the court to prevent unwarranted costs and delays in the resolution of every action. See Fed. R. Civ. P. 1. While Rule 26 sets forth various factors to evaluate proportionality, on this discovery motion, the Court's focus is on "the importance of the discovery in resolving the issues" and "whether the burden or expense of the proposed discovery outweighs its likely benefit." Id. The Court will not authorize discovery that, in its estimation, is unlikely to advance any claim or defense in this case. See Henry v. Morgan's Hotel Grp., Inc., No. 15 Civ. 1789 (ER)(JLC), 2016 WL 303114, at *3 (S.D.N.Y. Jan. 25, 2016) (internal citation and quotation marks omitted) (Rule 26(b)(1) is "intended to encourage judges to be more aggressive in identifying and discouraging discovery overuse by emphasizing the need to analyze proportionality before ordering production of relevant information.").

The parties have represented that the contemplated sampling will be costly, time consuming, and will likely result in challenges to the admissibility of the evidence. And as set forth more fully below, the defendant believes such evidence cannot prove plaintiffs' claims. Such discovery should not be undertaken lightly. Critically, however, the Court's ruling is on a

7

discovery motion. And while this opinion reaches a conclusion on the burden of proof for the parties' claims and defense, such conclusion is intended to guide the Court's proportionality analysis. Accordingly, at summary judgment or trial, conclusions of law set forth in this opinion should not be deemed to have law-of-the-case effect.

## II. Section 2.03 Breach of Representation and Warranty Claims

### A. Plaintiffs Must Proceed Loan by Loan

Because this action has progressed beyond the pleading stage and is well on its way to summary judgment and trial, plaintiffs must be ready to prove HSBC's alleged misconduct "loan-by-loan and trust-by-trust." Ret. Bd. of the Policemen's Annuity and Benefit Fund of the City of Chicago v. Bank of N.Y. Mellon, 775 F.3d 154, 162 (2d Cir. 2014) ("Retirement Board"). "Whether [the trustee of an RMBS trust] was obligated to repurchase a given loan" requires "examining *which loans, in which trusts*, were in breach of the representations and warranties." Id. (emphasis added). The Court of Appeals in Retirement Board rejected plaintiffs' wholesale proof that the defendant trustee "violated its duties when it failed to notify certificateholders of Countrywide's breaches of the governing agreements, failed to force Countrywide to repurchase defaulted mortgage loans, and failed to ensure that the mortgage loans held by the trusts were correctly documented." Id. This Court has echoed the requirement that "at trial or summary judgment, plaintiffs must prove their claims loan-by loan and trust-by-trust." Royal Park, 109 F. Supp. 3d at 601.

Courts in this District have dismissed theories of generalized wrongdoing after the pleading stage. At summary judgment, the court in MASTR denied plaintiff trustees' argument of "pervasive breach," that is, the argument that defendant should have been on notice that "a significant number of loans, beyond those specifically identified, were also in breach" based on

8

government investigations, ratings downgrades, and other information publicly available at the time. MASTR Adjustable Rate Mortg. Trust 2006-OA2 v. UBS Real Estate Secs. Inc., No. 12 Civ. 7322 (PKC), 2015 WL 764665, at *11 (S.D.N.Y. Jan. 9, 2015) ("MASTR I"). Similarly, the U.S. Bank court could not, at trial, "determine whether the Trusts have proved that UBS received notice or otherwise discovered that a loan was in beach *unless the loan is identified*," stressing the need to show "breaches on an individualized loan-by-loan basis." U.S. Bank, N.A. v. UBS Real Estate Secs., Inc., No. 12 Civ. 7322 (PKC)(JCF), 2016 WL 4690410, at *27, 75 (S.D.N.Y. Sept. 6, 2016) ("U.S. Bank"). Other courts have, in denying motions to dismiss, affirmed that more specific proof will be needed at summary judgment or trial. See Blackrock Core Bond Portfolio, et al. v. U.S. Bank Nat'l Ass'n, 165 F. Supp. 3d 80, 100 (S.D.N.Y. 2016) ("[W]hen the question is one of plausibility of allegations, plaintiffs may ride the coattails of some of this work. Down the road at trial, they will be put to their proof. At that point, relying on wrongs elsewhere demonstrated would be insufficient.").

### B. Section 2.03 Contains Loan-Specific Elements

To prevail on their § 2.03 breach of contract claims, plaintiffs must establish that HSBC failed to act as required under the PSA. The elements of such a claim require establishing loan-specific proof related to a particular defect, that that defect was material to the value of the loan, that HSBC failed to act with respect to the loan-specific remedies available for a particular defect, and that such failure caused the plaintiffs harm. Plaintiffs seek to use samples of loans pulled from 295 trusts to prove HSBC's liability with respect to each of those trusts by extrapolating breach rates. But replacing loan-specific proof with extrapolated pool- or trust-wide breach rates ignores the Court of Appeals' requirement that breaches be proven on a loan-by-loan basis.

Plaintiffs must first show which specific loans were in breach because any defect that would be cured by repurchase is loan-specific. That is, HSBC must discover "any materially defective document in, or that a document is missing from, *a Mortgage File*" or that there was "a breach by the Seller of any representation, warranty or covenant . . . in respect of *any Loan* . . . ." DBALT 2006-AR5 PSA § 2.03 (emphasis added); see also Retirement Bd., 775 F.3d at 162 ("And whether a loan's documentation was deficient requires looking at individual loans and documents."). To do so, plaintiffs must establish the relevant underwriting guidelines and show that the loan breached a specific R&W.

The materiality of an R&W breach is also loan-specific. Pursuant to the PSAs, only those breaches that "materially and adversely affects the value of *such Loan* or the interest therein of the Certificateholders" trigger a cure or repurchase obligation. DBALT 2006-AR5 PSA § 2.03(a) (emphasis added); see also MASTR Adjustable Rate Mortgs. Trust 2006-OA2 v. UBS Real Estate Secs. Inc., No. 12 Civ. 7322 (PKC), 2015 WL 797972, at *3 (S.D.N.Y. Feb. 25, 2015) ("Materiality is determined not by the degree of deviation from the internal underwriting standards, but by how the deviation affects the Certificateholders in relation to 'such Mortgage Loan.'" (internal quotation marks omitted)) ("MASTR II"); MASTR I, at *16 ("The Trusts may rely upon proof that *as to a specific loan*, there is a material or significant increase in the risk of loss." (emphasis added)); Lehman XS Trust, Series 2006–4N v. GreenPoint Mortg. Funding, Inc., 991 F. Supp. 2d 472, 479 (S.D.N.Y. 2014). Thus, beyond those loans within the sample, sampling cannot reliably prove which loan defects had a material and adverse effect on the value of a particular loan.

Sampling will not "adequately distinguish between breaches that are material and adverse as to a particular loan and those that are not." MASTR I, at *10 ("[A] failure to follow internal

10

underwriting standards—which is a breach of a representation and warranty at issue—may or may not significantly increase the risk of a loss in a particular borrower's loan, *i.e.*, 'such Mortgage Loan.'"). Sampling may fail to capture whether the nature of the breach had a material and adverse effect at the time a repurchase obligation, if any, was triggered, especially when the sample that plaintiffs here draw consists of current loan performance information. Sampling may also detect a technical breach or deviation from underwriting standards but fail to capture mitigating circumstances or compensating factors. For example, a missing verification of employment in a loan file is a technical deviation of the underwriting guidelines. Yet the defect may not have had any material and adverse effect (and is therefore not an R&W breach requiring a repurchase remedy) if the borrower was actually employed and earned a stable income

Finally, the cure and repurchase remedies, the sole remedies under the PSAs, are themselves loan-specific. See DBALT 2006-AR5 PSA § 2.03(a) (to "repurchase *such* Loan from the Trust Fund at the Purchase Price") (emphasis added). The "Purchase Price" is defined as the sum of the "Principal Balance," the "accrued interest on such Principal Balance at the applicable Net Mortgage Rate," unreimbursed "Servicing Advances," and reasonably incurred expenses. Accordingly, all the components of the "Purchase Price" are specific to a particular loan. "Thus, the repurchase mechanism established by the parties is targeted to a specific loan, and not to a group or category of loans." MASTR I, at *11; see also U.S. Bank, 2016 WL 4690410, at *27 ("[L]oan-specific repurchase remedy" applies to "breaches on an individualized, loan-by-loan basis").

### C. Plaintiffs' Authority is Inapposite

Plaintiffs rely on Flagstar as an example of the admissibility of statistical sampling in RMBS cases. In Flagstar, a monoline insurer alleged fraud against the defendant who served as

11

the sponsor, servicer, depositor, and originator of all the loans underlying the two trusts at issue. At trial, the defendant challenged the use of statistical sampling to prove liability, arguing that materiality required a consideration of the loan file. Judge Rakoff rejected this argument, concluding that sampling was a "widely accepted method of proof in . . . cases relating to RMBS and involving repurchase claims" and that the sample was "reflective of the proportion of the individual members in the entire pool exhibiting any given characteristic." 920 F. Supp. 2d at 512. Flagstar, however, does not provide categorical support for the plaintiffs' position that sampling will generate the type of loan-specific proof of liability required in this breach of contract case. In Flagstar, sampling was used to show the extent of defects within only two trusts where all the loans were underwritten using the same guidelines. Plaintiffs' proposed strategy of extrapolating breach rates from a sample of loans to all 295 trusts, involving numerous originators, servicers, depositors, sponsors, and differing underwriting guidelines, is one that Judge Rakoff's holding did not cover. Flagstar therefore stands on factual footing that is distinguishable from the specific context here.[2]

      Plaintiffs have marshaled other cases approving the use of sampling to prove liability and damages. But many of those cases are inapposite. They involve claims sounding in fraud, which require a critical mass of breaching loans rather than loan-specific breaches. See, e.g., Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc., 104 F. Supp. 3d 441 (S.D.N.Y. 2015); Fed. Hous. Fin. Agency v. JPMorgan Chase & Co., No. 11 Civ. 6188 (DLC), 2012 WL 6000885 (S.D.N.Y. Dec. 3, 2012). They involve a monoline plaintiff, which is not limited to a repurchase remedy. See, e.g., Assured Guar. Mun. Corp. v. DB Structured Prods., Inc., No. 650605/2010, 2014 WL

---

[2] To the extent Judge Rakoff found that inquiry notice of pervasive breaches was adequate to trigger Flagstar's obligations, this Court declines to impose an inquiry notice standard on the trustee under these governing agreements.

3282310 (N.Y. Sup. Ct. July 3, 2014); Flagstar, 920 F. Supp. 2d 475; Syncora Guarantee Inc. v. EMC Mortg. Corp., No. 09 Civ. 3106 (PAC), 2011 WL 1135007 (S.D.N.Y. Mar. 25, 2011); MBIA Ins. Corp. v. Countrywide Home Loans, Inc., No. 602825/08, 2010 WL 5186702 (N.Y. Sup. Ct. Dec. 22, 2010). They hinge on a trustee plaintiff suing a loan sponsor on the ground of pervasive breach. See, e.g., Law Debenture Trust Co. of N.Y. v. WMC Mortg., LLC, No. 12 Civ. 1538 (CSH), 2015 WL 9581729 (D. Conn. Dec. 30, 2015); Deutsche Bank Nat'l Trust Co v. WMC Mortg., LLC, No. 12 Civ. 933 (CSH), 2014 WL 3824333 (D. Conn. Aug. 4, 2014).

None of these cases counsels this Court to authorize costly expert discovery that will not satisfy the plaintiffs' burden of proof required by the Court of Appeals and the terms of the PSAs.

### D. Section 2.03 Claims Require Proving "Discovery" of the Underlying Breach

#### 1. Meaning of "Discovery"

Plaintiffs argue that "discovery" as used in Section 2.03 requires only inquiry or constructive notice (i.e., HSBC should have known of pervasive R&W breaches), citing decisions that define the "discovery" of a breach as the moment a party "knows or *should* know that the breach has occurred." Bank of N.Y. Mellon Trust Co., Nat'l Ass'n v. Morgan Stanley Mortg. Capital, Inc., No. 11 Civ. 505 (CM)(GWG), 2013 WL 3146824, at *19 (S.D.N.Y. June 19, 2013) (internal citation and quotation marks omitted). The Court, however, reads "discovery" as used in Section 2.03 to mean actual knowledge. This interpretation is consistent with the contractual remedies available under the PSA and HSBC's limited duties.

The repurchase remedy contemplated in Section 2.03 rests on the ability of an RMBS trustee to undertake defined, concrete measures (i.e., enforce the originator's or the seller's repurchase obligation) with respect to a specific defect, in a specific loan, in a specific trust. In

particular, once HSBC discovers an R&W breach, it must provide notice of breach to the offending party. See DBALT 2006-AR5 PSA § 2.03(a). A trustee cannot provide notice without knowing the specific missing document or the specific breach.

As an example of inquiry notice, plaintiffs cite a letter from Goldman Sachs, the trusts' securities underwriter, warning HSBC's Corporate Trust and Loan Agency group of *potential* breaches in 14 trusts backed by loans from the same originator without identifying *specific* breaches. Pls.' Mem. at 9–10. Plaintiffs argue that HSBC "discovered" the breaches in these 14 trusts because it should have known they existed due to the pervasive breach rates. But without knowing the specific document defects in specific loans, HSBC could not have "discovered" any breaches in the trust and provide notice. See U.S. Bank, 2016 WL 4690410, at *27–28 (Plaintiffs' constructive knowledge argument was "little more than a reformulation of [plaintiffs'] pervasive breach theory" and ignored the fact that the sole remedies contemplated by the PSAs only applied to "breaches on an individualized loan-by-loan basis." (internal quotation marks omitted)).

Equating "discovery" with constructive knowledge is also inconsistent with the bargained-for terms of the PSAs, which limit HSBC's pre-EOD duties as trustee to the four corners of the governing agreements. See, e.g., DBALT 2006-AR5 PSA § 9.01 (requiring trustee, prior to a Master Servicer Event of Default, to "perform such duties and only such duties as are specifically set forth in this Agreement"); id. (prior to a Master Servicer Event of Default, "no implied covenants or obligations shall be read into this Agreement against the Trustee"); id. at § 9.02(a)(iii) (vesting trustee with satisfactory indemnification of costs incurred in litigation at the direction of the certificateholders).

Specifically, the PSAs did not obligate HSBC to investigate until it received notice or obtained actual knowledge of a Master Servicer EOD (rather than constructive notice of potential breaches). See DBALT 2006-AR5 PSA § 9.02(a)(v) ("[T]he Trustee . . . shall not be bound to make any investigation into the facts or matters stated in any [document], unless requested in writing to do so by the Holders of Certificates evidencing, in aggregate, not less than 25% of the Trust Fund."); U.S. Bank, 2016 WL 4690410, at *28 ("The parties could have, but did not, bargain for additional remedies or a notice provision that did not turn on loan-specific knowledge. The [plaintiffs] therefore may not rely on evidence of 'constructive knowledge' or 'pervasive breach' to prove UBS's knowledge of breached warranties."). Before an Event of Default, "an indenture trustee is more like a stakeholder whose duties and obligations are exclusively defined by the terms of the indenture agreement." Royal Park, 109 F. Supp. 3d at 597. Consistent with Section 9.2(a)(v) of the PSAs, the First Department has ruled that an RMBS trustee has no "duty to 'nose to the source'" with respect to "*discover[ing]* if Events of Default or Master Servicer Event of Defaults [sic] or *other PSA breaches* had occurred." Commerce Bank v. Bank of N.Y. Mellon, 141 A.D.3d 413, 415–16 (1st Dep't 2016) (rejecting plaintiffs' allegation that a trustee's general awareness of loan defaults, litigation, and other public information was sufficient to trigger an investigation of breaches (emphasis added)).

Importing a "should have known" standard is also inconsistent with cases that have emphasized the limited role of an indenture RMBS trustee. See Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc., 837 F. Supp. 2d 162, 189 (S.D.N.Y. 2011) (holding that trustees did not have any "monitoring or safeguarding duties beyond those explicitly provided in the PSA"); Commerce Bank, 141 A.D.3d at 415 ("Plaintiffs allege that defendant [trustee] had the duty to notify them that other parties to the PSA had failed to perform their obligations and that

15

the Master Servicer was covering up defendant's failures. However, in order to give plaintiffs such notice, defendant would have had to monitor other parties. A failure to monitor other parties plainly does not involve the performance of basic non-discretionary ministerial tasks." (internal citation and quotation marks omitted)).

### 2. Sampling Will Not Demonstrate Actual Knowledge

Sampling cannot establish that HSBC had actual knowledge of specific breaches on the requisite loan-by-loan basis. See MASTR I, at *10 (rejecting sampling on the ground that "the terms of the PSAs foreclose such a broad and improvised remedy"); FHFA v. UBS Ams., Inc., 2013 WL 3284118, at *15 (S.D.N.Y. June 28, 2013) ("[E]vidence of generalized knowledge" cannot qualify as "circumstantial evidence of particularized, actual knowledge."). While sampling may identify deficiencies within a drawn loan pool, HSBC's duties as trustee, including its obligation to enforce the repurchase remedy, are triggered only when it knew or received written notice of a defect for a particular loan in the trust. Conducting a sampling review seven or eight years after the fact cannot establish which specific loans HSBC would have actually found to be in breach had it performed an investigation at the time.

### III. Section 8.01 Master Servicer Event of Default Claims

Under the PSAs, an EOD (and, relatedly, HSBC's duty to act as a prudent investor) is triggered by a servicing breach by the Master Servicer, defined as "*any* failure on the part of the Master Servicer duly to observe or perform in any material respect any other of the covenants or agreements on the part of the Master Servicer contained *in this Agreement*." See DBALT 2006-AR5 PSA § 8.01 (emphasis added). The Master Servicer must then receive written notice of the breach from certain enumerated parties. The Master Servicer's failure to cure the breach after a 30- or 60-day period culminates in a Master Servicer EOD. HSBC's heightened duties, including

16

providing notice to noteholders, are triggered only when it obtains actual knowledge or written notice of a Master Servicer EOD. Even when it does receive notice or knowledge, however, its obligations are "still circumscribed by the indenture." Royal Park, 109 F. Supp. 3d at 597 ("The trustee is not required to act beyond his contractually conferred rights and powers.").

Plaintiffs claim that, because of the widespread, public nature of the financial crisis, servicer EODs occurred when servicers failed to notify HSBC of R&W breaches. HSBC acquired actual knowledge of these failures, based on publicly available information and notices. Plaintiffs further assert that HSBC breached its obligations under Section 8.01 when, after obtaining actual knowledge of such servicer EODs, it failed to proceed as a prudent person would (i.e., by failing to investigate, to uncover the full extent of breaching loans, and to then successfully repurchase the loans). According to plaintiffs, re-underwriting a sample of loans will prove the existence and rate of breaching loans. But as with their Section 2.03 claims, plaintiffs' reliance on sampling as a method of proof for their Section 8.01 claims is unavailing.

### A. EODs Requires Loan-Specific Proof

Plaintiffs assert that servicer EODs include a servicer's failure to "promptly send notice to HSBC and the other parties upon discovery of mortgage loan representation and warranty breaches." Pls.' Mem. at 17. First, any failure to send notice is premised on the existence of underlying R&W breaches that are loan-specific in nature. Accordingly, in order to prove the occurrence of an EOD tied to loan R&W breaches, plaintiffs will need to prove (1) the existence of loan-specific, material and adverse R&W breaches, (2) the servicer's discovery of those individual breaching loans, and (3) the servicer's failure to report those loans to HSBC. Second, plaintiffs' description of EODs as *servicer* failures overlooks the fact that most of the PSAs governing the trusts at issue indicate that an EOD triggering prudent conduct by the trustee

requires misconduct or a failure to perform by the *master servicer*, not just any servicer. See, e.g., DBALT 2006-AR5 PSA §§ 8.01, 9.01 (defining a "Master Servicer Event of Default" and outlining the duties of the trustee with regards to a Master Servicer Event of Default).

### B. HSBC's Actual Knowledge of EODs

In order to trigger Section 8.01's prudent person standard, HSBC must have obtained actual knowledge or written notice of the EOD. Plaintiffs argue that, based on publicly available information, HSBC obtained actual knowledge of widespread breaches of mortgage loan R&Ws and of servicers' failure to report those breaches. But this publicly available information did not identify individual loans in breach. Generalized information indicating the *trusts* with loan defaults or R&W breaches therefore cannot substitute for proof that a servicer or Master Servicer had actual knowledge of *loan-specific* R&W breaches and that HSBC actually knew of the servicer's or Master Servicer's failure to report those breaches. As discussed above, sampling will not aid plaintiffs in this endeavor.

### C. HSBC's Failure to Investigate and Enforce Repurchase

In addition, plaintiffs have not demonstrated that under Section 8.01's prudent person standard, HSBC was obligated to investigate unreported R&W breaches, such as by performing some kind of sampling review, and failed to do so. First, even in the post-EOD context, "[t]he trustee is not required to act beyond his contractually conferred rights and powers." Royal Park, 109 F. Supp. 3d at 597. Any investigatory duty assumed by the trustee is still limited by the terms of the governing agreements, which allow a trustee to refrain from expending or risking its own funds in conducting an investigation without securing satisfactory indemnification. See DBALT 2006-AR5 PSA § 9.02(a)(v). The plaintiffs have not established that the PSAs required

HSBC to assume the extremely burdensome task of performing a review of the trusts in order to find the specific breaching loans.

Second, plaintiffs have cited no evidence, such as industry standards or customs at the time, showing that performing some kind of sampling review, identifying and investigating loan breaches, and subsequently enforcing repurchase was "what a prudent person would have done" following an EOD. Pls.' Mem. at 17 ("[I]n hundreds of cases filed in the aftermath of the financial crisis, RMBS trustees have sought to enforce repurchase obligations with respect to all loans breaching R&Ws *through the use of sampling*." (emphasis added)). The argument that HSBC should have performed an extensive sampling review of the loans at issue is "simply too distant a leap for this Court to make without plausible allegations that other MBS trusts' trustees have taken similar action in similar circumstances (bolstering the actions a 'prudent person' would have taken)." Policemen's Annuity & Benefit Fund of City of Chi. v. Bank of Am., N.A., 907 F. Supp. 2d 536, 666 (S.D.N.Y. 2012).

### D.  Existence of Specific Defective Loans Had an Investigation Been Performed

Sampling, according to plaintiffs, will "prove the existence and rate of defective loans HSBC would have found had it acted as a prudent person." Pls.' Mem. at 18. But to successfully enforce repurchase of a specific loan after a defined EOD has occurred, HSBC would have needed to locate the individual breaching loans themselves rather than determine trust-wide breach rates. It is not clear how sampling can show that after performing an investigation, HSBC would have located the *specific* breaching loans outside of a sample based on the existence and rate of defective loans within the given sample. Plaintiffs have cited no authority affirming that in the context of a defendant RMBS trustee obtaining actual knowledge of servicer EODs, the rate of breaches in a sample of breaching loans allows the trustee to identify specific breaching

19

loans outside the sample. This attenuation is made all the more glaring by the fact that the loans in the trusts at issue vary in terms of maturity date, interest rate, and type. See Policemen's Annuity and Benefit Fund of City of Chi., 907 F. Supp. 2d at 547 (holding that "loan defaults" in one trust "will not 'infect' the value of certificates" issued by another trust).

## CONCLUSION

Accordingly, plaintiffs' motion to re-underwrite a sampling of loans for the purpose of proving HSBC's liability or damages beyond the loans in the sample is DENIED. The parties are directed to the Court's February 24, 2017 Order as to submitting a joint status letter regarding Phase II of the Loan Re-Underwriting Protocol.

**SO ORDERED.**

_____
SARAH NETBURN
United States Magistrate Judge

DATED:   New York, New York
         March 10, 2017