# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Royal Park Investments SA/NV, Individually and on Behalf of All Others Similarly Situated, Plaintiff, —v— Deutsche Bank National Trust Company, as Trustee, Defendant. | 14-CV-4394 (AJN) MEMORANDUM & ORDER |

ALISON J. NATHAN, District Judge:

Plaintiff Royal Park Investments SA/NV ("Royal Park") brings this putative class action against Defendant Deutsche Bank National Trust Company ("Deutsche Bank"), asserting claims for breach of contract and breach of trust in connection with Deutsche Bank's service as trustee of ten residential mortgage-backed securities ("RMBS") trusts of which Royal Park and the putative class members are or were beneficiaries (the "Trusts").[1]  Before the Court is Royal Park's motion to certify this matter as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3), to appoint Royal Park as class representative, and to appoint Royal Park's counsel, Robbins Geller Rudman & Dowd LLP ("Robbins Geller"), as class counsel.  Dkt. No. 185.  As set forth further below, because the Court cannot conclude on the record before it that Royal Park's proposed class, as currently defined, satisfies the ascertainability requirement as recently explicated by the Second Circuit Court of Appeals, Royal Park's motion is DENIED

---

[1] Royal Park originally also asserted a claim under the Trust Indenture Act of 1939 (the "TIA") and derivative claims on behalf of the Trusts at issue.  Royal Park expressly withdrew its derivative claims during the pendency of Deutsche Bank's motion to dismiss, and the Court dismissed the TIA claim with prejudice in a Memorandum and Order dated February 3, 2016.  *See Royal Park Investments SA/NV v. Deutsche Bank Nat. Trust Co.*, 14-cv-4394, 2016 WL 439020, at *10-11 (S.D.N.Y. Feb. 3, 2016).

1

without prejudice and with leave to renew the motion so as to propose an appropriately redefined class.

## I.    Background

The Court assumes familiarity with the factual background in this matter as set forth in its previous Orders.

Briefly, the ten subject Trusts,[2] formed between 2006 and 2007, issued bond-like instruments referred to as RMBS certificates (the "Certificates"), in which Royal Park and other investors acquired beneficial interests.  Comp. ¶¶ 4, 30, 33-35, 40-42.  The Certificates are collateralized by thousands of mortgage loans held in the Trusts, and Certificate holders are entitled to the cash flows generated by those loans.  *Id.* ¶¶ 4 & n.1, 42.  As is typical in this context, the loans were transferred to the Trusts by institutional entities known as "Depositors," which had in turn acquired them in large pools from entities – often referred to as "Sponsors" or "Sellers" – that had either purchased the loans directly or indirectly from originating lenders and aggregated them or originated the loans themselves.  *Id.* ¶¶ 36-37, 39-40.

The Trusts are governed by Pooling and Servicing Agreements (the "PSAs") running between, as applicable, the Trustee, relevant Depositors, Sponsors and/or Sellers, and other interested parties, as well as by certain related agreements.  *Id.* ¶¶ 5; 37-38, 44; *see also id.* Ex. A. (exemplar Pooling and Service Agreement governing First Franklin Mortgage Loan Trust 2006-FF9).  Among other things, the PSAs set forth or incorporate by reference certain representations and warranties (the "R&Ws") made by the relevant Sponsors/Sellers (or, as applicable, by other loan-originating or transferring entities) as to the credit quality and characteristics of the loans held by the Trusts and as to the accuracy of the data conveyed about such loans, and require the warranting entities to cure, substitute and/or repurchase any loans

---

[2] The Trusts are First Franklin Mortgage Loan Trust 2006-FF9; GSR Mortgage Loan Trust 2007-AR2; HSI Asset Securitization Corporation Trust 2007-WF1; HarborView Mortgage Loan Trust 2006-8; Morgan Stanley ABS Capital I Inc. Trust 2007-NC2; Morgan Stanley ABS Capital I Trust 2007-NC3; Morgan Stanley IXIS Real Estate Capital Trust 2006-1; NovaStar Mortgage Funding Trust, Series 2006-4; Saxon Asset Securities Trust 2006-2; and Soundview Home Loan Trust 2007-NS1.  *See* Complaint, Dkt. No. 1 ("Comp."), ¶ 2.

failing to conform to the R&Ws. *See, e.g., id.* ¶¶ 7-8 & n.3, 38, 47-48. The PSAs also establish certain rights and duties of Deutsche Bank as Trustee, to be discharged for the benefit of Certificate holders. *See, e.g., id.* ¶¶ 8-13, 44, 46. Deutsche Bank's responsibilities include:

> (i) the duty to provide prompt notice to the contracting parties of breaches of R&Ws discovered by the Trustee and, if such breaches are not timely cured, to enforce the breaching warrantors' obligations to repurchase or substitute the defective loans; and

> (ii) the obligation to take certain actions upon discovery of a so-called "Event of Default" by a "Master Servicer" or "Servicer" (an entity designated by the relevant PSA to service mortgage loans held in Trust), including notifying the relevant Master Servicer or Servicer and demanding timely cure, giving notice to Trust beneficiaries of uncured Events of Default, taking further remedial steps as necessary (such as termination of the Servicer or institution of litigation), and, more broadly, exercising the Trustees' rights and powers to protect investors' interests as a "reasonably prudent person" would to protect its own.

*Id.* ¶¶ 8-13, 41, 44-60

Following the Court's February 23, 2016 resolution of Deutsche Bank's motion to dismiss, Royal Park is left with two operative claims. One asserts that Deutsche Bank breached the express contractual obligations set forth above. The other avers that Deutsche Bank breached its common law duty of trust to avoid conflicts of interest with the Trust beneficiaries by, among other things, maintaining "ongoing and prospective business relationships" with many of the Sponsors/Sellers, Master Servicers/Servicers, and others, whose own contractual obligations it was required to enforce. *Id.* ¶¶ 19-24, 61, 206-219. Royal Park now seeks to certify the following class to further prosecute these claims:

> All persons and entities who held Certificates in the [Trusts] and were damaged thereby. Excluded from the class are defendant, the loan originators, the Warrantors, the Master Servicers and the Servicers to the [Trusts], and their officers and directors, their legal representatives, successors, or assigns, and any entity in which they have or had a controlling interest.

*See* Plaintiff Royal Park's Memorandum of Law in Support of Its Motion for Class Certification and Appointment of Class Representative and Class Counsel, Dkt. No. 185 ("Br.") at 1.

## II.    Legal Framework

In order to qualify for class certification, a plaintiff must first demonstrate that the class it proposes satisfies the four prerequisites of Federal Rule of Civil Procedure 23(a).  Those requirements are:

(1)    the class is so numerous that joinder of all members is impracticable;

(2)    there are questions of law or fact common to the class;

(3)    the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4)    the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  These "four requirements – numerosity, commonality, typicality, and adequate representation – effectively limit the class claims to those fairly encompassed by the named plaintiff's claims." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011) (internal quotation marks omitted).  "A class may be certified only if, 'after a rigorous analysis,' the . . . court is satisfied that the prerequisites of [Rule 23(a)] are met." *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015) (quoting *Comcast Corp. v. Behrend*, __ U.S. __, 133 S. Ct. 1426, 1432 (2013)).

Assuming the requirements of Rule 23(a) are met, a plaintiff must then establish that certification is appropriate for one of the three reasons set forth in Rule 23(b).  Here, Royal Park seeks certification pursuant to Rule 23(b)(3), under which a court must "find[] that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b).  "The matters pertinent to these

findings include: (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." *Id.*

Of particular importance here, independent of the express requirements of Rule 23, the Court of Appeals has recognized that the Rule includes "'an implied requirement of ascertainability.'" *Brecher v. Republic of Argentina*, 806 F.3d 22, 24 (2d Cir. 2015) (quoting *In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24, 30 (2d Cir. 2006) ("*In re IPO*")). As discussed further below, that implied requirement mandates that the class be "sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." *Brecher*, 806 F.3d at 24 (internal quotation marks omitted).

"The party seeking class certification bears the burden of establishing by a preponderance of the evidence that each of Rule 23's requirements have been met." *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015); *see also Dukes*, 564 U.S. at 350 ("Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule – that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common question of law or fact, etc.") (emphasis in original). Accordingly, although a Rule 23 inquiry should not "extend into a protracted mini-trial of substantial portions of the underlying litigation," the "district judge must receive enough evidence, by affidavits, documents, or testimony," including expert evidence as appropriate, to "be satisfied" that the necessary elements of class certification have been established. *In re IPO*, 471 F.3d at 41; *see also Comcast* 133 S. Ct. at 1432-1434 (directing

5

courts to, for example, "conduct a rigorous analysis" of damages model proffered by certification proponent's expert) (internal quotation marks omitted).

A determination that class certification is appropriate "can be made only if," among other things, "the judge resolves factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts are relevant to a particular Rule 23 requirement have been established and is persuaded to rule, based on the relevant facts and the applicable legal standard, that the requirement is met." *In re IPO*, 471 F.3d at 41. The court's "obligation to make such [a] determination[] is not lessened by overlap between a Rule 23 requirement and a merits issue," *id.*, and, indeed, the court's analysis at the certification stage "[f]requently" will "entail some overlap with the merits of the plaintiff's underlying claim" – "[t]hat cannot be helped," *Dukes*, 564 U.S. at 351; *see also Gen. Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 160 (1982) ("the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action") (internal quotation marks omitted). Still, at this stage of the litigation, the court "should not assess any aspect of the merits unrelated to a Rule 23 requirement." *In re IPO*, 471 F.3d at 41.

## III.    Discussion

Before the Court can properly analyze whether Royal Park has carried its burden with respect to the express requirements of Rule 23, it is necessary to resolve certain challenges that implicate the proposed class definition. Deutsche Bank maintains (i) that the membership of the putative class, as defined, is insufficiently ascertainable and (ii) that the proposed definition is impermissibly overbroad insofar as it includes, by its terms, putative members who necessarily lack standing to assert the claims at issue in this matter. These arguments raise what are essentially threshold issues that bear on the Court's ability to reliably assess the parties' positions

on questions of commonality, adequacy, and predominance among other things. *See, e.g.,*

*Charron v. Pinnacle Gr. N.Y. LLC*, 269 F.R.D. 221, 228 (S.D.N.Y. 2010); *In re Fosamax Prods.*

*Liab. Litig.*, 248 F.R.D. 389, 397 (S.D.N.Y. 2008) ("until a class of persons alleged to be entitled

to relief is defined, the Court cannot conduct the numerosity, commonality, typicality and

adequacy analyses that must precede certification"); *Wright v. Giuliani*, 99-cv-10091, 2000 WL

777940, at *10-11 (S.D.N.Y. Jun. 14, 2001) ("The definition of the class is of primary

importance, since it enables courts to accurately determine whether the proposed class satisfie[s]

the other requirements of Rule 23.") (internal quotation marks omitted); 5 *Moore's Federal*

*Practice* § 23.21[d] ("[C]ourts commonly examine whether a class is adequately defined before

turning to the other requirements for class certification."); *see also Byrd v. Aaron's Inc.*, 784

F.3d 154, 163 (3d Cir. 2015) (characterizing ascertainability inquiry as a "preliminary analysis"

that "dovetails with, but is separate from," a court's obligation to adequately define the class in

any certification order); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 308 F.R.D. 606, 612

(N.D. Cal. 2015) ("the party seeking class certification must demonstrate," as "a threshold

matter, and apart from the explicit requirements of Rule 23(a)," that an "ascertainable class

exists") (internal quotation marks omitted); *N.B. v. Hamos*, 26 F. Supp. 3d 756, 763 (E.D. Ill.

2014) ("[A]scertainability is really a threshold issue – if the class cannot be identified, then

courts cannot reliably assess whether an action on behalf of that class satisfies the express

requirements of Rule 23."). Accordingly, these issues must be addressed at the outset.

      Deutsche Bank's contention – it appears – is not only that the purported defects that it

identifies preclude certification of the proposed class as currently defined but also that they

constitute such fundamental infirmities that they cannot be addressed through redefinition.

While the Court is not necessarily persuaded at this time that Royal Park will be unable to

modify its proposal to ameliorate the deficiencies discussed below, it does agree at least that, on the current record, Royal Park has failed to carry its burden to demonstrate that the proposed class is sufficiently ascertainable.

### A.     The Current Record Does Not Demonstrate By a Preponderance of the Evidence that the Proposed Class is Sufficiently Ascertainable

Although the Court of Appeals has recognized Rule 23's implied ascertainability requirement for some time, *see, e.g.*, *In re IPO*, 471 F.3d at 30, 44-45, it was not until its recent decision in *Brecher* that the Court "further defined its content," 806 F.3d at 24.  In *Brecher*, the Court expressly "clarif[ied]" that the "touchstone of ascertainability is whether the class is sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member," and that, to pass muster under Rule 23, a putative class must both be "defined by objective criteria that are administratively feasible" and be susceptible to the "identif[ication] [of] its members" without "requir[ing] a mini-hearing on the merits of each case." *Brecher*, 806 F.3d at 24-25; *see also Weiner v. Snapple Beverage Corp.*, 07-cv-8742, 2010 WL 3119452, at *12 (S.D.N.Y Aug. 5, 2010) (observing, pre-*Brecher*, that the question of ascertainability "turns on the definition of the proposed class").

With critical implications for Royal Park's proposed class, the *Brecher* Court applied its newly articulated ascertainability guidelines to a proposed class comprised of "all holders of beneficial interests in the relevant [sovereign debt] bond series without limitation as to time held." *Id.* at 24.  It concluded that the only "objective standard" defining the class at issue – "owning a beneficial interest in a bond series without reference to time owned" – was "insufficiently definite to allow ready identification of the class or the persons who will be bound by the judgment." *Id.* at 25.  Noting the "active" secondary market for the bonds at issue, the Court explained:

8

> [A]n individual holding a beneficial interest in Argentina's bond
> series possesses a right to the *benefit* of the bond but does not hold
> the physical bond itself. Thus, trading on the secondary market
> changes only to whom the benefit enures. Further, all bonds from
> the same series have the same trading number identifier (called a
> CUSIP/ISIN), making it practically impossible to trace purchases
> and sales of a particular beneficial interest. Thus, when it becomes
> necessary to determine who holds bonds that fall inside (or
> outside) of the class, it will be nearly impossible to distinguish
> between them once traded on the secondary market without a
> criterion as to time held.

*Id.* at 25-26. Thus, the Court held, "[w]ithout a defined class period or temporal limitation, such

as the continuous holder requirement, the nature of the beneficial interest itself and the difficulty

of establishing a particular interest's provenance in the particular circumstances of this case

make the objective criterion used here inadequate." *Id.* at 25 (also rejecting the argument that the

use of some objective criteria is itself sufficient to satisfy the ascertainability requirement "when

those criteria, taken together, do not establish the definite boundaries of a readily identifiable

class"). The Court accordingly deemed the class, as defined, "insufficiently definite as a matter

of law." *Id.* at 26; *see also In re IPO*, 471 F.3d at 45 (noting that "the need for numerous

individualized determinations of class membership" – an "ascertainability" problem "distinct

from the predominance requirement" – "provide[d] further support for [the] basic conclusion that

individual questions will permeate this litigation").

     The class proposed by Royal Park presents, in several important respects, ascertainability

challenges that closely track those that precluded certification in *Brecher*. First, the proposed

definition lacks an expressly defined class period and, indeed, any meaningful temporal

limitation at all, as it includes on its face "[a]ll persons and entities who held Certificates in the

[Trusts]," without reference to a fixed date, a window of acquisition, or length or continuity of

ownership. *See Brecher*, 806 F.3d at 25 (because the only "objective standard" for class

9

membership was "owning a beneficial interest in a bond series without reference to time owned," the proposed definition was "insufficiently define to allow ready identification of the class"); *see also id.* at 25 n.3 ("'[T]he failure to propose an appropriate time limitation in defining the class period usually will result in a finding that the class is impermissibly overbroad and not ascertainable.'") (quoting 1 McLaughlin on Class Actions § 4:2 (11th ed. 2014)) (brackets in original). The Certificates in question here were issued in 2006 or 2007 – some ten years ago or more as of the date of this Order – and, as discussed further below, have been subject to active over-the-counter trading on the secondary market. Given that landscape of potential class members, Royal Park's failure to propose any temporal constraint whatsoever would exacerbate the administrative obstacles to class member identification that are expected to be presented by certain characteristics of the Certificates which the Court will address shortly. *See Brecher*, 806 F.3d at 25 ("Without a defined class period or temporal limitation, such as the continuous holder requirement, the nature of the beneficial interest itself and the difficulty of establishing a particular interest's provenance in the particular circumstances of this case make the objective criterion used here inadequate.").

Royal Park concedes that, under *Brecher*, "a class definition ordinarily should have temporal limitations."[3] It argues however, that its proposed definition comports with the ascertainability requirement because it makes use of the past tense, employing the phrase "persons and entities who *__held__* Certificates," rather than "*__holders__* of beneficial interests," as was the case in *Brecher*. Reply at 3-4. It may be true that one of the concerns cited in *Brecher* was, in a sense, prospective: that under the definition at issue, proposed class members would "remain

---

[3] Plaintiff Royal Park's Reply Memorandum of Law in Further Support of its Motion for Class Certification and Appointment of Class Representative and Class Counsel, Dkt. No. 283 ("Reply"), at 3.

fluid even following entry of judgment, since nothing in the new class definition freezes the class composition at any designated time." *Brecher*, 806 F.3d at 25 n.3. But without any fixed point of reference, the word "held" (as used by Royal Park here) is only slightly less indeterminate than the word "hold," and thus does little by itself to ameliorate the concern articulated by the *Brecher* Court. After all, the class of persons and entities who "held" Certificates at some unspecified point in the past may well vary depending upon whether one's vantage point is, for example, the date the class is proposed; the date the class is certified; the date that class notice is disseminated; the date a liability judgment is entered; or the date any necessary claims processing procedure commences. In addition, Royal Park's use of – and emphasis on – the word "held" invites the independent, though related, question of whether it seeks to *exclude* from the class definition those who *currently hold* Certificates. While the Court strongly suspects that Royal Park intends no such interpretation of its proposal, the ambiguity only underscores the insufficiency – particularly in light of *Brecher* – of using a past tense verb, without more, as the class definition's sole purported temporal constraint.[4]

The second notable similarity to *Brecher* is that the nature of the securities at issue implicates the same sorts of inherent obstacles to ready identification of holders that the Court of Appeals confronted in that case. As explained in the Expert Report of John H. Dolan, proffered

---

[4] Royal Park also suggests in a footnote that *Brecher* is inapposite to the present case because it involved an appeal of a damages-stage modification to a class that had previously been approved and, indeed, had won judgment on liability. Reply at 4 n.5. Although the Court of Appeals indeed noted this unusual posture in citing, as an ancillary concern, "the specter of one-way intervention that motivated the 1966 amendments to Rule 23," nothing in *Brecher* suggests that ascertainability principles articulated by the Court apply only to damages classes or that the Court's ascertainability analysis was substantially driven or affected by the stage of the litigation. And the fact that a class had previously been certified in *Brecher* is of no particular moment. The Court of Appeals emphasized that that class had been "certified . . . under a *continuous holder requirement*" – just the sort of "temporal limitation" absent from the modified class considered by the Court of Appeals and, of course, from the proposed class here. *Brecher*, 806 F.3d at 23-26.

by Deutsche Bank,[5] the Certificates lack unique identifiers corresponding to individual investors'
ownership interests, but rather are identifiable only by a CUSIP number that applies universally
to all interests in a given tranche of a securitization.[6]   As such, "one cannot distinguish one
owner's holdings from another owner's holdings within the same RMBS tranche."   Dolan Rep.
¶ 24.   Since their issuance, the Certificates have traded over-the-counter among entities located
in more than ten different countries through geographically dispersed broker-dealers located in
various parts of the world, with ownership interests likely at times being sold off in pieces to
multiple investors and individual purchase orders likely at times being filled by holdings
previously acquired from multiple different sources.   Dolan Rep. ¶¶ 25-29, 47; *see also id.* ¶ 51
(noting that produced trade runs reflect "hundreds" of aftermarket trades in the Certificates);
Declaration of Lucas F. Olts in Support of Plaintiff Royal Park's Motion for Class Certification
and Appointment of Class Representative and Class Counsel ("Olts Dec.") Ex. A. (Expert Report
of W. Scott Dalrymple, CFA ("Dalrymple Rep.")) ¶ 48 ("[I]nvestors in the Covered Trusts are
from all over the country . . . as well as from outside the United States, include Europe and
Asia").   Adding a layer of complexity to the ownership chain, Certificates were, in some cases,
originally included within collateralized debt obligations – financial instruments potentially
backed a wide variety of fixed-income assets – that later collapsed, their assets being sold at
public auction.   *Id.* ¶¶ 28, 38.   Indeed, Royal Park itself allegedly acquired some of its
Certificates from CDOs in liquidation.   Comp. ¶ 32.   For these reasons, among others, there
exists "no central repository of trade history to allow one to follow changes in ownership over

---

[5] Both parties proffered expert reports in support of their briefs.  Neither party moved to exclude an expert
report or otherwise raised an objection under Federal Rule of Evidence 702 to any portion of an expert report on
which the Court has relied in reaching the conclusions set forth in this Order.
[6] Declaration of Tera M. Heintz in Support of Defendant's Deutsche Bank's Memorandum of Law in
Opposition to Plaintiff's Motion for Class Certification and Appointment of Class Representative and Class Counsel
("Heintz Dec.") Ex. 1 (Expert Report of John H. Dolan ("Dolan Rep.")) ¶ 24.

time," and, according to Mr. Dolan, "reconstructing the chain of ownership of any given [C]ertificate can only be ascertained through highly detailed and individualized inquiry." Dolan Rep. ¶¶ 26, 30.

What is more, as in *Brecher*, the Certificates are not held directly, in physical form or otherwise, by investors. Rather, they are beneficially owned and held in "book entry" form, by the Depository Trust Company ("DTC") (a clearing agency) in the U.S. and similar institutions abroad. *Id.* ¶¶ 31-32; Dalrymple Rep. ¶¶ 41-44. On the domestic side, the Certificates are, by and large, legally held only in the name of a DTC nominee, on behalf of various participant banks and brokerage firms, whose own customers, in turn, are usually the ultimate beneficial owners of the securities. Dolan Rep. ¶ 32; Dalrymple Rep. ¶¶ 41-43. This "layered nature" of Certificate ownership recordation presents hurdles even to identifying *current* Certificate holders, and thus compounds the challenge of identifying, in an administratively feasible manner, all those who have ever "held" Certificates at any time since their issuance, without resort to individualized inquiries. *See, e.g.*, Dolan Rep. ¶ 31 (opining that "identifying all owners of relevant securities over time is practically impossible").

Such "[d]ifficulty [in] establishing a particular interest's provenance," *Brecher*, 806 F.3d at 25, is especially problematic under the circumstances presented by this matter. In contrast to many of the previously certified RMBS-investor classes cited by Royal Park, which involved predominantly claims under Sections 11 and 12(a)(2) of the Securities Act of 1933,[7] the claims at issue here are common law breach of contract and breach of trust claims. Determining a particular aftermarket investor's standing to assert claims under Sections 11 and 12(a)(2) is, at

---

[7] *See, e.g., Forth Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116 (S.D.N.Y. 2014); *N.J. Carpenters Health Fund v. Residential Capital, LLC*, 08-cv-8781, 2013 WL 6839093 (S.D.N.Y. 2013); *In re IndyMac Mortgage-Backed Sec. Litig.*, 286 F.R.D. 226 (S.D.N.Y. 2012); *Pub Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co.*, 277 F.R.D. 97 (S.D.N.Y. 2011).

least comparatively, a straightforward proposition: aftermarket purchasers may sue under Section

11 if they can "trace their shares to an allegedly misleading registration statement"; but

"[s]tanding to assert a Section 12(a)(2) claim is limited to persons who directly purchase

securities from the defendant in a public offering, rather than on the secondary market." *See,*

*e.g.*, *In re Petrobras Secs. Litig.*, 116 F. Supp. 3d 368, 384 (S.D.N.Y. 2015) (internal quotation

marks omitted). By contrast, the standing of those "hundreds" of investors who assigned or

acquired Certificates via the secondary market, Dolan Rep. ¶ 51, to assert, for example, breach of

contract claims, may well turn on both the nature and terms of the assignments themselves (as

well as any predecessor assignments) and on the particular jurisdiction whose law governs those

assignments.

 For example, many jurisdictions generally require an assignor, consistent with common

law principles, to "manifest an intention to transfer" a litigation right or claim. Restatement

(Second) of Contracts § 324; *see also DNAML Pty, Ltd. v. Apple Inc.*, 13-cv-6516, 2015 WL

9077075, at *4 (S.D.N.Y. 2015) (discussing common law rule and noting that, historically, there

was "no presumption of an automatic assignment of the right to bring a claim associated with the

property when the property was sold," and that, generally, "the law has required an express

assignment of right to bring a cause of action"). These include jurisdictions in which Royal

Park's expert locates investors in the Certificates. Dalrymple Rep. ¶ 48; Br. at 10 n.7 (collecting

case law from, for example, California, Illinois, and Texas). The New York General Obligations

Law, on the other hand, provides that, "[u]nless expressly reserved in writing, a transfer of any

bond shall vest in the transferee all claims or demands of the transferrer, whether or not such

claims or demands are known to exist . . . for damages against the trustee or depository under

any indenture under which such bond was issued." G.O.L. § 13-107(1); *see also Bluebird*

*Partners, L.P. v. First Fidelity Bank, N.A.*, 97 N.Y.2d 456, 461 & n.1, 767 N.E.2d 672, 675, 741 N.Y.S.2d 181, 184 (2002) (noting that before § 13-107's passage, "a transfer of bonds did not automatically carry with it existing claims for damages against a trustee; an express agreement was required to transfer those claims" and recognizing that the current rule places New York at odds with most other jurisdictions); *Racepoint Partners, LLC v. JPMorgan Chase Bank*, 06-cv-2500, 2006 WL 3044416, at *4 (S.D.N.Y. Oct. 26, 2006) ("To the knowledge of the parties, New York is the only state have enacted such a provision for the automatic assignment of bondholders' claims.").

As a result, and as Deutsche Bank persuasively argues, identifying class members with contract claims in the face of active aftermarket trading across multiple domestic and international jurisdictions is likely to require a two-part inquiry. First, it would be necessary to determine, based on New York's fact-intensive "grouping of contacts" choice-of-law framework, which jurisdiction's law governs the relevant assignment (or assignments, if the ownership chain includes multiple links).[8] And, second, the Court would have to apply that law to determine whether claims were assigned along with the Certificates or retained by the seller. Indeed – and as Deutsche Bank notes – Royal Park itself presents an example of the need for precisely this sort of individualized inquiry. Royal Park alleges that it acquired its Certificates on the secondary market in 2009 and 2010 pursuant to transactions in which it also obtained all of the sellers' litigation rights and claims. Comp. ¶ 32. But Royal Park also subsequently sold some or all of its holdings under a contract by which it expressly *retained* its litigation rights. Heintz Dec. Ex. 4. (Portfolio Sale Agreement, dated April 26, 2013).

---

[8] *See, e.g., Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.*, 84 N.Y.2d 309, 317-18, 642 N.E.2d 1065, 1068-69, 618 N.Y.S.2d 609, 612-13 (1994). That approach considers (i) the place of contracting; (ii) the places of negotiation and performance; (iii) the location of the subject matter; (iv) and the domicile or place of business of the contracting parties. *Id.*

Royal Park attempts to allay any concern about the prospect of aftermarket trading necessitating individualized inquiries into class membership by urging that, under General Obligations Law § 5-1401, New York choice-of-law provisions contained in the PSAs mean that New York law necessarily governs all instruments effecting transfers of Certificates. *See* Reply at 4 & n.7. But the Court fails to see why Section 5-1401, which provides only that contracts reaching a certain consideration threshold may incorporate enforceable New York choice-of-law provisions, would operate here to bind independent assignment contracts by the PSAs' choice-of-law provisions. Indeed, at least one court in this District has rejected a very similar argument. *See Semi-Tech Litig. LLC v. Bankers Trust Co.*, 272 F. Supp. 2d 319, 330 (S.D.N.Y. 2003) (indenture's governing law clause had "'no relevance to the question whether the contracts of sale of notes operated to assign certain rights of action'" – a "question . . . controlled, as to each sale, by New York choice of law principles") (internal alterations omitted) (quoting *In re Nucorp Energy Sec. Litig.*, 772 F.2d 1486, 1492 (9th Cir. 1985)). Royal Park suggests that *Excelsior Fund, Inc. v. JP Morgan Chase Bank, N.A.*, 06-cv-5246, 2007 WL 950134, at *6 (S.D.N.Y. Mar. 28, 2007) is contrary authority. Reply at 4 n.7. The Court disagrees. In *Excelsior*, Judge Koeltl relied on the fact – not present in the current record here – that the notes themselves contained an "express New York law governing provision." 2007 WL 950134, at *6. If anything, Judge Koeltl favorably acknowledged Judge Kaplan's "mere[] observ[ation]" in *Semi-Tech* that "the governing law clause in the indenture had 'no relevance' to whether rights of action were assigned under contracts of sale of the notes." *Id.*

In the face of these ascertainability obstacles, Royal Park has not met its burden of demonstrating that the requirement can be satisfied in an administratively feasible manner that does not required individualized hearings. In its moving papers, Royal Park notably declined to

directly address (or even acknowledge) the ascertainability requirement, although its expert, Mr.

Dalrymple, did estimate, for purposes of his numerosity analysis, that there were at least 856

(apparently then-current) beneficial holders of Certificates, based on "conservative assumptions

applied to incomplete data" provided by a subset of DTC's participant entities. Dalrymple Rep.

¶¶ 40-48. Responding to Deutsche Bank's ascertainability contentions on reply, neither Royal

Park nor Mr. Dalrymple cited affirmative evidence as to the ready identifiability of putative class

members without the need for individualized hearings. Rather than grapple substantively with

the challenge, identified by Deutsche Bank, of tracing the ownership history of beneficial

interests in the Certificates (and corresponding breach of contract claims), Mr. Dalrymple

principally noted that it was an exercise that he had neither attempted nor been asked to attempt,

pointed out that there had been no effort "to date to acquire all available data" necessary to do so,

and asserted without substantiation that "it would be possible, with a complete set of transaction

data, to determine which parties held the Certificates and when." *See* Declaration of Lucas F.

Olts in Support of Plaintiff Royal Park's Reply Memorandum in Further Support of Its Motion

for Class Certification and Appointment of Class Representative and Class Counsel, Dkt. No.

284 ("Olts. Reply Dec.") Ex. A (Response Report of W. Scott Dalrymple, CFA ("Dalrymple

Resp. Rep.")) ¶¶ 32-40 (also conceding that "it may not be possible to identify all transactions or

beneficial holders from the data I reviewed" thus far). Especially in light of the extensive class

and other discovery in which the parties have already engaged, the Court cannot deem such

vague references to additional datasets from unidentified sources and "possible" further analyses

sufficient to carry Royal Park across the figurative 50-yard line. *Cf. Carrera v. Bayer Corp.*, 727

F.3d 300, 306-07 (3d Cir. 2013) (noting that a "plaintiff may not merely propose a method of

ascertaining a class without any evidentiary support that the method will be successful," and that

"[a] party's assurance to the court that it intends or plans to meet the requirement[] . . . is insufficient," because "[a] critical need of the trial court at certification is to determine how the case will be tried, including how the class is to be ascertained") (internal quotation marks and citations omitted). Perhaps more importantly, even crediting Mr. Dalrymple's suggestion that all holders and former holders of Certificates could be feasibly identified with additional data, the Court sees no evidence that such an identification exercise would not require individualized hearings or inquiries. *See Brecher*, 806 F.3d at 26 ("Even if there were a method by which the beneficial interests could be traced, determining class membership would require the kind of individualized mini-hearings that run contrary to the principle of ascertainability.").

What is more, Mr. Dalrymple acknowledged at deposition that he was unaware of any trade data that would allow for systematic determination of, for example, which former Certificate holders sold their beneficial interests before the initial alleged PSA breaches occurred, or which investors assigned their litigation rights to other investors over the ten-plus-year period since the Certificates were issued. *See* Heintz Dec. Ex. 3 (Deposition of W. Scott Dalrymple) at 262:14-264:3, 264:18-265:6.[9] Given Royal Park's assertion in its reply papers that these sorts of investors necessarily fall *outside* its proposed class as currently defined, the obstacles to their identification as recognized by Mr. Dalrymple constitute further evidence of the difficulties to be confronted in distinguishing class members from non-class members. *See* Reply at 2 ("To the extent that an assignor lacked any injury-in-fact by virtue of an assignment,

---

[9] Consistent with those observations, Deutsche Bank's expert, Mr. Dolan, explained during his deposition that, even it were theoretically possible to "understand the ownership history of the relevant [T]rusts" with a "hypothetical" set of records reflecting all trades since issuance, one still could not determine precisely how the beneficial ownership interests actually moved as between individual investors. *See* Olts Reply Dec. Ex. C (Deposition of John H. Dolan) at 101:9-102:14, as modified by accompanying errata sheet, Dkt. No. 295-3. Contrary to Royal Park's characterization, the Court does not view Mr. Dolan's statements as any "concession" as to ascertainability. Reply at 3.

the assignor would not be entitled to damages as a matter of law and would therefore be

excluded from the class."). Such difficulties, taken together, preclude a finding that the proposed

class is sufficiently ascertainable.

*     *     *

Two concluding comments on the ascertainability requirement are in order.

First, the Court is mindful of the longstanding rule in this Circuit – invoked by Royal

Park on reply – that class members need not actually "*be ascertained* prior to certification";

rather "the exact membership of the class must be *ascertainable* at some point in the case." *In re*

*Methyl Tertiary Butyl Ether Prod. Liability Litig.*, 209 F.R.D. 323, 337 (S.D.N.Y. 2002)

(emphasis added) (internal quotation marks omitted). That is a rule that *Brecher* – far from

altering – expressly reaffirmed. 806 F.3d at 25 n.2 " ("Of course, 'identifiable' does not mean

'identified'; ascertainability does not require a complete list of class members at the certification

stage.") Plaintiffs, then, are by no means required to identify a comprehensive roster of putative

class members at the certification stage, and the Court's conclusion in this Order is not premised

on Royal Park's failure to do so here. But plaintiffs *are required* to show by a preponderance of

the evidence that class members will be, at some point, readily identifiable without resort to

individualized hearings. And that Royal Park has not done.

At the same time, the Court is not prepared to endorse a broad reading of *Brecher*, as

Deutsche Bank would appear, implicitly, to urge.[10] The *Brecher* Court took care to couch its

conclusion in the "particular circumstances" of the case and the "unique features of the bonds" at

issue. 806 F.3d at 25-26. On the other hand, the instrument-specific "features" of primary

---

[10] Memorandum of Law of Deutsche Bank in Opposition to Motion for Class Certification and
Appointment of Class Representative and of Class Representative of Royal Park ("Opp.") at 5-6.

importance to the *Brecher* Court – indirect beneficial ownership, identification only by series-wide CUSIP, active trading on the secondary market – are, as Mr. Dalrymple emphatically notes – not necessarily uncommon properties of RMBS, or even, to some extent, of debt securities more generally. *See, e.g.*, Dalrymple Resp. Rep. ¶ 35 (citing deposition testimony of defense expert Dolan conceding that corporate bonds are sometimes identifiable only by CUSIP). For purposes of this decision, the Court need not and does not conclude, as Deutsche Bank might contend, that *Brecher* implicitly abrogates years of decisions in this Circuit certifying classes of RMBS investors. Rather, the Court concludes only that the particular combination of factors present here – Royal Park's failure to include a temporal limit in its proposed class definition, the difficulties in identifying holders of indirect beneficial interests in actively traded RMBS identifiable only by tranche-wide CUSIP, and the need to trace the ownership history of these interests to determine the transfer (or lack thereof) of breach of contract claims – renders the proposed class insufficiently ascertainable on the current record.

For all of the foregoing reasons, Royal Park has not met its burden of demonstrating the ascertainability of the proposed class, as currently defined, by a preponderance of the evidence. *See Brecher*, 806 F.3d at 26-27 (vacating certification of modified class based on insufficient ascertainability); *Leyse v. Lifetime Entm't Servs., LLC*, __ Fed. App'x __, 2017 WL 659894, at *2 (2d Cir. 2017) (Summary Order) (upholding denial of class certification when plaintiff "failed to show a sufficiently reliable method for identifying the proposed class to avoid mini-hearings on the merits of each case") (internal quotation marks and brackets omitted).

Denial of class certification with prejudice on that ground, however, would be unwarranted. In the analogous context of an overbroad proposed class, "reformation of the class definition, if possible," is usually deemed the "appropriate response." *In re Libor-Based Fin.*

*Instruments Antitrust Litig.*, 11-mdl-2262, 2016 WL 2851333, at *2 (S.D.N.Y. May 13, 2016);

*see also Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 757 (7th Cir. 2014) (in face of

overbreadth problems that do not necessarily "call into question the validity of the class as a

whole," the "better course is not to deny class certification entirely but to amend the class

definition as needed to correct for the overbreadth") (internal quotation marks omitted); 7A

Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1759 (3d ed. 2005)

("if plaintiff's definition of the class is found to be unacceptable, the court may construe the

complaint or redefine the class to bring it within the scope of Rule 23 or it may allow plaintiff to

amend in order to limit the class").  Because the Court, as noted, is not persuaded at this time that

the circumstances of this case fundamentally preclude identification of some sufficiently

ascertainable class, an opportunity to modify the proposed class definition is similarly

appropriate here.  *Cf. U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 408 (1980) (approving

remand to afford certification proponent the "opportunity to request certification of subclasses

after the class he proposed was rejected"); *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 594

(3d Cir. 2012) (instructing district court on remand to address "serious ascertainability issues"

raised by proposed class by, among other things, "adjusting the class definition as needed").  The

Court recognizes that, under Federal Rule of Civil Procedure 23(c), it "has authority *sua sponte*

to modify a proposed class definition."  *Ruzhinskaya v. Healthport Techs. LLC*, 311 F.R.D. 87,

108-09 (S.D.N.Y. 2015); *see also Vincent v. Money Store*, 304 F.R.D. 446, 453 (S.D.N.Y. 2015)

("district court may carve out a narrower class from an overbroad class proposed in the

Complaint"); *McIntire v. China MediaExpress Holdings, Inc.* 38 F. Supp. 3d 415, 423 (S.D.N.Y.

2014) (district courts have "substantial discretion" to "alter or modify the class" or "create

subclasses") (internal quotation marks omitted).  Still, the Court is "not obligated" to do so "on

21

its own initiative," and it is generally "'plaintiff's burden to show how the action may be subclassed to avoid certification problems.'" *Lundquist v. Security Pacific Automotive Fin. Servs. Corp.*, 993 F.2d 11, 14-15 (quoting *Geraghty*, 445 U.S. at 408). The parties having thus far largely confined their briefing on potential modified class definitions to passing footnotes addressed to hypotheticals, the Court is ill-positioned to attempt an appropriate carve-out and will decline to do so. Instead, the Court will grant Royal Pak leave to renew its motion with a modified class definition as set forth at the conclusion of this Order. *See, e.g.*, *Ruzhinskaya*, 311 F.R.D. at 109-110 ("[i]n deference to the parties," affording plaintiff the opportunity to move for certification of modified class in light of deficiencies in proposed definition identified by court).

## B.  The Overbreadth Challenges Raised by Deutsche Bank Do Not Constitute Independent Bars to Certification

Next, the Court briefly addresses Deutsche Bank's second challenge bearing on the class definition: that the proposed class may not be certified because it is overbroad in necessarily including certain categories of investors who would lack standing to sue.

Although there may well be some conceptual overlap between this argument and the ascertainability argument discussed above, the Court agrees with the parties' framing of the two issues as related but independent. Opp. at 3-5; Reply at 2-3. Unlike the ascertainability inquiry, which in this case turns in part on whether investors with standing may be readily distinguished from investors without standing absent individualized hearings, the essential question here is whether – as Deutsche Bank urges – the proposed class definition impermissibly purports to include both.

It is no doubt correct, at least in this Circuit, that "[t]he filing of suit as a class action does not relax [the] jurisdictional requirement" of Article III standing. *Denney v. Deutsche Bank AG*, 443 F.3d 253, 263 (2d Cir. 2006). Thus, while individual passive members of a putative class

22

are not required "to submit evidence of personal standing," the class "must . . . be defined in such a way that anyone within it would have standing." *Id.* at 263-64. Indeed, the Court of Appeals has made clear that "no class may be certified that contains members lacking Article III standing." *Id.* at 264; *see also In re Literary Works in Elec. Databases Copyright Litig.*, 509 F.3d 116, 126 (2d Cir. 2007) ("[W]e have applied Article III's jurisdictional requirements to each member of a class."), *rev'd on other grounds*, *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010).

But the Court is not persuaded that Royal Park's putative class – whatever ascertainability deficiencies it reflects – runs afoul of this standing requirement. Deutsche Bank argues that because the proposed class purports to include "[a]ll persons and entities" who ever "held" Certificates, it necessarily includes would-be members who once "held" but then assigned away beneficial ownership interests and corresponding litigation rights. Opp. at 3-5. These sorts of investors, Deutsche Bank notes, lack standing to prosecute breach of contract claims in light of the well-established proposition that "'[a]n unequivocal and complete assignment extinguishes the assignor's rights against the obligor and leaves the assignor without standing to sue the obligor.'" Opp. at 4-5 (quoting *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, Nat'l Ass'n*, 731 F.2d 112, 125 (2d Cir. 1984)). Neither the Court nor, evidently, Royal Park dispute the latter proposition. But the former is without support. The Court of Appeals has explained that complete assignment of a class member's claims results in the assignee standing in the "shoes" of the assignor for purposes of class membership. *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 100-02 (2d Cir. 2007). In essence, that is, a complete assignment *substitutes* one putative class member for another; it does not, as Deutsche Bank would have it, create two putative class members, one with standing and one without. *See id.*

("Western Pacific and EqualNet *were* both members of the class. As a result of Western

Pacific's and EqualNet's assignments of their respective claims and interests in this litigation to

Cordes and Creditors Trust, Cordes and Creditors Trust stood before the district court *in the*

*shoes* of Western Pacific and EqualNet, for the purposes of this litigation, as assimilated

members of the class. By virtue of the assignment, they *do*, as Western Pacific and EqualNet

*did*, possess the same interest and thus may continue to assert a claim for the same injury shared

by all members of the class.") (emphasis added). The Court is unaware of any case denying

class certification purely on the basis of a proposed class definition that could be read to include

both assignors and assignees of litigation rights, and it sees no reason to do so here.

Furthermore, even assuming that the apparent inclusion of former-investor assignors renders the

putative class, if nothing else, somewhat unclear in its breadth, that issue could be easily cured

by simply modifying the class definition to explicitly exclude Certificate holders who have

contractually relinquished their claims. *Cf. Dukes*, 564 U.S. at 364-65 (recognizing Court of

Appeals' need to trim proposed class consisting of all current and former female employees of

retailer because "those plaintiffs no longer employed by [defendant] lack standing to seek

injunctive or declaratory relief against its employment practices"); *Estate of Gardner v.*

*Continental Cas. Co.*, 316 F.R.D. 57, 68-69 (D. Conn. 2016) (approving plaintiffs' revisions to

class definition in light of standing challenge as "eliminat[ing] any problems of overbreadth that

might otherwise have existed").

     Deutsche Bank also contends that the class definition, in employing the unadorned phrase

"damaged thereby," fails to properly link putative class members' alleged injuries to the

particular misconduct ascribed to Royal Park. Opp. at 4. As a result, Deutsche Bank maintains,

the putative class impermissibly includes would-be members who were "damaged" by virtue of

24

their *mere ownership* of Certificates, rather than by Deutsche Bank's alleged breaches of the PSAs. *Id.* The inclusion of such members, Deutsche Bank continues, would violate the basic standing requirement that a plaintiff must "have suffered or be imminently threatened with a concrete and particularized 'injury in fact'" that "*is fairly traceable to the challenged action of the defendant.*" *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, __ U.S. __, 134 S. Ct. 1377, 1386 (2014) (emphasis added) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). As Royal Park correctly notes, however, "[t]he phrase 'and were damaged thereby' appears regularly in class definitions," including in the securities context, and often lacks the sort of precise "linking" language that Deutsche Bank seeks. *See, e.g.*, *Fort Worth*, 301 F.R.D. at 143-44. Indeed, the Fifth Circuit – relying in part on decisions from this District – has deemed the language "routine" and "'superfluous,' merely conveying a basic standing requirement." *Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 640 (5th Cir. 2012) (quoting *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 492 (S.D.N.Y. 2009)) (also observing that "no court has found [the phrase] to be problematic"). In any event, Royal Park suggests in reply that, for the sake of clarity, the proposed class definition could be modified to replace the word "thereby" with the phrase "as a result of Deutsche Bank National Trust Company's conduct alleged in the Complaint." Reply at 2. The Court is satisfied that such a modification would sufficiently address any residual standing problem, to the extent that one arguably exists.

Accordingly, the Court concludes that, notwithstanding its determination that the proposed class, as defined, is insufficiently ascertainable, there is no independent basis to deny certification on grounds of overbreadth.

IV.     **Sealing**

Finally, Royal Park has made two applications by e-mail, dated October 6, 2016 and December 20, 2016, respectively, to maintain under seal unredacted versions of certain portions of evidentiary submissions made by Deutsche Bank in support of its opposition to class certification.  The basis for both applications is that public disclosure of matters reflected in the relevant evidentiary materials would harm the business and/or financial interests of non-parties to this litigation that have produced documents pursuant to confidentiality agreements.

Consistent with earlier conclusions of the courts of this District, the documents at issue are "judicial documents" for purposes of the framework for evaluating sealing requests set forth by the Court of Appeals in *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006).  *See, e.g., Tropical Sails Corp. v. Yext, Inc.*, 14-cv-7582, 2016 WL 1451548, at *3 (S.D.N.Y. Apr. 12, 2016) ("exhibits supporting a motion for, or opposition to, class certification would certainly be relevant to the judicial function and useful to the judicial process in probing behind the pleadings to determine whether the plaintiff's suit meets the special criteria set forth in Rule 23 for class certification"); *Mark v. Gawker Media LLC*, 13-cv-4347, 2015 WL 7288641, at *2  (S.D.N.Y. Nov. 16, 2015) (deeming "documents submitted in connection with Plaintiff's Motion for Class Certification" to be judicial documents for purposes of the *Lugosch* analysis).  Furthermore, having carefully reviewed the documents' contents, the Court determines that there is a significant presumption of access to the subject information under both the common law and the First Amendment.  *Mark*, 2015 WL 7288641, at *2; *cf. Lugosch*, 435 F.3d at 121 ("[D]ocuments submitted to a court for its consideration in a summary judgment motion are – as a matter of law – judicial documents to which a strong presumption of access attaches, under both the common law and the First Amendment.").  The Court does find, however, that the

privacy interests of the affected non-parties are sufficient to overcome the presumption of access

and that the requested sealing and proposed redactions, which are limited in absolute scope and

"narrowly tailed to serve [such] interest[s]," are "essential to preserve higher values." *United*

*States v. Erie Cty.*, 763 F.3d 235, 239 (2d Cir. 2014) (internal quotation marks omitted). While it

is true that "the mere existence of a confidentiality agreement covering judicial documents is

insufficient to overcome the First Amendment presumption of access," *Aioi Nissay Dowa Ins.*

*Co. v. Prosight Specialty Mgmt. Co., Inc.*, 12-cv-3274, 2012 WL 3583176, at *6 (S.D.N.Y. Aug.

21, 2012) (internal quotation marks omitted), the nature of the information at issue – which

discloses, among other things, non-parties' confidential customer information and the granular

terms of private securities transactions involving non-parties – is sufficiently sensitive to merit

protection at this stage of the proceedings. *See, e.g.*, *Dodona I, LLC v. Goldman, Sachs & Co.*,

119 F. Supp. 3d 152, 156-57 (S.D.N.Y. 2015) (finding information identifying third-parties'

customers and disclosing their "information concerning their trading strategies, objectives, and

transactions" to overcome presumption of public access); *see also Lown v. Salvation Army, Inc.*,

04-cv-1562, 2012 WL 4888534, at *2 (S.D.N.Y. Oct. 12, 2012) (privacy interests of "innocent

third-part[ies]" are "entitled to significant weight in the balancing against the public's right to

access") (citing *Gardner v. Newsday, Inc.*, 895 F.2d 74, 79 (2d Cir. 1990)). Accordingly, Royal

Park's sealing applications are GRANTED.

## V.    Conclusion

For the reasons set forth above, Royal Park's motion to certify this matter as a class

action, to appoint Royal Park as class representative, and to appoint Robbins Geller as class

counsel is DENIED without prejudice and with leave to renew the motion so as to propose an

appropriately redefined class. Because the Court resolves this motion on ascertainability

grounds, it neither reaches nor expresses a view at this time on any questions concerning the

remaining requirements of numerosity, commonality, typicality, adequacy, predominance, or superiority.

 Should Royal Park wish to renew its motion, Royal Park's opening submission in support thereof shall be filed on or before May 1, 2017, Deutsche Bank's submission in opposition shall be filed on or before May 15, 2017, and Royal Park's reply submission shall be filed on or before May 22, 2017.  To the extent that the parties wish to rely on arguments or evidence already submitted to the Court in connection with the instant motion, they may incorporate such materials by express reference and need not reassert them at length.

 Royal Park's application to seal documents submitted to the Court in connection with Deutsche Bank's opposition papers is GRANTED.  Deutsche Bank shall, within ten business days of this Order, publicly file appropriately redacted copies of its opposition papers, including slip sheets to reflect sealed exhibits as appropriate.  The Court will file unredacted copies under SEAL forthwith.

 Because it arguably contains reference to information that Royal Park has requested be maintained under seal, this Order shall be filed under TEMPORARY SEAL.  The parties are directed to meet and confer and to advise the in writing Court within ten business days of this Order whether they believe that any portion should be redacted prior to its public docketing.

 This resolves Dkt. No. 160

 SO ORDERED.

Dated: March ＿, 2017
  New York, New York

_____
ALISON J. NATHAN
United States District Judge

28