# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROYAL PARK INVESTMENTS SA/NV,<br><br>                              Plaintiff,<br>        v.<br><br>HSBC BANK USA, NATIONAL<br>ASSOCIATION,<br><br>                              Defendant. | **Case No. 14-CV-8175-LGS-SN** |
| BLACKROCK BALANCED CAPITAL<br>PORTFOLIO (FI), *et al.*,<br><br>                              Plaintiffs,<br>        v.<br><br>HSBC BANK USA, NATIONAL<br>ASSOCIATION,<br><br>                              Defendant. | **Case No. 14-CV-9366-LGS-SN** |

**HSBC BANK USA, N.A.'S SUR-REPLY IN OPPOSITION
TO PLAINTIFFS' AMENDED MOTIONS FOR CLASS CERTIFICATION**

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

ARGUMENT ........................................................................................................................2

I.  Plaintiffs' Purported "Classwide" Damages Models Fail to Measure Damages on a Classwide Basis. ....................................................................................................2

II.  Dr. Hartzmark's Damages Model Would Award Damages to Investors Who Have Suffered No Losses and Who Have Profited on Their Investments. .................................5

    A.  Dr. Hartzmark's Flawed Method of Allocation ..........................................................5

        1.  The M-1 Tranche Has Not, and Almost Certainly Will Not, Experience Loss of Principal. ....................................................................6

        2.  PIMCO Has Profited on Its Position in the M-1 Tranche. ..........................7

        3.  Dr. Hartzmark's Method Nevertheless Would Award PIMCO Damages For Its Position in the M-1 Tranche. ...........................................8

        4.  Dr. Hartzmark's Method Would Also Award Damages to the Senior A-4 Tranche, Which Also Has No Principal Losses. .......................9

    B.  There Is No Legal Basis for Dr. Hartzmark's Increased-Risk Damages, Which Would Constitute Prohibited Consequential Damages. ...........................10

    C.  Dr. Hartzmark's Method Underscores Intra-Class Conflicts. ...............................12

    D.  Dr. Hartzmark's Use of Market Prices Is Economically Unjustified. ..................13

    E.  Dr. Hartzmark's Method Would Award Damages Without Proof of Causation. ...............................................................................................17

    F.  Dr. Hartzmark's Back-Pedaling at His Deposition Highlights the Lack of a Workable Classwide Damages Model. ...............................................18

CONCLUSION ...................................................................................................................19

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Americas*, 727 F. Supp. 2d
    256 (S.D.N.Y. 2010) ...................................................................................11

*Baker v. Saint-Gobain Performance Plastics Corp.*, 232 F. Supp. 3d 233
    (N.D.N.Y. 2017) .......................................................................................11

*Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013) .......................................... passim

*In re Petrobras Secs.*, 862 F.3d 250 (2d Cir. 2017)..............................................1

*LNC Investments, Inc. v. First Fidelity Bank*, 1997 WL 528283 (S.D.N.Y. Aug.
    27, 1997) ........................................................................................10, 11, 13

*Ret. Bd. of Policemen's Annuity & Benefit Fund of Chi. v. Bank of N.Y. Mellon*,
    775 F.3d 154 (2d Cir. 2014).......................................................................3

*Roach v. T. L. Cannon Corp.*, 778 F.3d 401 (2d Cir. 2015) ................................2

*Waxman v. Cliffs Nat. Res., Inc.*, 222 F. Supp. 3d 281 (S.D.N.Y. 2016) ...................11

## STATE CASES

*Askey v. Occidental Chem. Corp.*, 102 A.D.2d 130 (4th Dep't 1984).........................12

*Caronia v. Philip Morris USA, Inc.*, 22 N.Y.3d 439 (2013)............................10, 11, 12

*Western & Southern Life Insurance Co., et al. v. Bank of New York Mellon*, Case
    No. A1302490 (Ct. of Common Pleas, Hamilton Cty.)....................................5, 18

## STATUTES

15 U.S.C. § 77www(b) ...................................................................................11

## OTHER AUTHORITIES

Dungey, M., Dwyer, G.P., and Flavin, T., "Systematic and Liquidity Risk in
    Subprime-Mortgage Backed Securities," Working Paper 2011-15, Federal
    Reserve Bank of Atlanta, November 2011 ...........................................................14

Frank J. Fabozzi, The Handbook of Fixed Income Securities 73 (7th ed. 2005) ...................13, 17

Fender, I. and Scheicher, M., "The Pricing of Subprime Mortgage Risk in Good
    Times and Bad: Evidence from the ABX.HE Indices," *Applied Financial
    Economics* 19, 2009 .....................................................................................14

Merrill, C.B., Nadauld, T.D., Stultz, R.M., and Sherlund, S.M., "Were there fire sales in the RMBS market?" May 2014.................................................................................14

Vickery, J. and Wright, J., "TBA Trading and Liquidity in the Agency MBS Market," *Federal Reserve Bank of New York Economic Policy Review*, May 2013...........................................................................................................................15

## INTRODUCTION

HSBC Bank USA, N.A. ("HSBC") submits this Sur-Reply to address new arguments raised in Plaintiffs' reply briefs, rebuttal expert reports and expert depositions concerning class certification.  These materials highlight many of the reasons that certification should be denied under the "rigorous analysis" that is required "to determine whether putative class plaintiffs meet Rule 23's requirements."  *In re Petrobras Secs.*, 862 F.3d 250, 260 n.11 (2d Cir. 2017).[1]  In particular, it is now clear that neither Royal Park's nor the *BlackRock* Plaintiffs' experts have offered anything approaching a model that could determine damages on a classwide basis.  Because their purported "classwide" models operate on a trust-by-trust basis and must take account of a plethora of individualized factors, they are incapable of  "classwide proof," as required by *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013).  In addition, the method of allocating damages that the *BlackRock* expert proposes in his rebuttal report is legally and economically flawed—it would (1) award damages to investors who have not suffered any loss in principal, and who have in fact profited on their investments; (2) award consequential damages that are prohibited under New York law and the governing agreements; (3) exacerbate intra-class conflicts; (4) rely on market prices of RMBS to determine damages, despite multiple problems with that approach; and (5) award damages without a showing of causation.

---

[1] Notably, in *Petrobras* the Second Circuit explained that prior Second Circuit precedent that applied a "less deferential standard when the district court has denied class certification . . . arose from a misreading of earlier Second Circuit cases" and "is out of step with recent Supreme Court authority."  *Petrobras*, 862 F.3d at 260 n.11.

## ARGUMENT

**I.      Plaintiffs' Purported "Classwide" Damages Models Fail to Measure Damages on a Classwide Basis.**

Both Royal Park's expert (W. Scott Dalrymple) and the *BlackRock* Plaintiffs' expert (Michael Hartzmark) have proposed damages methodologies, but their rebuttal reports and depositions show that these methodologies do not "establish[] that damages are capable of measurement on a classwide basis," as required by *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013).[2]

The first reason that the experts' approaches are not "classwide" is that, as both experts concede, the calculations they propose would need to be carried out for each trust, not across all trusts covered by the proposed class definitions.  Decl. of George A. Borden in Supp. of Sur-Reply ("Borden Sur-Reply Decl.") Ex. 1 at 68:5-69:1; Borden Sur-Reply Decl. Ex. 2 at 15:8-14. In fact, because some trusts include separate loan groups that support separate securities, a separate model is necessary for each loan group, and thus the number of "models" is even greater than the number of trusts.

The experts' models are necessarily trust-specific because Plaintiffs' theory is that HSBC, as trustee, should have recovered funds through the trust-specific (indeed, loan-specific) remedy of enforcing repurchase of defective loans by other parties.  The amounts that HSBC supposedly could have recovered by that remedy would have benefitted the specific trust which owned the defective loan.  Therefore, Plaintiffs' models necessarily posit that HSBC would have

---

[2] Plaintiffs contend that under *Roach v. T. L. Cannon Corp.*, 778 F.3d 401 (2d Cir. 2015), a classwide damages model is not required.  But even if a model is not required in every case, *Roach* confirms that under *Comcast*, if a plaintiff does propose a model, it "must actually measure damages that result from the class's asserted theory of injury," *id*. at 407.  Plaintiffs' methodologies fail that test here.

recovered separate amounts of repurchase proceeds for each trust.  Dalrymple Rep. ¶ 51; Hartzmark Rep. ¶ 52.  Plaintiffs' models are also trust-specific because they entail modeling the effect of these hypothetical repurchase recoveries under each trust's unique "waterfall"—i.e., the priority of payments defined in the specific trust's governing documents.  Both experts propose, in essence, to pour the separate buckets of money HSBC allegedly should have recovered for each trust over each trust's unique waterfall to identify the amounts that would have flowed to each class of certificates (or "tranches") in each trust.  Dalrymple Rep. ¶ 55; Hartzmark Rep. ¶¶ 71-73.  Given these features of the models, it is not surprising that Mr. Dalrymple admitted that he really proposes four models, not one—reflecting that the Royal Park case involves three trusts, one of which has two entirely separate loan groups underlying that trust's securities. Borden Sur-Reply Decl. Ex. 1 at 68:4-69:13.  Thus, the notion that any single model could be "classwide"—even for three trusts, much less 24—is simply not true.

A second, and more pervasive, reason that Plaintiffs' models do not determine classwide damages is that, once the many individualized issues are accounted for, virtually nothing is left of these "models."  Both Dr. Hartzmark and Mr. Dalrymple agree that if Plaintiffs must prove their cases on a loan-by-loan basis—as is required under *Retirement Board of Policemen's Annuity & Benefit Fund of Chicago v. Bank of New York Mellon*, 775 F.3d 154, 162 (2d Cir. 2014)—their models would be required to take account of individualized issues.  These individual issues would predominate over any common issues.

Both experts concede that the many individualized factors affecting whether and how much HSBC could and should have recovered for any particular trust must be considered as "inputs" to any damages calculation.  *See* Dalrymple Rebuttal Rep. ¶¶ 13-18; Borden Sur-Reply Decl. Ex. 1 at 73:11-86:21; Hartzmark Rebuttal Rep. ¶¶ 31-45; Borden Sur-Reply Decl. Ex. 2 at

21:16-26:3.  These factors include whether there were loan-by-loan breaches of representations or warranties; whether HSBC discovered each breach; whether HSBC would have received sufficient support and indemnification from holders to undertake enforcement action; whether those efforts would have succeeded; and how much HSBC would have recovered on each defective loan.  The *BlackRock* Plaintiffs' expert also admits that his "model" would have to make individualized accommodations for opt-outs, and for individual class members who have no standing or are otherwise barred from recovering.  Hartzmark Rebuttal Rep. ¶¶ 93-98; Borden Sur-Reply Decl. Ex. 2 at 108:8-115:1.  None of these factors or adjustments can be determined on a classwide basis.

Plaintiffs' "models" therefore are nothing more than very general plans to (1) accept the amounts (if any) that result from many distinct decisions on the issues that affect what HSBC could and should have recovered; (2) pour those amounts over the waterfall (or waterfalls) for that specific trust to see to which class of certificates the money would flow; and (3) then perform individualized calculations to determine which actual class members should recover and how much, based on yet more individualized factors.  It is not surprising, then, Royal Park's expert admitted that his approach is not a model at all, but rather just a vague "framework." Borden Sur-Reply Decl. Ex. 1 at 57:24-58:20.  At best, Plaintiffs' "models" boil down to *We have an expert and he will calculate how much each class member should recover.  See* Borden Sur-Reply Decl. Ex. 2 at 19:8-13 ("Q. . . . So the algorithm is at the level of generality of see how much money should have come in, see what the waterfall is, and see where the money would flow?  A. That's the common methodology that would be consistent across all 24 bellwether trusts.").

Even in a non-class case, these vague "models" would not pass muster.  Significantly, in the first RMBS trustee case to go to trial, *Western & Southern Life Insurance Co., et al. v. Bank of New York Mellon*, Case No. A1302490 (Ct. of Common Pleas, Hamilton Cty.), in a decision rendered just this past Friday, the court found the model devised by the plaintiff's damages expert included "questionable assumptions" on many of these same critical issues and therefore was "not a reliable basis for finding damages."  *See* Borden Sur-Reply Decl. Ex. 3 ¶ 98.  For example, the expert's model assumed a 100% success rate on the hypothetical repurchase demands the trustee allegedly should have made, just as Mr. Dalrymple's and Dr. Hartzmark's models do, Torous Rep. ¶¶ 44, 83, but the court found the evidence to be to the contrary, Borden Sur-Reply Decl. Ex. 3 ¶¶ 101-103.

For all these reasons, neither Mr. Dalrymple nor Dr. Hartzmark have provided a classwide damages model that could support certification.  *See Comcast*, 133 S. Ct. at 1434-35 (classwide damages models must be "capable of classwide proof").

## II.   Dr. Hartzmark's Damages Model Would Award Damages to Investors Who Have Suffered No Losses and Who Have Profited on Their Investments.

In his rebuttal report, Dr. Hartzmark set out for the first time how he would allocate to the various classes of securities in each trust the amounts HSBC allegedly should have recovered. His method, however, suffers from multiple fatal flaws.  These flaws doom the *BlackRock* Plaintiffs' reliance on his opinion to support certification.

### A.   Dr. Hartzmark's Flawed Method of Allocation

Under the allocation methodology Dr. Hartzmark now proposes, each tranche would recover an amount equal to (1) the cash payment that would flow to that tranche under the particular trust's waterfall rules *plus* (2) the market value of the post-award principal balance of

the tranche (based on hypothetical post-award market prices that he would unilaterally create)[3]

*minus* (3) the market value of the pre-award principal balance of the tranche.  Hartzmark

Rebuttal Rep. ¶¶ 80-81.  As is obvious from this recipe, Dr. Hartzmark's method relies heavily

on the reliability, predictability, and legal relevance of market prices for RMBS securities—none

of which is established, as described below.  Noticeably absent from his formula, on the other

hand, is any term representing any actual loss of principal suffered by the current

certificateholders.  Nor does Dr. Hartzmark's method take into account the prices at which

current certificateholders (the members of the proposed *BlackRock* class) purchased their

securities and thus whether they have made, rather than lost, money on their investments.

Prior to Dr. Hartzmark's rebuttal report, Dr. Torous had already pointed out the general

problems with using "market" prices as provided by third-party sources[4] in any damages model.

*See* Torous Rep. ¶¶ 84-85.  The rebuttal report's allocation method makes these problems more

concrete and shows that Dr. Torous' criticisms are correct.

### 1.    The M-1 Tranche Has Not, and Almost Certainly Will Not, Experience Loss of Principal.

The perverse consequences of Dr. Hartzmark's method are illustrated by the example

provided in Exhibit 3 to his rebuttal report.  This example sets forth how Dr. Hartzmark would

allocate a hypothetical $35 million recovery by Plaintiffs in connection with bellwether trust

---

[3] In his rebuttal report, Dr. Hartzmark proposed to determine these post-award market prices using "weighted average prices based on the pre-award prices and the pre-award balances of the different tranches," assuming "the same amounts of pre-award balances of tranches are supported by the same pre-award prices."  Hartzmark Rebuttal Rep. at 44 n.74.  If the Court is confused by that description, it is not alone.  In any event, in his deposition Dr. Hartzmark equivocated on how he would determine the hypothetical post-award prices.  *See* Section II.F below.

[4] Dr. Hartzmark uses prices provided by IDC in his rebuttal report.

WFHET 2006-2.  One named Plaintiff in the *BlackRock* action (PIMCO) holds certificates in the M-1 tranche of that trust.

Although some more junior tranches of the WFHET 2006-2 trust have suffered realized losses of principal, the M-1 tranche has not realized any principal losses.  In fact, a prominent third-party provider of information about RMBS trusts—Bloomberg—projects that holders in the M-1 tranche will *never* suffer any loss of principal.  Torous Rep. Ex. 8 & Borden Sur-Reply Decl. Ex. 6.  That outcome is logical, given that as of March 2017 (the date as of which Dr. Hartzmark made his calculations), there was more than $130 million of collateral in the trust to support the principal of approximately $30 million owed to the holders of M-1 certificates (even taking into account the approximately $47 million owed to holders of the A-4 certificates, the only remaining tranche that is more senior to M-1).[5]  As shown in the monthly remittance report for the trust for March 2017, even if every loan in the trust that was delinquent by 30 days or more defaulted and suffered a total loss—an unduly pessimistic assumption, since not all delinquent loans default, and even defaulted loans do not result in total losses, as foreclosure and sale of the property yields at least partial recovery—there would still be more than enough collateral to satisfy the A-4 and M-1 holders.[6]

### 2.      PIMCO Has Profited on Its Position in the M-1 Tranche.

Moreover, PIMCO has profited on its investments in this security.  As described in HSBC's Opposition (HSBC Opp. at 40-43), PIMCO is a treasure-hunter that took advantage of

---

[5] Borden Sur-Reply Decl. Ex. 5 at 1.  The three most senior certificates (A-1 through A-3) have received full repayment of principal and therefore have been retired.

[6] The remittance report shows an Actual Ending Collateral Balance of $132,019,782.  Borden Sur-Reply Decl. Ex. 5 at 7.  The total amount of loans in delinquency, bankruptcy, foreclosure or REO status was $42,279,209.  *Id.* at 9.  Thus, assuming a total loss on the delinquent loans, there would still be more than $89.7 million of remaining collateral.

the financial crisis to buy RMBS at depressed prices.  Its purchases of the WFHET 2006-2 M-1

certificates is an example of this profitable strategy.  As set forth in Exhibit 7 to the Report of

Walter N. Torous, PIMCO purchased M-1 certificates in two installments in August and

September 2014—after it had already sued HSBC in state court and shortly before it filed this

action—at prices of 82.44 and 83.25.[7]  Torous Rep. Ex. 7.  Since then, it has received interest

payments of more than $200,000, *id.*, and by March of this year, the market price had risen to

90.65, Hartzmark Rebuttal Rep. Ex. 1.  Thus, not only has PIMCO suffered no loss of principal,

but on an out-of-pocket basis it has a gain, not a loss.

### 3.    Dr. Hartzmark's Method Nevertheless Would Award PIMCO Damages For Its Position in the M-1 Tranche.

Despite all this, Dr. Hartzmark would award damages to PIMCO as a holder of M-1

certificates.  As set forth in Exhibit 3 to his rebuttal report, in the event of a $35 million recovery

for the trust, Dr. Hartzmark would allocate more than $2.2 million to the M-1 holders.  He bases

this conclusion on his speculative supposition that the hypothetical $35 million recovery would

cause the market price of M-1 certificates to rise from 90.65 to 98.06.[8]

---

[7] RMBS, like other bonds, are typically priced on a scale on which a price of 100 corresponds to 100% of the outstanding principal.  For conventional bonds, the outstanding principal corresponds to the face value of the bond, which is returned when the bond matures.  RMBS differ in that they repay principal (as well as interest) during the term of the security, and thus the amount of outstanding principal diminishes over time.

[8] Applying the formula described above, Dr. Hartzmark then calculates the sum of the portion of the $35 million cash recovery that would flow to the M-1 tranche (in this case, zero, because the entire $35 million would flow to the more senior A-4 tranche) *plus* the hypothetical post-award market value of the M-1 principal (equal to the post-award principal balance of $30.01 million multiplied by the hypothesized post-award price of 98.06, or $29,417,481) *minus* the pre-award market value of the $30.01 million principal (equal to $30.01 million multiplied by the pre-award price of 90.65, or $27,195,906), for a total allocation of $2,220,674 to the M-1 holders.  Hartzmark Rebuttal Rep. ¶¶ 85-88 & Ex. 3

### 4.   Dr. Hartzmark's Method Would Also Award Damages to the Senior A-4 Tranche, Which Also Has No Principal Losses.

Dr. Hartzmark's method also would award damages to the holders of the A-4 tranche of WFHET 2006-2, although that tranche also has suffered no loss of principal, and Bloomberg also projects no future principal loss for that tranche.  Borden Sur-Reply Decl. Ex. 6.  In fact, it is even more implausible that A-4 holders would ever suffer a principal loss, because their senior-most position in the waterfall gives them first priority on the ample trust collateral.  In addition, Dr. Hartzmark's model assumes that the hypothetical $35 million recovery would not cause the market price of the security to rise—it would remain 98.06.  In other words, even if HSBC could and should have recovered this amount for the trust, it would not have caused the value of the A-4 certificates to change.  But Dr. Hartzmark nonetheless would allocate $680,750 of the recovery to the A-4 tranche.[9]

\* \* \*

Obviously, there is something grievously wrong with any damages methodology that would award money to investors who have suffered no loss.  *See Comcast*, 133 S. Ct. at 1433 ("[A]ny model supporting a plaintiff's damages case must be consistent with its liability case . . . .").  Dr. Hartzmark's excuse for this result is that the market prices he manipulates in his allocation formula indicate to him that there is a "risk" that in some "states of the world . . . there

---

[9] In this instance, Dr. Hartzmark applies his formula as follows: the sum of the portion of the $35 million cash recovery that would flow to the A-4 tranche (in this case, all $35 million) *plus* the hypothetical post-award market value of the A-4 principal (equal to the post-award principal balance of $12.366 million multiplied by the hypothesized post-award price of 98.06, or $12.125 million) *minus* the pre-award market value of the $47.3 million principal (equal to $47.3 million multiplied by the pre-award price of 98.06, or $46.4 million), for a total allocation of $680,750 to the A-4 holders.  In essence, the result of this manipulation is to award the A-4 tranche the difference between 100 and 98.06 multiplied by the $35 million recovery—i.e., 1.94% of $35 million.  Hartzmark Rebuttal Rep. ¶ 85 & Ex. 3

could be loss," Borden Sur-Reply Decl. Ex. 2 at 50:21-51:24, and that investors are entitled to

be compensated for this risk. That position is legally baseless; highlights intra-class conflicts;

rests on unjustified assumptions about the market prices of RMBS; and would produce damages

in the absence of a showing of causation. These points are elaborated in the following sections.

### B. There Is No Legal Basis for Dr. Hartzmark's Increased-Risk Damages, Which Would Constitute Prohibited Consequential Damages.

Even if market prices of RMBS reliably reflected risk of principal loss (and they do not,

as explained in Section II.C below), Dr. Hartzmark's increased-risk damages are not recoverable.

This is not a securities fraud case; it is a breach of contract case. The *BlackRock* Plaintiffs are

therefore entitled—at most—only to a benefit-of-the-bargain measure of damages.[10]  But HSBC,

as trustee, never entered into any bargain to protect Plaintiffs from lower market prices in the

absence of actual loss of principal. Even Dr. Hartzmark agrees that there would be no damages

in the event of full repayment of principal. Borden Sur-Reply Decl. Ex. 2 at 46:16-22 ("One

hundred percent principal repayment and no realized losses, based on the damages methodology

that I propose there would be no damage."). Compensation for the *risk of loss* that Dr.

Hartzmark hypothesizes would constitute consequential damages under New York law, which

are not recoverable as a matter of law and are explicitly ruled out under the governing

agreements.

Under New York law, damages for increased risk of future harm, in the absence of actual

present injury, are considered consequential damages. *See Caronia v. Philip Morris USA, Inc.*,

---

[10] There is reason to doubt that purchasers of RMBS certificates—especially late purchasers who are vulture investors—truly have any bargain with the trustee. *See LNC Investments, Inc.*, 1997 WL 528283, at *37 ("[T]he trustees are neither the primary obligors nor the guarantors of the debt . . . under the indenture. . . . The indenture does not represent a bargain with the trustees . . . . There is no bargain on which to base benefit-of-the-bargain damages.").

22 N.Y.3d 439, 447-48 (2013); *Baker v. Saint-Gobain Performance Plastics Corp.*, 232 F. Supp. 3d 233, 250-51 (N.D.N.Y. 2017) (damages based on increased risk are consequential damages); *see also Waxman v. Cliffs Nat. Res., Inc.*, 222 F. Supp. 3d 281, 288 (S.D.N.Y. 2016) (noteholders had not suffered an injury-in-fact from a risk of future harm from bankruptcy); *Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Americas*, 727 F. Supp. 2d 256, 279 (S.D.N.Y. 2010) (refusing a failure-to-mitigate jury instruction; characterizing a duty to eliminate increased risk as a duty to eliminate consequential damages).  Under the definitive Court of Appeals holding in *Caronia*, New York law does not permit recovery of such consequential increased-risk damages for uninjured parties even in tort cases, let alone breach of contract cases.  *See Caronia*, 22 N.Y.3d at 451-52.  The *Caronia* court explained the many policy reasons not to recognize this type of claim:  Among other things, allowing recovery by uninjured parties could "deplet[e] the purported [wrongdoer's] resources for those who have actually sustained damage," and "lead to the inequitable diversion of money away from those who have actually sustained an injury."  *Id*. at 451.

But even if New York law allowed this form of damages, the governing contracts for the vast majority of the bellwether trusts expressly rule it out.  For example, section 9.2(xi) of the DBALT 2006-AR5 PSA expressly provides that:

> In no event shall the Trustee be liable, directly or indirectly, for any special, indirect or consequential damages, even if the Trustee has been advised of the possibility of such damages . . . .[11]

___

[11] In all, 21 of the 23 bellwether trusts governed by PSAs contain similar provisions precluding the recovery of consequential damages.  Consequential damages are also unavailable for the one bellwether trust governed by an Indenture, because the Trust Indenture Act ("TIA") applies to that trust, and the TIA precludes consequential damages by allowing only the recovery of actual, or out-of-pocket, damages. 15 U.S.C. § 77www(b) ("[N]o person permitted to maintain a suit for damages under the provisions of this subchapter shall recover, through satisfaction of judgment in one or more actions, a total amount in excess of his actual damages on account of the act complained of."); *LNC Investments, Inc. v. First Fidelity Bank*, 1997 WL 528283, at *37

Because Dr. Hartzmark's method would produce consequential damages that are inconsistent with any viable theory of Plaintiffs' claims, it fails under *Comcast*.

### C.      Dr. Hartzmark's Method Underscores Intra-Class Conflicts.

The policy reasons to reject increased-risk damages, as recited by the *Caronia* court, have special relevance to the intra-class conflict issues HSBC has raised.  HSBC Opp. at 21-23 & 40. Injured and uninjured parties in the same class have obvious incentives to disagree about whether parties who are merely at risk of some future harm get to share in a recovery that would otherwise go to those who have currently realized losses.[12]  Dr. Hartzmark's allocation method only highlights these conflicting incentives.  In particular, in the hypothetical example in Exhibit 3 to Dr. Hartzmark's rebuttal report, the holders of certificates in WFHET 2006-2 that have suffered realized losses clearly would have an incentive to object to Dr. Hartzmark's allocation of damages to more senior certificates that have incurred no principal loss.  Those junior holders would contend that his method would "lead to the inequitable diversion of money away from those who have actually sustained an injury," 22 N.Y.3d at 451, exactly as the *Caronia* court condemned.  (Royal Park is one of those junior holders, so it is likely no coincidence that it and the *BlackRock* Plaintiffs have proposed different damages approaches[13]—just as they have disagreed about many other things in these cases.)

_____

(S.D.N.Y. Aug. 27, 1997) (TIA mandates an "out-of-pocket measure of damages, rather than [] a contract theory of recovery.").

[12] Before *Caronia*, some lower courts in New York had recognized some form of damages for increased risk, *see Askey v. Occidental Chem. Corp.*, 102 A.D.2d 130, 135 (4th Dep't 1984), but even the *Askey* court declined to certify a class of such claimants, *id.* at 138.

[13] Royal Park's expert, Mr. Dalrymple, has not even attempted to propose a model for classwide damages (*see* Section I above), much less a method of allocation of the type Dr. Hartzmark now proposes.  That failure is itself grounds to deny Royal Park's motion.

Conversely, the holders of the A-4 certificate (and other similarly situated senior holders) would prefer an allocation method that is even more favorable to them than the one Dr. Hartzmark proposes.  As Dr. Torous pointed out in his report, senior holders have an incentive to contend that they should receive the entirety of any recovery, because under the trust waterfall, any recovery would be paid first to their tranche up to the outstanding balance of the tranche. *See* Torous Rep. ¶¶ 62-65.  For example, as described above, in the example in Exhibit 3 to Dr. Hartzmark's rebuttal report, the entire $35 million hypothetical recovery would flow to the A-4 tranche.  In his deposition, Dr. Hartzmark scoffed at the idea that A-4 holders should receive the entire recovery, but he could not deny that the senior holders would have an incentive to argue for that result.  Borden Sur-Reply Decl. Ex. 2 at 41:4-22.  Notably, none of the named Plaintiffs who retained Dr. Hartzmark hold A-4 certificates, and he concedes he did not consult with any such holders in designing his plan of allocation.  *Id.* at 38:6-9.

### D.    Dr. Hartzmark's Use of Market Prices Is Economically Unjustified.

Plaintiffs may attempt to argue that even though HSBC had no duty to maintain the price of their securities, loss of value of those securities is a proper measure of the damages for the breaches they allege.  *See, e.g.*, Hartzmark Rep.  ¶¶ 27-28.  But using market prices to determine damages would be economically unjustified.[14]

The value of any security is equal to the present value of the expected future cash flows from it and appropriate discount rates.  *See* Frank J. Fabozzi, The Handbook of Fixed Income Securities 73 (7th ed. 2005).  In well-functioning, efficient markets, such as the major stock

---

[14] RMBS market prices may be relevant to damages in the one bellwether trust governed by an indenture, MLMBS 2007-2, because the TIA governs that trust and limits damages to out-of-pocket loss, *LNC Investments, Inc.*, 1997 WL 528283, at *37.  However, as HSBC's expert determined, the only named Plaintiff that holds certificates in this trust actually has an out-of-pocket *gain*.  Torous Rep. Ex. 7 (reflecting gain by PIMCO in MLMBS 2007-2).

exchanges, market prices represent investors' equilibrium views as to the present value of future cash flows.  The market for RMBS, however, is not this type of market.  Indeed, it is beyond dispute that market prices of RMBS frequently have not accurately reflected the actual present value of expected cash flows from those investments.

During the financial crisis, the lack of liquidity—people willing to buy and sell, at any price—led to what economists call a dislocation of the market.  It is well-known that beginning in mid-2007, the market for non-agency RMBS became highly illiquid and volatile, as evidenced by wide bid-offer spreads for RMBS and frequently resulting in depressed prices for these certificates.[15]  Economic scholarship has confirmed that conditions during this period resulted in "deviations in price from an asset's fundamental value."[16]

These characteristics of the RMBS market have been long-lasting.  In May 2013, the Federal Reserve Bank of New York was still commenting on illiquid market conditions in the non-agency RMBS market; it stated that "[o]nly a small number of non-agency residential MBS

---

[15] The impact of the financial crisis reached assets of all credit rating levels and vintages.  *See*, for example, Fender, I. and Scheicher, M., "The Pricing of Subprime Mortgage Risk in Good Times and Bad: Evidence from the ABX.HE Indices," *Applied Financial Economics* 19, 2009, pp. 1925-1945, (*e.g.*, "While fundamental factors, such as indicators of housing market activity, have continued to exert an important influence on the subordinated ABX indices, the AA and AAA indices have tended to react more to the general deterioration of the financial market environment, such as declining risk premia and market liquidity," p. 1943 ); and Dungey, M., Dwyer, G.P., and Flavin, T., "Systematic and Liquidity Risk in Subprime-Mortgage Backed Securities," Working Paper 2011-15, Federal Reserve Bank of Atlanta, November 2011, (*e.g.*, "From mid-2007 onward, the [common shock to asset volatility] swamps all other factors, suggesting that all AAA-rated assets behaved increasingly alike without any distinguishing vintage effects," p. 11).

[16] Merrill, C.B., Nadauld, T.D., Stultz, R.M., and Sherlund, S.M., "Were there fire sales in the RMBS market?" May 2014, p. 16.

14

have been issued since mid-2007 and, during this period, secondary markets for trading non-agency MBS have been extremely illiquid."[17]

Indeed, some of the named Plaintiffs—particularly the largest investor among them, PIMCO—have continued to take advantage of these depressed prices to make handsome profits. As described above, PIMCO's purchases of WFHET 2006-2 tranche M-1 in late 2014 fit this pattern.  As PIMCO portfolio manager Alfred Murata testified, PIMCO believed that "the majority of downgraded senior non-agency RMBS retained some portion of legitimate triple A value."  Borden Sur-Reply Decl. Ex. 7 at 235:6-237:8.  HSBC's Opposition and the Torous Report described the success PIMCO achieved and the profits it realized by capitalizing on these depressed prices.  HSBC Opp. at 40-43.  As Murata testified, the basic rationale for PIMCO's strategy was that "the price was low relative to the projection of future cash flow," Borden Sur-Reply Decl. Ex. 7 at 246:25-247:6—i.e., the market prices did not reflect true value.

Even today, it is impossible to conclude that market prices of RMBS accurately reflect the actual expectation of future cash flows and discount rates of RMBS.  *See* Torous Rep. ¶¶ 84-85.  Many of the sophisticated named Plaintiffs recognize that the "intrinsic value" or "realizable value" (i.e., the present value of expected future cash flows under the most likely assumptions of future conditions) is greater than market value.  For example, BlackRock advises the NCUA (a plaintiff in a coordinated case but otherwise a member of the proposed class) on its portfolio of RMBS.  BlackRock provides NCUA with both the market value of these securities and the intrinsic value under many different scenarios (i.e., many different sets of assumptions of future

---

[17] Vickery, J. and Wright, J., "TBA Trading and Liquidity in the Agency MBS Market," *Federal Reserve Bank of New York Economic Policy Review*, May 2013, p. 3.

conditions).[18]   As the NCUA explained in a recent public statement about its RMBS holdings (as

of third quarter 2016), the "net realizable value" of its securities, "based on BlackRock

projections of cash flows over the life of the securities," exceeded the market value by more than

a billion dollars.  *See* Borden Sur-Reply Decl. Ex. 10 at 9 (showing "Net Realizable Value" of

$11.5 billion and market value of $10.3 billion).  As the NCUA's 30(b)(6) designee testified, this

situation presents a dilemma for the agency's plans to dispose of the RMBS securities going

forward—should the agency sell and "get a really low market value" or hold the securities to get

"much closer to what we think the intrinsic or net realizable value is."  Borden Sur-Reply Decl.

Ex. 9 at 101:20-102:5; *see also id.* at 131:5-19.

To take just one example, NCUA holds certificates in the A-2 tranche of trust WFHET

2006-3.  As documents produced by the NCUA show, the IDC market price of this security was

95.97 as of February 28, 2017.  Borden Sur-Reply Decl. Ex. 11.  But under every one of nine

different sets of assumptions about the future—from most pessimistic to most optimistic—

BlackRock projected zero principal losses.  Thus, by focusing on market price, Dr. Hartzmark's

methodology could produce damages even when BlackRock itself sees no possibility of any

principal loss.

Dr. Hartzmark's award of damages to the A-4 tranche of WFHET 2006-2 in his Exhibit 3

illustrates an additional problem with his reliance on market prices.  As described above (see

page 9 and footnote 9 above), Dr. Hartzmark's allocation method would produce $680,750 in

damages for the A-4 holders based on the difference between 100 and his hypothesized post-

award price of 98.06 (i.e., 1.94%), applied to the $35 million recovery.  But as Dr. Hartzmark

---

[18] Similarly, PIMCO uses its own internal models for valuing RMBS because it views market prices as unreliable for measuring the intrinsic value of these securities—or, at most, only one factor to be considered in valuing RMBS.  *See* Borden Sur-Reply Decl. Ex. 8 at 5-6.

admitted at his deposition, the fact that a bond's price is less than 100 does not necessarily indicate a risk of loss of principal.  In particular, Dr. Hartzmark admitted that a price of 98.06 for the A-4 tranche of WFHET 2006-2 could reflect an expectation of full repayment of principal but be below 100 because of other factors, such as interest rates.  Borden Sur-Reply Decl. Ex. 2 at 49:19-50:6.  Thus, even if one accepts Dr. Hartzmark's (incorrect) premise that Plaintiffs should be compensated for increased risk of principal loss, a sub-100 price simply does not equate to such a risk.

Finally, Dr. Hartzmark's reliance on an average-weighted-price method to determine his hypothetical post-award prices—to the extent he even continues to espouse that approach after his deposition—also undermines his opinion.  Dr. Hartzmark has provided no authority to establish that this methodology is accurate or an accepted approach to valuing RMBS that can reliably account for the "multitude" of factors that Dr. Hartzmark acknowledges affect RMBS prices.  Borden Sur-Reply Decl. Ex. 2 at 63:21-23.  His method mechanically applies a weighted average principal price to securities with differing features.  Without explicitly accounting for securities' specific features—such as the coupon interest rate the security pays, which affects its value, *see* Fabozzi, *supra*, at 73—Dr. Hartzmark's simplistic average-weighted-price method cannot be correct.

For all these reasons, Dr. Hartzmark's allocation methodology is improper and unreliable.  That conclusion necessarily renders his entire "model" unreliable and, therefore, incapable of supporting Plaintiffs' motion.

### E.   Dr. Hartzmark's Method Would Award Damages Without Proof of Causation.

Not only would Dr. Hartzmark's model award money to investors with no principal losses, it would do so without any showing of causation.  Dr. Hartzmark admits that a "multitude

of factors" affect RMBS prices.  Borden Sur-Reply Decl. Ex. 2 at 63:21-23.  It is beyond dispute that many factors unrelated to HSBC's performance as trustee have affected the prices of Plaintiffs' certificates.  As the court in *Western & Southern* found after a full trial, RMBS investors' losses were caused by "the failure of thousands of individuals to make payments on the loans," which in turn was caused by "an economic crisis that was historic in its severity and duration"; these losses "had nothing to do with" the trustee.  Borden Sur-Reply Decl. Ex. 4 at 3-4.  Yet Plaintiffs' methodology makes no effort to segregate damages caused by HSBC and other causes of loss.  Speculating that an infusion of money today would cause a certificate's price to rise, as Dr. Hartzmark does, is a far cry from establishing that HSBC's past conduct is responsible for low certificate values.

Moreover, Dr. Hartzmark's method would award damages even where a recovery would *not* change certificate prices.  The clearest example is his proposed award to the A-4 holders in his Exhibit 3 hypothetical example.  As described above, Dr. Hartzmark assumes that the price of this security would not change even upon infusion of the $35 million hypothetical recovery in this case, but rather would remain 98.06.  In other words, even if one credits the (incorrect) view that certificate prices reflect risk of principal loss, the market's assessment of that risk would not change whether or not HSBC recovered the funds that Plaintiffs allege it should have.  Awarding damages in this scenario would be tantamount to permitting Plaintiffs to recover without any showing of causation.  Any model that produces such "false positives" cannot support certification.  *Comcast*, 133 S. Ct. at 1433.

**F.    Dr. Hartzmark's Back-Pedaling at His Deposition Highlights the Lack of a Workable Classwide Damages Model.**

When confronted with the many difficulties discussed above at his deposition, Dr. Hartzmark back-pedaled, admitting that the method of allocating damages set forth in his rebuttal

report was merely a "hypothetical example" and not "the actual damages model." Borden Sur-Reply Decl. Ex. 2 at 56:9-22; *see also id.* at 73:19-25 ("I haven't been asked at this point to come up with the ultimate damages analysis."). In particular, Dr. Hartzmark equivocated on how he would determine market prices for the securities at issue, one of the inputs to his damages calculation, conceding that "[t]he prices themselves might change in the ultimate analysis," *id.* at 75:9-11, and that "I haven't considered yet whether Bloomberg, Fitch, IDC is the appropriate way [to determine market prices]," *id.* at 64:15-65:6. Given the importance of market prices to Dr. Hartzmark's proposed methodology, however, these admissions fatally undermine the assertions in his rebuttal report that "my methodology offers a plan of allocation of a damages award," Hartzmark Rebuttal Rep. ¶ 78, that is "objective, fair, reasonable, and appropriate," *id.* ¶ 79. While it is perhaps unsurprising that at deposition Dr. Hartzmark was unable to defend the indefensible, it is remarkable that the methodology he touted in his report he now pronounces to be merely hypothetical and preliminary. In effect, Dr. Hartzmark has conceded that he does not have a model that can measure damages consistent with Plaintiffs' theory of liability on a classwide basis, as is required by *Comcast*.

## CONCLUSION

For all of the reasons stated above, in addition to those stated in HSBC's Opposition to Plaintiffs' motions, the motions for class certification should be denied.

Dated: August 7, 2017        By:     <u>/s/ *George A. Borden*</u>

                     George A. Borden
                     Kevin M. Hodges (*pro hac vice*)
                     Andrew W. Rudge  (*pro hac vice*)
                     Edward C. Reddington (*pro hac vice*)
                     Vidya Atre Mirmira (*pro hac vice*)
                     Eric C. Wiener (*pro hac vice*)
                     WILLIAMS & CONNOLLY LLP
                     725 Twelfth Street, N.W.
                     Washington, DC 20005
                     Telephone: (202) 434-5000
                     Facsimile: (202) 434-5029
                     gborden@wc.com
                     khodges@wc.com
                     arudge@wc.com
                     ereddington@wc.com
                     vmirmira@wc.com
                     ewiener@wc.com

                     *Counsel for HSBC Bank USA, N.A.*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 7, 2017, I electronically filed the foregoing document by email to the chambers of Judge Schofield, in accordance with Individual Rule § I.C.3, and counsel of record.

/s/ *Jeffrey R. Hoops*
Jeffrey R. Hoops